# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. [UNDER SEAL],<br><br>      Plaintiffs/Relators,<br><br>v.<br><br>[UNDER SEAL],<br><br>      Defendant. | CIVIL ACTION FILE NO.<br><br>**5 : 18-CV- 382** |

**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**PLEASE DO NOT MAKE AVAILABLE ON PACER**

1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA ex rel., ALEX PERMENTER, ERIC RODIGHIERO, and CHRIS WHEELER | **CIVIL ACTION FILE NO.** |
|  | **Case No. _____** |
| Plaintiffs, |  |
| v. |  |
| eCLINICALWORKS, LLC, |  |
| Defendant. |  |

## FILED IN CAMERA AND UNDER SEAL
## PURSUANT TO 31 U.S.C. § 3730(b)(2)

## **<u>PLEASE DO NOT MAKE AVAILABLE ON PACER</u>**

2

# COMPLAINT

COME NOW, ALEX PERMENTER, ERIC RODIGHIERO, and CHRIS WHEELER, Plaintiffs/Relators in the above-styled action, and file this Complaint on behalf of the United States of America against eCLINICALWORKS, LLC.

## I.  INTRODUCTION

1.

This is an action to recover all available damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and/or caused to be made by defendant and/or its agents, employees, and co-conspirators in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.

2.

This case involves grave security vulnerabilities in the software of one of the Nation's major vendors of Electronic Health Records ("EHR") software— eClinicalWorks, LLC ("ECW").  The security vulnerabilities in ECW's EHR software allow malicious actors to access the Protected Health Information ("PHI"), social security numbers, and other private information of *tens of millions* of federal healthcare beneficiaries and other Americans.  By exposing the PHI of *tens of millions* of Americans to malicious actors, ECW is knowingly and recklessly exposing those citizens to identify theft, blackmail, and other illicit

demands.  The security flaws in ECW's EHR software are so basic and obvious that they are known to ECW.  By continuing to market and sell its EHR software to thousands of physicians and by continuing to avoid fixing the numerous security flaws in its software,  ECW is playing Russian roulette with the PHI of *tens of millions* of American citizens.  Even worse, the security flaws in ECW's EHR software make it difficult, and potentially impossible, to tell whether a bad actor has already accessed and downloaded the PHI of American citizens.  Given how weak ECW's EHR software's security is, there is a very real and present danger that the PHI of American citizens has already been accessed and exploited.

3.

These fundamental security flaws pose more than just a risk of financial harm.  They literally involve matters of life and death as malicious actors could *access and alter* the PHI of American patients.  These security flaws permit a malicious actor to access and alter the medical records of patients while sitting behind the keyboard of a computer or tablet anywhere in the world.  Given the extreme vulnerabilities of ECW's EHR software, a malicious actor could alter the known allergies of a patient, change their medication, or do any other myriad of nefarious things to harm a public or private citizen while posing as a doctor or nurse with access to the patient's PHI and medical records.

4

4.

In addition to exposing the PHI of *tens of milli*ons of American citizens to the malicious acts of bad actors, the grave and fundamental security flaws in ECW's EHR software also make it ineligible for certification as an acceptable EHR program under federal regulations.  Those security flaws likewise make it impossible for any physician or phyisician practice group using ECW's EHR software to truthfully certify that they are complying with applicable HIPAA security requirements when submitting claims for payment to CMS or to one of CMS's contractors.  ECW's misconduct has caused the submission of false claims and cost the government millions in federal healthcare reimbursement and incentive payments.

## II. THE PARTIES

### A. Relators

5.

ALEX PERMENTER ("Relator Permenter") is the founder of Alex's PC Solutions ("PC Solutions"), a Managed Services Provider and FCC licensed telecom in Macon, Georgia.  Relator Permenter leads a team that services roughly ███████████, including many healthcare practices, and more than ███████████ ███████ in Middle Georgia.  PC Solutions services healthcare provider clients ranging in size from a single provider to large multi-location groups with over 100

5

employees.  Relator Permenter founded his own technology company 18 years ago
and has worked in the technology field ever since.  He has been an expert
computer forensics witness in both the Superior Courts of Bibb and Houston
Counties.  Relator Permenter has substantial experience in a wide variety of fields,
including telecom, information security, networking, systems administration, and
regulatory compliance.  He is active in several technology focused peer groups and
holds multiple technical certifications.

Through his work with PC Solutions' healthcare provider clients, Relator
Permenter has substantial knowledge of and technical expertise with ECW's EHR
software.

6.

ERIC RODIGHIERO ("Relator Rodighiero") received his degree in
Mathematics in 2008 from California State University, Northridge.  He has been
involved in the world of computers for over 30 years as a student of the technology
and as a part-time developer.  Relator Rodigherio previously worked at Knowledge
Adventure Software, where he was responsible for disassembling and reassembling
software in different programming languages.  More recently, he has been a coder
(C++, Python, LUA), database admin (MySQL/MariaDB), and content developer
(various tools) for a donation-supported multiplayer online game.  Relator
Rodighiero joined PC Solutions in 2015 as a helpdesk engineer.  In 2017, he

became a partial owner of PC Solutions and now manages the helpdesk
department.

Through his work with PC Solutions' healthcare provider clients, Relator
Rodigherio has substantial knowledge of and technical expertise with ECW's EHR
software.

7.

CHRIS WHEELER ("Relator Wheeler") studied Computer Science at
Georgia Southwestern University.  During his time studying Computer Science,
Relator Wheeler worked for a Managed Service Provider ("MSP") called NEOS
Technologies, which provided IT resources to Sumter Regional Hospital, Flint
River Hospital, and many other healthcare providers.  While working for NEOS,
Relator Wheeler first gained substantial technical expertise with ECW's EHR
software.  He has built on that substantial technical expertise with ECW's EHR
software in his subsequent IT positions, including at PC Solutions.  Relator
Wheeler has also gained expertise in cybersecurity and cryptography while
working on multiple side projects, including freelance software development and
embedded systems engineering, designing the printed circuit boards, and writing
the software that runs many bitcoin ATMs in Finland.  Relator Wheeler has
assisted the Computer Technology Industry Association in developing their
Cloud+ certification and was the first CompTIA Cloud+ Certified systems

7

engineer in Georgia.

