**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.,* ALEX PERMENTER, ERIC RODIGHIERO, and CHRIS WHEELER,<br><br>Plaintiff,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>Defendant. | Case No. 5:18-cv-00382-MTT |

# DEFENDANT ECLINICALWORKS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS


James W. Cobb
Georgia Bar No. 420133
jcobb@caplancobb.com
Julia Blackburn Stone
Georgia Bar No. 200070
jstone@caplancobb.com
Caplan Cobb LLC
75 Fourteenth Street N.E.,
Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604

Aaron Katz (*pro hac vice*)
aaron.katz@ropesgray.com
Emma Notis-McConarty (*pro hac vice*)
emma.notis-mcconarty@ropesgray.com
ROPES & GRAY LLP
800 Boylston Street, Prudential Tower
Boston, Massachusetts 02199-3600
Tel.: (617) 951-7000
Fax: (617) 951-7050

Geoffrey M. Wyatt (*pro hac vice*)
geoffrey.wyatt@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7000
Fax: (202) 393-5760

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 4

A. ECW ........................................................................................ 4

B. Medicare's Meaningful Use And MIPS Programs .............................. 4

1. EHR Software Certification ...................................................... 4

2. Meaningful Use Incentive Program, MIPS And PQRS ............ 6

C. The HIPAA Security Rule ................................................................ 8

D. The Government's Oversight Of eCW And The CIA ......................... 9

E. Relators' Factual Allegations ........................................................ 10

F. Procedural History ........................................................................ 11

STANDARD OF REVIEW ........................................................................ 12

ARGUMENT ........................................................................................ 13

I. RELATORS HAVE NOT PLAUSIBLY ALLEGED THAT eCW CAUSED THE SUBMISSION OF ANY FALSE CLAIMS. ...................... 14

A. Relators' EHR Certification Theory Fails For Lack Of A False Certification. ........................................................................ 15

1. Relators Fail To Adequately Allege Any Violation Related To User Verification. ................................................ 15

2. Relators Fail To Adequately Allege Any Violation Concerning Audit Logs. ........................................................ 17

3. Relators Fail To Adequately Allege Any Violation Concerning Password Hashing. ............................................ 20

4. Relators Fail To Adequately Allege Any Violation Concerning Local Storage Of PHI. .......... 22

B. Relators' HIPAA-Compliance Theory Fails For Lack Of A False Certification. .......... 23

II. RELATORS DO NOT PLAUSIBLY ALLEGE THAT THE PURPORTED FLAWS IN eCW'S SOFTWARE WERE MATERIAL TO THE GOVERNMENT'S DECISION TO REIMBURSE CLAIMS. .......... 25

III. RELATORS FAIL TO PLAUSIBLY ALLEGE SCIENTER.......... 31

IV. THE AMENDED COMPLAINT'S "REVERSE FALSE CLAIMS" THEORY FAILS AS A MATTER OF LAW. .......... 34

CONCLUSION.......... 34

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Animation Workers Antitrust Litigation*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015)........................................................ 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................... 12, 28

*Blue Cross & Blue Shield of Alabama v. Weitz*,
913 F.2d 1544 (11th Cir. 1990)................................................................ 16

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012)................................................................ 12

*Cooper v. Blue Cross & Blue Shield of Florida, Inc.*,
19 F.3d 562 (11th Cir. 1994)...................................................................... 3

*D'Agostino v. ev3, Inc.*,
845 F.3d 1 (1st Cir. 2016) ........................................................... 27, 28

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006)................................................................ 13

*K.T. v. Royal Caribbean Cruises, Limited*,
931 F.3d 1041 (11th Cir. 2019)................................................................ 13

*Lavelle v. Williamson*,
No. 5:21-CV-170 (MTT), 2021 U.S. Dist. LEXIS 185127
(M.D. Ga. Sept. 28, 2021) ........................................................................ 12

*Patel v. Specialized Loan Servicing, LLC*,
904 F.3d 1314 (11th Cir. 2018)................................................................ 12

*United States ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006)................................................................ 13

*United States ex rel. Barrett v. Beauty Basics, Inc.*,
No. 2:13-CV-1989-SLB, 2015 WL 3650960
(N.D. Ala. June 11, 2015)........................................................................ 33

*United States ex rel. Clausen v. Laboratory Corp. of America*,
290 F.3d 1301 (11th Cir. 2002) ................................................................... 13

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
874 F.3d 905 (6th Cir. 2017) ....................................................................... 35

*United States ex rel. Lewis v. Community Health Systems, Inc.*,
No. 18-20394-Civ-Scola, 2020 WL 3103994
(S.D. Fla. June 11, 2020) ................................................................. 32, 33, 34

*United States ex rel. Maur v. Hage-Korban*,
981 F.3d 516 (6th Cir. 2020) ....................................................................... 29

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
865 F.3d 29 (1st Cir. 2017) ......................................................................... 27

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) ................................................................... 32

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App’x 237 (5th Cir. 2020) ..................................................... 26, 27, 28

*United States ex rel. Sheldon v. Kettering Health Network*,
816 F.3d 399 (6th Cir. 2016) ............................................................ 15, 24, 25

*United States v. Bryant*,
996 F.3d 1243 (11th Cir. 2021) ................................................................... 21

*United States v. Fulton County*,
No. 1:14-cv-4071-WSD, 2016 WL 4158392
(N.D. Ga. Aug. 5, 2016) ......................................................................... 32, 33

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ................................................................................... 3, 26

*Urquilla-Diaz v. Kaplan University*,
780 F.3d 1039 (11th Cir. 2015) ........................................................ 14, 15, 32

*Webb v. Smart Document Solutions, LLC*,
499 F.3d 1078 (9th Cir. 2007) ................................................................... 21

*Wiersum v. U.S. Bank, N.A.*,
785 F.3d 483 (11th Cir. 2015) ................................................................... 12

*Ziemba v. Cascade International, Inc.*,
256 F.3d 1194 (11th Cir. 2001) ................................................................. 13

## STATUTES

31 U.S.C. § 3729(a)(1)(A) ........................................................................ 32

31 U.S.C. § 3729(b) ................................................................................... 32

42 U.S.C. § 300jj-11(b)(2) ........................................................................... 4

42 U.S.C. § 300jj-11(b)(6) ........................................................................... 4

42 U.S.C. § 1320d-1(a) ................................................................................ 8

42 U.S.C. § 1320d-1(c) ................................................................................ 8

42 U.S.C. § 1320d-1(d) ................................................................................ 8

## RULES

Fed. R. Civ. P. 9(b) ................................................................................... 13

Fed. R. Evid. 201 ....................................................................................... 13

Fed. R. Evid. 201(b)(2) ............................................................................... 31

