**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ALEX PERMENTER, ERIC RODIGHIERO, AND CHRIS WHEELER,<br><br>Plaintiffs/Relators,<br><br>v.<br><br>eCLINICALWORKS LLC,<br><br>Defendant. | **No. 5:18-cv-382** |

**DEFENDANT'S CORRECTED ANSWER TO THE SECOND AMENDED COMPLAINT***

* Defendant is filing this Corrected Answer to address two scrivener's errors in Defendant's original Answer (filed January 6, 2023): the civil action number in the caption (changed in this document from 5:18-cv-386 to 5:18-cv-382) and the date on the signature page (changed from January 6, 2022 to January 6, 2023). Before filing this Corrected Answer, Defendant informed Relators' counsel of these two errors and that Defendant would be correcting them.

By and through undersigned counsel, Defendant eClinicalWorks LLC ("eCW") hereby answers the relators' Second Amended Complaint. For avoidance of doubt, any allegation not expressly admitted is denied; to the extent any allegation is admitted in part, it is denied in remaining part. For further avoidance of doubt, eCW assumes that section headings do not constitute separate allegations; in the event they are so construed, they are denied. eCW reserves the right to amend this Answer, including the right to assert compulsory or permissive counterclaims against the relators, upon receipt of information not presently within eCW's knowledge or possession. Redactions included in this document are identical to the redactions included in the redacted version of the publicly-filed complaint that was re-filed at ECF No. 48-2. Subject to the foregoing, eCW answers each paragraph and subparagraph of the Second Amended Complaint as follows:

# I. <u>INTRODUCTION</u>

1.

This is an action to recover all available damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and/or caused to be made by defendant and/or its agents, employees, and co-conspirators in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.

**ANSWER: eClinicalWorks, LLC ("eCW") admits that the relators'**

**complaint is filed pursuant to the federal False Claims Act.**

2.

This case involves grave security vulnerabilities in the software of one of the Nation's major vendors of Electronic Health Records ("EHR") software—eClinicalWorks, LLC ("ECW"). The security vulnerabilities in ECW's EHR software allow malicious actors to access the Protected Health Information ("PHI"), social security numbers, and other private information of *tens of millions* of federal healthcare beneficiaries and other Americans. By exposing the PHI of *tens of millions* of Americans to malicious actors, ECW is knowingly and recklessly exposing those citizens to identity theft, blackmail, and other illicit demands. The security flaws in ECW's EHR software are so basic and obvious that they are known to ECW now and were known to ECW when Relators filed their initial Complaint under seal on October 12, 2018.

**ANSWER: Denied.**

3.

Since Relators filed their initial Complaint, ECW has been made aware of the security flaws Relators identified in their initial Complaint. ECW, however, has done almost nothing as a result of receiving this information. ECW's EHR software is just as vulnerable and insecure today as it was when Relators filed their initial Complaint.

**ANSWER: eCW admits that, after the relators filed their initial complaint, the Department of Justice informed eCW of certain allegations that had been made about the company's EHR software. eCW otherwise denies the allegations in this paragraph.**

4.

Moreover, ECW is continuing to intentionally mislead the Government and its customers regarding the security of ECW's EHR software. Since Relators filed their initial Complaint, ECW has released two so-called "security patches"—*the first such "security patches" ever released in the entire time the company has existed*. Many of the purported "fixes" ECW put in place through those "security patches" are merely window dressing intended to mislead the Government and ECW's customers into believing that the grave security flaws in ECW's EHR software have been resolved when they have not been resolved. ECW's EHR software remains catastrophically broken and insecure. Those patches only addressed some specific limited examples of the security issues identified by Relators in their initial Complaint. ECW ignored every other security issue that exists in its EHR software. ECW did not disclose the reason for its security patches to its customers; nor has it taken other basic remedial steps, such as advising its customers to reset their passwords immediately, that could help reduce the risk of malicious attacks on ECW's software. ECW clearly decided that it cannot make such a disclosure without

suffering business related harm, so ECW continues to expose the PHI of millions of Americans and to allow the submission of millions of dollars in false claims to the government.

**ANSWER: Denied.**

5.

Additionally, since Relators filed their initial Complaint, Relators have uncovered additional grave security flaws in ECW's EHR software. ECW has made no attempt whatsoever to "fix" these additional security flaws in either of its "security patches." Given that Relators were able to easily identify these additional flaws through (1) their routine technology work for healthcare providers and (2) free software auditing tools, there is no question that ECW knows, or is reckless in not knowing, about the existence of these additional flaws. That these security flaws still exist in ECW's software proves ECW does not care about the security of its product and has not done a proper audit of its software.

**ANSWER: Denied.**

6.

By continuing to market and sell its EHR software to thousands of physicians and by continuing to avoid fixing the numerous security flaws in its software, ECW is playing Russian roulette with the PHI of *tens of millions* of American citizens. Even worse, the security flaws in ECW's EHR software make it difficult, and

potentially impossible, to tell whether a bad actor has already accessed and downloaded the PHI of American citizens. Given how weak ECW's EHR software's security is, there is a very real and present danger that the PHI of American citizens has already been accessed and exploited.

**ANSWER: Denied.**

7.

These fundamental security flaws pose more than just a risk of financial harm. They literally involve matters of life and death as malicious actors could *access and alter* the PHI of American patients. These security flaws permit a malicious actor to access and alter the medical records of patients while sitting behind the keyboard of a computer or tablet anywhere in the world. Given the extreme vulnerabilities of ECW's EHR software, a malicious actor could alter the known allergies of a patient, change their medication, or do any other myriad of nefarious things to harm a public or private citizen while posing as a doctor or nurse with access to the patient's PHI and medical records.

**ANSWER: Denied.**

8.

In addition to exposing the PHI of *tens of milli*ons of American citizens to the malicious acts of bad actors, the grave and fundamental security flaws in ECW's EHR software also make it ineligible for certification as an acceptable EHR program

under federal regulations. Those security flaws likewise make it impossible for any physician or physician practice group using ECW's EHR software to truthfully certify that they are complying with applicable HIPAA security requirements when submitting claims for payment to the Centers for Medicare & Medicaid Services ("CMS") or to one of CMS's contractors. ECW's misconduct has caused the submission of false claims and cost the government millions in federal healthcare reimbursement and incentive payments.

**ANSWER: Denied.**

## II. THE PARTIES

### *A. Relators*

9.

ALEX PERMENTER ("Relator Permenter") is the founder of Alex's PC Solutions ("PC Solutions"), a Managed Services Provider and FCC licensed telecom in Macon, Georgia. Relator Permenter leads a team that services roughly [redacted] including many healthcare practices, and more than [redacted] in Middle Georgia. PC Solutions services healthcare provider clients ranging in size from a single provider to large multi-location groups with over 100 employees. Relator Permenter founded his own technology company nearly two decades ago and has worked in the technology field ever since. He has been an expert computer forensics witness in both the Superior Courts of Bibb and Houston

Counties. Relator Permenter has substantial experience in a wide variety of fields, including telecom, information security, networking, systems administration, and regulatory compliance. He is active in several technology focused peer groups and holds multiple technical certifications.

Through his work with PC Solutions' healthcare provider clients, Relator Permenter has substantial knowledge of and technical expertise with ECW's EHR software.

**ANSWER: eCW lacks information sufficient to admit or deny the allegations in this paragraph.**

10.

ERIC RODIGHIERO ("Relator Rodighiero") received his degree in Mathematics in 2008 from California State University, Northridge. He has been involved in the world of computers for over 30 years as a student of the technology and as a part-time developer. Relator Rodighiero previously worked at Knowledge Adventure Software, where he was responsible for disassembling and reassembling software in different programming languages. More recently, he has been a coder (C++, Python, LUA), database admin (MySQL/MariaDB), and content developer (various tools) for a donation-supported multiplayer online game. Relator Rodighiero joined PC Solutions in 2015 as a helpdesk engineer. In 2017, he became a partial owner of PC Solutions and now manages the helpdesk department.

Through his work with PC Solutions' healthcare provider clients, Relator Rodighiero has substantial knowledge of and technical expertise with ECW's EHR software.

**ANSWER: eCW lacks information sufficient to admit or deny the allegations in this paragraph.**

11.

CHRIS WHEELER ("Relator Wheeler") studied Computer Science at Georgia Southwestern University. During his time studying Computer Science, Relator Wheeler worked for a Managed Service Provider ("MSP") called NEOS Technologies, which provided IT resources to Sumter Regional Hospital, Flint River Hospital, and many other healthcare providers. While working for NEOS, Relator Wheeler first gained substantial technical expertise with ECW's EHR software. He has built on that substantial technical expertise with ECW's EHR software in his subsequent IT positions, including at PC Solutions. Relator Wheeler has also gained expertise in cybersecurity and cryptography while working on multiple side projects, including freelance software development and embedded systems engineering, designing the printed circuit boards, and writing the software that runs many bitcoin ATMs in Finland. Relator Wheeler has assisted the Computer Technology Industry Association ("CompTIA") in developing their Cloud+ certification and was the first CompTIA Cloud+ Certified systems engineer in Georgia.

Through his work with PC Solutions' healthcare provider clients, Relator Wheeler has substantial knowledge of and technical expertise with ECW's EHR software.

**ANSWER: eCW lacks information sufficient to admit or deny the allegations in this paragraph.**

12.

Relators are original sources and bring this *qui tam* action based upon direct and unique information they possess with regard to the fraudulent acts of defendant set forth and described with particularity hereafter.

**ANSWER: This paragraph contains conclusions of law that do not require a response. To the extent the allegations in this paragraph require a response, eCW denies them.**

***B. Defendant ECW***

13.

Defendant ECW is a Delaware limited liability company with its principal place of business located at 2 Technology Drive, Westborough, Massachusetts 01581. Defendant ECW maintains an office in Georgia at 555 North Point Center E #515, Alpharetta, Georgia 30022.

**ANSWER: eCW denies that it presently maintains an office in Alpharetta, Georgia. eCW otherwise admits the allegations in this paragraph.**

14.

Defendant ECW is a privately held healthcare software and technology company.

**ANSWER: Admitted.**

15.

ECW's co-founders and key corporate officers are Girish Navani (Chief Executive Officer), Rajesh Dharampuriya, M.D. (Chief Medical Officer), and Mahesh Navani (Chief Operating Officer).

**ANSWER: eCW admits that the individuals named in this paragraph are co-founders and officers of the company.**

16.

ECW's principal business is developing and licensing EHR software to healthcare providers such as physician practices and hospitals.

**ANSWER: Admitted that eCW's principal business is developing and licensing EHR software to ambulatory medical practices.**

17.

