UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, et al.<br><br>          Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>          Defendant. | CIVIL ACTION FILE<br><br>NUMBER 5:18-CV-382 |

## **RELATORS' MOTION FOR SANCTIONS**

Robert H. Snyder, Jr.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
Hannah D. Amanuel
  Georgia Bar No. 922743
  hannah@cannellasnyder.com
Alexandra "Sachi" Cole
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
Devin L. Mashman
  Georgia Bar No. 257588
  devin@cannellasnyder.com
Chase Lyndale
  Georgia Bar No. 183762
  chase@cannellasnyder.com


CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

Brian P. Adams
  Georgia Bar No. 142474
  brian@brianadamslaw.com
Mary Beth Hand
  Georgia Bar No. 322836
  mbhand@brianadamslaw.com

ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231

Anna Green Cross
  Georgia Bar No. 306674
  anna@crosskincaid.com
Meredith Kincaid
  Georgia Bar No. 148549
  meredith@crosskincaid.com

CROSS KINCAID LLC
315 W. Ponce de Leon Ave., Suite 715
Decatur, Georgia 30030
(404) 948-3022


**COUNSEL FOR RELATORS/PLAINTIFFS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND RELEVANT TO MOTION ..................................................... 7

        A.  eCW's Delays in Document Production.................................................. 7

        B.  Late and Incomplete Production of JIRA tickets.................................... 9

        C.  ███████████████████████████████████ .................................................. 16

III.    ARGUMENT ..................................................................................................... 21

        A.  Sanctions Under Rule 37(c) ................................................................. 21

        B.  Sanctions Under Rule 16(f) .................................................................. 25

        C.  The Court's Inherent Authority to Impose Sanctions............................ 27

IV.     eCW's CONDUCT WARRANTS SUBSTANTIAL SANCTIONS .............................. 28

V.      CONCLUSION ................................................................................................. 30

## I.    INTRODUCTION

On May 6, 2024, Relators contacted the Court raising two discovery disputes and seeking leave to file a motion for sanctions based on eCW's admitted failure to timely produce highly relevant evidence.  On May 14, 2024, the Court extended the case deadlines by 60 days and instructed Relators to file their motion if they believed that eCW had engaged in sanctionable conduct.  ECF No. 136.  While Relators and their counsel do not file this motion lightly, they regrettably believe sanctions are appropriate based on eCW's improper discovery conduct.[1]

As the Court knows, this long running False Claims Act case arises out of eCW's fraudulent attestations that its electronic health record (EHR) software meets federal security requirements.  After the Court unsealed this case in January 2022, eCW stated a desire to move forward quickly.  It even suggested that the docket in this District was more congested than in Boston, which it cited as one of the reasons the case should be transferred to eCW's home district.  ECF No. 49-1.  But since discovery started roughly 20 months ago, eCW has done seemingly everything it can to slow the case down to a crawl.  And while Relators have tried to push discovery forward, to let go of all non-critical disputes,[2] and to be forthright in discovery, eCW has engaged in improper gamesmanship by withholding crucial evidence that eCW now admits should have been produced long ago.

The worst of that withheld evidence relates directly to the security vulnerabilities at the core of this case.  As Relators have explained, eCW's software has grave security vulnerabilities that allow anyone with technical expertise to improperly access patient records.  eCW uses a

___

[1] Relators were delayed in this filing as they continued to review additional disclosures of evidence by eCW after the Court's May 14 Order granting Relators leave to file this motion. They have attempted to narrow the scope of the dispute but have not been able to resolve the core issue raised herein.

[2] Relators' counsel have had at least 16 conferences with eCW lawyers about the issues raised in this motion.

software called JIRA to track changes to the software's programming.  When a new issue is identified, eCW's programmers create a JIRA "ticket" that collects the company's work related to fixing (or not fixing) the issue.  Each ticket identifies the programmers who worked on the issue, has a timeline, comments from the developers, and, in some cases, uploaded attachments.  A screen shot of a redacted JIRA ticket is attached to this motion as Exhibit A.

As is common in cases like this one, Relators have been forced to depend on eCW's good faith in gathering and producing responsive evidence solely in eCW's possession.  In December 2022, eCW agreed to produce everything it produced to the Department of Justice (DOJ) during its investigation.[3]  For reasons that made no sense, eCW took over four months to produce those previously collected and numbered documents.  eCW also removed from those DOJ productions two JIRA files.  So, in March 2023, Relators formally requested eCW's entire JIRA server.  eCW refused, claiming that producing the entire server would be burdensome and would include many non-security tickets.  eCW denied then (and at other times until very recently) that it had produced its entire JIRA server to the DOJ.  In an effort to compromise, Relators spent months negotiating search terms for eCW to use to locate responsive JIRA tickets.  eCW also refused to produce the attachments to responsive JIRA tickets uploaded by eCW programmers (usually screenshots documenting the problem) and suggested that it could only produce excerpts from the tickets, not the full tickets themselves.

Relators reluctantly agreed to eCW's proposed limited productions, with leave to seek more evidence once they reviewed the production.  In August 2023, eCW produced over 150 spreadsheets that excerpted some data from the allegedly responsive JIRA tickets.  After determining those spreadsheets were both over and underinclusive, and largely unusable,

---

[3] ECF No. 100 at 5.

Relators again asked eCW to produce its entire JIRA server.  After several more months, eCW agreed but only after insisting on unnecessary modifications to the Court's protective order, to which Relators again reluctantly agreed.

