# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., ALEX PERMENTER, ERIC RODIGHIERO, and CHRIS WHEELER <br><br> Plaintiffs, <br><br> v. <br><br> eCLINICALWORKS, LLC, <br><br> Defendant. | **CIVIL ACTION FILE NO.** <br><br> **Case No. 5:18-CV-382** |

**DECLARATION OF ROBERT H. SNYDER, JR.**

Pursuant to 28 U.S.C. § 1746, I, Robert H. Snyder, Jr., declare under penalty of perjury that the following is true to the best of my knowledge and recollection:

1.     I am over the age of 18 and competent to give the following testimony.

2.     I am lead counsel for Relators and have been representing the Relators since approximately 2018.

3.     To the best of my knowledge, I have been copied on, sent, or received every email about discovery in this case and have taken part in every meet and confer discussion.

4.     Throughout the discovery process, Relators and their lawyers have attempted to be accommodating to all reasonable requests from eCW.  For example, when eCW has claimed that one of Relators' requests was allegedly overly broad, we have listened to the explanation in good faith and have attempted, where possible, to revise or limit discovery accordingly.  As is almost always true in cases like these, the defendant has possession of nearly all the relevant evidence and the plaintiffs must attempt to work with the defendant to obtain the necessary materials.

1

5.      I was counsel throughout the seal period when the DOJ was investigating the case. Although I did not know the specifics and was not provided any documents, my understanding was that eCW had made substantial productions of documents to the DOJ during that time.

6.      After the Court denied eCW's motion to dismiss on December 6, 2022, I took the lead role on behalf of the Relators during the parties' initial planning conference on December 15, 2022.  During that conference, I told eCW's counsel that Relators intended to seek eCW's full production of documents to the DOJ and after review of those materials Relators would send follow up document requests.  eCW agreed to this plan, and it was incorporated in the parties' discovery plan submission and in the Court's scheduling and discovery order.  Doc. No. 100 at 5 ("Relators need not use a document request to seek eClinicalWorks' production of the documents that it previously produced to the DOJ during the DOJ's investigation. *EClinicalWorks has agreed to produce those documents without a formal request.*" (emphasis added)).

7.      Because eCW had previously collected and served productions on the DOJ, I assumed that the production of DOJ materials could be done quickly.  But for reasons that have never been adequately explained, eCW claimed that it had to re-review and renumber the DOJ production before producing it to the Relators, a process that took months to complete.

8.      As a result of that delay and because the original fact discovery deadline closed on December 31, 2023, on March 29, 2023, Relators served their first round of written discovery requests before eCW completed its production of DOJ materials.  In those first requests, Relators sought a complete copy of eCW's issue tracking software.  Relators did not know what issue tracking software eCW used, but they suspected eCW used JIRA.  Issue tracking software is commonly used by software companies and would provide crucial evidence about issues eCW

identified with the software and the steps taken to fix the problem or ignore the problem. Relators now know that eCW uses JIRA, Contrast Security, and previously used a software called Bugzilla.

9.      Before eCW's response to Relators' first request was due, eCW "completed" its production of DOJ produced materials on April 7, 2023.  In total, eCW produced more than 250,000 documents, totaling more than 2 million pages.  In the cover letter with its final DOJ production, eCW noted that it had removed some documents from the production, including two JIRA XML files.  eCW's counsel noted that we would discuss the removed files during an upcoming meet and confer.

10.     Five days later I took part in the April 12, 2023 meet and confer call with eCW counsel to discuss Relators' first document requests, including their request for eCW's complete issue tracking server or servers.  On that call, eCW stated that it intended to use search terms to locate responsive JIRA tickets because eCW claimed that producing all tickets would be overly burdensome and would include tickets unrelated to Relators' allegations.  I specifically asked then whether eCW had provided its complete JIRA server to the DOJ during its investigation. eCW denied producing its full JIRA server to the DOJ and stated that only a small number of JIRA tickets had been produced.  As a result of eCW's express representations, I agreed to consider using search terms to locate responsive JIRA tickets.