Through his work with PC Solutions' healthcare provider clients, Relator Wheeler has substantial knowledge of and technical expertise with ECW's EHR software.

8.

Relators are original sources and bring this *qui tam* action based upon direct and unique information they possess with regard to the fraudulent acts of defendant set forth and described with particularity hereafter.

## *B. Defendant ECW*

9.

Defendant ECW is a Delaware limited liability company with its principal place of business located at 2 Technology Drive, Westborough, Massachusetts 01581. Defendant ECW maintains an office in Georgia at 555 North Point Center E #515, Alpharetta, GA 30022.

10.

Defendant ECW is a privately held healthcare software and technology company.

11.

ECW's co-founders and key corporate officers are Girish Navani (Chief Executive Officer), Rajesh Dharampuriya, M.D. (Chief Medical Officer), and

Mahesh Navani (Chief Operating Officer).

12.

ECW's principal business is developing and licensing EHR software to health care providers such as physician practices and hospitals.

13.

According to ECW, more than 130,000 healthcare providers use ECW's EHR software in the United States.  Those 130,000 healthcare providers treat at least *tens of millions* of Americans.  Thus, those 130,000 healthcare providers possess the PHI of at least *tens of millions* of Americans.

14.

ECW contends that it "is the leading cloud-based EHR in the industry," meaning that much of the patient data stored in ECW's EHR software is stored "in the cloud."

15.

ECW has an established track record of fraud in connection with its EHR software.  In 2017, ECW settled a FCA case seeking to recover federal dollars paid out in "Meaningful Use" payments to physicians.  The case was brought by Relator Brendan Delaney and alleged ECW falsely represented to customers that its EHR software complied with applicable federal regulations while concealing fundamental defects in the system.  *See United States ex rel. Delaney v.*

*eClinicalWorks, LLC,* Case No. 15-CV-00095 (D. Vt.).  The defects in the ECW system identified by Delaney related to the program's functionality.  *See Delaney* Compl. ¶¶ 63-107.  Specifically, Delaney alleged that ECW's EHR software failed reliably to document and track medications administered to patients, failed reliably to record and track laboratory results, and failed to contain adequate protections to retain prescriptions, avoid overmedications, and avoid editing of patient notes.  *Id.* ECW agreed to settle the claims in the *Delaney* suit and the government released ECW for Meaningful Use payments related to "Covered Conduct" through February 1, 2017.  The settlement agreement defines "Covered Conduct" to be the claims alleged in the *Delaney* complaint in intervention and makes clear that the ***only*** claims released are the "Covered Conduct."

None of the allegations in the *Delaney* suit had anything to with ECW's complete and utter failure to create a secure EHR program that is not vulnerable to hackers or other bad actors.  None of the claims raised herein are part of the Covered Conduct released by the Government in the *Delaney* case.  Relators are original sources of the matters set forth in this Complaint.  There has been no public disclosure of any of the security vulnerabilities in ECW's EHR software that are raised in and form the basis of this Complaint.

16.

As part of its settlement of the *Delaney* case, ECW also agreed to be subject to a Corporate Integrity Agreement (or "CIA") with the Office of Inspector General of the U.S. Department of Health & Human Services ("OIG"). OIG has authority to negotiate Corporate Integrity Agreements with healthcare providers and other entities such as EHR developers as part of the settlement of Federal health care program investigations arising under the federal False Claims Act and other false claims statutes. In entering the Corporate Integrity Agreement, a healthcare provider or entity agrees to adhere to the obligations set forth in the CIA and, in exchange, OIG agrees not to seek the provider's exclusion from participation in Medicare, Medicaid, or other Federal health care programs. *See* https://oig.hhs.gov/compliance/corporate-integrity-agreements/. The effective date of ECW's CIA is May 30, 2017. ECW's CIA is effective for five years from that date. A copy of ECW's CIA is attached as Exhibit A. Though not a part of the *Delaney* lawsuit, the conduct alleged herein violates both the FCA and ECW's CIA.

### III. JURISDICTION AND VENUE

17.

This Court has jurisdiction over the parties and the subject matter of the claims brought in this action under the FCA pursuant to 28 U.S.C. § 1331 and 31

U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court

for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

18.

Under 31 U.S.C. § 3730(e)(4), there has been no statutorily relevant public

disclosure of the "allegations or transactions" in this Complaint, and, to the extent

any party asserts that there was any such relevant public disclosure, as set forth

below, Relators are original sources of the information on which this action is

based and voluntarily provided that information to the Government before filing

suit.  None of the conduct alleged herein is based upon or related to the allegations

or transactions at issue in the *Delaney* case.  Relators discovered the massive

security flaws in ECW's EHR software on their own while assessing the security

of their clients' patients' PHI without any knowledge of even the existence of the

*Delaney* case.

19.

Venue is appropriate as to ECW in this district because ECW can be found

in, resides in, transacts business in, and/or has committed an act proscribed by the

FCA in this judicial district.  Therefore, within the meaning of 28 U.S.C. § 1391(c)

and 31 U.S.C. § 3732(a), venue is proper.

20.

Relators have presented the Government with timely disclosures regarding the False Claims Act violations described herein as required by 31 U.S.C. § 3730(b)(2).

21.

On information and belief, ECW is the business entity that committed the unlawful and fraudulent activities alleged in this Complaint.  To the extent any related business entities and/or natural persons also engaged in such unlawful conduct, Relators hereby give notice that they seek to hold any such related business entities and/or natural persons liable for such unlawful conduct.

## IV. THE FALSE CLAIMS ACT

22.

Defendant's conduct described herein violates the FCA.  The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the statute to enhance the federal Government's ability to recover losses sustained as a result of fraud committed against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization.  Congress intended that the amendments create incentives for individuals with knowledge of fraud being committed against

the United States to disclose that information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

23.

The FCA allows persons having information about a violation of the FCA to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

24.

31 U.S.C. § 3729(a)(1)(A) provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $10,781 and not more than $21,563 per false claim made. 20 C.F.R. § 356.3.

25.