## REGULATIONS

42 C.F.R. § 414.90(h)(2) ............................................................................. 8

42 C.F.R. § 414.1380 ..... 7

42 C.F.R. § 414.1405 ..... 7

42 C.F.R. § 495.20(l)(1) ..... 7

45 C.F.R. § 160.103 ..... 21

45 C.F.R. § 164.304 ..... 17, 19

45 C.F.R. § 164.306(a)(1) ..... 9, 24

45 C.F.R. § 164.306(a)(2) ..... 24

45 C.F.R. § 170.102 ..... 21

45 C.F.R. § 170.210(e)(1) (2012) ..... 19

45 C.F.R. § 170.210(e)(2) (2012) ..... 19

45 C.F.R. § 170.210(f) ..... 21

45 C.F.R. § 170.314 ..... 16

45 C.F.R. § 170.314(d)(1) ..... 16

45 C.F.R. § 170.314(d)(1)(i) ..... 16, 17

45 C.F.R. § 170.314(d)(2)(i)(A) ..... 18, 19

45 C.F.R. § 170.314(d)(2)(i)(B) ..... 18, 19

45 C.F.R. § 170.314(e)(1)(i) ..... 20, 21

45 C.F.R. § 170.315 ..... 16

45 C.F.R. § 170.315(d)(1)-(13) ..... 5

45 C.F.R. § 170.315(d)(1)(i) ..... 17

45 C.F.R. § 170.315(d)(2)(i)(A) .......... 18

45 C.F.R. § 170.315(d)(2)(i)(B) .......... 18

45 C.F.R. § 170.315(d)(7)(i) .......... 23

45 C.F.R. § 170.315(d)(7)(i)(A) .......... 23

45 C.F.R. § 170.315(d)(7)(ii) .......... 23

45 C.F.R. § 170.545 .......... 5

45 C.F.R. § 170.550 .......... 5

45 C.F.R. § 170.556 .......... 9

45 C.F.R. § 170.556(a) .......... 5

45 C.F.R. § 170.556(b) .......... 6

45 C.F.R. § 170.556(c) .......... 5

45 C.F.R. § 170.556(d)(1) .......... 6

45 C.F.R. § 170.556(d)(5) .......... 6

45 C.F.R. § 170.556(d)(6) .......... 6

45 C.F.R. § 171.102 .......... 21

68 Fed. Reg. 8334 (Feb. 20, 2003) .......... 2, 24

77 Fed. Reg. 54,163 (Sept. 4, 2012) .......... passim

78 Fed. Reg. 5566 (Jan. 25, 2013) .......... 9

80 Fed. Reg. 62,602 (Oct. 16, 2015) .......... 17, 18

## INTRODUCTION

Plaintiff-relators allege that eClinicalWorks LLC ("eCW") caused physicians to submit false claims to the federal government and should therefore be liable under the False Claims Act ("FCA") because: (1) eCW's Electronic Health Records ("EHR") software contains purported "security vulnerabilities"; and (2) as a result, physicians who used the software and submitted Medicare claims to the federal government falsely attested that they were using an EHR system that complies with federal laws and regulations. Relators' convoluted theory fails to state a plausible cause of action for violation of the FCA for multiple reasons.

First, relators do not plausibly allege that any Medicare program claims submitted by eCW's physician customers were false. Relators' EHR certification theory posits that healthcare providers who used eCW's software submitted false claims because they attested to using "certified EHR technology," Am. Compl. ¶¶ 133-134, even though the software allegedly does not meet the applicable certification requirements issued by the Office of the National Coordinator for Health Information Technology ("ONC") at the Department of Health and Human Services ("HHS"). But relators do not plausibly allege that eCW's EHR software fails to conform to the ONC's certification criteria. None of the criteria invoked by the relators requires that EHR software be designed in a manner that eliminates any risk of unauthorized access by third parties; indeed, the federal government has

expressly recognized that "nothing is ever 100% impenetrable." 77 Fed. Reg. 54,163, 54,235 (Sept. 4, 2012). Rather, relators mischaracterize their design preferences for EHR software as certification criteria—and then seek FCA damages on the ground that those design preferences were not satisfied.

Relators' other theory of liability—that eCW caused physicians using its EHR software to falsely attest that they were in compliance with the Health Insurance Portability and Accountability Act's Security Rule (the "HIPAA Security Rule")—similarly fails to state a cause of action. Relators allege that the purported "security vulnerabilities" in eCW's software make it impossible to "ensure the confidentiality, safety, and integrity" of patients' personal health information ("PHI"). Am. Compl. ¶ 113. But in promulgating the HIPAA Security Rule, HHS made clear that "there is no such thing as" a system that "carries no risks to security"; thus, doctors are only required to "take steps, to the best of [their] ability, to protect [patients'] information." 68 Fed. Reg. 8334, 8346 (Feb. 20, 2003). Relators do not allege that eCW's customers violated this standard. Accordingly, the Amended Complaint does not plausibly allege that eCW's customers falsely represented that they complied with HIPAA.

Second, relators' claims also fail to satisfy the FCA's "demanding" materiality requirement because they do not plausibly allege that any alleged falsity affected the government's decision to reimburse claims for payment by eCW's

physician customers. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). To the contrary, relators expressly acknowledge that the government "paid and continues to pay the claims" they allege to be fraudulent, Am. Compl. ¶ 166, even though HHS has been closely monitoring eCW's software pursuant to a Corporate Integrity Agreement ("CIA") since June 2017 and was informed about the substance of relators' allegations in 2018. During that time, HHS has not taken any adverse actions against eCW to decertify the EHR software or deny any of the Medicare program claims submitted by physicians who use eCW's EHR software. This, too, forecloses an inference of materiality.

Third, relators' claims separately fail because they do not sufficiently plead scienter—i.e., that eCW knowingly caused its customers to submit false claims. Instead, their allegations on this score consist of boilerplate claims that eCW acted "knowingly," "recklessly" and "fraudulently," *see, e.g.*, Am. Compl. ¶¶ 2, 5, 47, 61, 68, which do not suffice to satisfy the rigorous scienter requirement of the False Claims Act. *See, e.g.*, *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 (11th Cir. 1994) (holding that "general conclusory allegations of fraud" are insufficient to adequately plead FCA cause of action).

For all of these reasons, discussed in greater detail below, the Court should dismiss relators' Amended Complaint in its entirety.

## BACKGROUND

### A. ECW

Defendant eCW is a privately held healthcare technology company based in Massachusetts. Am. Compl. ¶¶ 13-14. Its flagship product is EHR software that is used by tens of thousands of physicians nationwide. *Id.* ¶ 17.

### B. Medicare's Meaningful Use And MIPS Programs

This case arises out of the federal government's Meaningful Use Incentive Program and the Merit-Based Incentive Payment System ("MIPS") that replaced it, both of which offered hospitals and physicians financial incentives to implement modern EHR systems in their practices. Am. Compl. ¶¶ 130-131. The government promotes the use of EHRs because they improve the quality of medical care, promote coordination among healthcare providers, and reduce the costs that can result from inefficiency and human error. 42 U.S.C. § 300jj-11(b)(2), (6). In order to receive the incentives established for this purpose, a hospital or physician must attest to the government that it has used certified EHR software.