According to ECW, more than 130,000 healthcare providers use ECW's EHR software in the United States. Those 130,000 healthcare providers treat at least *tens of millions* of Americans. Thus, those 130,000 healthcare providers possess the PHI of at least *tens of millions* of Americans.

**ANSWER: eCW admits that more than 100,000 healthcare providers in the United States have used eCW's EHR software. eCW further admits that these providers have treated more than ten million unique patients.**

18.

ECW contends that it "is the leading cloud-based EHR in the industry," meaning that much of the patient data stored in ECW's EHR software is stored "in the cloud."

**ANSWER: eCW admits that it is one of the largest cloud-based EHR providers in the United States. eCW further admits that a third-party website, www.topazsystems.com, describes eCW as "the leading cloud-based EHR in the industry."**

19.

ECW has an established track record of fraud in connection with its EHR software. In 2017, ECW settled a FCA case seeking to recover federal dollars paid out in "Meaningful Use" payments to physicians. The case was brought by Relator Brendan Delaney and alleged ECW falsely represented to customers that its EHR software complied with applicable federal regulations while concealing fundamental defects in the system. *See United States ex rel. Delaney v. eClinicalWorks, LLC,* Case No. 15-CV-00095 (D. Vt.). The defects in the ECW system identified by Delaney related to the program's functionality. *See Delaney* Compl. ¶¶ 63-107.

Specifically, Delaney alleged that ECW's EHR software failed reliably to document and track medications administered to patients, failed reliably to record and track laboratory results, and failed to contain adequate protections to retain prescriptions, avoid overmedications, and avoid editing of patient notes. *Id.* ECW agreed to settle the claims in the *Delaney* suit and the government released ECW for Meaningful Use payments related to "Covered Conduct" through February 1, 2017. The settlement agreement defines "Covered Conduct" to be the claims alleged in the *Delaney* complaint in intervention and makes clear that the ***only*** claims released are the "Covered Conduct."

None of the allegations in the *Delaney* suit had anything to do with ECW's complete and utter failure to create a secure EHR program that is not vulnerable to hackers or other bad actors. None of the claims raised herein are part of the Covered Conduct released by the Government in the *Delaney* case. Relators are original sources of the matters set forth in both the initial Complaint and this First Amended Complaint. There has been no public disclosure of any of the security vulnerabilities in ECW's EHR software that are raised in and form the basis of both the initial Complaint and this First Amended Complaint.

**ANSWER: eCW admits that it entered into a settlement agreement with the United States in *United States ex rel. Delaney v. eClinicalWorks, LLC,* Case No. 15-CV-00095 (D. Vt.). The operative complaint in that matter, as well as**

**the settlement agreement, speak for themselves. eCW denies that the "only claims released" by the United States under the *Delaney* settlement agreement were "the 'Covered Conduct.'" This paragraph's allegations regarding the relators being "original sources" are conclusions of law to which no response is required, but to the extent a response is required, eCW denies the allegations.**

20.

As part of its settlement of the *Delaney* case, ECW also agreed to be subject to a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health & Human Services ("OIG"). OIG has authority to negotiate Corporate Integrity Agreements with healthcare providers and other entities such as EHR developers as part of the settlement of Federal health care program investigations arising under the federal False Claims Act and other false claims statutes. In entering a Corporate Integrity Agreement, a healthcare provider or entity agrees to adhere to the obligations set forth in the CIA and, in exchange, OIG agrees not to seek the provider's exclusion from participation in Medicare, Medicaid, or other Federal health care programs.[1] The effective date of ECW's CIA is May 30, 2017. ECW's CIA is effective for five years from that date. A copy of ECW's CIA is attached as Exhibit A. Though not a part of the *Delaney* lawsuit, the

[1] *See* OIG, Corporate Integrity Agreements, *available at* https://oig.hhs.gov /compliance/corporate-integrity-agreements/ (last visited June 19, 2019).

conduct alleged herein violates both the FCA and ECW's CIA.

**ANSWER: eCW admits that, as part of the *Delaney* settlement, it entered into a five-year Corporate Integrity Agreement with the Department of Health and Human Services Office of the Inspector General, commencing May 30, 2017. The balance of this paragraph constitute legal conclusions to which no response is required, but to the extent a response is required, eCW denies the allegations.**

21.

ECW routinely flouts fundamental provisions of the CIA. For example, the CIA precludes ECW from "restrict[ing] or prohibit[ing], by contract or otherwise, the rights of Existing Customers, former customers, or any new customers or users of eCW's EHR Software to discuss problems with eCW's EHR Software or associated services in any forum whatsoever." CIA at p. 27, III(D)(6); *see also* CIA at p. 8, III(A)(2)(b)(ii) (requiring ECW to "proactively monitor[] sources of information about potential software defects, usability problems, deficiencies, and other issues that may present Patient Safety Issues or Certification Issues"); CIA at p. 15, III(3)(B)(2)(e) (requiring ECW to "address[] and remedy[] customer and user complaints"). Far from adhering to these requirements, ECW is hostile towards healthcare practices and their representatives who report problems to ECW regarding ECW's EHR software. In addition to ignoring reports of serious flaws in

ECW's EHR software and falsely denying those flaws exists, ECW reacts negatively and aggressively against those who bring flaws to ECW's attention and attempt to create a record of doing so. ECW has done so despite the fact ECW is subject to a "Stipulated Penalty of $25,000 for each instance in which eCW . . . [t]akes action, whether by enforcing a contractual right *or otherwise*, and whether by formal legal process *or otherwise*, that has the effect of restricting or prohibiting a customer's right to discuss problems with the EHR Software or eCW's services." CIA at p. 62, X(A)(10)(d) (emphasis added).

**ANSWER: eCW's Corporate Integrity Agreement speaks for itself. eCW otherwise denies the allegations in this paragraph.**

## III. <u>OVERVIEW OF *U.S. EX REL. PERMENTER* TO DATE</u>

22.

Because ECW's misconduct from the date Relators filed their initial Complaint to the present is relevant to Relators' First Amended Complaint, Relators provide a brief overview of the progress of the case so far.

**ANSWER: Denied.**

23.

After Relators learned about the grave security flaws in ECW's EHR software through their work for healthcare provider clients, Relators promptly filed their initial Complaint under seal on October 12, 2018. Relators' initial Complaint

outlined examples of the security flaws Relators had identified in ECW's EHR software. That same day, Relators served the Government with the Complaint and Relators' disclosure statement, which contained additional detailed technical information concerning the security flaws. Upon information and belief, the Government thereafter provided ECW with the security vulnerabilities Relators identified while this case remained under seal.

**ANSWER: eCW admits that the relators filed their *qui tam* complaint under seal on October 12, 2018. eCW further admits that the Department of Justice subsequently notified eCW that allegations regarding security vulnerabilities had been made against the company. eCW otherwise denies the allegations.**

24.

In response to being provided the security vulnerabilities Relators' identified by the Government, on or about December 17, 2018, ECW released a so-called "security patch" that purported to address some of—but far from all—the security flaws identified in Relators' initial Complaint and the additional materials Relators provided to the Government. On February 10, 2019, ECW released a second so-called "security patch." One reason Relators are filing this First Amended Complaint is to emphasize that these so-called "security patches" do not come close to remedying the grave security flaws contained in ECW's EHR software—despite

what ECW may be telling the government. Many of the major flaws identified by Relators in the initial Complaint remain. In addition, many other grave security issues not discussed in Relators initial Complaint are present in ECW's software. And with respect to the extremely serious SQL Injection Attack vulnerability identified in Relators' initial Complaint, ECW's first patch appears to create the illusion that the vulnerability has been remedied when, in fact, it still exists and could easily be exploited by malicious actors.

**ANSWER: eCW admits that it, as is common in the software industry, releases software patches from time to time. eCW further admits that patches released in or around December 2018 and February 2019 included security enhancements to its EHR software. eCW otherwise denies the allegations.**

25.

ECW's failed attempts to remedy the security vulnerabilities identified by Relators is an admission that those grave security flaws exist. ECW was not, however, successful in fixing the problems. In addition to failing to remedy the grave security flaws identified in Relators' initial Complaint, ECW has failed to conduct a basic review of the overall security of its EHR software. Since filing their initial Complaint, Relators have continued to find egregious security vulnerabilities in ECW's EHR software using basic auditing tools that ECW—a company that boasts about having 5,000 employees—certainly has at its disposal.

**ANSWER: Denied.**

## IV. JURISDICTION AND VENUE

26.

This Court has jurisdiction over the parties and the subject matter of the claims brought in this action under the FCA pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

**ANSWER: eCW admits that this Court has subject matter jurisdiction over this lawsuit.**

27.

Under 31 U.S.C. § 3730(e)(4), there has been no statutorily relevant public disclosure of the "allegations or transactions" in either Relators' initial Complaint or this First Amended Complaint, and, to the extent any party asserts that there was any such relevant public disclosure, as set forth below, Relators are original sources of the information on which this action is based and voluntarily provided that information to the Government before filing suit. None of the conduct alleged herein is based upon or related to the allegations or transactions at issue in the *Delaney* case. Relators discovered the massive security flaws in ECW's EHR software on their own while assessing the security of their clients' patients' PHI without any knowledge of even the existence of the *Delaney* case.

**ANSWER: Denied.**

28.

Venue is appropriate as to ECW in this district because ECW can be found in, resides in, transacts business in, and/or has committed an act proscribed by the FCA in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

**ANSWER: eCW admits that this Court has statutory venue over this lawsuit.**

29.

Relators have presented the Government with timely disclosures regarding the False Claims Act violations described herein as required by 31 U.S.C. § 3730(b)(2).

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required. To the extent the allegations in this paragraph require a response, eCW denies them.**

30.

On information and belief, ECW is the business entity that committed the unlawful and fraudulent activities alleged in Relators' initial Complaint and this First Amended Complaint. To the extent any related business entities and/or natural persons also engaged in such unlawful conduct, Relators hereby give notice that they

seek to hold any such related business entities and/or natural persons liable for such unlawful conduct.

**ANSWER: eCW denies that it engaged in any unlawful or fraudulent activities.**

## V. THE FALSE CLAIMS ACT

31.

Defendant's conduct described herein violates the FCA. The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the statute to enhance the federal Government's ability to recover losses sustained as a result of fraud committed against the United States after finding that fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud being committed against the United States to disclose that information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

**ANSWER: eCW denies the first sentence of this paragraph. The balance of this paragraph's allegations of legal conclusions to which no response is required.**

32.

The FCA allows persons having information about a violation of the FCA to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

33.