In December 2023, nine months after Relators requested the full JIRA server and one week before Relators were required to produce expert reports about the software's security, eCW produced what it claimed was eCW's complete JIRA server.  ***That was not true.***  Instead, almost three months later, eCW suddenly claimed to have located additional JIRA tickets that allegedly had been "archived" and overlooked during the two prior productions.  That "overlooked" evidence included more than ***11,000*** JIRA tickets collected in a seven-year long project called "Security Enhancements/AppSec" that focused exclusively on security issues in the software.  It quickly became clear that eCW had withheld many other relevant tickets.

eCW's claim that the JIRA evidence was "archived" and overlooked was not true.  The AppSec tickets were visible to hundreds of eCW JIRA users and eCW programmers worked in the AppSec project up to and after eCW's allegedly "complete" December 2023 production.  Even worse, belatedly produced audit logs show that eCW employees ***deleted*** the entire AppSec project, as well as 32 other projects, from the December 2023 JIRA production before giving it to Relators.  eCW's lawyers now claim that even they were in the dark about these improperly withheld JIRA tickets.

eCW produced the withheld JIRA AppSec tickets in late February 2024, but given the press of other issues and case deadlines, Relators have not been able to fully review those tickets.  eCW's conduct denied Relators the ability to review key evidence materials through all of 2023 and the beginning of 2024 while Relators were preparing their expert reports and serving written discovery on eCW, the government, and third parties.  The disadvantage to Relators that eCW

3

caused by this blatant and willful discovery abuse is far-reaching and undeniable.

The improperly withheld JIRA tickets are just the tip of the iceberg. Since eCW's late revelation of improperly withheld JIRA tickets even more evidence of eCW's gamesmanship has come to light. eCW previously stated that producing attachments uploaded to the JIRA server—including screenshots of the code being edited and other documentation of the precise issue being addressed—was too burdensome to accomplish. After revealing the existence of the withheld JIRA tickets, eCW changed its story and produced relevant attachments in less than two weeks. Relators did not have all relevant JIRA attachments until after they had produced six expert reports about software security. Relators and their retained technical expert have not yet had the opportunity to fully review those attachments, and the full impact of the late disclosed material has yet to be determined.

Another example: eCW uses an automated code scanning tool called Contrast. Like the JIRA tickets, eCW ran word searches to locate relevant Contrast evidence and produced incomplete spreadsheets collecting that evidence in late December. But the withheld JIRA tickets proved how incomplete and unusable that production was by revealing Contrast evidence that eCW had not produced. After months of refusing to give Relators access to its Contrast materials and after this Court's May 14, 2024 letter Order, eCW finally provided Contrast access to the Relators at the end of June. But Relators did not have that access until after producing their expert reports and after they and their retained expert were deposed. While Relator Wheeler has only run high level searches of the server, he has found more than 40,000 entries relating to the exact types of issues Relators have disclosed in this case.[4] Obviously, Relators and their technical expert have not yet reviewed that evidence either and thus the full impact of

---

[4] Ex. B, Aug. 12, 2024 Decl. of Chris Wheeler Decl. ¶ 5.

the late disclosed material has yet to be determined.

The list goes on. eCW withheld other responsive documents requested by Relators, including: (1) ██████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████, (2) Design Specifications and Design Requirements for eCW versions 11.52.153 forward, and (3) automated certification test scripts that the company purportedly uses to test its software for compliance with federal regulations. Relators requested all those items in their original March 2023 requests, but did not receive them until after (1) figuring out they existed despite eCW's refusal to produce them, and (2) requesting them, *again*.[5]

eCW's improper gamesmanship has unquestionably wasted Relators time and resources over the last year. eCW's decision to wait a year (or more in some cases) to produce crucial evidence has caused a series of cascading problems. Without having access and an appropriate amount of time to review critical documents, Relators have served and responded to written discovery, served subpoenas on third parties, taken ten depositions, produced eight expert reports (seven directly related to withheld evidence), and submitted written questions to government agencies. Fact discovery is now closed. eCW has deposed all three Relators and one of their hired experts, with two more expert depositions in the coming weeks. Relators are now reviewing expert reports produced by seven eCW experts and will be deposing those seven, plus

---

[5] In an attempt to keep this motion to a manageable length, Relators have not raised several other issues, including eCW's practice of producing large volumes of documents on the night before depositions, its assertion of a baseless affirmative defense followed by refusal to provide support for the defense and then a sudden withdrawal of the defense after eighteen months; and eCW's ongoing attempts to paint Relators as bad actors for discovering eCW's fraud. As the Court knows, a motion about eCW's abuse of privilege designations also is pending. eCW's pattern of abusive discovery behavior has become undeniable.

eCW's technical expert, in the coming weeks.  And they must prepare rebuttal reports for some, or all, of those hired experts.  Every bit of that extensive work is affected by eCW's decision to withhold critical evidence.

Unwinding eCW's misconduct would essentially require Relators to stay all other activities so they can devote the time and resources necessary to study all that was belatedly withheld, to re-review evidence already reviewed with the context provided by the withheld evidence, and to continue to seek more documents that eCW has withheld.  That solution—more delay—only benefits eCW.  Instead of asking the Court to again delay this long running case, Relators instead ask the Court to sanction eCW for its improper withholding of key evidence.

eCW admits that it should have produced the withheld AppSec tickets long ago.  It has attempted to avoid sanctions since this Court authorized this motion by hurriedly producing materials that it claimed burdensome to collect or that didn't exist.  And for the first time in undersigned counsel's career, eCW invited Relators to send a monetary "demand" for attorneys' fees and expenses incurred because of this misconduct.  eCW's misconduct **has** caused Relators to incur substantial fees and expenses.  But eCW already must pay Relators' fees and expenses if it settles the case or pays a judgment.  31 U.S.C. § 3730(d)(2).  And allowing eCW to buy its way out of the mess it created by pre-paying fees and expenses it already must pay is a meaningless sanction.

Relators respectfully submit more is necessary.  As described below, the most fitting sanction is to preclude eCW from arguing or presenting evidence that its software met the federal certification requirements.  That sanction is well within the Court's authority, is directly related to the chaos eCW has caused by withholding crucial evidence about the software's development, and punishes eCW for its misconduct in a meaningful way.

## II.    BACKGROUND RELEVANT TO MOTION

### A.  eCW's Delays in Document Production

Since discovery started, eCW has dragged its feet in discovery.  The parties are supposed to be completely through fact discovery, but Relators have not received or reviewed all responsive materials.  As noted above, eCW agreed to produce everything it produced during the DOJ investigation without a request.[6]  But eCW took more than four months to produce those documents, even though it had reviewed and numbered the production before.