11.     Approximately one month later, on May 17, 2023, eCW provided a high level demonstration of the input screens for eCW's JIRA server.  A copy of the PDF provided by eCW showing its JIRA input screens is attached hereto as Exhibit 1.  It also reported that its search terms were resulting in a large number of hits.  During that call, I again asked if eCW had provided its complete JIRA server to the DOJ and was told again that it had not.  At no point

3

during either the April or May calls did eCW state that there were other "projects" on eCW's JIRA server that might contain responsive JIRA tickets. As a result of eCW's statements and again in an attempt to compromise, I agreed to the continued use of search terms to locate responsive JIRA tickets.

12.    For the next three months, I had several follow-up conversations, emails, and meet and confers with eCW counsel about the proposed JIRA production, as well as about many other issues. On many occasions during this time, eCW's counsel stated that producing attachments uploaded to the JIRA server would be unduly burdensome and asked that Relators review its forthcoming JIRA production and ask for specific attachments after reviewing the tickets. eCW's developers are able to upload attachments to individual JIRA tickets that document the issue being addressed. In many instances, those attachments are necessary in order to locate the precise location of the vulnerability within eCW's source code.

13.    On August 11, 2023, after another round of discussions about JIRA tickets, responsive fields in the JIRA server, the formatting of the production, and the alleged complications of providing the JIRA tickets, I sent an email asking for a third time whether eCW had provided its complete JIRA server to the DOJ. eCW said again, this time in writing, that "some JIRA tickets were produced in connection with the DOJ production, but not the entire JIRA database." ECF No. 157-7 at 2.

14.    On August 24, 2023, eCW produced 165 spreadsheets that included extracted information from JIRA tickets. An example spreadsheet is attached as Exhibit 2. That example has 865 entries, but in total there were about 150,000 entries in the production. The cells are not uniformly formatted, the entries have embedded special characters that make sentences difficult to understand and to search with character recognition, and searching within the spreadsheets is

4

very difficult.  Despite that, Relators (and counsel) attempted to review the spreadsheets.  That review revealed that the spreadsheets were both overinclusive (containing tickets that were not security related at all) and underinclusive (missing tickets for known security issues that eCW had attempted to or actually fixed).

15.     On October 23, 2023, I emailed eCW counsel and again asked for a complete copy of the JIRA server with attachments given the ongoing issues with the production.  eCW agreed to produce all JIRA tickets without attachments on October 26, 2023, but insisted that a further modification of the protective order was necessary.  The Court entered that Order on December 5, 2023.

16.     On October 31, 2023, the Court held an in-person hearing about eCW's request to extend the discovery period.  At that hearing, the Court made clear that the case needed to keep moving and granted only a six-week extension of discovery.  Relators agreed then and agree now that this case needs to keep moving to completion.

17.     On December 7, 2023, eCW produced one JIRA .xml file that supposedly included all responsive tickets.  As eCW's own expert has conceded, that single file was not sufficient to create a working copy of eCW's JIRA server.  Mr. Wheeler attempted to use the file to create a working JIRA copy but was unable to do so.

18.     Also on December 7, 2023, eCW produced three spreadsheets that it described as "Contrast security testing."   Those Contrast spreadsheets included more than 72,000 entries, representing approximately 50,000 individual security vulnerabilities flagged by Contrast. The Contrast spreadsheets were incomplete and largely unusable.  An excerpt of two high security vulnerabilities flagged by Contrast and discussed by Mr. Wheeler are attached as Exhibit 3.

5

Contrast is a security scanning software that eCW uses and that is integrated into eCW's JIRA system.

19.     Under the parties agreed deadlines, Relators were obligated to produce expert "technical source code" reports on December 15, 2023.  Relators produced those reports on December 15, 2023 without the benefit of a working JIRA production or any ability to even perform a high level review of the Contrast production.  Relators' retained expert Dr. Eric Cole produced his own report on January 6, 2024, also without the benefit of any meaningful review of the JIRA or Contrast evidence.  (Dr. Cole's report was delayed by several weeks because he was hospitalized with Covid around this time.).