31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty

14

and for three times the amount of damages which the Government sustains because of the act of that person.  The current civil penalty is not less than $10,781 and not more than $21,563 per false claim made.  20 C.F.R. § 356.3.

26.

31 U.S.C. § 3729(a)(1)(C) provides that any person who conspires to commit a violation of subparagraph (A) and/or subparagraph (B) of 31 U.S.C. § 3729(a)(1) is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person.  The current civil penalty is not less than $10,781 and not more than $21,563 per false claim made.  20 C.F.R. § 356.3.

27.

31 U.S.C. § 3729(a)(1)(G) provides that any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person.  The current civil penalty is not less than $10,781 and not more than $21,563 per false claim made. 20 C.F.R. § 356.3.

28.

The False Claims Act defines "claim" to include any request or demand made upon an agency of the United States for payment of money.  31 U.S.C. § 3729(b)(2).

29.

No proof of specific intent to defraud is required to prove a False Claims Act violation.  The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; *or* (2) acts in deliberate ignorance of the truth or falsity of the information; *or* (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).

30.

Relators seek to recover all available damages, civil penalties, and other relief available at law for the violations alleged herein.

## VI.  BACKGROUND

### A. ECW's Widely Used EHR Software

31.

Based on Relators' extensive experience performing technology work for healthcare practices, Relators' know that ECW's EHR software is widely used.  Most of Relators' healthcare practice clients use ECW's EHR software.

32.

████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████

33.

ECW's EHR software makes patient data easily accessible to healthcare providers—and anyone who gains access to a healthcare provider's ECW credentials. Indeed, one of ECW's key selling points for its EHR software is that "[p]roviders enjoy easy documentation, the latest in interoperability, and can *access patient data anytime, anywhere* — on a PC or Mac using a web browser, a smartphone, or an iPad."[1]

34.

ECW represents to healthcare providers that "the eClinicalWorks Cloud keeps your private data private."[2] That representation is both false and reckless.

---

[1] *See* ECW, EHR for Practices, https://www.eclinicalworks.com/products-services/ehr-for-practices/ (emphasis added) (last visited October 5, 2018).

[2] ECW, About Us, https://www.eclinicalworks.com/about-us/ (last visited October 5, 2018).

35.

ECW represents to healthcare providers that its "***single focus***" is providing

its "customers with ***secure***, cloud based solutions to their healthcare IT needs."[3]

That representation is both false and reckless.

36.

ECW represents to healthcare providers that it "keeps your patient and

practice data safe, secure, and fully accessible regardless of time, network traffic,

or Mother Nature."[4]  That representation is both false and reckless.

37.

ECW's conduct—as set forth in greater detail below—violates both the FCA

and the CIA.  The security vulnerabilities in ECW's EHR software and the massive

harm that could result from a data breach—to the extent one has not already

occurred—is unparalleled in scope, a grave danger to the health and security of

American citizens, and a significant threat to national security given that this

information could potentially be used by malicious actors and unscrupulous nation

states to try and blackmail, extort, or manipulate public officials.

---

[3] *See* About eClinicalWorks, https://www.eclinicalworks.com/ (emphasis added)
(last visited October 7, 2018).
[4] *See* https://www.eclinicalworks.com/about-us/ (last visited October 7, 2018).

### B. Grave Security Vulnerabilities in ECW's EHR.

38.

A significant portion of Relators' work with their healthcare clients involves servicing and providing support to their clients' use of ECW's EHR software. With only a small amount of time and the limited access allowed them by their client work, Relators have identified numerous grave security vulnerabilities in ECW's EHR software. Relators' goal in bringing this action is to ensure that the PHI of their clients' patients and other American citizens is secure and protected from disclosure to unauthorized persons who may use it for illicit purposes. Relators provide a list of these vulnerabilities below. The list is illustrative only. Because the security of ECW's EHR software is so recklessly and knowingly deficient, there are many other examples that Relators can and are prepared to identify to the government in the appropriate setting. Upon information and belief, ECW's software likely has additional major security flaws that are not apparent to Relators who only have limited access to ECW's servers.

39.

At a high level, the flaws in the security of ECW's EHR software make it possible for a bad actor to rather easily access the EHR systems of all or nearly all physicians and physician practices using ECW's EHR software. Once logged in to the system, a bad actor could do a whole host of things ███████████████



40.

The flaws in the ECW EHR software are system-wide and easily exploitable. A motivated bad actor could write an undetectable program that could download the PHI of every patient of an ECW EHR software user. A motivated bad actor could also send targeted requests for the PHI of politicians, public officials, celebrities, and other people of note who could be subject to blackmail or worse. A bad actor also could easily write a program that would crash the entire ECW EHR system, causing chaos and massive disruption in the delivery of medical services to American citizens. These threats are not mere hyperbole. They are real and present dangers. The results of such breaches of the ECW EHR system would be catastrophic. ECW knows or should know of the grave security risks posed by its EHR software.

**1.** ████████████████████████████████████████████
████████████████████████████████

41.

████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ .

42.

████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████"[5]  Many of the security
flaws discussed below would be evident to anyone ██████████████████
██████████  In other words, ECW has left a roadmap showing any bad actor the
path to complete access to the ECW EHR system ████████████████████████████
████████████████████████████

_____

████████████████████████████████████████
█████████████████████████████████████

43.



---

[6] *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1539 n. 17 (11th Cir. 1996) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[F] n. 271 (1995) (quotation marks omitted)).
[7] *Id.*
[8] *Id.* (emphasis added).



46.

ECW's EHR software is not "open source" software, like Mozilla Firefox.

Open source software is intentionally distributed with the source code available for

modification by users.  The source code for ECW's EHR software, however,

should be carefully guarded because it contains an immense amount of information

that a malicious actor could use to breach PHI stored on ECW's servers.  Indeed, if

a malicious actor obtained ECW's source code, the malicious actor would know all

of the inner workings of ECW's EHR software and how to exploit the security

flaws in the program. ████████████████████████████████████

_____

9 ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ Anyone could very easily steal the source code

and utilize it to obtain the PHI of ECW's customers' patients. ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████

### 2. ECW's Web Servers Provide Extremely Sensitive Information Without Any Authentication.

47.