#### 1. EHR Software Certification

To become certified, EHR software must satisfy regulatory standards promulgated by the ONC, Am. Compl. ¶ 116, including several criteria related to "privacy and security," 45 C.F.R. § 170.315(d)(1)-(13). For example, EHR software must have the ability to "[v]erify against a unique identifier(s) (e.g., a username or number) that a person seeking access to electronic health information is the one

claimed." *See, e.g.*, Am. Compl. ¶¶ 121-124 (citation omitted). None of the criteria demands perfection or imposes impossible requirements (e.g., that the software be impenetrable to malicious actors).

Independent, ONC-approved third parties known as "Authorized Certification Bodies" ("ONC-ACBs") conduct certification tests, approved by the ONC, that are designed to confirm whether a developer's EHR software meets the ONC certification requirements. *See* 45 C.F.R. §§ 170.545, 170.550. If the ONC-ACB's testing confirms that the software satisfies the certification criteria, the EHR software receives the ONC's certification. If the software satisfies the applicable standards, it must be certified. All certification results are posted publicly.[1]

Once EHR software receives ONC certification and is made available to physicians, the software is subject to ONC's and ONC-ACBs' "surveillance 'in the field,' as necessary" to ensure that the software "continues to conform to" the ONC's certification criteria. 45 C.F.R. § 170.556(a). Certified EHR software is subject to random in-the-field surveillance. *Id.* § 170.556(c). In addition, if the ONC "becomes aware of facts or circumstances that would cause a reasonable person to question a certified [EHR software's] continued conformity to the requirements of its certification," the ONC "*must* initiate surveillance (including, as necessary, in-

1 *Certified Health IT Product List*, HEALTHIT.GOV, https://chpl.healthit.gov/#/search (last visited Apr. 24, 2022).

the-field surveillance)." *Id.* § 170.556(b) (emphasis added). If the ONC "determines, through surveillance . . . or otherwise, that a [previously-certified EHR software] does not conform to the requirements of its certification," the ONC must "notify the developer of its findings and require the developer to submit a proposed corrective action plan for the applicable certification criterion, certification criteria, or certification requirement."[2] *Id.* § 170.556(d)(1). The ONC may suspend or revoke the software's certification only if the developer fails to complete the ONC's corrective action plan in the time specified therein. *See id.* § 170.556(d)(5)-(6). In short, HHS recognizes that EHR software is not perfect and may suffer from technical problems that result in non-conformance with the certification criteria. When such a situation arises, HHS does not withhold incentive payments from healthcare providers who use the software.

2. Meaningful Use Incentive Program, MIPS And PQRS

Until 2017, a healthcare provider could qualify for payments from the federal government under the Meaningful Use Incentive Program if it meaningfully used certified EHR software. Am. Compl. ¶¶ 132, 141. To demonstrate "meaningful use," a healthcare provider had to meet certain benchmarks (or criteria), such as using a functionality for a minimum number of patients. *See* 42 C.F.R. §

[2] The ONC makes information regarding identified non-conformities and corrective action plans publicly available at https://chpl.healthit.gov/#/collections/corrective-action (last visited Apr. 24, 2022).

495.20(l)(1). To obtain the incentive, the healthcare provider was required to state, among other things, which software was used and that the applicable benchmarks were met or surpassed. *See, e.g.*, *id.*

In 2017, the Meaningful Use Incentive Program was replaced by MIPS. Under the MIPS program, physicians who do not use a "certified" EHR software to report quality of care measures to the Centers for Medicare and Medicaid Services ("CMS") may be subject to a downward percentage adjustment in their Medicare fee-for-service payments. *See* 42 C.F.R. § 414.1380 (scoring); *id.* § 414.1405 (payment). A physician's meaningful use of certified EHR software is just one of several metrics that determine whether a physician will receive any downward or upward payment adjustment under MIPS, and the use of certified EHR software does not itself qualify a physician for an upward payment adjustment or insulate a physician against a downward adjustment. *See id.* § 414.1380.

In addition to the programs discussed above, the Tax Relief and Health Care Act of 2006 allowed for a 1.5% upward adjustment (subject to an overall cap) in Medicare reimbursement rates for physicians who successfully submitted certain healthcare quality data to CMS, under a program known as the Physician Quality Reporting System ("PQRS"). The purpose of the PQRS program was to encourage physicians to report healthcare quality measures to CMS, so that the physicians and

CMS can better assess the quality of care that patients were receiving.[3] To ensure the accuracy of the quality-related data that physicians reported, CMS required physicians to report PQRS data through one of four methods: (1) Medicare Part B claims; (2) a PQRS registry; (3) EHR software certified by ONC to calculate the specific quality measure that the physician was reporting; or (4) a clinical data registry. *See, e.g.*, 42 C.F.R. § 414.90(h)(2). In 2010, as part of the Affordable Care Act, Congress modified the PQRS program to include downward payment adjustments for physicians who did not successfully report quality data to CMS. The PQRS program expired in 2018.

### C. The HIPAA Security Rule

Under HIPAA, the Secretary of HHS must adopt "standards" and "specifications" for healthcare providers related to the transmission of electronic health information. 42 U.S.C. § 1320d-1(a), (c)-(d). Pursuant to this provision, HHS promulgated the HIPAA Security Rule, which generally requires physicians and their offices to "[e]nsure the confidentiality, integrity, and availability of" their patients' electronic health information. 45 C.F.R. § 164.306(a)(1). In its formal rulemaking comments, HHS stated that the Security Rule "is structured to be both scalable and flexible" and that it does "not mandate the use of specific technologies,

---

[3] *See* Centers for Medicare & Medicaid Services, Physician Quality Reporting System (PQRS) Overview, https://www.cms.gov/medicare/quality-initiatives-patient-assessment-instruments/pqrs/downloads/pqrs_overviewfactsheet_2013_08_06.pdf.

or require uniform policies and procedures for compliance." 78 Fed. Reg. 5566, 5591 (Jan. 25, 2013).