31 U.S.C. § 3729(a)(1)(A) provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $11,181 and not more than $22,363 per false claim made. 31 U.S.C. § 3729(a)(1), as adjusted by 28 C.F.R. § 85.5.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

34.

31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $11,181 and not more than $22,363 per false claim made. 31 U.S.C. § 3729(a)(1), as adjusted by 28 C.F.R. § 85.5.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

35.

31 U.S.C. § 3729(a)(1)(C) provides that any person who conspires to commit a violation of subparagraph (A) and/or subparagraph (B) of 31 U.S.C. § 3729(a)(1) is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $11,181 and not more than $22,363 per false claim made. 31 U.S.C. § 3729(a)(1), as adjusted by 28 C.F.R. § 85.5.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

36.

31 U.S.C. § 3729(a)(1)(G) provides that any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $11,181 and not more than $22,363 per false claim made. 31 U.S.C. § 3729(a)(1), as adjusted by 28 C.F.R. § 85.5.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

37.

The False Claims Act defines "claim" to include any request or demand made upon an agency of the United States for payment of money. 31 U.S.C. § 3729(b)(2).

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

38.

No proof of specific intent to defraud is required to prove a False Claims Act violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; ***or*** (2) acts in deliberate ignorance of the truth or falsity of the information; ***or*** (3) acts in reckless disregard of the truth or

falsity of the information. 31 U.S.C. § 3729(b)(1).

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

39.

Relators seek to recover all available damages, civil penalties, and other relief available at law for the violations alleged herein.

**ANSWER: eCW admits that the relators are seeking damages and penalties in their lawsuit.**

## VI. BACKGROUND

### *A. ECW's Widely Used EHR Software.*

40.

Based on Relators' extensive experience performing technology work for healthcare practices, Relators know that ECW's EHR software is widely used. Most of Relators' healthcare practice clients use ECW's EHR software.

**ANSWER: eCW admits that its EHR software is among the most widely used in the United States. eCW is otherwise without sufficient information to confirm or deny the allegations in this paragraph.**

41.

[redacted]

[redacted]

**ANSWER: eCW admits that its EHR software allows a physician to enter a patient's personal health information and that this information is stored either on eCW's cloud-based servers or the customer's local server. eCW otherwise denies the allegations in this paragraph.**

42.

ECW's EHR software makes patient data easily accessible to healthcare providers—and anyone who gains access to a healthcare provider's ECW credentials. Indeed, one of ECW's key selling points for its EHR software is that "[p]roviders enjoy easy documentation, the latest in interoperability, and can ***access patient data anytime, anywhere***—on a PC or Mac using a web browser, a smartphone, or an iPad."[2]

**ANSWER: eCW denies that "patient data" is "easily accessible to . . . anyone who gains access to a healthcare provider's ECW credentials." eCW otherwise admits that healthcare providers with appropriate credentials can**

[2] *See* ECW, EHR for Practices, https://www.eclinicalworks.com/products-services/ehr-for-practices/ (emphasis added) (last visited June 19, 2019).

**efficiently access their patients' health information and that this is a beneficial feature of eCW's EHR software.**

43.

ECW represents to healthcare providers that "the eClinicalWorks Cloud keeps your private data private."[3] That representation is both false and reckless.

**ANSWER: eCW admits that its website contains the quoted language. eCW denies that the language is false or reckless.**

44.

ECW represents to healthcare providers that its "***single focus***" is providing its "customers with ***secure***, cloud based solutions to their healthcare IT needs."[4] That representation is both false and reckless.

**ANSWER: eCW admits that its website contains the quoted language. eCW denies that the language is false or reckless.**

45.

ECW represents to healthcare providers that it keeps "your patient and practice data safe, secure, and fully accessible regardless of time, network traffic, or Mother Nature."[5] That representation is both false and reckless.

---

[3] ECW, About Us, https://www.eclinicalworks.com/about-us/ (last visited June 19, 2019).
[4] *See* About eClinicalWorks, https://www.eclinicalworks.com/ (emphasis added) (last visited June 19, 2019).
[5] *See* https://www.eclinicalworks.com/about-us/ (last visited June 19, 2019).

**ANSWER: eCW admits that its website contains the quoted language. eCW denies that the language is false or reckless.**

46.

ECW's conduct—as set forth in greater detail below—violates both the FCA and the CIA. The security vulnerabilities in ECW's EHR software and the massive harm that could result from a data breach—to the extent one has not already occurred—is unparalleled in scope, a grave danger to the health and security of American citizens, and a significant threat to national security given that this information could potentially be used by malicious actors and unscrupulous nation states to try and blackmail, extort, or manipulate public officials.

**ANSWER: Denied.**

### *B. Grave Security Vulnerabilities in ECW's EHR Identified in Relator's Initial Complaint.*

47.

A significant portion of Relators' work with their healthcare clients involves servicing and providing support to their clients' use of ECW's EHR software. With only a small amount of time and the limited access allowed them by their client work, Relators have identified numerous grave security vulnerabilities in ECW's EHR software. Relators' goal in bringing this action is to ensure that the PHI of their clients' patients and other American citizens is secure and protected from disclosure to unauthorized persons who may use it for illicit purposes. Relators

provide a list of these vulnerabilities below. The list is illustrative only. Because the security of ECW's EHR software is so recklessly and knowingly deficient, there are many other examples that Relators can and are prepared to identify to the government in the appropriate setting. Upon information and belief, ECW's software likely has additional major security flaws that are not apparent to Relators who only have limited access to ECW's servers.

**ANSWER: eCW is without sufficient information to confirm or deny the relators' allegations regarding the nature of their work or their "goals" in bringing this action. eCW admits that the relators have limited access to eCW's servers. eCW otherwise denies the allegations in this paragraph.**

48.

At a high level, the flaws in the security of ECW's EHR software make it possible for a bad actor to rather easily access the EHR systems of all or nearly all physicians and physician practices using ECW's EHR software. Once logged in to the system, a bad actor could do a whole host of things including: [redacted]

**ANSWER: Denied.**

49.

The flaws in the ECW EHR software are system-wide and easily exploitable. A motivated bad actor could write an undetectable program that could download the PHI of every patient of an ECW EHR software user. A motivated bad actor could also send targeted requests for the PHI of politicians, public officials, celebrities, and other people of note who could be subject to blackmail or worse. A bad actor also could easily write a program that would crash the entire ECW EHR system, causing chaos and massive disruption in the delivery of medical services to American citizens. These threats are not mere hyperbole. They are real and present dangers. The results of such breaches of the ECW EHR system would be catastrophic. ECW knows or should know of the grave security risks posed by its EHR software.

**ANSWER: Denied.**

**1.** [redacted]

50.

Inexplicably, ECW leaves [redacted]

**ANSWER: Denied.**

51.

[redacted]"[6] Many of the security flaws discussed in Relator's initial Complaint and in this First Amended Complaint would be evident to anyone who [redacted]. In other words, ECW has left a roadmap showing any bad actor the path to complete access to the ECW EHR system [redacted]

**ANSWER: Denied.**

52.

[redacted]

---

[6] Christian Chessman, Note, *A "Source" of Error: Computer Code, Criminal Defendants, and the Constitution*, 105 Calif. L. Rev. 179, 182–83 (2017).

[redacted]”[9]

**ANSWER: eCW is without sufficient information to confirm or deny whether most commercial programs are sold only in object code form. eCW otherwise admits that quoted language appears in the cited Eleventh Circuit case, which has nothing to do with the False Claims Act.**

[redacted]

[redacted]

[redacted]

---

[redacted] *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1539 n. 17 (11th Cir. 1996) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[F] n. 271 (1995) (quotation marks omitted)).

[8] *Id.*

[9] *Id.* (emphasis added).

[redacted]

**ANSWER: eCW admits that the quoted language appears in the cited sources.**

[redacted]

[redacted] [redacted]

**ANSWER: Denied.**

55.

ECW's EHR software is not "open source" software, like Mozilla Firefox. Open source software is intentionally distributed with the source code available for modification by users. The source code for ECW's EHR software, however, should be carefully guarded because it contains an immense amount of information that a malicious actor could use to breach PHI stored on ECW's servers. Indeed, if a malicious actor obtained ECW's source code, the malicious actor would know all of

---

10 [redacted]

the inner workings of ECW's EHR software and how to exploit the security flaws in the program. [redacted] Anyone could very easily steal the source code and utilize it to obtain the PHI of ECW's customers' patients. [redacted]

**ANSWER: Denied.**

**2. ECW's Web Servers Provide Extremely Sensitive <u>Information Without Any Authentication</u>.**

56.

ECW's web based servers are grossly insecure. [redacted]

11 [redacted]

[redacted]

**ANSWER: Denied.**

57.

Armed with that information, any motivated bad actor could easily and quickly determine the actual passwords of individual practice administrators. Once an administrator's login and password were known, a person could gain complete administrative control of the practice's EHR and could download, change, or delete PHI, in addition to a whole host of other bad acts. All of those bad acts could be done with little to no detection whatsoever. This flaw in the ECW web based servers was or, at the very least, should have been obvious to ECW. Inexplicably, ECW did nothing to fix the problem until several months after Relators filed their initial Complaint, apparently after having been provided a list of the security vulnerabilities Relators identified by the Government.

**ANSWER: Denied.**

58.

Although ECW purported to address some of these .jsp problems—which are, frankly, the "low hanging fruit"—in its December 2018 patch, many of these problems remain. The "fixes" are mere window dressing.

**ANSWER: eCW admits that, as is common in the software industry, it releases software patches from time to time and that those patches may sometimes include security-related enhancements. eCW further admits that in December 2018 it released a software patch that included security-related enhancements. eCW otherwise denies the allegations in this paragraph.**

### 3. ECW's bogus "CAPTCHA" security feature.

59.

As Relators explained in their initial Complaint, ECW has recklessly and fraudulently used a bogus CAPTCHA feature. ECW's use of the bogus CAPTCHA feature is emblematic of all of ECW's security issues. ECW knows that it should have security protocols in place to prevent unauthorized access to its customers' patients PHI, but instead of designing a secure EHR system, ECW has only created a system that appears secure.

**ANSWER: Denied.**

60.

As of the filing of Relators' initial Complaint, the ECW CAPTCHA feature provided absolutely no protection from the very thing CAPTCHAs are meant to protect against—bot attacks. ECW's EHR contained a CAPTCHA requiring a human user to fill in the CAPTCHA text in order to change her username. But because of the flaws in ECW's security, a bot could gain access to and send a direct

command to the ECW server to change a password without having to meet the CAPTCHA requirements. The result is that ECW made it harder for actual human users to change their own passwords, but did nothing to stop a bot from manipulating passwords and gaining access to the system. ECW's CAPTCHA provided the illusion of security while actually diminishing the security of its own EHR software.