While waiting for that DOJ production, Relators issued their first document requests on March 29, 2023.[7]  Relevant to this motion, Relators sought:

- "a complete copy of the issue tracking systems (such as Jira, Bugzilla, etc.) used in eClinicalWorks versions 10.0.0 to the current version";

- "All documents sent to or received from any governmental entity (including ONC and DOJ) or governmental employee from October 16, 2018 to the present related to or referencing the matters alleged in this lawsuit including, but not limited to the Relators' allegations, the security of the eClinicalWorks' software, and ONC certification of eClinicalWorks' software;"

- "All documents sent to or received from the SQOO related to or referencing the matters alleged in this lawsuit including, but not limited to Relators' allegations, the security of the eClinicalWorks' software, and ONC certification of eClinicalWorks' software;" and

- "All documents related to or referencing the October 1, 2019 letter from HHS-OIG to eClinicalWorks and the administrative proceeding that followed."[8]

---

[6] ECF No. 100 at 5.

[7] Ex. C, Rels.' Mar. 29, 2023 document requests.

[8] ████████████████████████████████████████

7

Outside of source code productions, eCW did not begin producing new substantive materials until July 13, 2023 when it produced 250 pages of documents related to the government's October 1, 2019 stipulated penalties demand to eCW for repeated violations of its Corporate Integrity Agreement.  The parties regularly conferred about eCW's production schedule to attempt compliance with the agreed December 31, 2023 fact discovery deadline.[9] After production was underway, eCW informed Relators it needed through the end of 2023 to finish ***producing*** all responsive documents leaving no time for depositions or follow up—which caused the parties' first request for a discovery extension, ECF No. 113, which the Court denied. ECF No. 114.

On September 28, 2023, the parties requested a scheduling conference with the Court. eCW told Relators then that it had roughly 120,000 documents left to produce.[10]  At the October 2023 discovery conference, eCW told the Court it would largely be finished producing documents by the end of 2023 and would produce any straggling documents by the end of January 2024.  Relators reiterated to the Court that they did not want an extension but had to agree because they were waiting on additional documents from eCW and needed time to review the materials.  Based on those representations, the Court granted a 6-week extension of the then current deadlines, extending fact discovery through April 30, 2024.  ECF No. 119.

Despite eCW's representations, eCW's production was not largely done by year end.  On December 29, 2023, eCW produced around 10,000 documents.  Relators assumed that would be eCW's final large production.  To Relators' surprise, however, on January 7, 2024, eCW produced nearly 50,000 documents—its largest production of non-DOJ produced documents.

---

[9] ECF No. 100 at 3.
[10] That number wound was off by more than 100,000 documents. eCW produced more than 235,000 documents between September and February.

On February 1, 2024, eCW produced another 8,000 pages of materials and represented that it had "substantially completed" its responsive production.  In total, eCW produced more than 235,000 documents between September and February—almost double what it told Relators it would produce in that time.

eCW's drawn out production process slowed the case down and made it impossible for Relators to meaningfully determine whether all responsive documents had been produced.  That process is still ongoing.  eCW's massive late productions had exactly the result eCW wanted: Relators were forced to choose between delaying other discovery efforts, such as depositions, to review the late produced documents or move forward with discovery without a full opportunity to review the materials.  Relators opted to push the case forward while also trying to review the late disclosures.  They produced technical expert reports in December 2023 and January 2024, sent their first draft 30(b)(6) deposition notice to eCW on February 17, 2024,[11] and began talks to set expert depositions.

But, as described more fully below, on February 20, 2024, eCW told Relators that the company had failed to produce a large number of additional JIRA tickets.  Unraveling what eCW failed to produce and attempting to gather all withheld materials has been ongoing ever since.  Just since May 2024, eCW has made at least 12 more document productions, most happening after Relators learned in a deposition that even more responsive documents had been withheld.

### B.  Late and Incomplete Production of JIRA tickets

Since before discovery officially opened, Relators have been engaged in an extended attempt to obtain all JIRA tickets related to their claims.  A comprehensive timeline of relevant

---

[11] eCW even made the simple taking of a Rule 30(b)(6) deposition difficult by splitting the notice between six different witnesses.

events related to eCW's failure to produce JIRA tickets is attached to this Motion as Exhibit E. Relators' summary of those efforts is below.

Initially, Relators expected to see JIRA materials in the DOJ production that eCW had committed to producing as soon as discovery opened.  But there was no substantial JIRA evidence in the DOJ materials and when eCW produced its final installment of DOJ materials in April 2023, it unilaterally amended the parties' discovery plan by stating it would not produce to Relators several groups of files it had produced to the DOJ, including two JIRA files.  When Relators asked about those files, eCW stated that they were a subset of JIRA tickets, and not the entire database.

By then Relators had already requested a complete copy of eCW's JIRA server, so Relators did not insist that eCW also produce what it claimed was a limited JIRA production to the DOJ.  Relators then spent months conferring with eCW about its JIRA production, during which time eCW claimed the full server would be overly inclusive and difficult to produce. After months of conferring and a second confirmation that eCW supposedly had not produced its full JIRA server to the DOJ,[12] Relators agreed to eCW's proposal to produce selected JIRA ticket extracts using an agreed upon list of search terms.  In August 2023, five months after Relators initially requested the full JIRA server, eCW made its first, incomplete JIRA production.  That production consisted of 165 spreadsheets each containing between 20 and 1,000 entries.  The spreadsheets were nearly unusable because of their formatting and the number of columns.

After an initial review, Relators first requested all the comments and attachments to the

---

[12] Ex. F, Aug. 11, 2024 email from St. Amand to Snyder ("It is our understanding that some JIRA tickets were produced in connection with the DOJ production, but not the entire JIRA database.")