20.     During January and February, Relators and Relators' counsel was busy reviewing eCW's massive document productions and planning depositions within the discovery period.

21.     On February 20, eCW Counsel Mr. Bernardo called me about a discovery issue.  He stated on that call that one of eCW's expert had identified a "tranche" of JIRA tickets that were responsive to Realtors' discovery requests but that had not been produced.  He also stated that eCW's expert had asked that the December JIRA production be provided in a "different" format and asked if Relators wanted to receive that same "format."  I told Mr. Bernardo that we wanted whatever was being sent to eCW's experts.

22.     On February 28, 2024, we held a meet and confer call with eCW counsel where they stated that the missing "tranche" of tickets was approximately 11,000 security focused tickets that were part of an archived application security project called APPSEC or Security Enhancements.  eCW stated that there more than 80 other JIRA projects that also had not been produced and agreed to provide a list of all other projects.  Later that same day, eCW produced the withheld APPSEC tickets and the "new format" of the December 2023 production.  The

6

"new format" of the December 2023 production was simply the same December production except it now included two .xml files. The withheld APPSEC tickets were also produced as two .xml files. With these two files, Mr. Wheeler was able to create a working JIRA version of December 2023 production using the two files provided by eCW. The second .xml file that eCW withheld in December included the audit logs from that production which showed the lengthy process eCW went through to delete the 84 projects from its December production to Relators.

23. On March 5, 2024, I requested production of all attachments to APPSEC tickets. Nine days later, eCW largely produced those attachments.

24. On March 12, 2024, eCW produced a copy of all other "projects" that had been withheld from production. Many of the withheld projects contained potentially relevant tickets including projects related to eCW's faxing function and kiosks (both mentioned extensively in Relators' filings), as well as a project called "███████████████." ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

25. Over the next month, we continued to have many conversations with eCW about the JIRA server, the withheld tickets and attachments, and other discovery issues. It wasn't until April 12, 2024 that Relators finally had a full working JIRA server that included all tickets, although only attachments for just the APPSEC project had been given.

26. On that same day, April 12, 2024, Relators asked eCW to provide a complete copy of its Contrast server and provided an example of one Contrast issue that was not included in the December Contrast spreadsheets. Relators made that request because once the JIRA server was finally working it became clear that many details of security related JIRA tickets were stored in

the Contrast server and required logging in to the Contrast server to see express details of the issue, including how to fix the problem and the specific lines of code at issue. Two representative APPSEC tickets are attached to this declaration as Exhibit 4. In each ticket, the description of the issue reads: "In order to view details about this issue, please login to contrast … with your username and password. Enter the TRACE ID … and HIT enter. This should open the traceID with all of the details. Please go through the Summary, How to Fix, Details and Notes to get complete details on this issue." In other words, most of the detail about the problem and how eCW was telling its developers to fix it was within the Contrast server.

27.    On May 6, 2024, I emailed the Court regarding a number of discovery disputes including JIRA and Contrast and eCW responded. On May 14, 2024, the Court sent a letter directing Relators to file a motion for sanctions, if they believed it appropriate.

28.    After much back and forth, eCW provided attachments for all requested JIRA projects on June 7, 2024. Three weeks later on June 28, 2024, eCW provided Relators access to its Contrast server.

29.    When viewed on the Contrast server, there are several tabs containing information about each vulnerability, including: Overview, Details, HTTP Info, How to Fix, Notes, and Activity. Tabs for Contrast ID ▮▮▮▮▮▮▮▮▮▮▮ are attached as Exhibit 5.[1] The Overview tab identifies and describes the issue and, crucially for purpose of review, provides the line of code that has the vulnerability. The Activity page provides the "justification" for why eCW marked the issue as "not a problem" or "fixed."