ECW's web based servers are grossly insecure. ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

─────────────────────

███████████████████████████████████████████

48.

Armed with that information, any motivated bad actor could easily and quickly determine the actual passwords of individual practice administrators. Once an administrator's login and password are known, a person could gain complete administrative control of the practice's EHR and could download, change, or delete PHI, in addition to a whole host of other bad acts. All of those bad acts could be done with little to no detection whatsoever. This flaw in the ECW web based servers is or, at the very least, should be obvious to ECW. Inexplicably, ECW has done nothing to fix the problem.

### 3. ECW's bogus "CAPTCHA" security feature.

49.

ECW's use of a bogus CAPTCHA feature is reckless, fraudulent, and emblematic of all of ECW's security issues. ECW knows that it should have security protocols in place to prevent unauthorized access to its customers' patients PHI, but instead of designing a secure EHR system, ECW has only created a system that appears secure.

50.

The ECW CAPTCHA feature provides absolutely no protection from the very thing that it is meant to protect against—bot attacks. ECW's EHR conatins a

CAPTCHA in which a human user is required to fill in the CAPTCHA text in order to change her username.  But because of the flaws in ECW's security, a bot can gain access to and send a direct command to the ECW server to change a password without having to meet the CAPTCHA requirements.  The result is that ECW has made it harder for actual human users to change their own passwords, but done nothing to stop a bot from manipulating passwords and gaining access to the system.  ECW's CAPTCHA provides the illusion of security while actually diminishing the security of its own EHR software.

51.

ECW's use of a bogus CAPTCHA feature is reckless, fraudulent, and emblematic of all of ECW's security issues.  ECW knows that it should have security protocols in place to prevent unauthorized access to its customers' patients' PHI, but instead of designing a secure EHR system, ECW has only created a system that *appears* secure.

### 4. The User Passwords ECW Stores on its Servers are Susceptible to Cracking.

52.

ECW fails to protect its users' passwords using standard industry security practices ███████████████████████████████████████████████████████ ███████ As a result, the "hashed" passwords stored in ECW's servers are very

susceptible to cracking.  Once a malicious actor has access to an ECW user's

password, the malicious actor can download or alter PHI undetected.

53.

By way of background, user passwords stored on ECW's servers are not

stored as plain text.  Instead, ECW stores the "hash" of a user's password.  A

"hash" is created by running a password through a "hashing algorithm."  "Hashing

algorithms take inputs of plaintext of an arbitrary length and produce alphanumeric

digests or 'hashes' of a fixed length."[11]

54.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████ Hackers have created gigantic

databases called "rainbow tables" that provide the plain text passwords associated

with specific hashes.

---

[11] Jason R. Wool, *Does the Cryptographic Hashing of Passwords Qualify for
Statutory Breach Notification Safe Harbor?*, 6 J.L. & Cyber Warfare 56, 65
(2018).

55.

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████

56.

Not only does ECW utilize a weak hashing algorithm, ECW does not take

additional steps to secure passwords, ██████████████████████████████

57.

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

_____

[12] *Id.*

[13] *See* NIST SP 800-132 Section 5.1, available at
https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-132.pdf
(last visited October 5, 2018).

[14] Jason R. Wool, *Does the Cryptographic Hashing of Passwords Qualify for
Statutory Breach Notification Safe Harbor?*, 6 J.L. & Cyber Warfare 56, 68
(2018).

██████████████████████████████████████████

██████████████████████████████████████████

58.

████████████████████████████ ECW is knowingly and

recklessly making these passwords very susceptible to cracking. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████elators were able to determine the plain text passwords associated with

50% of the users' password hashes *within 20 seconds*. As soon as a malicious

actor obtained *one* such username and password, the malicious actor would be able

to download or alter PHI with complete autonomy and without detection.

### 5. *ECW's EHR Software is Vulnerable to SQL Injection Attacks.*

59.

Shockingly, ECW's EHR software is knowingly, recklessly, and

extraordinarily vulnerable to a widely known type of attack called a "SQL

Injection Attack."[15]

---

[15] SQL, which some pronounce as "S-Q-L" and others pronounce as "Sequel," stands for "Structural Query Language."  SQL is a computer programming language used to program databases.  Most websites that allow users to request information (for example, by typing a request into a search field) contain databases and use SQL.

60.

This vulnerability could easily result in the PHI of millions of federal

healthcare beneficiaries—and other Americans—being breached.

61.

SQL Injection Attacks are not novel.  As one security commentator wrote *in*

*2011*, "SQL Injection vulnerabilities . . . have led to history's largest data

breaches."[16]

62.

Wired Magazine has written that "*the SQL injection method . . . is one of*

*the most basic and oldest tricks hackers use to get into websites and the contents*

*of backend databases connected to those sites*. Those databases can contain Social

Security and credit card numbers, health records, or a host of other sensitive data,

including log-in credentials for website administrators and others that can give a

hacker access to other parts of a network beyond databases."[17]

---

[16] Josh Shaul, Why Do SQL Injection Attacks Continue to Succeed?, SC Mag. (May 24, 2011), http://perma.cc/PM4C-TECV (last visited October 5, 2018).
[17] Kim Zetter, Hacker Lexicon: SQL Injections, An Everyday Hacker's Favorite Attack, Wired Magazine (May 11, 2016), https://www.wired.com/2016/05/hacker-lexicon-sql-injections-everyday-hackers-favorite-attack/ (emphasis added) (last visited October 5, 2018).

63.

As a leading legal scholar recently explained in the Columbia Law Review,
a SQL Injection Attack "exploits a security bug or hole" in a web server.[18]  A SQL
Injection Attack "is executed by attaching special extra language to the end of a
web request" on a website.[19]  SQL Injection Attacks work because some web
servers—***such as ECW's servers***—"are misconfigured so that this extra language
will execute a command on the web server rather than return a webpage."[20]

64.

The risk posed by SQL Injection Attacks is real and widely known
throughout the software industry, including to ECW.

65.