### D. The Government's Oversight Of eCW And The CIA

eCW's EHR software is overseen, monitored and routinely tested by federal agencies. *See, e.g.*, 45 C.F.R. § 170.556 (providing for ongoing surveillance of certified EHRs by ONC-ACBs). On May 30, 2017, eCW entered into a CIA with HHS, providing the agency with virtually unlimited access to review and audit all of eCW's corporate records, including the source code for the company's EHR software. *See* Am. Compl. Ex. A, § VII (providing that HHS or its duly authorized representatives "may examine or request copies of eCW's software code . . . for the purpose of verifying and evaluating . . . eCW's compliance with . . . the ONC Health IT Certification Program"). The CIA also requires eCW to make the source code available for inspection and audit by Quandary Peak, which serves as the HHS-approved independent software quality oversight organization ("SQOO"). *See id.*, § III(E)(2) (providing that the SQOO "shall have timely access to . . . relevant software, media, and code"). One of Quandary Peak's express obligations under the CIA is "to ensure that eCW and its EHR software comply with applicable ONC Health IT Certification Program requirements," including the certification requirements relating to cybersecurity. *Id.*, § III(E)(1)(c). Quandary Peak is also required to submit biannual reports to HHS reporting its findings and

recommendations, including findings and recommendations regarding the EHR software's compliance with certification requirements. *See id.*, § III(E)(3)-(5). The CIA has been in effect for the entirety of this lawsuit. *See generally id.*

**E. <u>Relators' Factual Allegations</u>**

Relators proffer two different theories in support of their claim that eCW allegedly caused healthcare providers who used its EHR software to submit false claims to the government. <u>First</u>, relators allege that eCW's EHR software fails to meet the certification requirements promulgated by the ONC and that all Medicare claims submitted by physicians are therefore "false" to the extent they were contingent on the physicians' use of ONC-certified EHR software. *See* Am. Compl. ¶¶ 8, 134, 141-143, 149-150. In support of this EHR certification theory, relators allege that: (i) eCW's EHR software cannot "[v]erify against a unique identifier(s) (e.g., a username or number) that a person seeking access to electronic health information is the one claimed" due to cybersecurity vulnerabilities, *id.* ¶ 121 (citation omitted); (ii) the audit logs within eCW's EHR software do not satisfy the applicable requirements because malicious actors can access the system without being recorded and tamper with the audit logs themselves, *id.* ¶ 122; (iii) eCW's EHR software cannot send PHI "in accordance with the standard for encryption and hashing algorithms" specified in the regulations because "ECW uses the weak

hashing algorithm MD5 to hash user passwords," *id.* ¶¶ 123-127 (citation omitted);[4] and (iv) eCW's EHR software does not comply with the regulation providing that EHRs must encrypt electronic health information on end-user devices after use of the technology on those devices stops, *id.* ¶ 128.

Second, relators allege that "the security vulnerabilities inherent in [e]CW's EHR software made it impossible for a healthcare provider using the software to ensure the confidentiality, safety, and integrity" of patients' personal health information, as required by the HIPAA Security Rule. *Id.* ¶ 113. According to relators, this means that physicians who use eCW's EHR software are not in "compliance with the HIPAA security regulations," and therefore, that Medicare claims submitted by these providers constitute false claims. *Id.* ¶ 114.

### F. Procedural History

Relators filed this lawsuit under seal on October 16, 2018, *see* ECF No. 3, after which they "served the Government with the Complaint and Relators' disclosure statement, which contained additional detailed technical information concerning the security flaws," Am. Compl. ¶ 23. On October 18, 2021, the government notified the Court that, after investigating the allegations for three years, it was declining to intervene in the case. ECF No. 32. On October 20, 2021, relators

[4] Essentially, when a password has been "hash[ed]," it means it has been turned into a scrambled representation of itself. *See* Am. Compl. ¶¶ 63-64.

filed an Amended Complaint, ECF No. 34, which eCW now moves to dismiss.

## STANDARD OF REVIEW

"To avoid dismissal pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Lavelle v. Williamson*, No. 5:21-CV-170 (MTT), 2021 U.S. Dist. LEXIS 185127, at *3 (M.D. Ga. Sept. 28, 2021) (Treadwell, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." *Id.* (quoting *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)). Although well-pleaded facts are accepted as true at the motion to dismiss stage, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Id.* (quoting *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 485 (11th Cir. 2015)). A court may also "dismiss a claim regardless of the alleged facts" if there are "dispositive issues of law." *Id.* (citing *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018)). Notably, a court considering a motion to dismiss "may supplement the allegations in a complaint with facts contained in judicially noticed materials," such as public records and government documents. *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1048 (11th Cir. 2019); *see also* Fed. R. Evid. 201.

An FCA complaint is also subject to Federal Rule of Civil Procedure 9(b)'s

heightened pleading requirements. *See United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309-10 (11th Cir. 2002). Rule 9(b) requires that the complaint plead "with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint "must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citations omitted). In other words, a complaint grounded in alleged fraud must plead "the who, what, when, where, and how [of the defendant's purportedly fraudulent conduct]: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). The purpose of Rule 9(b) is not only to "alert[] defendants to the 'precise misconduct with which they are charged,'" but also to "protect[] defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citations omitted).

## ARGUMENT

Relators' *qui tam* lawsuit should be dismissed in its entirety for at least three reasons. First, relators do not plausibly allege that any claims submitted by healthcare providers who used eCW's EHR software were false. Second, relators' own allegations foreclose the notion that the supposed security vulnerabilities in

eCW's software were material to HHS's decision to reimburse the claims in question. And third, the Amended Complaint fails to adequately plead that eCW acted with the requisite scienter.

## I. RELATORS HAVE NOT PLAUSIBLY ALLEGED THAT eCW CAUSED THE SUBMISSION OF ANY FALSE CLAIMS.

The Court should dismiss relators' Amended Complaint first and foremost because it does not plead a viable theory that eCW's customers submitted false claims. The "'*sine qua non* of a False Claims Act violation' is the submission of a false claim to the government." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (citation omitted).

Where, as here, a relator's FCA claims are predicated on alleged false certifications of compliance with a regulatory requirement, the complaint must be dismissed if it does not adequately allege that a violation of such regulatory requirement in fact occurred. *See id.* at 1056 (agreeing that relator's qui tam complaint "failed to state a claim under the False Claims Act" because the complaint "had not adequately alleged how [the defendant's conduct] violated the [Department of Education's] 90/10 rule"). This pleading requirement is not satisfied where a Complaint merely pleads facts that are "consistent with [the defendant] having violated" the underlying regulatory requirement at issue. *Id.*

Relators have failed to adequately plead falsity under this standard. At most, relators have identified areas where they believe eCW's software can be improved,

but they have not identified: (1) any security vulnerabilities that would support a claim that eCW falsely obtained ONC certification of its software; or (2) any false attestations by physicians of compliance with HIPAA. This alone requires dismissal of their claims. *Cf. United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 409 (6th Cir. 2016) ("[A]ttestation of compliance [with the HIPAA Security Rule] is not rendered false by virtue of individual [security or data] breaches.").

## A. Relators' EHR Certification Theory Fails For Lack Of A False Certification.

Relators allege that physicians who used eCW's software submitted false claims for meaningful use incentives when they attested that they had used certified EHR, because "[e]CW's EHR software does not actually satisfy the ONC's EHR certification requirements." Am Compl. ¶ 134. This theory misreads the ONC certification criteria and seeks to impose requirements that do not exist.