**ANSWER: Denied.**

61.

ECW's use of a bogus CAPTCHA feature was reckless, fraudulent, and emblematic of all of ECW's security issues. ECW knows that it should have security protocols in place to prevent unauthorized access to its customers' patients' PHI, but instead of designing a secure EHR system, ECW has only created a system that ***appears*** secure.

**ANSWER: Denied.**

**4. The User Passwords ECW Stores on its Servers are <u>Susceptible to Cracking</u>.**

62.

ECW fails to protect its users' passwords using standard industry security practices. [redacted] As a result, the "hashed" passwords stored in ECW's servers are very susceptible to cracking. Once a malicious actor has access to an ECW user's password, the malicious actor can download or alter PHI undetected.

**ANSWER: eCW admits that, during certain periods of time potentially relevant to this matter, it used the method described in the allegation. eCW otherwise denies the allegations in this paragraph.**

63.

By way of background, user passwords stored on ECW's servers are not stored as plain text. Instead, ECW stores the "hash" of a user's password. A "hash" is created by running a password through a "hashing algorithm." "Hashing algorithms take inputs of plaintext of an arbitrary length and produce alphanumeric digests or 'hashes' of a fixed length."[12]

**ANSWER: eCW admits that, to the extent it stores user passwords on its servers, the passwords are stored in hashes.**

64.

[redacted] Hackers have created gigantic

[12] Jason R. Wool, *Does the Cryptographic Hashing of Passwords Qualify for Statutory Breach Notification Safe Harbor?*, 6 J.L. & Cyber Warfare 56, 65 (2018).

databases called "rainbow tables" that provide the plain text passwords associated with specific hashes.

**ANSWER: eCW admits that prior to a January 2017 source code update that was rolled out to customers during the first half of 2017 its EHR software encrypted user passwords solely using the described hashing algorithm. eCW admits that it is generally aware that malicious actors have created databases in an attempt to steal hashed passwords, though not necessarily passwords stored on eCW's servers.**

65.

[redacted]

**ANSWER: eCW denies that it is a "weak hashing algorithm." eCW is without sufficient information to confirm or deny the second sentence in this**

---

[13] *Id.*
[14] *See* NIST SP 800-132 Section 5.1, available at https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-132.pdf (last visited June 19, 2019).

**paragraph. eCW admits the algorithm is not expressly named on NIST's current list of recommended hashes for password storage.**

66.

Not only does ECW utilize a weak hashing algorithm, ECW does not take additional steps to secure passwords, such as "salting" users' passwords.

**ANSWER: Denied.**

67.

"Salting" passwords is a standard industry practice. "Salts are strings of characters automatically appended to a plaintext password prior to hashing, which add additional complexity and randomness to input plaintext."[15] What that means is that when a password gets run through the hashing algorithm, a few random numbers and letters (a "salt") are added to the hash. This makes it very unlikely that the salted hash is contained in one of the "rainbow tables" of password hashes.

**ANSWER: eCW is without sufficient information to confirm or deny that "salting" is a "standard industry practice." eCW admits that the paragraph correctly describes what "salting" is.**

---

[15] Jason R. Wool, *Does the Cryptographic Hashing of Passwords Qualify for Statutory Breach Notification Safe Harbor?*, 6 J.L. & Cyber Warfare 56, 68 (2018).

68.

[redacted], ECW is knowingly and recklessly making these passwords very susceptible to cracking. [redacted] Relators were able to determine the plain text passwords associated with 50% of the users' password hashes ***within 20 seconds***. As soon as a malicious actor obtained *one* such username and password, the malicious actor would be able to download or alter PHI with complete autonomy and without detection.

**ANSWER: eCW is without sufficient information to confirm or deny whether the relators were able to determine the plain text passwords associated with 50% of the users at one of their clients. eCW otherwise denies the allegations in this paragraph.**

**5. <u>ECW's EHR Software is Vulnerable to SQL Injection Attacks</u>.**

69.

Shockingly, ECW's EHR software is knowingly, recklessly, and extraordinarily vulnerable to a widely known type of attack called a "SQL Injection

Attack."[16] Although ECW made a convoluted attempt in its December 2018 so-called "security patch" to appear as though ECW has remedied this vulnerability, ECW has not done so. ECW's EHR software is still extraordinarily vulnerable to a SQL Injection Attack.

**ANSWER: Denied.**

70.

This vulnerability could easily result in the PHI of millions of federal healthcare beneficiaries—and other Americans—being breached.

**ANSWER: Denied.**

71.

SQL Injection Attacks are not novel. As one security commentator wrote ***in 2011***, "SQL Injection vulnerabilities . . . have led to history's largest data breaches."[17]

**ANSWER: eCW admits that SQL injection attacks can occur with respect to any web-based software and that the quoted language appears in the cited source.**

---

[16] SQL, which some pronounce as "S-Q-L" and others pronounce as "Sequel," stands for "Structural Query Language." SQL is a computer programming language used to program databases. Most websites that allow users to request information (for example, by typing a request into a search field) contain databases and use SQL.

[17] Josh Shaul, Why Do SQL Injection Attacks Continue to Succeed?, SC Mag. (May 24, 2011), http://perma.cc/PM4C-TECV (last visited June 19, 2019).

72.

Wired Magazine has written that "***the SQL injection method** . . . **is one of the most basic and oldest tricks hackers use to get into websites and the contents of backend databases connected to those sites***. Those databases can contain Social Security and credit card numbers, health records, or a host of other sensitive data, including log-in credentials for website administrators and others that can give a hacker access to other parts of a network beyond databases."[18]

**ANSWER: eCW admits that the quoted language appears in the cited source.**

73.

As a leading legal scholar recently explained in the Columbia Law Review, a SQL Injection Attack "exploits a security bug or hole" in a web server.[19] A SQL Injection Attack "is executed by attaching special extra language to the end of a web request" on a website.[20] SQL Injection Attacks work because some web servers—

[18] Kim Zetter, Hacker Lexicon: SQL Injections, An Everyday Hacker's Favorite Attack, Wired Magazine (May 11, 2016), https://www.wired.com/2016/05/hacker-lexicon-sql-injections-everyday-hackers-favorite-attack/ (emphasis added) (last visited June 19, 2019).
[19] Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143, 1172 (2016)
[20] *Id.*

***such as ECW's servers***—"are misconfigured so that this extra language will execute a command on the web server rather than return a webpage."[21]

**ANSWER: eCW admits that the quoted language appears in the cited source.**

74.

The risk posed by SQL Injection Attacks is real and widely known throughout the software industry, including to ECW.

**ANSWER: eCW admits that it is generally aware that SQL injection attacks can pose risks to software.**

75.

As recently as August 2016, the Federal Bureau of Investigation's Cyber Division issued an "FBI Flash" warning private industry that "an unknown actor [had] scanned a state's Board of Election website for vulnerabilities . . ., and ***after identifying a Structured Query Language (SQL) injection (SQLi) vulnerability*** used SQLmap [a program that exploits SQL vulnerabilities] to target the state website." 08/18/2016 FBI Flash, "Targeting Activity Against State Board of Election Systems," attached hereto as Exhibit B (emphasis added).

**ANSWER: eCW admits that the quoted language appears in the cited source.**

[21] *Id.*

76.

There are many infamous examples of SQL Injection Attacks.

**ANSWER: eCW admits that data breaches involving other companies reportedly were the result of SQL injection attacks.**

77.

For example, many observers have suggested that the massive 2017 Equifax data breach resulted from a SQL Injection Attack. *See, e.g.*, 9/18/17 Legal Week, 143 million credit records of US citizens exposed in Equifax hack, 2017 WLNR 27705557 ("Equifax, the credit ratings agency, has warned that it has been hacked, losing the personal details of some 143 million Americans—44 per cent of the adult population—in a data breach that ***outsiders suggest was the result of a simple SQL injection attack***." (Emphasis added)).

**ANSWER: eCW is without information sufficient to confirm or deny the cause of the Equifax data breach.**

78.

In 2010, a United States District Court Judge sentenced a hacker to two twenty year sentences for his role in "[u]sing a SQL-injection attack" to break "into the 7-Eleven network in August 2007, stealing an undetermined amount of card data,"

among other hacks.[22] The hacker and his cohorts "used the same kind of attack to infiltrate Hannaford Brothers in November 2007, which resulted in 4.2 million stolen debit and credit card numbers."[23]

**ANSWER: eCW is without information sufficient to confirm or deny the factual findings made in the criminal prosecution of the alleged 7-Eleven hackers.**

79.

Through their extensive work for healthcare providers, Relators have identified substantial SQL vulnerabilities in their clients' ECW EHR servers. Relators believe these SQL vulnerabilities exist in all ECW servers.

**ANSWER: Denied.**

80.

A hacker could exploit these SQL vulnerabilities by sending queries directly to the database. For example, a hacker could access a practice's web based server then inject a SQL command that allows the hacker to download ***the entire database*** of the medical server to a folder and work through that database offline without detection.

[22] Kim Zetter, Hacker Sentenced to 20 Years for Breach of Credit Card Processor., Wired Magazine (March 26, 2010), https://www.wired.com/2010/03/heartland-sentencing/ (last visited June 19, 2019).
[23] *Id.*

**ANSWER: Denied.**

81.

Any alteration or breach of PHI that a hacker made through a SQL Injection Attack would be ***virtually undetectable***. It is possible that hackers have already used SQL Injection Attacks to alter or obtain PHI through ECW's EHR.

**ANSWER: Denied.**

82.

Any alteration or breach of PHI that a hacker made through a SQL Injection Attack would therefore violate federal law, which requires that EHR technology be able to "[v]erify against a unique identifier(s) (e.g., a username or number) that a person seeking access to electronic health information ***is the one claimed***." 45 C.F.R. § 170.314(d)(1)(i) (emphasis added).

**ANSWER: eCW admits that a person would be in violation of federal criminal law if he or she tried to breach or gain unauthorized access to eCW's servers. To the extent this paragraph contains legal arguments regarding software certification requirements, no respone is required, but to the extent a response is required, eCW denies the remaining allegations in this paragraph.**

83.

Just as the risk of SQL Injection Attacks is widely known, so too are the ways to eliminate those risks.

**ANSWER: eCW admits that there are ways to mitigate the risk of SQL injection attacks.**

84.