JIRA ticket extracts identified in the spreadsheets.  eCW refused, instead suggesting that Relators identify specific tickets for which they would like to see the comments and attachments. After attempting to do so, Relators notified eCW that the JIRA spreadsheets were underinclusive and did not include tickets related to issues alleged in Relators' complaint, including ███████████ ████████████████████.  Relators again requested a complete copy of the JIRA server with attachments and comments to build a searchable database of the materials.  In a meet and confer on October 26, 2023, eCW agreed to produce its entire JIRA server but again refused to provide the comments or attachments for all JIRA tickets.  After yet more conferring, on November 10, 2023, eCW agreed to produce the full server with comments if the parties entered an additional (and seemingly unnecessary) protective order approved by the Court.  eCW represented, again, that producing attachments would be burdensome.  Relators again compromised and agreed to the limited production and proposed order, which the Court entered on December 5, 2023.[13]

Finally, on December 7, 2023, eCW produced a single "entities.xml" file that was supposed to contain the "full" JIRA server with no attachments.  eCW produced this file nine months after Relators' initial requests and *one week* before the Relators' technical expert reports were due.  Despite that, Relators attempted to use that single file to create a full working copy of the eCW JIRA server, but could not do so.  Given the timing, Relators abandoned review of the JIRA production and produced their expert report a week later.  Relators' retained expert Dr. Eric Cole produced his report in early January, also without reviewing the December production.

Months later, on February 20, 2024, eCW informed Relators they had purportedly located additional JIRA tickets.  At first, eCW stated that the tickets had been "archived" and essentially forgotten by eCW.  eCW stated it would be producing the tickets as soon as possible along with

---

[13] ECF No. 120.

a "different format" of the December 2023 JIRA production requested by eCW's expert.  On February 28, 2024, eCW's counsel stated the withheld tickets was more than 11,000 JIRA tickets collected from the AppSec project, which was used for more than five years to house all security JIRA tickets.  eCW also disclosed that it had withheld other JIRA projects and agreed to provide Relators with a list.  eCW produced the 11,000 AppSec tickets, along with the "different format" of the December production later that day.  As described below, the "different format" included two files, instead of the single file eCW produced in December.

After a year of JIRA ticket discussions, Relators were shocked to learn that all the withheld tickets related to security issues.  Relators also learned that the AppSec project had not been "archived" as initially described, but its name had simply been changed to "retired/ inactive."  The project remained visible to any eCW JIRA user working in the system, including hundreds of eCW developers.  On March 5, 2024, Relators requested the attachments to the withheld AppSec tickets.  Despite claiming that producing ticket attachments was burdensome, eCW produced those attachments *nine days later*.

In light of eCW's repeated false representations, on March 25, 2024, Relators again demanded a complete copy of eCW's JIRA server, with all comments, attachments, and projects included, so Relators could review and confirm there were no other relevant, responsive materials being withheld.  On March 27, 2024, eCW again agreed to provide Relators a full copy of its JIRA server, but again refused to produce attachments.  During that conference and despite its prior representations, eCW admitted for the first time that it had produced its entire JIRA server, including the withheld AppSec tickets, to the DOJ.[14]

---

[14] Since then, eCW has produced the two .xml files that it previously withheld from production. Relators have confirmed that those files were provided to the DOJ and included the entire eCW JIRA server, including the projects that were withheld from the Relators.

Unlike the December production which contained only a single entities.xml file, the February and March JIRA productions each contained two .xml files: an activeobjects.xml and an entities.xml.  Relators now know that when JIRA exports files it does so in those two files and that both are necessary to create a fully usable database.[15]  So when eCW made its December 2023 production that it claimed was a full copy of its JIRA server, eCW had purposefully removed one of the two files necessary to build a working database.

The withheld activeobjects.xml also contained the audit logs from the December 2023 production.  Those logs showed that days before the December production, an eCW employee manually deleted 33 projects from the production, including the AppSec project, before providing the file to Relators.  In addition to the AppSec project, eCW deleted other relevant projects such as "Regulatory Requirements," "APU," "EBO," "Kiosk," and "Faxing."[16]  The log shows that the projects were deleted at a regular pace of just a few minutes each with two major exceptions.  Both the AppSec and Regulatory Requirements projects had gaps of around an hour before each was deleted.[17]  eCW's designated witness could not explain those time gaps, but they suggest that eCW put significant thought into deleting these two clearly relevant projects.

The AppSec project tickets and later productions also showed that eCW had integrated other applications and data sources into its JIRA server in a way that was not previously obvious. These include SonarQube, which eCW used to detect and help remediate security problems, and

---

[15] Ex. G, May 31, 2024 Wheeler Supp. AppSec summary, at ¶ 14.

[16] . Each is relevant to Relators' discovery requests.

[17] Ex. G, Wheeler Supp. AppSec summary at 5.

DevDocs, which is a repository of functional testing documentation.[18]  All the applications are available in the JIRA server's Application Navigator which contains a pull-down menu of external systems accessible to eCW developers.[19]  Many are directly integrated into eCW's JIRA server and are necessary to understand how eCW was analyzing, reviewing, and resolving (or not resolving) security issues.  Like the deleted projects and audit logs, eCW's December 2023 production also deleted the Application Navigator.

Given the foregoing, Relators added a 30(b)(6) deposition topic on eCW's document productions and the withheld AppSec project, which Relators took on April 17, 2024.  Rather than producing an eCW employee to testify, eCW produced James Mittenthal, a professional testifier who works for eCW's discovery vendor, Triality.  Mr. Mittenthal has testified in matters for Skadden Arps—one of eCW's law firms—roughly 30 times, with half defended by one of eCW's lawyers in this case.[20]  Mr. Mittenthal is often brought in to testify on behalf of defendants accused of discovery misconduct.[21]  Unsurprisingly, in all those cases, Mr. Mittenthal concluded the defendants had done nothing wrong.[22]  And despite another Triality employee working with eCW since discovery started, Mr. Mittenthal did not become involved until March 2024 when eCW asked him to testify as its corporate representative.[23]

Relators' 30(b)(6) notice required eCW to produce a witness to testify about all aspects of the AppSec project, not just eCW's decision to withhold its production.  Instead of designating

---

[18] Relators had limited their requests to security testing, but did not know then that eCW was using functional testing in connection with security JIRA tickets.
[19] *Id.* at 8-10.  This includes: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████
[20] See Ex. H, Excerpts of April 17, 2024 Dep. of eCW through James Mittenthal at 20:14-24.
[21] *Id.* at 31:18-34:13.
[22] *Id.*
[23] *Id.* at 22:16-24.