30.    When eCW produced the Contrast spreadsheets on December 7, 2023, it did not include any information from the Overview tab for any of the 72,000 vulnerabilities, so it would have

---

[1] REL000620-625.

been very difficult to locate the actual vulnerabilities within the actual code. In addition, eCW only provided the "Activity" page information for the entries marked as "not a problem" (approximately 14,000 of the Contrast entries). So, the explanation for why eCW marked almost 40,000 Contrast issues as "fixed" was not available to Relators for review until June 28, 2024.

31.     Since eCW finally produced those crucial pieces of evidence, Mr. Wheeler has spent approximately 70 hours reviewing Contrast issues and cross-referencing those issues against JIRA tickets. Doing so is very labor intensive, so Mr. Wheeler was only able to review about 20 Contrast issues. As detailed in his declaration, Mr. Wheeler discovered several extremely serious security vulnerabilities that exist in the current version of the eCW software that were flagged multiple times by eCW's Contrast program and marked as "fixed" or "not a problem" by eCW. The two APPSEC tickets attached as Ex. 4 were created from Contrast findings associated with one of vulnerabilities he identified. Two of those newly discovered vulnerabilities are as serious as, or worse than, the most serious vulnerabilities previously discovered and disclosed. They also demonstrate that factual statements made by eCW to the DOJ, to the SQOO, to the ONC, and to Relators in this case are not true.

32.     Before June 28, 2024, Relators had effectively executed their entire factual discovery plan and were nearly through the expert discovery period. By June 28, 2024, Relators (or their counsel) had completed the following discovery tasks:

        a.  reviewed millions of pages of documents produced by eCW, Quandary Peak, and governmental agencies;

        b.  served three sets of written discovery requests on eCW;

        c.  responded to four sets of written discovery from eCW;

        d.  served non-party discovery requests on Quandary Peak;

9

e.  taken seven eCW employee depositions which included both individual and 30(b)(6) depositions;

f.  taken two Quandary Peak employee depositions;

g.  produced six expert reports, including two reports rebutting eCW's technical expert Mr. Wortman;

h.  been deposed by eCW;

i.  produced their technical expert Dr. Cole for deposition;

j.  worked for over a year with their certification expert Michael Arrigo; and

k.  served written deposition questions on HHS-OIG and ONC.

33.   During the ongoing discussions with eCW about the JIRA server, eCW counsel stated for the first time that it had provided its JIRA server to the DOJ in November 2019.  This was contrary to its three prior answers in March, April, and August 2023.  At my request, eCW agreed to provide its DOJ JIRA production and it did so on April 22, 2024.  The November 2019 eCW DOJ production was a complete copy of eCW's JIRA server and included 65 projects, including the APPSEC project.  A document showing screenshots from that November 2019 showing the 65 projects produced to the DOJ is attached as Exhibit 6.

34.   If eCW had truthfully admitted that it had provided its completed JIRA server to the DOJ, Relators would have insisted that eCW produce it and, if it refused, would have asked the Court to compel production.  Because eCW denied that it had produced the entire JIRA server to the DOJ three separate times, I did not insist on its production.  The Court cannot compel a documents that a defendant does not admit exists.

35.   If eCW had provided the DOJ JIRA server production to Relators in April 2023 that would have fundamentally changed all or nearly all the discovery that Relators have done.

10

Given the detailed nature of the review needed, Relators need several months to complete their review of the full JIRA and Contrast servers.  After that review, they would need to produce their own supplemental expert report and a supplemental report from their retained experts Dr. Eric Cole and Michael Arrigo; re-depose the following eCW employees, representatives, or experts, Michael Laycob, Matt Lewis, Rahul Jaiswal, James Mittenthal, Oren Wortman, Bryson Bort, and Robert Knacke;  re-depose Quandary Peak employees Brad Ulrich and Ajit Dhavle; and submit additional questions to HHS-OIG and ONC.  They might also need to serve additional written discovery and/or take additional depositions.  In addition to the extraordinary amount of time and energy needed to complete that additional discovery, re-doing all of that work would also result in significant additional incurred expenses likely well in excess of $100,000.00.

I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection.

This 1st day of October 2024.

/s/ *Robert H. Snyder, Jr.*
Robert H. Snyder, Jr.

11