As recently as August 2016, the Federal Bureau of Investigation's Cyber
Division issued an "FBI Flash" warning private industry that "an unknown actor
[had] scanned a state's Board of Election website for vulnerabilities . . ., and ***after
identifying a Structured Query Language (SQL) injection (SQLi) vulnerability***
used SQLmap [a program that exploits SQL vulnerabilities] to target the state

---

[18] Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1172 (2016)
[19] *Id.*
[20] *Id.*

website."  08/18/2016 FBI Flash, "Targeting Activity Against State Board of

Election Systems," attached hereto as Exhibit B. (emphasis added).

66.

There are many infamous examples of SQL Injection Attacks.

67.

For example, many observers have suggested that the massive 2017 Equifax

data breach resulted from a SQL Injection Attack.  *See, e.g.*, 9/18/17 Legal Week,

143 million credit records of US citizens exposed in Equifax hack, 2017 WLNR

27705557 ("Equifax, the credit ratings agency, has warned that it has been hacked,

losing the personal details of some 143 million Americans—44 per cent of the

adult population—in a data breach that ***outsiders suggest was the result of a***

***simple SQL injection attack***." (emphasis added)).

68.

In 2010, a United States District Court Judge sentenced a hacker to two

twenty year sentences for his role in "[u]sing a SQL-injection attack" to break

"into the 7-Eleven network in August 2007, stealing an undetermined amount of

card data," among other hacks.[21]  The hacker and his cohorts "used the same kind

---

[21] Kim Zetter, Hacker Sentenced to 20 Years for Breach of Credit Card Processor.,
Wired Magazine (March 26, 2010), https://www.wired.com/2010/03/heartland-
sentencing/ (last visited October 5, 2018).

of attack to infiltrate Hannaford Brothers in November 2007, which resulted in 4.2 million stolen debit and credit card numbers."[22]

69.

Through their extensive work for healthcare providers, Relators have identified substantial SQL vulnerabilities in their clients' ECW EHR servers. Relators believe these SQL vulnerabilities exist in all ECW servers.

70.

A hacker could exploit these SQL vulnerabilities by sending queries directly to the database. For example, a hacker could access a practice's web based server then inject a SQL command that allows the hacker to download ***the entire database*** of the medical server to a folder and work through that database offline without detection.

71.

Any alteration or breach of PHI that a hacker made through a SQL Injection Attack would be ***virtually undetectable***. It is possible that hackers have already used SQL Injection Attacks to alter or obtain PHI through ECW's EHR.

72.

Any alteration or breach of PHI that a hacker made through a SQL Injection Attack would therefore violate federal law, which requires that EHR technology be

---

[22] *Id.*

able to "[v]erify against a unique identifier(s) (e.g., a username or number) that a

person seeking access to electronic health information *is the one claimed*." 45

C.F.R. § 170.314(d)(1)(i) (emphasis added).

73.

Just as the risk of SQL Injection Attacks is widely known, so too are the

ways to eliminate those risks.

74.

For example, the University of California, Berkeley maintains a publicly

available website titled "How to Protect Against SQL Injection Attacks."[23]  After

stating that "SQL injection is one of the most common web attack mechanisms

utilized by attackers to steal sensitive data from organizations," the website

explains how to mitigate the risk.[24]  "Developers can prevent SQL Injection

vulnerabilities in web applications by utilizing parameterized database queries with

bound, typed parameters and careful use of parameterized stored procedures in the

database.  This can be accomplished in a variety of programming languages

including Java, .NET, PHP, and more."[25]  ECW does not do any of this.  ECW

---

[23] Berkley Information Security & Policy,
https://security.berkeley.edu/resources/best-practices-how-articles/system-application-security/how-protect-against-sql-injection (last visited October 5, 2018).
[24] *Id.*
[25] *Id.*

instead knowingly and recklessly exposes its customers' patients' PHI to a SQL
Injection Attack without even taking the most basic steps to prevent such an attack.

75.

As one of the Nation's major EHR software developers with hundreds of
millions of dollars in annual revenue, ECW knows—or is reckless in not
knowing—the extensive SQL vulnerabilities in its software.  It is unconscionable
for ECW to be putting the confidentiality of so many Americans' PHI, social
security numbers, and private financial information at such grave risk.

### 6. Additional Security Vulnerabilities.

76.

In addition to the vulnerabilities described above, Relators have identified
many additional grave security vulnerabilities in ECW's EHR software.  These
include:

77.

***Predictable naming conventions for ECW's EHR server names.***  Relators
have determined that ECW uses an easy-to-predict naming convention for many—
and potentially all—of the ECW "cloud" servers where healthcare providers store
PHI. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████



███████████████████████ Using Google, Relators were able to identify more than 8,000 live ECW cloud server sites using this naming convention *in a single night*.  Once the ECW cloud server sites are known, a bad actor could then gain access to the EHR and PHI contained on those sites by exploiting the security flaws described herein.

78.

***Easy encryption keys.*** █████████████████████████████

████████████████████████  ███████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

A malicious actor could easily gain access to ECW's EHR servers by ███████

████████████ using one of these easy-to-determine encryption keys.

████████████████████████████████████████

███████████████████████████

These encryption keys are extremely easy to find.  █████████████

████████████████████████████████████████

████████████████████████████████████████

─────────────────────

█ ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████   While Relators have not accessed any PHI they are

unauthorized to access, a malicious actor could easily do so.

79.

*ECW's servers freely distribute "security rights."*  ECW's servers, which

store PHI, rely on the ECW client (*e.g.*, a computer operating the ECW software)

to tell the servers what "security rights" the client has.  Once the ECW client tells

the ECW servers that the client is authorized to view or alter PHI, the client can do

so.  Additionally, the ECW servers allow the ECW client to tell the servers the type

of user the client is.  For example, a malicious actor who gained access to the ECW

servers through a ███████ could tell the servers that she was a doctor, gaining

maximum access to all information stored in the program, including PHI, social

security numbers, and private financial information.  The malicious actor could

then also edit patient records, for example, and the audit logs would reflect that the

doctor, as opposed to the malicious actor, had edited the patient records.  These

vulnerabilities flout standard industry practice and could literally lead to someone

being hurt or killed by, for example, a malicious actor altering the medication to be

provided to a patient or the patient's known allergies.

80.

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

could easily cause a breach of PHI.

81.