### 1. Relators Fail To Adequately Allege Any Violation Related To User Verification.

Relators first contend that eCW violated 45 C.F.R. § 170.314(d)(1)(i)[5] because "[t]he security flaws in [e]CW's software make it impossible for [e]CW to verify that the person seeking access to electronic health information is the one claimed." Am. Compl. ¶ 121. But the ONC's certification criteria do not require

[5] 45 C.F.R. § 170.314 has been deleted since the filing of the operative Amended Complaint; as explained *infra*, the relevant requirements remain codified at 45 C.F.R. § 170.315.

EHR software to ensure that unauthorized actors cannot access the system by using authorized users' credentials or new credentials. Rather, under section 170.314(d)(1), titled "Authentication, access control, and authorization," the ONC requires that EHR software be able to "[v]erify against a unique identifier(s) (e.g., username or number) that a person seeking access to electronic health information is the one claimed." 45 C.F.R. § 170.314(d)(1)(i). EHR software complies with this requirement as long as the software requires users to enter a "unique identifier[]" to log into the system. *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1548 (11th Cir. 1990) ("[Regulatory] interpretation must begin with the language of the [regulation], which must be interpreted in accordance with its 'plain meaning.'") (citation omitted). To reinforce the focus on authorized users, the ONC replaced the word "person" with "user," which Title 45 defines as "a person or entity with *authorized* access," in its 2015 Edition certification criteria.[6] *See* 45 C.F.R. § 164.304 (emphasis added); 80 Fed. Reg. 62,602, 62,655 (Oct. 16, 2015); *compare* 45 C.F.R. § 170.314(d)(1)(i), *with id.* § 170.315(d)(1)(i). Relators do not allege—nor could they—that eCW's EHR fails to satisfy the actual requirements of this subsection.

The limited scope of the regulation is made clear by the test script that the

---

[6] This criterion was otherwise left unchanged in the 2015 Edition. *See* 80 Fed. Reg. at 62,655.

ONC uses to confirm that software satisfies it. That script "verif[ies]" that a "duplicate" cannot be created, but does not otherwise require EHR vendors to show that unauthorized users are unable to access the EHR software. Drummond Group, Test Criteria: 170.314.d.1, at 4 (revised Mar. 1, 2013); *see also* ONC, 2015 Ed., Authentication, Access Ctrl., Authorization, Test Proc. 1.1, https://www.healthit.gov/sites/default/files/170%20315%28d%29%281%29%20 Authentication%20Access%20Control%20Authorization.pdf (revised Sept. 21, 2017) (updated test protocol calling for tester to simply "create a . . . unique identifier," "verif[y] that the [software] prevents an existing user identifier from being used again," and "verif[y] that the [software] does not permit . . . a disabled account to access" information). Accordingly, relators do not plausibly allege that eCW's audit logging capabilities fall short of any certification requirement, precluding their theory that providers' attestations about their use of certified EHR technology were somehow false.

2. <u>Relators Fail To Adequately Allege Any Violation Concerning Audit Logs.</u>

Relators also allege that eCW's audit logs do not satisfy 45 C.F.R. § 170.314(d)(2)(i)(A)-(B) because malicious actors are able to "bypass the [e]CW application altogether," which would result in "[e]CW's audit logs completely fail[ing] to record any of the malicious actor's downloads, uploads, or alterations of patient records," or any tampering with "the audit logs themselves." Am. Compl. ¶

122. But the provisions cited by relators do not require EHR software to record actions taken by malicious actors that have "bypassed" the EHR application "altogether." Were it otherwise, *no EHR software* could qualify for certification.

Under the ONC's 2014 Edition certification criteria, software must "[r]ecord actions related to electronic health information in accordance with . . . § 170.210(e)(1)," 45 C.F.R. § 170.314(d)(2)(i)(A), and "[r]ecord the audit log status (enabled or disabled) in accordance with . . . § 170.210(e)(2)," *id.* § 170.314(d)(2)(i)(B).[7] Sections 170.210(e)(1) and (2), in turn, both establish the ASTM as the standard for EHR audit logging capabilities. *See id.* § 170.210(e)(1)-(2) (2012) (adopting, among other sections, ASTM § 7.4). The applicable ASTM standard requires EHR software to record the "[u]nique identification of the user of the health information system" for all actions taken. ASTM E2147-01 § 7.4 (Decl. of Aaron Katz ("Katz Decl."), Ex. 4); *see id.* § 7.1 (audit logs "must contain [this] minimum data element[]"); *see also* 77 Fed. Reg. at 54,234 (sections 170.314(d)(2)(i)(A) and (B) "require that the user ID, date and time be recorded"). The ASTM defines "user" as "a person *authorized* to use the information contained in an information system as specified by their job function." ASTM E2147-01 § 3.1.15 (emphasis added); *see also* 45 C.F.R. § 164.304 (defining user as "a person

[7] The ONC did not alter these requirements in its 2015 Edition certification criteria. *See* 45 C.F.R. § 170.315(d)(2)(i)(A)-(B); 80 Fed. Reg. at 62,655-56.

or entity with authorized access"). Accordingly, the ONC only requires EHR software to record auditable events attributable to authorized users' unique identifiers, ***not*** events attributable to malicious actors who have "bypass[ed] the [EHR] application" altogether, as relators claim. *See* Am. Compl. ¶ 122.

The rulemaking process that led to the ONC's final rule codifying its 2014 Edition certification criteria demonstrates as much. In response to a comment expressing concern that "EHR technology can still be circumvented by select individuals with malicious intent," the ONC explained "that there is only so much that is within the control of EHR technology and that nothing is ever 100% impenetrable." 77 Fed. Reg. at 54,235. With that in mind, the final certification criterion was specifically drafted to require only that "the audit log must not be capable of being changed, overwritten, or deleted *by the EHR technology*." *Id.* (emphasis added).

Once again, the applicable test scripts further confirm eCW's compliance. The ONC does not test whether it can circumvent the software through illicit means. Instead, the ONC tester logs into the software, performs a series of actions that simulate those an ***authorized*** user would take, and "verifies that . . . an audit log entry . . . has been correctly generated." ONC, 2015 Ed., Auditable Events & Tamper-Resistance, Test Proc. 1.3, https://www.healthit.gov/sites/default/files/170 %20315%28d%29%282%29%20Auditable%20Events%20and%20Tamper-

resistance.pdf (revised Sept. 21, 2017).

Accordingly, relators do not plausibly allege that eCW's audit logging capabilities fall short of any certification requirement, and this, too, cannot support an allegation that the providers' attestations were false.

3. Relators Fail To Adequately Allege Any Violation Concerning Password Hashing.

Relators next allege that eCW's software does not satisfy 45 C.F.R. § 170.314(e)(1)(i). According to relators, the software fails to "'provide patients . . . with an online means to view, download, and transmit to a 3rd party' specified PHI" "in accordance with the standard for encryption and hashing algorithms specified at [45 C.F.R.] § 170.210(f)" because "[e]CW uses the weak hashing algorithm MD5 to hash user passwords." *See* Am. Compl. ¶¶ 123-127 (quoting 45 C.F.R. § 170.314(e)(1)(i)). But the ONC's certification requirements do not require EHR software to hash authentication credentials (e.g., user passwords) ***at all***, let alone use a certain hashing algorithm.