For example, the University of California, Berkeley maintains a publicly available website titled "How to Protect Against SQL Injection Attacks."[24] After stating that "SQL injection is one of the most common web attack mechanisms utilized by attackers to steal sensitive data from organizations," the website explains how to mitigate the risk.[25] "Developers can prevent SQL Injection vulnerabilities in web applications by utilizing parameterized database queries with bound, typed parameters and careful use of parameterized stored procedures in the database. This can be accomplished in a variety of programming languages including Java, .NET, PHP, and more."[26] ECW does not do any of this. ECW instead knowingly and recklessly exposes its customers' patients' PHI to a SQL Injection Attack without even taking the most basic steps to prevent such an attack.

**ANSWER: Denied.**

---

[24] Berkley Information Security & Policy, https://security.berkeley.edu/resources/best-practices-how-articles/system-application-security/how-protect-against-sql-injection (last visited June 19, 2019).

[25] *Id.*

[26] *Id.*

85.

Unfortunately, it gets much worse. Shortly after ECW released its first so-called "security patch" in December 2018 to address some of the security vulnerabilities Relators identified in their initial Complaint and provided to the Government, Relators analyzed the patch and the alterations the patch made to the ECW EHR software of Relators' clients. At first, Relators were surprised when it appeared to them that the patch addressed the SQL Injection Attack vulnerability identified in Relators' initial Complaint and in the other materials Relators provided to the Government. On closer inspection, however, Relators discovered that ECW had used an extremely convoluted computer code to create the mere illusion that ECW had remedied the SQL Injection Attack vulnerability when, in fact, ECW had not remedied the vulnerability. ECW's use of this convoluted computer code in the first so-called security patch was almost certainly intended to mislead the Government into believing the SQL Injection Attack vulnerability was fixed, when in actuality it was not. This vulnerability still very much exists and could result in the breach of tens of millions of Americans' PHI and other sensitive personal information.

**ANSWER: Denied.**

86.

As one of the Nation's major EHR software developers with hundreds of millions of dollars in annual revenue, ECW knows—or is reckless in not knowing—the extensive SQL vulnerabilities in its software. It is unconscionable for ECW to be putting the confidentiality of so many Americans' PHI, social security numbers, and private financial information at such grave risk.

**ANSWER: Denied.**

***C. Additional Security Vulnerabilities.***

87.

In addition to the vulnerabilities described above, Relators have identified many additional grave security vulnerabilities in ECW's EHR software. These include:

**ANSWER: Denied.**

88.

***Predictable naming conventions for ECW's EHR server names.*** Relators have determined that ECW uses an easy-to-predict naming convention for many—and potentially all—of the ECW "cloud" servers where healthcare providers store PHI. [redacted]

[redacted]. Using Google, Relators were able to identify more than 8,000 live ECW cloud server sites using this naming convention ***in a single night***. Once the ECW cloud server sites are known, a bad actor could then gain access to the EHR and PHI contained on those sites by exploiting the security flaws described herein.

**ANSWER: eCW admits that it uses URLs that are unique to each customer's practice and that certain customers' URLs utilized a naming convention as described in the allegation. eCW is without sufficient knowledge to confirm or deny whether the relators were able to identify 8,000 live eCW cloud server sites in a single night. eCW otherwise denies the allegations in this paragraph.**

89.

***Easy encryption keys.*** [redacted]

A malicious actor could easily gain access to ECW's EHR servers by [redacted]

---

[redacted]

[redacted] using one of these easy-to-determine encryption keys. [redacted]

These encryption keys are extremely easy to find. [redacted] While Relators have not accessed any PHI they are unauthorized to access, a malicious actor could easily do so.

**ANSWER: eCW admits that it utilizes encryption keys as part of its security processes. eCW further admits that certain encryption keys are or have been stored within the EHR source code. eCW is without information sufficient to confirm or deny whether the relators were able to discover an encryption key, which would have required the relators to violate the terms of service of eCW's software and exceed their authorized access in violation of federal criminal law. eCW otherwise denies the allegations in this paragraph.**

90.

***ECW's servers freely distribute "security rights."*** ECW's servers, which store PHI, rely on the ECW client (*e.g.*, a computer operating the ECW software) to tell the servers what "security rights" the client has. Once the ECW client tells the

ECW servers that the client is authorized to view or alter PHI, the client can do so. Additionally, the ECW servers allow the ECW client to tell the servers the type of user the client is. For example, a malicious actor who gained access to the ECW servers through a [redacted] could tell the servers that she was a doctor, gaining maximum access to all information stored in the program, including PHI, social security numbers, and private financial information. The malicious actor could then also edit patient records, for example, and the audit logs would reflect that the doctor, as opposed to the malicious actor, had edited the patient records. These vulnerabilities flout standard industry practice and could literally lead to someone being hurt or killed by, for example, a malicious actor altering the medication to be provided to a patient or the patient's known allergies.

**ANSWER: eCW admits that software servers in general are inherently at risk of a breach.**

91.

[redacted] ***have full access to ECW's EHR.*** Again, many healthcare providers have ECW [redacted] could easily cause a breach of PHI.

**ANSWER: eCW admits that many of its customers use mobile devices (such as iPad tablets) to access the EHR software servers. eCW otherwise denies the allegations in this paragraph.**

92.

***ECW's login page used outdated and discontinued software.*** [redacted] making it incredibly susceptible to exploitation by a hacker or malicious actor.

**ANSWER: eCW admits that, during certain time periods potentially relevant to this complaint, its login page utilized the product described. eCW otherwise denies the allegations in this paragraph.**

93.

All of the vulnerabilities identified above are known in the industry and totally preventable. ECW could easily strengthen the security of its software and prevent its customers' patients' [redacted] information from being placed at unreasonably high security risks. ECW has knowingly and recklessly exposed its customers' patients' [redacted] information to unreasonably high security risks while lying to them—and the Government—by claiming its EHR software is secure and

not vulnerable to attack. It is astounding how vulnerable the most private information imaginable of *tens of millions* of people throughout the United States is to disclosure and misuse.

**ANSWER: Denied.**

***D. Examples of Some Additional Security Flaws Identified Since Relators Filed Their Initial Complaint.***

94.

Since Relators filed their initial Complaint, Relators have detected many security flaws in ECW's EHR software in addition to those Relators previously identified. Relators identified these problems by running free software audit tools available by download on the internet. The problems include the following:

**ANSWER: Denied.**

95.

***Susceptibility to*** [redacted]**.** Using nothing more than [redacted], a malicious actor could use a [redacted] to exploit vulnerabilities in ECW's EHR software and download any and all information on a healthcare provider's server—[redacted]

**ANSWER: Denied.**

96.

[redacted]

**ANSWER: eCW admits that the quoted language appears in the cited sources.**

97.

As Relators have determined, a hacker could use a [redacted] on [redacted] to impermissibly access PHI on a healthcare provider's server. [redacted]

**ANSWER: Denied.**

[28] Web Application Security Consortium ("WASC"), http://projects.webappsec.org/w/page/13246952/Path%20Traversal (last visited June 19, 2019).
[29] *Id.*

98.

Relators have also determined that a hacker could use a [redacted] to impermissibly access [redacted] contained on any server housing ECW's EHR software. This flaw is extremely serious given that ECW often runs EHR software for as many as 100 different healthcare providers on a single cloud-based server. As soon as a hacker is able to login as a minimum user to a practice hosted on any one of these cloud-based servers, the hacker could [redacted] access PHI and other data from ***all*** of the practices hosted on that server.

**ANSWER: Denied.**

99.

[redacted] Although patient data stored within ECW's EHR software has the outward appearance of being encrypted, ECW has recklessly and fraudulently put in place a so-called encryption system that violates universally accepted minimum data protection standards.

**ANSWER: Denied.**

100.

Encryption tools require the use of "pseudo-random number generators" or "PRNGs." PRNGs are a "piece of code [that] scrambles . . . plaintext in such a way

that the encoded text has no systematic means of conversion" back into the original text.[30] PRNGs are "[a]n important part" of encryption systems.[31] "It is well known that a lack of true randomness is a weakness smart code breakers can eventually exploit. So, it's important to have a solid PRNG . . . ."[32]

**ANSWER: eCW admits that the quoted language appears in the cited sources.**

101.

The key to a solid PRNG is its "seed." "A good PRNG ***always*** uses an ***unpredictable 'seed,'*** a number that begins the randomization process. . . . ***[I]t's essential to begin the process with a seed that a potential enemy cannot possibly guess.***"[33]

**ANSWER: eCW admits that the quoted language appears in the cited sources.**

[redacted]

[redacted]

30 Steven Levy, Wired Magazine, "Wisecrackers," available at https://www.wired.com /1996/03/crackers/ (last visited June 19, 2019).
31 *Id.*
32 *Id.*
33 *Id.* (emphasis added).

[redacted]

**ANSWER: eCW admits that, during certain time periods potentially relevant to this matter, it used the technique described. eCW otherwise denies the allegations in this paragraph.**

[redacted]

**ANSWER: eCW admits that its method is a design choice that is part of an array of measures the company takes to ensure the security of its software and the information on its servers. eCW otherwise denies the allegations in this paragraph.**

104.

***ECW's EHR software stores PHI locally.*** ECW's EHR software stores PHI—such as diagnostic tools used in connection with specific patients—"locally,"

meaning on the physical computer on which the PHI is created. The locally stored PHI is not encrypted. A person with access to one of these computers could access the files containing locally stored PHI regardless of whether that person was logged into ECW's EHR software.

**ANSWER: Denied. eCW also denies the amended version of this paragraph that the relators filed with the Court on December 12, 2022.**

105.

***ECW's EHR Software Utilizes a Completely Ineffective "Lockout" Rule.*** Departing from widely-accepted industry standards, ECW recklessly utilizes a "lockout" rule for login attempts that fails to meaningfully prevent malicious actors from accessing ECW user accounts. [redacted]

[redacted]

**ANSWER: Denied.**

106.

[redacted] This internal ECW practice, which flouts standard industry norms and basic common sense, demonstrates ECW's cavalier attitude towards information security. Relators have also experienced instances in which ECW's helpdesk technicians have recklessly copied the PHI of patients of healthcare providers with no affiliation to Relators' health care clients onto Relators' computers in violation of HIPAA and ECW's Business Associate Agreements with those healthcare providers.

**ANSWER: eCW admits that, during certain time periods potentially relevant to this matter, certain eCW employees who worked in user support**

**roles utilized a common (i.e., shared) username and password in the course of their employment providing user support to certain customers. eCW is without sufficient information to confirm or deny the allegation regarding what information the relators included in their disclosure statement to the Department of Justice. eCW otherwise denies the allegations in this paragraph.**

## VII. ECW's FALSE CLAIMS ACT VIOLATIONS

As detailed below, the security vulnerabilities contained in ECW's fatally flawed EHR give rise to ECW's FCA liability in several ways.