the eCW employee involved in the JIRA productions, eCW designated Mr. Mittenthal.[24]

Unsurprisingly, he was unprepared.  Mr. Mittenthal did not know:

- who created the AppSec project;[25]
- whether there were documents discussing the creation of the AppSec project;[26]
- the types of tickets that were included in the AppSec project;[27]
- who decided which tickets went into the AppSec project;[28]
- who decided to "retire" the AppSec project;[29]
- how the decision to "retire" the AppSec project was communicated;[30]
- how the AppSec project name was changed from active to "retired"[31]
- when the AppSec project was last accessed by an eCW employee;[32]
- what work was done on tickets within the AppSec project after it was retired;[33]
- who at eCW ran the terms searches to retrieve and produce the August 2023 JIRA information to Relators;[34]
- how and when eCW determined which JIRA projects were relevant;[35]
- who deleted the AppSec project from the December 2023 production version of JIRA to be produced to Relators,[36]
- why there was a gap in time in deleting various projects from the production version of JIRA to be produced to Relators,[37]
- or why there were deleted comments and work logs in the entities .xml file produced to Relators.[38]

Even now, after many conferences, hurried supplemental productions, and a 30(b)(6) deposition, eCW has disclosed very little about the AppSec project and no believable reason for withholding it.  Some things have, however, come into focus.  eCW's claim that the company

---

[24] Ex. I, Rels.' 30(b)(6) Notice to eCW, Topic No. 15.
[25] Mittenthal dep. at 107:19-108:1.
[26] *Id*. at 108:15-25.
[27] *Id*. at 111:4-14.
[28] *Id*. at 113:6-24.
[29] *Id*. at 123:10-24.
[30] *Id*. at 124:4-9.
[31] *Id*. 83:13-25.
[32] *Id*. at 128:25-129:5.
[33] *Id*. at 131:2-4.
[34] *Id.* at 76:8-13.
[35] *Id*. at 103:9-104:25.
[36] *Id*. at 170:11-21.
[37] *Id*. at 171:11-24.
[38] *Id*. at 173:2-8.

"forgot" about the AppSec project because it was supposedly "retired" in February 2020 is just

wrong.[39]   The following facts are undisputed:

- Despite its representations, eCW produced its entire JIRA server, including AppSec, to the DOJ in 2019;[40]

- The same eCW employee who was consulted to produce the JIRA server to the DOJ, including the AppSec project, was consulted about producing the JIRA server to Relators;[41]

- Hundreds of eCW JIRA users had access to the AppSec project and would have seen it by simply clicking the drop-down menu for "projects" on their JIRA home screen;[42]

- Between February 2020 when the project was supposedly "retired" and March 2023, when Relators served their first discovery, 682 eCW JIRA users made 42,813 changes to AppSec tickets;[43]

- Between March 2023 and November 2023, 16 different JIRA users made 385 changes to AppSec tickets;[44] and

- Just weeks before eCW's December 2023 JIRA production, an eCW project manager named Mark Rowan ran a search in the JIRA server looking for tickets in the AppSec Project with the tag of "security" or "AppSecurity" and then shared the results of that search with *all* eCW JIRA users.[45]

Relators' first document requests to eCW sought documents sent to any government

entity or the SQOO related to certification of eCW's software, as well as all documents related to

the administrative proceeding filed by HHS-OIG against eCW in 2019.  Relators now know that

---

[39] *Id.* at 126:5-9; 136:7-13 (testifying eCW "in essence, forgot that, neglected that there was an old code that had been discontinued… and simply didn't think to include that in the search"). Mr. Mittenthal couldn't say who supposedly "forgot" about the AppSec tickets claiming it was a "collective" forgetting. *Id.* at 138:10.

[40] *Id.* at 64:23-65:4.

[41] *Id.* at 66:11-23, 101:17-102:12, 182:19-183:16.

[42] Ex. J, Redacted Project View Screen Shots (screen shots showing steps to see JIRA projects); Mittenthal Dep. at 127:19-24.

[43] Wheeler Decl. at ¶3, Ex. 1.

[44] *Id.* ¶4, Ex. 2.

[45] Mittenthal Dep. at 145:10-147:18.

eCW improperly withheld production of responsive documents related to those requests as well. After paying $155 million to settle its first FCA case related to fraudulent EHR certifications, *U.S. ex rel Delaney v. eClinicalWorks, LLC*, eCW entered into a Corporate Integrity Agreement with HHS-OIG.  Part of that agreement required eCW to retain a SQOO to ensure that eCW adhered to software standards and practices.[46]  eCW selected Quandary Peak as its SQOO and the SQOO began its work in 2017.

In its first production of newly gathered documents, eCW produced some pleadings from the administrative proceeding, but nothing else.  In May 2023, eCW served subpoenas on HHS Office of the National Coordinator for Health IT (ONC), who began producing documents in the late summer of 2023.



---

[46] *See* Ex. K, eCW CIA at 28-33.
[47] *See* Ex. D,
[48] Ex. L,
[49] eCW now claims that it did not interpret Relators' requests to include communications on this topic.  eCW says it has more documents to produce and the parties are conferring on how to handle that issue.





[58] *Id.* at 140:8-17. ██████████████████████████████████████████████████████

[59] ████████████████████████████

[60] *See* Ex. P, May 24, 2024 Snyder Discovery Email to Court.

[61] See Ex. Q, ██████████████████████████████████

[62] *Id.*

[63] *Id.* at 2-3.

[64] *Id.* at 15.

[65] *Id.* at 10, 13.

[66] ████████████████████████████████████████████████
██████████████████████████ Again, Relators had to make a supplemental request to get those documents.

19

███████████████████████████████████████████████████

████████████████████████████████████

      ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

      This is yet another example of gamesmanship eCW has engaged in.  Good faith and

Relators' discovery requests required eCW to produce ███████████████████

███████████████████████████████████████████████

███████████████  eCW simply refused to produce it.  ███████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

---

[67] *Id*. at 8.
[68] *Id*. at 5.
[69] In its transfer motion, eCW stated it intended to call SQOO team members as witnesses about their close monitoring of eCW's software since 2017. ECF No. 49-1 at 17-18.  Additionally, in its motion to dismiss, eCW argued the SQOO had access to eCW's source code so any vulnerabilities would have been discoverable to the SQOO before this case. ECF No. 69-1 at 28-29.