***ECW's login page uses outdated and discontinued software.*** ████████████

████████████████████████████████████████████████

██████████████████████████████ making it incredibly susceptible to

exploitation by a hacker or malicious actor.

82.

All of the vulnerabilities identified above are known in the industry and

totally preventable.  ECW could easily strengthen the security of its software and

prevent its customers' patients' ███████████████████████████████████

information from being placed at unreasonably high security risks.  ECW has

knowingly and recklessly exposed its customers' patients' █████████████████

████████████████████ information to unreasonably high security risks

while lying to them—and the Government—by claiming its EHR software is

secure and not vulnerable to attack.  It is astounding how vulnerable the most

private information imaginable of *tens of millions* of people throughout the United States is to disclosure and misuse.

## VII. ECW's False Claims Act Violations

As detailed below, the security vulnerabilities contained in ECW's fatally flawed EHR give rise to ECW's FCA liability in several ways.

### A. ECW has caused and is causing healthcare providers who bill federal healthcare programs to falsely certify their compliance with the HIPAA Security Regulations.

83.

ECW has violated and is violating the FCA by causing healthcare providers to falsely certify compliance with federal laws and regulations material to Government payment.

84.

Before a healthcare provider is permitted to submit claims electronically for government payment, the healthcare provider is required to execute an Electronic Data Interchange ("EDI") Enrollment Agreement.  After executing the EDI Enrollment Agreement, the healthcare provider is required to submit it to CMS via a Medicare Administrative Contractor ("MAC").  A blank EDI Enrollment Agreement is attached hereto as Exhibit C.

85.

The EDI Enrollment Agreement requires the healthcare provider to make

several express certifications to CMS.  Relevant here, the EDI Enrollment

Agreement requires the healthcare provider to expressly certify that the healthcare

provider "will use sufficient security procedures (*including compliance with all*

*provisions of the HIPAA security regulations*) to ensure that all transmissions of

documents are authorized and *protect all beneficiary-specific data from improper*

*access*."  Ex. C at 13 (EDI Agreement § A.11) (emphasis added).

86.

In addition to this express certification, healthcare providers impliedly

certify their compliance with the HIPAA security regulations when they submit a

claim for payment to CMS or one of CMS's contractors.  Thus, compliance with

the HIPAA security regulations is a condition precedent to payment by CMS and is

material to CMS's decision to pay a claim.  *See, e.g., United States v. Am. at Home*

*Healthcare & Nursing Servs., Ltd.*, No. 14-CV-1098, 2018 WL 319319, at *7

(N.D. Ill. Jan. 8, 2018).

87.

Among other requirements, the HIPAA security regulations require

healthcare providers to "[e]nsure the confidentiality, integrity and availability of all

electronic protected health information the covered entity or business associate

creates, receives, maintains, or transmits." 45 C.F.R. § 164.406(a)(1).  The HIPAA

security regulations also require healthcare providers to "[p]rotect against any

reasonably anticipated threats or hazards to the security or integrity of" all

electronic protected health information.  45 C.F.R. § 164.406(a)(2).  No doctor or

medical practice could possibly comply with those, and other, HIPAA security

requirements when using ECW's EHR software.

88.

ECW licenses its EHR software to medical practices in Middle Georgia—

and throughout the United States—who have executed the EDI Enrollment

Agreement and have submitted claims for payment to federal healthcare programs.

89.

As described in Paragraphs 38 to 82 of this Complaint, the security

vulnerabilities inherent in ECW's EHR software make it *impossible* for a

healthcare provider using the software to ensure the confidentiality, safety, and

integrity of Protected Health Information stored in ECW's EHR.

90.

In causing the healthcare providers to both expressly and impliedly falsely

certify compliance with the HIPAA security regulations, ECW fraudulently

induced CMS and its contractors into permitting those healthcare providers to bill

the Government for care provided to federal healthcare program beneficiaries.  As

41

a result, each and every claim submitted for government payment by a provider using ECW's EHR is a false claim, which ECW *caused* the provider to submit. *See, e.g.*, *Marsteller for use & benefit of United States v. Tilton*, 880 F.3d 1302, 1314 (11th Cir. 2018) (holding that, under the FCA fraudulent inducement basis of liability, "subsequent claims are false because of an *original fraud* (whether a certification or otherwise)" (citation and quotation marks omitted)).

### B. Meaningful Use Incentive Payments.

91.

In 2009, the federal Health Information Technology for Economic and Clinical Health Act ("the HITECH ACT") was enacted into law.

92.

Congress enacted the HITECH Act for the purpose of promoting the adoption *and meaningful use* of *certified* EHR technology by healthcare providers.

93.

Congress intended to effectuate this goal by providing substantial monetary incentives to healthcare providers—referred to as "Eligible Professionals" under the law—who established their "meaningful use" of *certified* EHR technology (the "Meaningful Use" programs). The Medicare Meaningful Use program provided meaningful use incentive payments of as much as $43,720 *per* healthcare provider who established meaningful use of *certified* EHR technology. Those payments

were made over a five year period ending in 2016.  The Medicaid Meaningful Use

program provides meaningful use incentive payments of as much as $63,750 *per*

healthcare provider who establishes meaningful use of *certified* EHR technology.

Those payments are made over a six year period ending in 2021.

94.

A healthcare provider can receive meaningful use incentive payments *only*

*after* attesting annually to the federal Government that the healthcare provider used

*certified* EHR technology and met certain specified Meaningful Use objectives and

measures.

95.

The only way a healthcare provider could know that it was using *certified*

EHR technology was based on representations made by the EHR vendor, in this

case ECW, that sold the EHR.

96.

The HITECH Act created a certification program for EHR technology.  The

U.S. Department of Health and Human Services Office of the National Coordinator

for Health Information Technology (commonly referred to as "ONC") administers

the certification program and creates certification requirements for EHR vendors,

such as ECW.  Under the certification program, EHR vendors, such as ECW, are

required to certify to agents of the federal Government called "authorized

43

certification bodies" and "accredited testing laboratories" that the vendor's EHR

technology satisfies ONC's certification requirements.

97.