The regulation at issue requires EHR software to encrypt patient health information, not passwords, using one of the hashing algorithms specified at 45 C.F.R. § 170.210(f). This is made clear by the title of subsection 210(f): "Encryption and hashing of *electronic health information*," *id.* (emphasis added)—i.e., information "[r]elat[ing] to the . . . physical or mental health or condition of an

individual," *id.* § 160.103.[8] Because authentication credentials do not relate to an individual's health or condition, section 170.210(f) cannot possibly require the hashing of authentication credentials. *See Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1084-85 (9th Cir. 2007) (holding that "when a [regulation] designates certain persons, things, or manners of operation, all omissions should be understood as exclusions" because the agency is "fully capable of writing in an even broader definition") (citation omitted); *see also United States v. Bryant*, 996 F.3d 1243, 1258 (11th Cir. 2021).

Once again, the ONC's statements during the rulemaking process confirm the lack of any requirement related to hashing for authentication credentials. Despite comments "recommend[ing] that [the ONC] specify requirements for authentication" under this provision, the ONC explicitly declined to do so. 77 Fed. Reg. at 54,181. The ONC further explained that it *would not "prescribe a particular form or 'level of assurance' for authentication*" because "there is significant innovation taking place with respect to authentication," and "requiring a particular form in this certification criterion would be overly prescriptive." *Id.* (emphasis added).

Finally, to the extent relators premise their claims on the allegation that

[8] In 45 C.F.R. § 170.102, the ONC states that the definition of "electronic health information" is at 45 C.F.R. § 171.102, which in turn defines the term as "electronic protected health information as defined in 45 CFR 160.103."

"[e]CW does not 'salt' the MD5 hashes" by adding "random numbers and letters," Am. Compl. ¶¶ 67, 127, their arguments are even more meritless. Relators do not point to any certification criterion requiring salting, because ONC's regulations do not purport to impose such a requirement with respect to any type of data.

For these reasons, relators have not pled that eCW's software violated the ONC criterion governing encryption, much less that such a purported violation rendered providers' attestations about the use of EHR certified technology false.

4. Relators Fail To Adequately Allege Any Violation Concerning Local Storage Of PHI.

Finally, relators allege that eCW's software violates 45 C.F.R. § 170.315(d)(7)(i)-(ii) by "stor[ing] ***unencrypted*** PHI 'locally' on computers in healthcare providers' offices." Am. Compl. ¶ 128. Relators again misread the ONC's requirements for certification.

Under subsection 170.315(d)(7), the ONC provides that EHR software must either (1) "encrypt the electronic health information stored on [end-user] devices *after use of the technology on those devices stops*," if it is "designed to locally store electronic health information on end-user devices"; or (2) be "designed to prevent electronic health information from being locally stored on end-user devices *after use of the technology on those devices stops*." 45 C.F.R. § 170.315(d)(7)(i)(A), (ii) (emphases added). The import of these provisions is clear: the ONC does not prohibit the local storage of unencrypted PHI in all cases, but rather, only after use

of the EHR software stops (i.e., when the user logs out or terminates the session). In fact, the current regulation was specifically intended to alter "the 'general encryption'" requirement that had previously existed. 77 Fed. Reg. at 54,236. Relators do not, and cannot, allege that eCW fails to encrypt PHI "after use of the technology . . . stops," and have thus failed to state a viable theory that the local storage of PHI violates any ONC certification requirement.

For this reason, too, relators' claims that providers' attestations about the use of EHR certified software were false lack merit.

**B. Relators' HIPAA-Compliance Theory Fails For Lack Of A False Certification.**

Relators also allege that eCW "caus[ed] healthcare providers to falsely certify compliance" with HIPAA security requirements. Am. Compl. ¶ 107. According to relators, eCW's customers submitted false certifications of compliance with 45 C.F.R. § 164.306(a)(1)-(2) of the HIPAA regulations, because the purported "security vulnerabilities" in eCW's software "make it impossible for a healthcare provider using the software to ensure the confidentiality, safety and integrity of Protected Health Information stored in [e]CW's EHR." Am. Compl. ¶ 113.

This assertion, without more, does not establish a HIPAA violation; far less does it transform the providers' express or implied attestations about HIPAA compliance into false claims. As CMS has explained, "providers need not 'fully mitigate all risks of e-PHI breaches.'" *Sheldon*, 816 F.3d at 409 (quoting CMS,

*Security Risk Analysis Tipsheet: Protecting Patients' Health Info.* 5 (revised Dec. 2013)); *see also id.* at 410 (HIPAA and its implementing regulations "do not impose a strict liability standard") (citation omitted). This guidance makes sense, since "there is no such thing as a totally secure system that carries no risk." 68 Fed. Reg. at 8346 (HHS responding to comment and explaining that physicians are entitled to strike "a balance between the information's identifiable risks and vulnerabilities, and the cost of various protective measures").

Applying these principles, the U.S. Court of Appeals for the Sixth Circuit affirmed the dismissal of an FCA case premised on an alleged failure to comply with the HIPAA Security Rule. As that court explained, an "attestation of compliance is not rendered false by virtue of individual [security or data] breaches," since the regulations "plainly contemplate[] occasional breaches." *Sheldon*, 816 F.3d at 409-10. If the actual data breaches at issue in *Sheldon* could not make out a claim, it follows that the allegations here, which merely hypothesize the potential for future breaches, do not either.[9]

---

[9] Enforcement of the General Requirements provision of the HIPAA Security Rule is generally delegated to the HHS Office of Civil Rights ("OCR") because it requires administrative expertise. It would thus invade the province of OCR to authorize private relators in a non-intervened case to premise FCA liability on alleged violations of the HIPAA Security Rule that OCR itself has not found. It would also raise serious policy concerns to allow lay juries to dictate the scope of the HIPAA Security Rule, which has implications for persons and entities subject to its requirements. Presumably for these reasons, eCW has not found a single reported case in which a court has allowed an alleged violation of the HIPAA Security Rule to serve as a predicate for an FCA claim that was not predicated on a preexisting finding of violation by OCR.

For this reason alone, relators' HIPAA-based claims should be dismissed.

## II. **RELATORS DO NOT PLAUSIBLY ALLEGE THAT THE PURPORTED FLAWS IN eCW'S SOFTWARE WERE MATERIAL TO THE GOVERNMENT'S DECISION TO REIMBURSE CLAIMS.**

Even if Relators had adequately pled the falsity element of their FCA claim, their Amended Complaint would still fail because they do not, and cannot, plausibly allege that the purported violations underlying their lawsuit were "material" to the government's decision to reimburse physicians for submitted claims.