**ANSWER: Denied.**

### *A. ECW Has Caused and Is Causing Healthcare Providers Who Bill Federal Healthcare Programs to Falsely Certify Their Compliance with the HIPAA Security Regulations.*

107.

ECW has violated and is violating the FCA by causing healthcare providers to falsely certify compliance with federal laws and regulations material to Government payment.

**ANSWER: Denied.**

108.

Before a healthcare provider is permitted to submit claims electronically for government payment, the healthcare provider is required to execute an Electronic Data Interchange ("EDI") Enrollment Agreement. After executing the EDI

Enrollment Agreement, the healthcare provider is required to submit it to CMS via a Medicare Administrative Contractor ("MAC"). A blank EDI Enrollment Agreement is attached hereto as Exhibit C.

**ANSWER: eCW is without information sufficient to confirm or deny what a healthcare provider must submit before it may electronically remit claims for payment to CMS.**

109.

The EDI Enrollment Agreement requires the healthcare provider to make several express certifications to CMS. Relevant here, the EDI Enrollment Agreement requires the healthcare provider to expressly certify that the healthcare provider "will use sufficient security procedures (***including compliance with all provisions of the HIPAA security regulations***) to ensure that all transmissions of documents are authorized and ***protect all beneficiary-specific data from improper access***." Ex. C at 13 (EDI Agreement § A.11) (emphasis added).

**ANSWER: eCW is without information sufficient to confirm or deny what a healthcare provider must certify before it may electronically remit claims for payment to CMS.**

110.

In addition to this express certification, healthcare providers impliedly certify their compliance with the HIPAA security regulations when they submit a claim for

payment to CMS or one of CMS's contractors. Thus, compliance with the HIPAA security regulations is a condition precedent to payment by CMS and is material to CMS's decision to pay a claim. *See, e.g., United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*, No. 14-CV-1098, 2018 WL 319319, at *7 (N.D. Ill. Jan. 8, 2018).

**ANSWER: The allegations in the paragraph are legal conclusions to which no response is required.**

111.

Among other requirements, the HIPAA security regulations require healthcare providers to "[e]nsure the confidentiality, integrity and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits." 45 C.F.R. § 164.306(a)(1). The HIPAA security regulations also require healthcare providers to "[p]rotect against any reasonably anticipated threats or hazards to the security or integrity of" all electronic protected health information. 45 C.F.R. § 164.306(a)(2). No doctor or medical practice could possibly comply with those, and other, HIPAA security requirements when using ECW's EHR software.

**ANSWER: The allegations in the paragraph are legal conclusions to which no response is required. To the extent a response is required, eCW denies the allegations.**

112.

ECW licenses its EHR software to medical practices in Middle Georgia—and throughout the United States—who have executed the EDI Enrollment Agreement and have submitted claims for payment to federal healthcare programs.

**ANSWER: eCW admits that it has licensed its EHR software to medical practices in the Middle District of Georgia.**

113.

As described in the First Amended Complaint, the security vulnerabilities inherent in ECW's EHR software make it *impossible* for a healthcare provider using the software to ensure the confidentiality, safety, and integrity of Protected Health Information stored in ECW's EHR.

**ANSWER: Denied.**

114.

In causing the healthcare providers to both expressly and impliedly falsely certify compliance with the HIPAA security regulations, ECW fraudulently induced CMS and its contractors into permitting those healthcare providers to bill the Government for care provided to federal healthcare program beneficiaries. As a result, each and every claim submitted for government payment by a provider using ECW's EHR is a false claim, which ECW *caused* the provider to submit. *See, e.g.*, *Marsteller for use & benefit of United States v. Tilton*, 880 F.3d 1302, 1314 (11th

Cir. 2018) (holding that, under the FCA fraudulent inducement basis of liability, "subsequent claims are false because of an *original fraud* (whether a certification or otherwise)" (citation and quotation marks omitted)).

**ANSWER: Denied.**

***B. False Certifications Relevant to ECW's FCA Violations Involving Claims Under the Meaningful Use, Merit-Based Incentive Payments System ("MIPS"), and Physician Quality Reporting System ("PQRS") Programs.***

115.

In 2009, the federal Health Information Technology for Economic and Clinical Health Act ("the HITECH Act") was enacted into law.

**ANSWER: Admitted.**

116.

The HITECH Act created a certification program for EHR technology. The U.S. Department of Health and Human Services Office of the National Coordinator for Health Information Technology (commonly referred to as "ONC") administers the certification program and creates certification requirements for EHR vendors, such as ECW. Under the certification program, EHR vendors, such as ECW, are required to certify to agents of the federal Government called "authorized certification bodies" and "accredited testing laboratories" that the vendor's EHR technology satisfies ONC's certification requirements.

**ANSWER: Admitted.**

117.

The use of ONC certified EHR is critical to the ability of healthcare providers to participate in numerous federally funded payment programs, including the Meaningful Use, Merit-Based Incentive Payment System ("MIPS"), and Physician Quality Reporting System ("PQRS") Programs. ECW attested to the agents of the federal Government that ECW's EHR satisfies ONC's certification requirements. In so attesting, ECW obtained ONC certification for its EHR technology. ECW then represented to healthcare providers that "eClinicalWorks V10 meets the Complete EHR certification criteria as an integrated bundle of EHR modular products."[34]

**ANSWER: eCW admits that a physician's use of ONC-certified EHR is one qualification criteria for certain government programs. eCW further admits that its EHR software system is certified by the ONC and that the ONC has never suspended the certification or de-certified the software.**

118.

ECW has a page on its website stating that "eClinicalWorks V11 is a 2015 Edition ONC Certified Health IT Product."[35]

**ANSWER: Admitted.**

[34] ECW, Meaningful Use, https://www.eclinicalworks.com/resources/meaningful-use/meaningful-use-disclosure/ (last visited June 19, 2019).

[35] *See* https://www.eclinicalworks.com/resources/meaningful-use/ (last visited June 19, 2019).

119.

ECW's attestations and representations were and are ***false***. The purpose of ECW's false attestations and representations is clear – by falsely trumpeting its products as "certified" by ONC, when ECW knows or at the very least should know that its product does not meet applicable security requirements required for certification, ECW has greatly increased the sales of its EHR software and has made millions off of unsuspecting healthcare providers who purchased ECW's EHR software and then obtained payments from the government though programs such as Meaningful Use, MIPS, and PQRS.

**ANSWER: Denied.**

120.

ECW has violated the ONC's EHR certification requirements in numerous ways. By way of example only, ONC's EHR certification requirements demand that EHR technology be able to "[v]erify against a unique identifier(s) (e.g., a username or number) that a person seeking access to electronic health information ***is the one claimed***." 45 C.F.R. § 170.314(d)(1)(i) (emphasis added). The security flaws in ECW's software make it impossible for ECW to verify that the person seeking access to electronic health information is ***the*** one claimed because the flaws in the system allow unauthorized persons to discover existing usernames and passwords and to create new usernames and passwords as if they were an authorized user. Once an

existing username and password is discovered or a new username and password is created, an unauthorized user has complete access to all of the PHI for that practice group.

**ANSWER: Denied.**

121.

The ONC's EHR certification requirements also dictate that EHR technology must contain an "audit log" for purposes of "[r]ecord[ing]" certain specified "actions related to electronic health information,"[36] including "additions, deletions, changes queries, print[ing], [and/or] copy[ing]" of electronic health information.[37] To comply with the ONC's EHR certification requirements, the information recorded in the audit log must be "specific enough" to allow a healthcare provider "to clearly determine if data designated by federal or state law as requiring specific confidentiality protection [e.g., PHI] has been accessed."[38] The security flaws in ECW's software make it impossible for the audit logs in ECW's EHR software to reliably perform these functions. Relators have established that a malicious actor [redacted]

[36] 45 C.F.R. § 170.314(d)(2)(i)(A), (B).
[37] *See* ASTM International, E2147-01, Standard Specification for Audit and Disclosure Logs for Use in Health Information Systems, Standard 7.6 (incorporated by reference in the ONC certification requirements by 45 C.F.R. § 170.314(d)(2)(i)(A), 45 C.F.R. § 170.210(e)(1)(i), and 45 C.F.R. § 170.210(h)) [hereinafter ASTM International, E2147-01].
[38] ASTM International, E2147-01, Standard 7.7.

[redacted] can cause ECW's EHR software to provide the malicious actor with the [redacted] to the healthcare provider's ECW [redacted]. Using this information, the malicious actor could easily log [redacted] for any patient that has ever visited the healthcare provider. Because a malicious actor who accessed the healthcare provider's patient document server using this method would bypass the ECW application altogether, ECW's audit logs would completely fail to record any of the malicious actor's downloads, uploads, or alterations of patient records. Further, the audit logs themselves are subject to the same level of tampering.

**ANSWER: Denied.**

122.

The ONC's EHR certification requirements also mandate that "EHR technology [such as ECW's EHR] must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3rd party" specified PHI, including the "Common Clinical Data Set." 45 C.F.R. §170.314(e)(1)(i). The Common Clinical Data Set includes highly sensitive patient

information such as the patient's sex, date of birth, race, smoking status, medications, laboratory tests, vital signs, and care plan, among other information.[39]

**ANSWER: Admitted that the cited regulation requires an EHR to provide patients with an online means to view and transmit certain information, including the common clinical data set.**

123.

The ONC's EHR certification requirements further mandate that transmission of data such as the Common Clinical Data set "must be through a secure channel that ensures all content is encrypted ***and integrity-protected in accordance with the standard for encryption and hashing algorithms specified at [45 C.F.R.] § 170.210(f)***." *Id.* (Emphasis added.)

**ANSWER: Admitted that the quoted language appears in the cited regulation.**

124.

45 C.F.R. § 170.210(f) provides that "[t]he Secretary of [the U.S. Department of Health and Human Services ("HHS")] adopts the following standards to protect electronic health information created, maintained, and exchanged: . . . Any encryption and hashing algorithm identified by the National Institute of Standards

[39] *See* ONC, Common Clinical Data Set, available at: https://www.healthit.gov/sites/default/files/commonclinicaldataset_ml_11-4-15.pdf (last visited June 24, 2019).

and Technology (NIST) as an approved security function in Annex A of the FIPS Publication 140–2."

**ANSWER: Admitted that the quoted language appears in the cited regulation.**

125.

[redacted]

**ANSWER: Admitted that it is not expressly listed in Annex A of the FIPS Publication 140-2.**

126.