███████████████████████████████████████████████████

██████████████████

## III.    ARGUMENT

The "[C]ourt has broad discretion to control discovery." *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993).  eCW improperly withheld evidence and made it impossible for Relators to complete necessary work in this complex case.  eCW's abuses have been continuous, are ongoing, and have and are actively interfering with discovery in this case.  For these reasons, Relators ask this Court to sanction eCW for its egregious misconduct and abuse under Rules 37(c), 16(f), and the Court's inherent powers.

### A.  Sanctions Under Rule 37(c)

District courts have "broad authority under Rule 37 to control discovery, including dismissal as the most severe sanction." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999).  "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to [ensure] the integrity of the discovery process." *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982).  Under Fed. R. Civ. P. 37(c), "[i]f a party fails to provide information … as required by Rule 26(a) or (e) … the court may "order payment of the reasonable expenses," "inform the jury of the party's failure," and "impose other appropriate sanctions, including [those in] in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c)(1); *see also* Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii) (authorizing issue preclusion sanctions).

Rule 26(e) "addresses [a party's] obligations to supplement disclosures and discovery responses, including its responses to [] document requests." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1355 (N.D. Ga. 2012), *modified sub nom.* No. CV 1:09-MD-2089-TCB, 2012 WL 12952328 (N.D. Ga. July 18, 2012).  The Rule does not forgive a failure to conduct an adequate and complete search for responsive documents, nor does it grant

21

parties "a right to produce information in a belated fashion." *Id.* at 1257; *see also SCADIF, S.A. v. First Union Nat'l Bank*, 208 F. Supp. 2d 1352, 1379 (S.D. Fla. 2002) ("[A] failure to timely produce known, requested and discoverable documents is one that cannot be dismissed lightly, even where the failure is the result of mere carelessness.").

A court may impose sanctions under Rule 37 for a party's failure to supplement its disclosures and discovery responses if the failure was not "substantially justified or is harmless." Fed. R. Civ. P. 37(c). A party's discovery conduct is only substantially justified if it "is a response to a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *DeVaney v. Cont'l Am. Ins.,* 989 F.2d 1154, 1163 (11th Cir. 1993)(internal quotation marks and citation omitted). "A discovery mistake is harmless if it is honest, and is coupled with the other party having sufficient knowledge that the material has not been produced." *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F.Supp.2d 1297, 1308 (N.D. Ga.2003). "Whether the opposing party suffered prejudice underlies the harmlessness determination." *Pitts v. HP Pelzer Auto. Sys., Inc.*, 331 F.R.D. 688, 692 (S.D. Ga. 2019). Critically, "[t]he nondisclosing party bears the burden of establishing that the failure to disclose was substantially justified or harmless." *Eckhardt v. United States*, No. 5:19-CV-00266-TES, 2022 WL 16841587, at *2 (M.D. Ga. Nov. 9, 2022). For all sanctions under Rule 37, the Court need not find bad faith unless it "imposes the most severe sanction – default or dismissal." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994). Thus, "[a] court may impose lesser sanctions without a showing of willfulness or bad faith on the part of the disobedient party." *Id.*

Here, eCW's belated production of the AppSec JIRA tickets is neither harmless nor substantially justified. This was not an honest mistake on eCW's part. eCW knew this case was

22

about the security of the software and knew that the JIRA tickets were at the heart of this case. The company knew about the AppSec project, as well as other relevant JIRA projects, and made an intentional choice to withhold production of the materials. Every eCW programmer who had access to JIRA server could go into the system, click on the projects tab at the top of the page, and see the existence of the AppSec project. And it is undisputed that hundreds of eCW programmers worked in the AppSec project after the company knew about this case. eCW even concealed the existence of these critical tickets from its own lawyers.

Even if eCW could credibly claim that the company "forgot" about the AppSec project, the withheld audit logs prove that eCW *manually* deleted the AppSec project and 32 others from eCW's JIRA server four days before it was produced to the Relators in December 2023.[70] eCW also removed the file from that production needed to create a working database and that also would have revealed the deleted projects.

Relators did not know about the AppSec project or that it was withheld so eCW's failure to produce it is not harmless. eCW agreed to produce a complete copy of its JIRA server to Relators, but never disclosed that it had deleted 33 projects from the server when it made the allegedly "complete copy" of the JIRA database in December 2023, or that one of those deleted projects was a long running security project. "The willful exchange of information is the nucleus of discovery, and trust that opposing parties will disclose relevant information is essential." *Pitts*, 331 F.R.D. at 693. Relators also would have known about the AppSec project if eCW had not removed JIRA files produced to the DOJ when it made its productions in this case, and then misled Relators by stating that the removed fields were not a complete copy of the server. Relators trusted that statement to be true when they decided to seek relevant JIRA materials

---

[70] Ex. G, Wheeler Suppl. APPSEC Summary, ¶ 22.

through the discovery process in this case.

eCW has no argument that it was justified in failing to produce the AppSec tickets. At all times, the AppSec tickets were in eCW's possession, plain to see on the screen of every eCW JIRA user. The parties extensively conferred about the production of JIRA tickets for nearly 8 months before the December 2023 production. eCW and its lawyers had more than enough time conduct a reasonable search of its system. A reasonable search of its system would require eCW to review the projects within its JIRA server to determine if any were relevant, and to review the relevant materials produced to the DOJ to ensure all those materials were being provided to the Relators, or at least accurately described.