ECW so attested to the agents of the federal Government.  In so attesting,

ECW obtained ONC certification for its EHR technology.  ECW then represented

to healthcare providers that, with respect to the Meaningful Use program,

"eClinicalWorks V10 meets the Complete EHR certification criteria as an

integrated bundle of EHR modular products."[27]

98.

ECW has a page dedicated to "Meaningful Use" on its website that states

"eClinicalWorks V11 is a 2015 Edition ONC Certified Health IT Product."[28]

99.

ECW's attestations and representations were *false*.  The purpose of ECW's

false attestations and representations is clear – by falsely trumpeting its products as

"certified" by ONC, when ECW knows or at the very least should know that its

product does not meet applicable security requirements required for certification,

ECW has greatly increased the sales of its EHR software and has made millions off

---

[27] ECW, Meaningful Use, https://www.eclinicalworks.com/resources/meaningful-use/meaningful-use-disclosure/ (last visited October 5, 2018).

[28] *See* https://www.eclinicalworks.com/resources/meaningful-use/ (last visited October 7, 2018).

44

of unsuspecting doctors who purchased the program and then improperly obtained

Meaningful Use payments from the government.

100.

By way of example only, ONC's EHR certification requirements demand

that EHR technology be able to "[v]erify against a unique identifier(s) (e.g., a

username or number) that a person seeking access to electronic health information

*is the one claimed*." 45 C.F.R. § 170.314(d)(1)(i) (emphasis added).  The security

flaws in ECW's software make it impossible for ECW to verify that the person

seeking access to electronic health information is *the* one claimed because the

flaws in the system allow unauthorized persons to discover existing usernames and

passwords and to create new usernames and passwords as if they were an

authorized user.  Once an existing username and password is discovered or a new

username and password is created, an unauthorized user has complete access to all

of the PHI for that practice group.

101.

The ONC's EHR certification requirements also mandate that "EHR

technology [such as ECW's EHR] must provide patients (and their authorized

representatives) with an online means to view, download, and transmit to a 3rd

party" specified PHI, including the "Common Clinical Data Set."  45 C.F.R.

§170.314(e)(1)(i).  The Common Clinical Data Set includes highly sensitive

patient information such as the patient's sex, date of birth, race, smoking status, medications, laboratory tests, vital signs, and care plan among other information.[29]

102.

The ONC's EHR certification requirements further mandate that "these capabilities must be through a secure channel that ensures all content is encrypted ***and integrity-protected in accordance with the standard for encryption and hashing algorithms specified at [45 C.F.R.] § 170.210(f)***." *Id.*  (Emphasis added.)

103.

45 C.F.R. § 170.210(f) provides that "[t]he Secretary of [the U.S. Department of Health and Human Services ("HHS")] adopts the following standards to protect electronic health information created, maintained, and exchanged: . . . Any encryption and hashing algorithm identified by the National Institute of Standards and Technology (NIST) as an approved security function in Annex A of the FIPS Publication 140–2."

104.

███████████████████████████████████████████

███████████

---

[29] *See* ONC, Common Clinical Data Set, available at: https://www.healthit.gov/sites/default/files/commonclinicaldataset_ml_11-4-15.pdf (last visited October 7, 2018).

████████████████████████████████████████████████

105.

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ ECW fails to "integrity-protect" PHI such as the

Common Clinical Data Set "*in accordance with the standard for encryption and*

*hashing algorithms specified at [45 C.F.R.] § 170.210(f)*." 45 C.F.R.

§170.314(e)(1)(i) (emphasis added).

106.

As Relators have demonstrated, the security vulnerabilities identified in

Paragraphs 38 to 82 of this Complaint, make it possible for a malicious actor to

access electronic health information without leaving any trace that the malicious

actor has done so.

107.

In light of these security vulnerabilities, ECW caused—and is causing—the

submission of false claims. Because ECW's EHR software does not actually

satisfy the ONC's EHR certification requirements, healthcare providers who use

ECW's EHR are not entitled to federal incentive payments under the Meaningful

_____

██████████████████████████████████████████████████

████████████████████████████████████

Use programs.  Any and all claims that a provider who uses ECW's EHR submits

for a federal incentive payment under the Meaningful Use programs are therefore

false claims, which ECW *caused* the provider to submit.

### C. Merit-Based Incentive Program ("MIPS") Enhanced Medicare Payments.

108.

Although the Medicare Meaningful Use Program ended after 2016, it was

largely replaced by aspects of the federal Merit-Based Incentive Program

("MIPS").

109.

Healthcare providers who participate in MIPS receive "positive payment

adjustments" while healthcare providers who do not participate in MIPS receive

"negative payment adjustments."  Payments adjustments will range from negative

4% to positive 4%.  The MIPS payment adjustments are set to take effect in 2019.

110.

Whether a healthcare provider participating in MIPS receives payment

adjustments depends on data the healthcare provider reports to CMS regarding

various "performance categories."

111.

One such performance category ("Advancing Care Information") requires

healthcare providers to use certified EHR.

112.

Relators know that many healthcare providers, including Relators' clients, have qualified for MIPS positive payment adjustments and avoided negative adjustments by representing that they satisfy the MIPS certified EHR requirement based on their use of ECW's EHR, which as established above, does not satisfy the ONC certification requirements.  If the Government were aware that ECW's EHR does not satisfy the ONC certification requirements, these healthcare providers would not be eligible for positive payment adjustments under MIPS.

113.

ECW uses its ability to help physicians obtain MIPS upward payments adjustments to market its EHR software.  The ECW website includes an entire page devoted to MIPS that describes the incentive payments available to providers who qualify for MIPS adjustments and promises to "work with individual and group practices to navigate the complex regulatory environment in the transition to value-based care."[31]   ECW's representations that its EHR software can help healthcare providers obtain positive MIPS incentive payments are reckless and false.

---

[31] *See* https://www.eclinicalworks.com/resources/macra/ (last visited October 7, 2018).

114.

In light of the security vulnerabilities inherent in ECW's EHR, ECW has or

will cause the submission of false claims when the MIPS payment adjustments

take effect.  Because ECW's EHR software does not actually satisfy the ONC's

EHR certification requirements, healthcare providers who use ECW's EHR are not

entitled to positive payment adjustments under MIPS and likely should be subject

to negative payment adjustments.  Any and all claims that a provider who uses

ECW's EHR submits to the federal government in 2019 (and thereafter) and

receives a positive payment adjustment for under MIPS is therefore a false claim,

which ECW will have *caused* the provider to submit.  Those claim amounts will be

in the millions at the very least.