The FCA imposes a "rigorous" and "demanding" materiality requirement in order to ensure that the statute is ***not*** used to "punish[] garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (materiality standard is not met where noncompliance is "minor or insubstantial"). To be material, a misrepresentation must be significant enough that a government payor "would [have] attach[ed] importance" to the violation in determining whether to pay the claim. *Id.* at 193 (citation omitted). "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements were not material." *Id.* at 195.

Importantly, *Escobar* expressly "reject[ed] . . . [the] assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss"; rather, "False Claims Act plaintiffs must . . . plead" this element "with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)." *Id.*

at 195 n.6. Consistent with the Supreme Court's *Escobar* holding, courts have not hesitated to dismiss FCA cases where—as here—a relator has failed to plead non-conclusory and plausible allegations that a defendant's purported regulatory violations had any bearing on the government's decision to reimburse claims for payment. *See, e.g.*, *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020) (lack of "specific allegations regarding the materiality" of the alleged fraud required dismissal), *cert. denied*, 141 S. Ct. 1238 (2021); *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (fact that "CMS ha[d] not denied reimbursement for Onyx in the wake of D'Agostino's allegations cast[ed] serious doubt on the materiality of the fraudulent representations"); *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 34-35 (1st Cir. 2017) (affirming dismissal of FCA claims arising out of allegations that manufacturer misled government in obtaining approval of hip implant where the government did not "withdraw or even suspend its approval" of the product).

In *Porter*, for example, the relator alleged that "her former employer, which contract[ed] with the Mississippi Division of Medicaid, violat[ed] the False Claims Act by using licensed professional nurses for tasks that require the expertise of registered nurses." 810 F. App'x at 238. The Mississippi Division of Medicaid, however, "took no action after [the relator] informed the Division that [the defendant] was staffing care and case manager positions with [unqualified] licensed

practical nurses. Instead, it continued payment [to the defendant] and renewed its contract with [the defendant] several times." *Id.* at 242. The U.S. Court of Appeals for the Fifth Circuit agreed with the district court that these facts, coupled with the complaint's lack of "specific allegations regarding the materiality of [the defendant's] alleged fraud," required dismissal of the relator's lawsuit. *Id.*

Similarly, in *D'Agostino*, the relator alleged that the manufacturer of an injectable liquid called Onyx had obtained FDA approval of the device through fraudulent representations. 845 F.3d at 3. The relator claimed, *inter alia*, that the defendant's application to the FDA "omitted critical safety information" about Onyx, which "***could have***" influenced the FDA to grant approval, thereby rendering the representations material. *Id.* at 7 (emphasis added). In affirming the district court's dismissal of the FCA claims, the U.S. Court of Appeals for the First Circuit determined that the relators had "misconstrue[d] the FCA's" "demanding" materiality requirement. *Id.* As the Court of Appeals explained, the fact that "CMS ha[d] not denied reimbursement for Onyx in the wake of D'Agostino's allegations cast[ed] serious doubt on the materiality of the fraudulent representations." *Id.* In addition, the First Circuit reasoned that the FDA's failure to withdraw its approval of Onyx or otherwise take any other action "in the face of [the relator's] allegations preclude[d] [the relator] from resting his claims on a contention that the FDA's approval was fraudulently obtained." *Id.* at 8.

The same logic applies here for multiple reasons.

First, although the Amended Complaint vaguely alleges that "the defendant caused the submission of false claims and made false statements material to false or fraudulent claims to the United States," *e.g.*, Am. Compl. ¶ 163, it does not set forth facts in support of that allegation. Relators' "conclusory statements" of materiality do not pass muster under Rule 8, *Iqbal*, 556 U.S. at 678-79, much less the heightened particularity standard of Rule 9(b), *see Porter*, 810 F. App'x at 242.

Second, relators' allegations of materiality are utterly implausible because, as the Amended Complaint implicitly acknowledges, the government has had the necessary tools to discover the purported shortcomings alleged by relators for years—and yet, it continues to certify eCW's software and reimburse claims by providers who use it.

As noted above, eCW has been subject to a CIA since 2017, under which the SQOO monitors eCW's software for compliance with "***all*** applicable ONC Health IT Certification Program requirements." Am. Compl. Ex. A, § III(E)(1)(c). In order to discharge that responsibility, the SQOO has had complete access to eCW's source code during the entire term of the CIA. *See* Am. Compl. Ex. A, § III(E)(2)(a). In addition, the SQOO has provided formal reports to HHS every six months documenting its activities and findings. *See id.* § III(E)(3)-(4). Thus, the supposed security vulnerabilities alleged by the relators would have been discoverable by the

SQOO and, by extension, by HHS (the agency in charge of the EHR certification criteria and HIPAA Security Rule) even before relators commenced suit. *Cf. United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 528 (6th Cir. 2020) (recognizing that a corporate integrity agreement subjects a company to "heightened scrutiny" by HHS).

This is all the more true because relators claim that the security vulnerabilities are "*so basic and obvious*" that common sense would lead anyone versed in industry practices to discover the alleged flaws in eCW's EHR software. *See, e.g.*, Am. Compl. ¶ 2 (emphasis added); *see also, e.g.*, *id.* ¶ 62 (eCW does not "use[] *standard industry security practices*") (emphasis added); *see also, e.g.*, *id.* ¶ 90 ("These vulnerabilities flout standard industry practice . . . ."); *id.* ¶ 106 ("This internal [e]CW practice[] . . . flouts standard industry norms and *basic common sense* . . . .") (emphasis added). If there were any truth to relators' allegations, the government—equipped with multiple tools to review and assess eCW's software and its compliance with all ONC certification criteria—would have discovered the purported flaws that relators deem to be "basic and obvious" violations of established industry practice.

In any event, relators specifically alerted the government to the underlying allegations approximately three-and-a-half years ago, when they filed and served the original complaint, Am. Compl. ¶ 23, accusing eCW's software of being marred by

"numerous grave security vulnerabilities," Orig. Compl. ¶ 38 (ECF No. 3). In addition, the CIA requires eCW to report certain matters to HHS's Office of Inspector General, pursuant to which eCW reported: (1) a December 2018 Letter of Concern from the U.S. Department of Justice ("DOJ") seeking to ensure that eCW was investigating the allegations raised by relators; (2) a February 2020 Civil Investigative Demand ("CID"), also from DOJ, seeking documents and propounding interrogatories pertaining to issues that largely track relators' allegations; and (3) an October 26, 2021 DOJ letter notifying eCW of relators' Amended Complaint and the allegations it contained. *See* Katz Decl. Ex. 1; Katz Decl. Ex. 2, Attachment B; *see also* ECF No. 32 (DOJ's declination letter).[10] Finally, there can be no question that HHS was well aware of the allegations in relators' Amended Complaint by November 2021, when eCW provided copies of the *qui tam* complaint to the agency. *See* Katz Decl. Ex. 3. Despite all of these notifications over the last several years, HHS has not suspended or revoked eCW's certification and has continued to reimburse the Medicare program claims submitted by physicians that relators allege to be false, and the Amended Complaint does not allege otherwise.