[redacted] ECW fails to "integrity-protect" PHI such as the Common Clinical Data Set "***in accordance with the standard for encryption and hashing algorithms specified at [45 C.F.R.] § 170.210(f)***." 45 C.F.R. §170.314(e)(1)(i)

---

[40] *See* NIST Annex A: Approved Security Functions for FIPS PUB 140-2, Security Requirements for Cryptographic Modules at 2, available at https://csrc.nist.gov/csrc/media/publications/fips/140/2/final/documents/fips1402annexa.pdf (last visited June 20, 2019).

(emphasis added). That failure means that ECW's EHR software does not comply with ONC's EHR certification requirements.

**ANSWER: Denied.**

127.

Additionally, ECW's EHR software stores ***unencrypted*** PHI "locally" on computers in healthcare providers' offices. This practice directly contravenes ONC's EHR certification requirements, which provide that PHI can only be stored locally *if* the PHI is encrypted. 45 C.F.R. § 170.315(d)(7)(i), (ii).

**ANSWER: Denied.**

128.

As described in the examples above, ECW's attestations and representations that its EHR software satisfied ONC's EHR certification requirements are knowingly false. ECW's false attestations and representations caused healthcare providers who used ECW's EHR software while participating in federally funded payment programs—such as Meaningful Use, MIPS, and PQRS—to submit false claims under those programs. These programs are described in more detail in the paragraphs that follow.

**ANSWER: Denied.**

**1. <u>Meaningful Use Incentive Payments</u>.**

129.

One of Congress's goals in enacting the HITECH Act in 2009 was to promote the adoption *and meaningful use* of *certified* EHR technology by healthcare providers.

**ANSWER: The allegation in this paragraph is a legal conclusion to which no response is required.**

130.

Congress intended to effectuate this goal by providing substantial monetary incentives to healthcare providers—referred to as "Eligible Professionals" under the law—who established their "meaningful use" of *certified* EHR technology (the "Meaningful Use" programs). The Medicare Meaningful Use program provided meaningful use incentive payments of as much as $43,720 *per* healthcare provider who established meaningful use of *certified* EHR technology. Those payments were made over a five year period ending in 2016. The Medicaid Meaningful Use program provides meaningful use incentive payments of as much as $63,750 *per* healthcare provider who establishes meaningful use of *certified* EHR technology. Those payments are made over a six year period ending in 2021.

**ANSWER: eCW admits that the Meaningful Use incentive program provided certain financial incentives to physicians who used ONC-certfied EHR technology and satisfied certain criteria.**

131.

A healthcare provider can receive meaningful use incentive payments *only after* attesting annually to the federal Government that the healthcare provider used *certified* EHR technology and met certain specified Meaningful Use objectives and measures.

**ANSWER: Admitted.**

132.

The only way a healthcare provider could know that it was using *certified* EHR technology was based on representations made by the EHR vendor, in this case ECW, that sold the EHR.

**ANSWER: Denied.**

133.

In light of the security vulnerabilities Relators have identified, ECW caused—and is causing—the submission of false claims. Because ECW's EHR software does not actually satisfy the ONC's EHR certification requirements, healthcare providers who use ECW's EHR are not entitled to federal incentive payments under the Meaningful Use programs. Any and all claims that a provider who uses ECW's

EHR submits for a federal incentive payment under the Meaningful Use programs are therefore false claims, which ECW *caused* the provider to submit.

**ANSWER: Denied.**

**2. Merit-Based Incentive Payment System ("MIPS") Enhanced Medicare Payments.**

134.

Although the Medicare Meaningful Use Program ended after 2016, it was largely replaced by aspects of the federal MIPS program.

**ANSWER: eCW admits that the MIPS program went into effect after the conclusion of the Meaningful Use program.**

135.

Hundreds of thousands of healthcare providers who submit claims to Medicare Part B are required to participate in MIPS.[41]

**ANSWER: eCW is without information sufficient to confirm or deny whether hundreds of thousands of healthcare providers are required to participate in MIPS.**

[41] *See, e.g.,* Medicare Program; Merit-Based Incentive Payment System (MIPS) and Alternative Payment Model (APM) Incentive Under the Physician Fee Schedule, and Criteria for Physician-Focused Payment Models, 81 FR 77008-01, 77014 (Nov. 4, 2016).

137.

Healthcare providers who participate in MIPS receive "positive payment adjustments" while non-exempted healthcare providers who do not participate in MIPS or do not satisfy governing MIPS criteria receive "negative payment adjustments." Payments adjustments range from negative 4% to positive 4%. The MIPS payment adjustments took effect in January 2019.

**ANSWER: eCW admits that the MIPS programs provide for certain payment adjustments to healthcare providers based on various criteria.**

138.

Whether a healthcare provider participating in MIPS receives payment adjustments depends on data the healthcare provider reports to CMS regarding various "performance categories."

**ANSWER: eCW admits that the MIPS programs provide for certain payment adjustments to healthcare providers based on various criteria.**

139.

One such performance category, which CMS originally referred to as "Advancing Care Information" but now refers to as "Promoting Interoperability,"[42] requires healthcare providers to use *certified* EHR. According to CMS, "[t]his

[42] CMS, Quality Payment Program, MIPS Overview, *available at* https://qpp.cms.gov/mips/overview (last visited June 19, 2019).

performance category replaced the Medicare EHR Incentive Program . . . commonly known as Meaningful Use."[43] This performance category counts as ***25 percent*** of a provider's final MIPS score.[44] Using "a certified EHR technology," such as ECW purports to be,[45] "to capture and report [] clinical data" also allows healthcare providers to "earn bonus point on top of [the provider's] performance score," which can "positively impact [the provider's] overall MIPS payment."[46]

**ANSWER: eCW admits that the MIPS programs provide for certain payment adjustments to healthcare providers based on various criteria. eCW further admits that one criteria is the use of ONC-certified EHR software.**

140.

The vast majority of healthcare providers who participate in MIPS saw their Medicare reimbursements increase and avoided negative payment adjustments beginning in January 2019 based on their 2017 MIPS data. As CMS reported in November 2018 shortly after Relators filed their initial Complaint, "93 percent of

---

[43] *Id.*
[44] CMS, Quality Payment Program, *available at* Promoting Interoperability (PI) Requirements https://qpp.cms.gov/mips/promoting-interoperability?py=2017 (emphasis added) (last visited June 19, 2019).
[45] *See, e.g.*, Office of the National Coordinator for Health Information Technology (ONC), Certified Health IT Product List Entry for eClinicalWorks, *available at* https://chpl.healthit.gov/#/product/4040 (last visited June 19, 2019).
[46] Quality Measures Reporting, *available at* https://www.healthit.gov/topic/federal-incentive-programs/MACRA/MIPS/quality-measures-reporting (last visited June 19, 2019)

MIPS eligible clinicians received a positive payment adjustment for their performance in 2017, and 95 percent overall avoided a negative payment adjustment."[47]

**ANSWER: eCW admits that quoted language appears in the cited source.**

141.

A healthcare provider can receive positive payment adjustments and avoid negative payment adjustments under MIPS *only after* attesting to the federal Government that the healthcare provider used *certified* EHR technology. The only way a healthcare provider could know that it was using *certified* EHR technology was based on false representations made by the EHR vendor, in this case ECW, that sold the EHR.

**ANSWER: Denied.**

142.

Relators know that many healthcare providers, including Relators' clients, have qualified for MIPS positive payment adjustments and avoided negative adjustments by representing that they satisfy the MIPS certified EHR requirement

---

[47] CMS Administrator Seema Verma, Quality Payment Program (QPP) Year 1 Performance Results**,** *available at* https://www.cms.gov/blog/quality-payment-program-qpp-year-1-performance-results#_edn1 (Nov. 8, 2018) (last visited June 19, 2019).

based on their use of ECW's EHR, which as established above, does not satisfy the ONC certification requirements. If the Government knew that ECW's EHR does not satisfy the ONC certification requirements, these healthcare providers would not be eligible for positive payment adjustments under MIPS. Indeed, these healthcare providers would likely be subject to negative payment adjustments.

**ANSWER: Denied.**

143.

Additionally, many of Relators' healthcare provider clients are members Georgia Physicians for Accountable Care ("GPAC"), which is an Accountable Care Organization ("ACO") "comprised of several groups of primary care and specialist physicians in Georgia."[48] GPAC and its member healthcare providers participate in MIPS as a group, which CMS allows.[49] When healthcare providers participate in MIPS as a group, "the group [] receive[s] the same payment adjustment based on the group's performance across all 4 MIPS performance categories," including the Advancing Care Information/Promoting Interoperability category.[50] If the Government knew that ECW's EHR does not satisfy the ONC certification

[48] *See* Georgia Physicians for Accountable Care, available at http://www.gpaco.org/ (last visited July 1, 2019).
[49] See CMS, Quality Payment Program, MIPS Individual or Group Participation, *available at* https://qpp.cms.gov/mips/individual-or-group-participation (last visited June 20, 2019) ("If you are Merit-based Incentive Payment System (MIPS)-eligible, you can choose to participate as an individual, a group, or both.").
[50] *Id.*

requirements, the entire group, which includes nearly 1,000 independent physicians, would not be eligible for positive payment adjustments under MIPS. Indeed, the entire group would be subject to negative payment adjustments.

**ANSWER: Denied.**

144.

ECW uses its ability to help physicians obtain MIPS upward payments adjustments to market its EHR software. The ECW website includes an entire page devoted to MIPS that describes the incentive payments available to providers who qualify for MIPS adjustments and promises to "work with individual and group practices to navigate the complex regulatory environment in the transition to value-based care."[51] ECW's representations that its EHR software can help healthcare providers obtain positive MIPS incentive payments are reckless and false.

**ANSWER: Denied.**

145.

In light of the security vulnerabilities inherent in ECW's EHR, ECW has caused and will further cause the submission of false claims by providers who receive positive payment adjustments under MIPS. Because ECW's EHR software does not actually satisfy the ONC's EHR certification requirements, healthcare

[51] *See* https://www.eclinicalworks.com/resources/macra/ (last visited June 20, 2019).

providers who use ECW's EHR are not entitled to positive payment adjustments under MIPS and likely should be subject to negative payment adjustments. Any and all claims that a provider who uses ECW's EHR submits to the federal government in 2019 (and thereafter) and for which the provider receives a positive payment adjustment (or avoids a negative payment adjustment) under MIPS is therefore a false claim, which ECW *caused* the provider to submit. Those claim amounts are in the millions at the very least.

**ANSWER: Denied.**

**3. Physician Quality Reporting System ("PQRS") Enhanced Medicare Payments.**

146.

Initiated in 2006, the Medicare Physician Quality Reporting System ("PQRS") is a voluntary quality reporting program that applies a "downward payment adjustment" to promote the reporting of quality information by healthcare providers (referred to under law as "eligible professionals") and group practices.