The same is true for eCW's refusal to produce attachments to its JIRA tickets and access to its Contrast server. Relators had no access to those materials until after they produced their expert reports and had been deposed ███████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████. The list goes on, but the pattern is the same: eCW not only failed to disclose highly relevant evidence, but did so while actively misleading Relators and Relators' counsel. eCW's conduct is inexcusable. That is likely why eCW's lawyers invited Relators to make a demand for fees and expenses related to this issue.

eCW's failure to produce these documents has prejudiced Relators by causing significant delay and disruption in this litigation. *Malautea*, 987 F.2d at 1540-42 (delay in producing documents warranted default sanction). The parties are now 20 months into this laborious discovery process and Relators have only recently gained access to critical documents. But those productions came after expert reports and depositions and cannot unwind the time wasted and

24

lost.  It also does not make up for the hours spent reviewing JIRA tickets unrelated to Relators' claims, conferring with eCW about how to search its own JIRA database, and waiting for eCW to finally make a usable production.  If eCW had produced these documents when requested, they would have guided Relators' discovery and given them ample time to review crucial documents before submitting expert reports and beginning depositions.  eCW's conduct has robbed Relators of that opportunity.  Sanctions are appropriate under Rule 37(c).

### B.  Sanctions Under Rule 16(f)

Under Rule 16(f) a court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), "if a party of its attorney … fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1)(C).  Sanctions under Rule 16(f) are "designed to punish lawyers and parties for conduct which unreasonably delays or otherwise interferes with the expeditious management of trial preparation."  *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985).  While a default sanction requires a finding of willfulness or bad faith, "[a] court may impose lesser sanctions without a showing of willfulness or bad faith."  *Andrews v. Autoliv Japan, Ltd.*, No. 1:14-CV-3432-SCJ, 2019 WL 13040493, at *3 (N.D. Ga. Sept. 10, 2019), on reconsideration, 2020 WL 10969020 (N.D. Ga. May 4, 2020) (citation and internal quotation marks omitted).  "[D]istrict courts have discretion to decide if there is a pattern of delay … that justifies a sanction."  *United States v. Samaniego*, 345 F.3d 1280, 1284 (11th Cir. 2003).

This Court entered its Scheduling Order in January 2023 setting the completion of fact discovery for December 31, 2023.[71]  As explained above, eCW has flouted the Court's Scheduling Order since discovery started.  eCW took months to produce materials it had reviewed, numbered, and produced to the DOJ.  And when it did so, it removed files,

---

[71] ECF No. 100 at 3.

renumbered the documents, and then misled Relators about what it had removed.  The bulk of

eCW's production related to Relators' discovery requests and its custodial productions did not

begin until the end of September 2023.  Between September 29 and December 29, 2023, eCW

produced about **1,427,000** pages of materials responsive to Relators' discovery requests.

Relators could do nothing but try to digest the hundreds of thousands of pages they were

receiving in the final three months of the fact discovery period.  eCW's delayed productions

required a discovery extension.  But even after that extension,[72] eCW continued to inexplicably

delay its productions.  It produced nearly half a million pages of materials in January 2024 alone.

Despite having no time to review those materials, Relators tried to push forward by sending

deposition notices and offering their experts for deposition in late February, which eCW rejected.

That rejection also required the parties to seek a modification of the fact discovery deadline,

which the Court granted, pushing the fact discovery cut off to May 31, 2024.[73]

But one week after the Court granted that extension, eCW revealed that it had concealed

the AppSec JIRA project and many other documents.  That revelation exploded the Scheduling

Order.  Even so, Relators made every attempt to meet the revised fact discovery deadline.  They

began depositions, all while trying to review eCW's belated productions and conferring with

eCW about the withheld JIRA evidence.  When it became clear that eCW's concealment made it

impossible, again, to meet the fact discovery deadline, Relators emailed the Court requesting

guidance.  As a result, the Court granted a 60-day extension, moving the fact discovery deadline

to July 30, 2024.[74]

It is now August, after the fact discovery cutoff.  Relators have not fully reviewed the

---

[72] ECF No. 119.
[73] ECF No. 135.
[74] ECF No. 136.

belated and withheld productions.  They have been forced to proceed without crucial evidence, or adequate time to review that evidence, and will continue to do so as they work through the last months of discovery.  As noted above, those months include deposing and rebutting at least 8 eCW experts, defending their own experts, and now deposing at least one governmental entity.

The Court's Scheduling Order was not a suggestion that eCW could ignore.  *See Rice v. Barnes*, 201 F.R.D. 549, 551 (M.D. Ala. 2001) ("The court does not enter scheduling orders merely to create paperwork for the court's staff."); *see also Robson v. Hallenbeck*, 81 F.3d 1, 4 (1st Cir. 1996) ("Calendars are simply too crowded for parties to treat scheduling orders as optional.").  eCW's concealment of crucial evidence, and its consistent refusal to produce relevant evidence violated the Court's Scheduling Orders, and has caused unnecessary delay and prejudice to Relators.  As such, sanctions are also appropriate under Rule 16(f).

### C.  The Court's Inherent Authority to Impose Sanctions

Courts also have an "inherent authority to control the proceedings before [them], which includes the authority to impose 'reasonable and appropriate' sanctions."  *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002).  "District courts have inherent power to sanction a party for bad faith, vexatious, wanton, or oppressive conduct."  *N. Am. Factory for Technologically Advanced Aircraft, LLC. v. Weatherly Aircraft Co.*, No. 1:10-CV-037 (WLS), 2016 WL 11020711, at *5 (M.D. Ga. Mar. 31, 2016).  A party acts in bad faith when it engages in "delaying or disrupting the litigation or hampering enforcement of a court order."  *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006).  The Court "makes a determination of bad faith by drawing inferences from the conduct before it."  *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001).

Even if the Court concludes that eCW's conduct is not sanctionable under the above

Federal Rules, the Court may still impose sanctions under its inherent power. Relators will not repeat everything that has already been described above. In short, eCW withheld production of crucial evidence, misled Relators and Relators' counsel about prior productions and alleged difficulties in producing evidence, intentionally deleted responsive materials, and then produced a professional testifier unable to answer Relators' questions about all those issues. eCW has acted in bad faith.[75] And sanctions also are appropriate under the Court's inherent power.