### D. Physician Quality Reporting System ("PQRS") Enhanced Medicare Payments.

115.

Initiated in 2006, the Medicare Physician Quality Reporting System

("PQRS") is a voluntary quality reporting program that applies a "downward

payment adjustment" to promote the reporting of quality information by healthcare

providers (referred to under law as "eligible professionals") and group practices.

116.

The PQRS program applies a downward payment adjustment to healthcare

providers who do not satisfactorily report data on quality measures for covered

Medicare Physician Fee Schedule (MPFS) services furnished to Medicare Part B Fee-for-Service (FFS) beneficiaries.  For example, those healthcare providers who report satisfactory data for the 2016 program year will avoid the 2018 PQRS downward payment adjustment.

117.

Healthcare providers taking part in the PQRS program are required to use ONC certified EHR software.[32]

118.

Healthcare providers who used ECW's EHR to avoid negative payment adjustments under PQRS were not entitled to do so because ECW's EHR, as established herein, is not actually ONC compliant.

---

[32] *See* CMS, 2016 Physician Quality Reporting System (PQRS): Reporting Using an Electronic Health Record (EHR) Made Simple, Feb. 2017, available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/Downloads/2016PQRS_EHR_Made_Simple.pdf (last visited October 8, 2018) ("Individual EPs can avoid the 2018 PQRS payment adjustment by meeting the following criteria for satisfactory reporting:
1. Report on at least 9 measures covering at least 3 National Quality Strategy (NQS) domains
2. ***Use a direct EHR product that is CEHRT*** or EHR data submission vendor (DSV) that is CEHRT ["ONC Certified Electronic Health Records Technology"]." (emphasis added)).

119.

ECW caused the submission of false statements material to false claims with respect to those providers who used ECW's EHR software to avoid negative payment adjustments under the PQRS program.

### E. Corporate Integrity Agreement.

120.

ECW is subject to a CIA with the Office of Inspector General of the U.S. Department of Health & Human Services ("OIG").  The effective date of ECW's CIA is May 30, 2017.

121.

Under ECW's CIA, ECW is required to pay "[a] Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) *for each day* ECW fails" in its "obligation[]" of "reporting of Reportable Events."  CIA at pp. 59-60, X.A.1.o, Ex. A.

122.

ECW's CIA defines "Reportable Event" to include "anything that involves . . . a matter that a reasonable person would consider a probable violation of applicable criminal, civil, or administrative laws and regulations or any applicable Federal health care program requirements for which penalties or exclusion may be authorized."  CIA at pg. 46, III.L.1.c, Ex. A.

123.

ECW had an obligation—and has an ongoing obligation—to pay the government $2,500 in Stipulated Penalties per day due to the security vulnerabilities in ECW's EHR.  A reasonable person would conclude that the security vulnerabilities in ECW's EHR—which ECW either knows about or is reckless in not knowing about—implicate "probable violations of applicable criminal, civil, or administrative laws and regulations."  By way of example only, ECW is causing healthcare providers to submit false claims for Government payment in violation of the federal False Claims Act, an applicable civil law.

124.

Because the security vulnerabilities have existed since before ECW entered the CIA, ECW's obligation to make Stipulated Penalty payments in the amount of $2,500 per day began on May 31, 2017 and continue to this day.  Upon information and belief, ECW has made no such Stipulated Penalty payments related to the fraudulent activities discussed herein.

125.

ECW's failure to satisfy its obligation to make Stipulated Penalty payments violates the FCA, which prohibits "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  By failing to make

Stipulated Penalty payments, ECW has "avoided" an "obligation to pay or transmit money or property to the Government," in violation of the FCA.

## COUNT I

126.

Relators re-allege and reincorporate paragraphs 1 through 125 as if fully set forth herein.

127.

This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

128.

As described above, the defendant caused the submission of false claims and made false statements material to false or fraudulent claims to the United States and agencies thereof.

129.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, were induced by ECW's fraud.

130.

By virtue of the acts described above, defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government

for payment or approval, and/or presented false or fraudulent claims to contractors,

grantees, or other recipients seeking payment of money provided by the United

States Government or to be reimbursed by the United States Government to be

spent or used on the Government's behalf or to advance a Government program or

interest.

131.

The Government, unaware of the falsity of claims submitted or caused to be

submitted by the defendant, paid and continues to pay the claims that would not be

paid but for defendant's fraudulent conduct.

132.

By reason of defendant's acts, the United States has been damaged, and

continues to be damaged, in substantial amount to be determined at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Relators pray for judgment against the defendant as follows:

133.

That defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

134.

That this Court enter judgment against defendant in an amount equal to three

times the amount of damages the United States has sustained because of

55

defendant's actions, plus a civil penalty of not less than $11,000 and not more than $21,563 for each violation of 31 U.S.C. § 3729, *et seq.*;

## 135.

That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

## 136.

That Relators be awarded all costs of this action, including attorneys' fees and expenses; and,

## 137.

That Relators recover such other relief as the Court deems just and proper.

Respectfully submitted this 12th day of October, 2018.


BUTLER WOOTEN & PEAK LLP

BY: _____

BRANDON L. PEAK
  brandon@butlerwooten.com
  Georgia Bar No. 141605
ROBERT H. SNYDER JR.
  rob@butlerwooten.com
  Georgia Bar No. 404522
RAMSEY B. PRATHER
  ramsey@butlerwooten.com
  Georgia Bar No. 658395
105 13th Street
P.O. Box 2766
Columbus, Georgia 31902
(706) 322-1990
(706) 323-2962 Fax

ADAMS LAW FIRM

BY: _____

BRIAN P. ADAMS
  brian@brianadamslaw.com
  Georgia Bar No. 142474
MARY BETH HAND
  mbhand@brianadamslaw.com
  Georgia Bar No. 322836
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231
(478) 216-9188 Fax


Attorneys for Relators/Plaintiffs