In sum, the federal government has declined to intervene in this lawsuit, HHS

---

[10] The Court can take judicial notice of the letters and CID because they are government records and their limited use here (namely, their date and the fact of what they contain) concerns matters whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1198-99 & n.2 (N.D. Cal. 2015) (granting motion for judicial notice of civil investigative demand issued by Department of Justice, among other items).

has never found that eCW's security measures violate applicable legal requirements, and HHS has continued to certify the software and reimburse claims by providers who use it. These circumstances firmly establish that the purported security issues with eCW's software and relators' corresponding allegations of fraud have had no bearing on the government's decision to reimburse claims—and thus require dismissal of relators' lawsuit for lack of materiality.

## III. <u>RELATORS FAIL TO PLAUSIBLY ALLEGE SCIENTER.</u>

Relators' lawsuit should be dismissed for yet another independent reason: they fail to plausibly plead scienter.

The FCA imposes a "rigorous" scienter requirement because it is "not intended to 'punish[] honest mistakes or incorrect claims submitted through mere negligence.'" *United States v. Fulton County*, No. 1:14-cv-4071-WSD, 2016 WL 4158392, at *11 (N.D. Ga. Aug. 5, 2016) (quoting *Urquilla-Diaz*, 780 F.3d at 1058). Pursuant to this requirement, a false claim is only actionable if it is presented "knowingly," which is defined as "'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard'" for the truth. *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017); *see also* 31 U.S.C. § 3729(a)(1)(A), (b). To state a claim and survive a motion to dismiss, a relator must "set forth actual *facts* alleging that [the defendant] had knowledge of fraud or misrepresentations made to the government" or recklessly disregarded that such deception would occur. *See*

*United States ex rel. Lewis v. Cmty. Health Sys., Inc.*, No. 18-20394-Civ-Scola, 2020 WL 3103994, at *15 (S.D. Fla. June 11, 2020) (finding scienter inadequately pled where relators relied on conclusory allegations and failed to "set forth actual *facts* alleging that [an electronic health records company] had knowledge of fraud or misrepresentations made to the government"); *Fulton County*, 2016 WL 4158392, at *11 n.16 (dismissing on scienter grounds where, "[e]xcept for two conclusory assertions that simply parrot language from the FCA, the [c]omplaint does not allege, even in general terms, that [d]efendants knew their claims were false"); *United States ex rel. Barrett v. Beauty Basics, Inc.*, No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *5 (N.D. Ala. June 11, 2015) (dismissing FCA claim and noting that "[r]elators' complaint must contain some facts creating an inference that the individual(s) who submitted the alleged false certifications to the government did so with knowledge of their falsity").

In *Lewis*, for example, the relators alleged "that an assortment of [EHR] software functionalities did not work properly and that [the defendant], therefore, should not have been able to get its software certified [by the ONC]." 2020 WL 3103994, at *17. Some of the alleged problems related to security, including the software's purported inability "to properly limit who could view and modify patient information." *Id.* at *15. Although the relators alleged that the defendant "knew that its software failed to provide required functionality and misrepresented its

software's ability to regularly perform functions required for . . . certification," the court held that such "immaterial generalities" and "conclusory allegations" were not accompanied by "actual *facts* . . . that [defendant] had knowledge of fraud or misrepresentations made to the government." *Id.* (citation omitted). Moreover, the court reasoned, even if the defendant had "first-hand knowledge of many issues that appear[ed] to render the software non-compliant with federal regulations," that "do[es] not amount to a showing of fraud." *Id.* at *16-17. Accordingly, the relators failed to state a claim under the FCA, and their lawsuit was dismissed.

Relators' allegations of scienter here consist of similarly conclusory and speculative assertions that eCW acted "knowingly and recklessly." Am. Compl. ¶¶ 2, 5, 47, 61, 68, 69, 84, 86, 93, 99, 155. For example, the Amended Complaint alleges that because "Relators were able to easily identify these additional flaws . . . there is no question that [e]CW knows, or is reckless in not knowing, about the existence of these additional flaws." *Id.* ¶ 5. But relators offer no facts that would demonstrate eCW's knowledge of the alleged flaws or their contribution to the allegedly false claims. Similarly, relators repeatedly allege that "[e]CW is knowingly and recklessly" permitting security flaws to exist, without any facts to support their conclusory statements. *Id.* ¶¶ 68, 69, 93. These self-serving and conclusory claims do not adequately plead scienter, further requiring dismissal of relators' Amended Complaint.

## IV. THE AMENDED COMPLAINT'S "REVERSE FALSE CLAIMS" THEORY FAILS AS A MATTER OF LAW.

Finally, relators allege that eCW owes "stipulated penalties" under its CIA and that eCW's non-payment of those stipulated penalties constitutes a "reverse false claim." This allegation fails too.

Section X(C) of the CIA requires eCW to pay stipulated penalties only if HHS has issued a stipulated penalty demand. Absent such a demand, eCW is not subject to any payment obligation under the CIA. The Amended Complaint does not (and cannot) allege that HHS has issued a stipulated penalty demand. Accordingly, this claim fails as well. *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 922 (6th Cir. 2017) (dismissing reverse false claims theory predicated on non-payment of stipulated penalties under a CIA, where HHS had not issued a penalty demand).

## CONCLUSION

For the foregoing reasons, eCW respectfully requests that the Court dismiss the Amended Complaint in its entirety with prejudice.

Dated: April 25, 2022

Respectfully submitted,

*<u>/s/</u>* <u>James W. Cobb</u>
James W. Cobb
Georgia Bar No. 420133
jcobb@caplancobb.com
Julia Blackburn Stone
Georgia Bar No. 200070
jstone@caplancobb.com
Caplan Cobb LLC
75 Fourteenth Street N.E., Suite 2700
Atlanta, Georgia 30309

Tel: (404) 596-5600
Fax: (404) 596-5604

Aaron Katz (*pro hac vice*)
aaron.katz@ropesgray.com
Emma Notis-McConarty (*pro hac vice*)
emma.notis-mcconarty@ropesgray.com
Ropes & Gray LLP
800 Boylston Street, Prudential Tower
Boston, Massachusetts 02199-3600
Tel.: (617) 951-7000
Fax: (617) 951-7050

Elizabeth Tolon (*pro hac vice*)
elizabeth.tolon@ropesgray.com
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Tel.: (212) 596-9919

Geoffrey M. Wyatt (*pro hac vice*)
geoffrey.wyatt@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7000
Fax: (202) 393-5760

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 25, 2022, the foregoing documents were filed with the Clerk of the U.S. District Court for the Middle District of Georgia, Macon Division, using the Court's electronic filing system ("ECF"), and that all counsel of record received the same via ECF. Copies were sent via email to Department of Justice attorney Christelle Klovers.


*/s/* James W. Cobb
James W. Cobb
Caplan Cobb LLC
75 Fourteenth Street N.E., Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604