**ANSWER: eCW admits that CMS has a program called PQRS.**

147.

The PQRS program applies a downward payment adjustment to healthcare providers who do not satisfactorily report data on quality measures for covered Medicare Physician Fee Schedule (MPFS) services furnished to Medicare Part B Fee-for-Service (FFS) beneficiaries. For example, those healthcare providers who

reported satisfactory data for the 2016 program year avoided the 2018 PQRS downward payment adjustment.

**ANSWER: eCW admits that the PQRS program includes potential fee adjustments.**

148.

Healthcare providers taking part in the PQRS program are required to use ONC certified EHR software.[52]

**ANSWER: Admitted.**

149.

Healthcare providers who used ECW's EHR to avoid negative payment adjustments under PQRS were not entitled to do so because ECW's EHR, as established herein, is not actually ONC compliant.

**ANSWER: Denied.**

---

[52] *See* CMS, 2016 Physician Quality Reporting System (PQRS): Reporting Using an Electronic Health Record (EHR) Made Simple, Feb. 2017, available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/Downloads/2016PQRS_EHR_Made_Simple.pdf (last visited June 20, 2019) ("Individual EPs can avoid the 2018 PQRS payment adjustment by meeting the following criteria for satisfactory reporting:
1. Report on at least 9 measures covering at least 3 National Quality Strategy (NQS) domains
2. ***Use a direct EHR product that is CEHRT*** or EHR data submission vendor (DSV) that is CEHRT ['ONC Certified Electronic Health Records Technology']." (emphasis added)).

150.

ECW caused the submission of false statements material to false claims with respect to those providers who used ECW's EHR software to avoid negative payment adjustments under the PQRS program.

**ANSWER: Denied.**

***C. Corporate Integrity Agreement.***

151.

ECW is subject to a CIA with the Office of Inspector General of the U.S. Department of Health & Human Services ("OIG"). The effective date of ECW's CIA is May 30, 2017.

**ANSWER: eCW admits that it entered into a five-year CIA effective May 30, 2017.**

152.

Under ECW's CIA, ECW is required to pay "[a] Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) ***for each day*** ECW fails" in its "obligation[]" of "reporting of Reportable Events." CIA at pp. 59-60, X.A.1.o, Ex. A.

**ANSWER: eCW admits that the CIA included provisions regarding stipulated penalties for non-compliance with the CIA's requirements.**

153.

ECW's CIA defines "Reportable Event" to include "anything that involves . . . a matter that a reasonable person would consider a probable violation of applicable criminal, civil, or administrative laws and regulations or any applicable Federal health care program requirements for which penalties or exclusion may be authorized." CIA at pg. 46, III.L.1.c, Ex. A.

**ANSWER: eCW admits that the quoted language appears in the CIA.**

154.

ECW had an obligation—and has an ongoing obligation—to pay the government $2,500 in Stipulated Penalties per day due to the security vulnerabilities in ECW's EHR. A reasonable person would conclude that the security vulnerabilities in ECW's EHR—which ECW either knows about or is reckless in not knowing about—implicate "probable violations of applicable criminal, civil, or administrative laws and regulations." By way of example only, ECW is causing healthcare providers to submit false claims for Government payment in violation of the federal False Claims Act, an applicable civil law.

**ANSWER: Denied.**

155.

Because the security vulnerabilities have existed since before ECW entered the CIA, ECW's obligation to make Stipulated Penalty payments in the amount of

$2,500 per day began on May 31, 2017 and continues to this day. Upon information and belief, ECW has made no such Stipulated Penalty payments related to the fraudulent activities discussed herein.

**ANSWER: eCW admits that the OIG never demanded that eCW pay any stipulated penalties with respect to the supposed security vulnerabilities alleged in the relators' *qui tam* complaint. eCW otherwise denies the allegations in this paragraph.**

156.

Additionally, ECW's CIA also provides that ECW is subject to a "Stipulated Penalty of $25,000 for each instance in which eCW . . . [t]akes action, whether by enforcing a contractual right *or otherwise*, and whether by formal legal process *or otherwise*, that has the effect of restricting or prohibiting a customer's right to discuss problems with the EHR Software or eCW's services." CIA at p. 62, X(A)(10)(d) (emphasis added).

**ANSWER: eCW admits that the quoted language appears in the CIA.**

157.

ECW has "taken action" against persons who have reported problems with ECW's EHR software on behalf of ECW's customers. ECW has refused to listen to complaints of problems with its software and even has threatened to take retaliatory action against those who identify legitimate issues with the software.

**ANSWER: Denied.**

158.

Upon information and belief, ECW has made no Stipulated Penalty payments related to the fact that ECW has "taken action" against persons who have reported problems with ECW's EHR software on behalf of ECW's customers.

**ANSWER: eCW admits that OIG never demanded stipulated penalties for eCW supposedly taking "action" against persons who reported "problems" with eCW's EHR software. eCW otherwise denies the allegations in this paragraph.**

159.

ECW's failure to satisfy its obligation to make Stipulated Penalty payments violates the FCA, which prohibits "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). By failing to make Stipulated Penalty payments, ECW has "avoided" an "obligation to pay or transmit money or property to the Government," in violation of the FCA.

**ANSWER: Denied.**

**COUNT I**

160.

Relators re-allege and reincorporate paragraphs 1 through 160 as if fully set forth herein.

**ANSWER: eCW incorporates its answers to paragraphs 1 through 160.**

161.

This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

**ANSWER: Admitted.**

162.

As described above, the defendant caused the submission of false claims and made false statements material to false or fraudulent claims to the United States and agencies thereof.

**ANSWER: Denied.**

163.

As a result of the above-described conduct, claims received and payments made by the United States, including departments and agencies thereof, were induced by ECW's fraud.

**ANSWER: Denied.**

164.

By virtue of the acts described above, defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, and/or presented false or fraudulent claims to contractors, grantees, or other recipients seeking payment of money provided by the United States Government or to be reimbursed by the United States Government to be spent or used on the Government's behalf or to advance a Government program or interest.

**ANSWER: Denied.**

165.

The Government, unaware of the falsity of claims submitted or caused to be submitted by the defendant, paid and continues to pay the claims that would not be paid but for defendant's fraudulent conduct.

**ANSWER: eCW admits that the federal government has never suspended the ONC certification of eCW's EHR software or de-certified eCW's HER software. eCW further admits that the federal government has never denied any payments to a healthcare provider based on the supposed security vulnerabilities alleged in the relators' *qui tam* complaints. eCW otherwise denies the allegation in this paragraph.**

166.

By reason of defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**ANSWER: Denied.**

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray for judgment against the defendant as follows:

167.

That defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

**ANSWER: eCW has not violated the False Claims Act.**

168.

That this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $11,181 and not more than $22,363 for each violation of 31 U.S.C. § 3729, *et seq.*;

**ANSWER: eCW has not violated the False Claims Act.**

169.

That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

**ANSWER: eCW has not violated the False Claims Act.**

170.

That Relators be awarded all costs of this action, including attorneys' fees and expenses; and,

**ANSWER: eCW has not violated the False Claims Act, and so the relators are not entitled to an award of fees or costs.**

171.

That Relators recover such other relief as the Court deems just and proper.

**ANSWER: eCW has not violated the False Claims Act.**

* * * *

## DEFENSES

eCW asserts the following defenses pursuant to Federal Rule of Civil Procedure 8(c). eCW undertakes the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Further, eCW reserves the right to amend the Answer if additional defenses become apparent through the course of this action, and eCW reserves the right to assert any and all defenses as to which it does not bear the burden of proof.

### FIRST DEFENSE

The United States's claims, as brought by the relators, are barred, in whole or in part, under the doctrine of estoppel.

**SECOND DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, because the United States had actual or constructive knowledge of the relevant facts and elected to pay in full the healthcare providers using eCW's software.

**THIRD DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, because the United States failed to mitigate any alleged damages after it had knowledge of relevant facts and allegations.

**FOURTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, under the doctrine of waiver.

**FIFTH DEFENSE**

Penalties and treble damages authorized under the False Claims Act would so exceed any actual loss incurred by the United States here that the Act as applied would violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution and/or the Due Process Clause of the Fifth Amendment to the United States Constitution.

**SIXTH DEFENSE**

The United States's claims, as brought by the relators, are barred insofar as they rely upon provisions of the False Claims Act or underlying statutes and regulations that are too ambiguous to satisfy the Due Process Clause's fair warning requirement, either facially or as applied, or that would violate the First Amendment as applied.

**SEVENTH DEFENSE**

The United States's claims, as brought by the relators, are barred insofar as they rely upon administrative provisions, rules, guidance, or adjudicatory decisions that do not comply with the requirements of *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019).

**EIGHTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, by the statute of limitations.

**NINTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, by the release of claims to which the United States agreed as part of the settlement of *United States ex rel. Delaney v. eClinicalWorks, LLC,* Case No. 15-CV-00095 (D. Vt.).

**TENTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, by the False Claims Act's public disclosure bar.

**ELEVENTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, by the False Claims Act's government action bar.

**TWELTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, by doctrine of unclean hands insofar as the relators engaged in violations of state or federal law, or breached or interfered with eCW's customer contracts, in an attempt to discover the purported factual bases for their causes of action.

**THIRTEENTH DEFENSE**

The United States's claims, as brought by the relators, are barred, in whole or in part, because eCW's interpretation and implementation of the ONC's certification requirements was objectively reasonable.

Dated: January 6, 2023

Respectfully submitted,

*/s/* James W. Cobb

James W. Cobb
Georgia Bar No. 420133
jcobb@caplancobb.com
Julia Blackburn Stone
Georgia Bar No. 200070
jstone@caplancobb.com
Caplan Cobb LLC
75 Fourteenth Street N.E., Suite 2700
Atlanta, Georgia 30309
Tel.: (404) 596-5600
Fax: (404) 596-5604

Aaron Katz (*pro hac vice*)
akatz@aaronkatzlaw.com
Aaron Katz Law LLC
399 Boylston Street, 6th Floor
Boston, Massachusetts 02116
Tel.: (617) 915-6305

Geoffrey M. Wyatt (*pro hac vice*)
geoffrey.wyatt@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel.: (202) 371-7000
Fax: (202) 393-5760

Emma Notis McConarty (*pro hac vice*)
emma.notis-mcconarty@ropesgray.com
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
Tel.: (617) 951-7000

## CERTIFICATE OF SERVICE

I, James W. Cobb, hereby certify that a true and correct copy of the foregoing document was served on all parties' counsel of record through the CM/ECF system. A copy was also emailed to Department of Justice attorney Christelle Klovers.

James W. Cobb
James W. Cobb