## IV.   eCW'S CONDUCT WARRANTS SUBSTANTIAL SANCTIONS

District courts are afforded substantial discretion in deciding whether and how to impose sanctions under the Federal Rules. *E.g., Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982); *Malautea.*, 987 F.2d at 1542 (discretion to strike answer). Rule 37 provides a non-exhaustive list of sanctions that a district court may impose including: issue preclusion, striking pleadings; or assessing reasonable attorneys' fees and expenses. Fed. R. Civ. P. 37(b)(2). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 2, 44-45 (1991).

The Court's inherent power to impose sanctions also carries with it broad discretion in setting the appropriate sanction. *Power Guardian, LLC v. Directional Energy Corp.*, No. 5:12-CV-236 MTT, 2013 WL 3893391, at *3 (M.D. Ga. July 26, 2013). That includes the discretion to grant issue preclusion sanctions in circumstances like these. *Bates v. Michelin N. Am.*, 2012 WL 453233 at *1 (N.D. Ga. Jan. 13, 2012) (granting issue preclusion that tire was defective and

---

[75] Relators have not focused on counsel's conduct. When confronted with allegations of hidden evidence defense lawyers often attempt to shift the blame to themselves to avoid sanctions. While counsel could have done more to confirm what eCW was telling them, Relators have no reason to think their false statements were anything other than being "the innocent lamb which the defendant[] led to the slaughter." *Malautea*, 987 F. 2d at 1543, n. 8 (considering lawyer misrepresentations in context of sanctions).

failed because of its defective condition).  In *Bates*, the court based its sanctions on a "pattern of subterfuge and withholding relevant and responsive documents until [p]laintiffs are forced to seek the Court's intervention" and ruled "this pattern of prejudicial discovery abuse" warranted a finding that defendant willfully violated the court's orders.  *Id.; see also Insurance Corp. of Ireland,* 456 U.S. at 697 (affirming sanction establishing in personam jurisdiction based on failure to comply with discovery orders).[76]

As a sanction for eCW's refusal to comply with its discovery obligations, continued misrepresentations about those failures, and for making adherence to this Court's Scheduling Orders impossible, Relators request that the Court enter issue preclusion sanctions and rule: (1) it is established that eCW's software did not meet the ONC certification requirements and thus was ineligible for use in federal incentive programs; and (2) eCW is precluded from presenting any evidence or argument that its software was properly certified.  eCW's ongoing abuses have prejudiced Relators' attempts at the orderly, effective development, and proof of their case, as well as the integrity of the legal process.  *Id*. at 24.  Because the withheld evidence is at the heart of Relators' claims, an order establishing that eCW's software is uncertifiable is narrowly tailored to eCW's abuses and is appropriate. *Bates*, 2012 WL 453233, at *23.

Realtors respectfully submit that something more than a fees and expenses award is necessary here.  As an FCA case, attorney's fees and expenses are mandatory if eCW settles or

---

[76] *Sitelock, LLC v. GoDaddy.com, LLC*, 562 F. Supp.3d 283, 323 (D. Ariz. 2022) (failure to disclose defense was harmful and supported precluding party from pursuing defense); *Chilcutt v. U.S.*, 4 F.3d 1313, 1321 (5th Cir. 1993) (sanction establishing prima facie case just and fair); *Voyager Indemn. Ins. Co., v. Zalman, Inc.,* 668 F. Supp. 3d 990, 1000 (C.D. Cal. 2023) (exclusion of subcontract appropriate sanction for failure to timely produce); *Baring Industries. Inc. v. 3 BP Property Owners, LL*C, 580 F. Supp.3d 41, 53 (S.D. N.Y. 2022) (withheld evidence would prejudice party if admitted and additional costs of supplemental discovery would prejudice other party).

pays a judgment.  31 U.S.C. § 3730(d)(1).  Thus, awarding fees and expenses would simply eCW to pay something that it already owes.   That is no punishment.  And granting additional time to complete discovery also is insufficient.  More time only benefits eCW as it delays resolution of this case.  And it will require Relators and counsel to re-do work they have already done.

While inadequate, if the Court does not believe issue preclusion sanctions are warranted, Relators request that the Court impose an attorneys' fees and expenses sanction for the additional work caused by eCW's misconduct.  At a minimum, such an Order will establish that eCW has refused to comply with its obligations, so when eCW invariably does so again there will be a record that it is not eCW's first such misconduct.  If the Court grants that sanction, Relators will submit appropriate evidence regarding the amount of fees and expenses caused by eCW's misconduct.[77]

## V.   CONCLUSION

eCW has intentionally prejudiced Relators.  Relators respectfully ask the Court to sanction eCW for its misconduct as requested above or in such other way that the Court deems appropriate.

*--signatures appear on the following page--*

---

[77] Relators considered seeking an Order barring eCW from moving for summary judgment on certification, coupled with an Order allowing Relators to continue discovery as needed on that issue until trial.  That would lighten the load on Relators and the Court for the upcoming briefing.  But, as with a fees sanction, it is insufficient.  Relators do not believe summary judgment will be granted on any issue, including certification, and do not believe they should be required to re-start discovery on this issue.

Respectfully submitted this 13th day of August, 2024.

/s/ Robert H. Snyder, Jr.

ROBERT H. SNYDER, JR.
  Georgia Bar. No. 404522
  rob@cannellasnyder.com
HANNAH D. AMANUEL
  Georgia Bar No. 922743
  hannah@cannellansnyder.com
ALEXANDRA "SACHI" COLE
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
Chase Lyndale
  Georgia Bar No. 183762
  chase@cannellasnyder.com

CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

BRIAN P. ADAMS
  Georgia Bar. No. 142474
  brian@brianadamslaw.com
MARY BETH HAND
  Georgia Bar No. 322836
  mbhand@brianadamslaw.com

ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231

ANNA GREEN CROSS
  Georgia Bar No. 306674
  anna@crosskincaid.com
MEREDITH KINCAID
  Georgia Bar No. 148549
  meredith@crosskincaid.com

CROSS KINCAID LLC
315 W. Ponce de Leon Avenue, Suite 715
Decatur, GA 30030
(404) 948-3022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 13th day of August, 2024.

<u>/s/ Robert H. Snyder Jr.</u>
Robert H. Snyder Jr.
Georgia Bar No. 404522