IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

_____

UNITED STATES OF AMERICA, ex      )
rel. ALEX PERMENTER, ERIC         )
RODIGHIERO and CHRIS WHEELER,     )
                                  )
    Plaintiffs,                  )
                                  ) Case No. 5:18-CV-382
vs.                               )
                                  ) Macon, Georgia
ECLINICAL WORKS, LLC,             )
                                  )
    Defendant.                   )
_____)

HEARING ON PLAINTIFFS' MOTION TO COMPEL

AND MOTION FOR SANCTIONS

October 10, 2024

BEFORE THE HONORABLE MARC T. TREADWELL
UNITED STATES DISTRICT JUDGE

Proceedings reported stenographically

_____

DARLENE D. FULLER, USCR
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
Georgia Certified Reporter No. 5641-3440-5157-6832

DEFENSE EXHIBITS ADMITTED DURING ARGUMENT

<u>NUMBER</u>          <u>DESCRIPTION</u>                              <u>PAGE</u>

DX 1             Bar chart demonstrative ..................84

APPEARANCES:

FOR THE PLAINTIFFS:          Robert H. Snyder
                             Alexandra Cole
                             Chase Lyndale
                             Hannah Drosky Amanuel
                             CANNELLA SNYDER
                             315 West Ponce de Leon Avenue
                             Suite 885
                             Decatur, Georgia 30030
                             rob@cannellasnyder.com
                             sachi@canellasnyder.com
                             chase@canellasnyder.com

                             Brian P. Adams
                             ADAMS LAW FIRM
                             598 D.T. Walton Sr. Way
                             Macon, Georgia 31201
                             (478) 238-0231
                             brian@brianadamslaw.com

                             Anna Green Cross
                             Meredith C. Kincaid
                             CROSS KINCAID
                             315 West Ponce De Leon Avenue
                             Suite 715
                             Decatur, Georgia 30030
                             (404) 948-3022
                             anna@crosskincaid.com
                             meredith@crosskincaid.com

FOR THE DEFENDANT:           Richard T. Bernardo
                             SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM, LLP
                             One Manhattan West, Suite 42-128
                             New York, New York  10001
                             (212) 735-3453
                             richard.bernardo@skadden.com

                             Geoffrey M. Wyatt
                             Nina R. Rose
                             SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM, LLP
                             1440 New York Avenue, N.W.
                             Washington, DC  20005
                             (202) 371-7000
                             geoffrey.wyatt@skadden.com

                             nina.rose@skadden.com

APPEARANCES CONTINUED:
FOR THE DEFENDANT:          James W. Cobb
                           CAPLAN COBB LLC
                           75 Fourteenth Street NE
                           Suite 2700
                           Atlanta, Georgia 30309
                           (404) 596-5600
                           jcobb@caplancobb.com

                           Aaron Katz
                           AARON KATZ LAW LLC
                           399 Boylston Street
                           Boston, Massachusetts 02116
                           (617) 915-6305
                           akatz@aaronkatzlaw.com

                           Duke R. Groover
                           Susan Elizabeth Hall
                           JAMES BATES
                           Post Office Box 4283
                           Macon, Georgia 31208
                           (478) 742-4280
                           dgroover@jamesbatesllp.com
                           ehall@jamesbatesllp.com

ALSO PRESENT:              Alex Permenter, Relator
                           Eric Rodighiero, Relator
                           Chris Wheeler, Relator

                           Michael Laycob, eClinicalWorks
                           Bowen R. Shoemaker, AUSA

                           Cathy Huff of Canella Snyder

Macon, Georgia

Thursday, October 10, 2024

10:04 a.m.

P R O C E E D I N G S

COURT OFFICER:  United States District Court for the Middle District of Georgia, Macon Division, is now in session.

THE COURT:  We are here because eCW requested a hearing on the motion for sanctions, which I would have scheduled a hearing anyway.

Let me get some introductions, first.  Mr. Wyatt?

MR. WYATT:  Good morning, Your Honor.

THE COURT:  I know you are not circled on my line-up here as one who is going to present discussion, but I'll let you introduce who you have with you.

MR. WYATT:  Thank you, Your Honor.  Appreciate it. With me today are Richard Bernardo and Nina Rose, who will be primarily addressing the Court on the matters pending today.

THE COURT:  Good.

MR. BERNARDO:  Good morning, your Honor.

THE COURT:  Good morning.

MS. ROSE:  Good morning, Your Honor.

MR. WYATT:  Also with me are Aaron Katz, whom you've met before, and James Cobb, who's appeared in this case before. We also have Duke Groover and Elizabeth Hall.  And from the company, we have the Chief Compliance Officer, Michael Laycob.

MR. LAYCOB:  Good morning, Your Honor.

THE COURT:  Mr. Laycob, you are still Chief Compliance Officer?

MR. LAYCOB:  That's right.

THE COURT:  Okay.  Good morning to you all.  I hope y'all found a place to stay.  Rooms were in short supply.

MR. WYATT:  We did, Your Honor.  We found that to be the case, but we were able to find lodging.

THE COURT:  And where was that?

MR. WYATT:  The Atlanta Airport Renaissance Hotel.

THE COURT:  Yeah, we've got quite a few visitors -- had a few, probably still here.

All right.  Mr. Snyder, why don't you tell us who you've got.

MR. SNYDER:  Morning, Your Honor.  I've got Brian Adams, who you know.  Sachi Cole.  My partner, Sachi and I, will be making the primary arguments today on the two motions.  Mr. Wheeler is one of the relators in the case.

In the gallery, Anna Cross and Meredith Kincaid from Cross Kincaid; my associate, Chase Lyndale; my paralegal, Cathy Huff; and then Mr. Permenter and Mr. Rodighiero are the other two relators in the case.

THE COURT:  Okay.  Good morning to you all.

I see Ms. Shoemaker back there, so the government has somebody present.  Good morning.

MS. SHOEMAKER:  Good morning, Your Honor.

THE COURT:  As I said, we're going to have a discussion.  Some of you are familiar and some of you may have heard that sometimes in these hearings I want to get information, and so I kind of take the lead.  And to some -- well, to a large extent I am going to be doing that this morning.  I want to focus on the facts, and jointly we're going to see if we can't come to an understanding about what the facts are.

I want to begin with the JIRA server issue.  Mr. Snyder, were you going to address that?

MR. SNYDER:  Yes, Your Honor.

THE COURT:  Well, I'll let you go to the podium, then.  Okay.  Thank you.

And for eCW, who is going to address the issue?

MR. BERNARDO:  I am, Your Honor.  Rich Bernardo.

THE COURT:  Mr. Bernardo, I've got your affidavit.  I'm glad you're here.  Periodically, as Mr. Snyder outlines the facts to me, I will be turning to you for confirmation or not.  If I do, you don't have to stand up, you can remain seated.  The microphone will pick you up better that way.

MR. BERNARDO:  Oh, great.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Snyder, again, I'm familiar with the record, as voluminous as it is.  Let's begin with the facts as they relate to the JIRA issue.  J-I-R-A.

I am going to give you a fact to start with, and that would be what I understand to be January the 5th, 2023, when the parties' discovery plan stated that eCW had agreed to produce all documents that it had produced to DOJ.  Is that an accurate fact?

MR. SNYDER:  That is correct, Your Honor.

THE COURT:  Mr. Bernardo, do you --

MR. BERNARDO:  I don't dispute that, Your Honor.

THE COURT:  And that would have included -- at least eCW had produced to DOJ the JIRA server; is that correct, Mr. Snyder?

MR. SNYDER:  That is correct.  In roughly November, 2019, eClinicalWorks had made a complete snapshot copy of its JIRA server that it produced to the DOJ.

THE COURT:  And did that server include the AppSec project?

MR. SNYDER:  It did.

THE COURT:  Is that correct, Mr. Bernardo?

MR. BERNARDO:  That is my understanding, Your Honor, yes.

THE COURT:  Okay.  So, with that baseline established, Mr. Snyder, I will let you pick up -- again, I am going to probably direct you a little bit because I want to move us to what I think the critical facts are.  I may be wrong about that, and you both can help me if I'm -- if I am wrong on

that. So, Mr. Snyder, go from there.

MR. SNYDER: Certainly, Your Honor. We actually -- you know, because the case was under seal for several years before the fall of 2021, when the government declined intervention, we knew that the company had made substantial productions of documents to the DOJ, and so we knew -- as you know in these cases, Your Honor, a lot of this is -- as the outsiders to the company, we are not sure exactly what documents there are.

We had a real unique situation in this case where we knew there was already a collection of documents that had been made and produced to the DOJ, so when we had our first discovery conference in December of 2022, after the Court denied the motion, we reached an agreement that the DOJ documents would be produced to us and that we did not even have to serve a formal request.

That agreement was picked up and placed in that January 5th, 2023, Order.

For reasons that I still don't fully understand, eClinicalWorks decided that they needed to renumber the DOJ production, and that process took three to four months to get a complete production from the DOJ -- from the DOJ production to the company. In the last cover letter, which we received in April, it mentioned a number of files that they said that they had removed and not produced to us. And that included two,

what they described as JIRA .xml files.

While we were waiting for the DOJ production to be complete, we served our first document requests. And in that first document request was a request for a complete copy of the issue tracking systems used in eClinicalWorks from Version 10 to the current version. We weren't certain that they used JIRA. We thought that they did. We served that because we knew from the beginning that that was going to be a key piece of evidence in this case.

THE COURT: Let me put some dates on this. You got the renumbered DOJ production, I will call it, on March 7th, 2023?

MR. SNYDER: It was -- it was a series of productions is my recollection. The last coming in early April.

THE COURT: All right.

MR. SNYDER: I think -- I don't --

THE COURT: That time frame.

MR. SNYDER: Yes, sir.

THE COURT: And then your request for production of documents was served on March 29, 2023?

MR. SNYDER: That is correct.

THE COURT: All right. Go ahead.

MR. SNYDER: Our plan was to hopefully get our hands on the DOJ production early so we could at least do a high-level review to understand the types of documents that

might be in the production, and that was going to help us guide our productions to the company.

THE COURT: All right.

MR. SNYDER: Because it was not happening in a timely fashion, in our opinion, we just went ahead and served our requests on the March 29th, 2023. And so before --

THE COURT: Excuse me, Mr. Snyder. Let me back up one step. I have a question for Mr. Bernardo.

MR. SNYDER: Sure.

THE COURT: Why was the DOJ production, as I am calling it, renumbered?

MR. BERNARDO: Your Honor, for a variety of reasons. First, because it really wasn't just a production; it was a series of pieces that we had to put back together, number one. Some of them we understood may not have been, and what we wanted to do was provide it in a way that could be usable in this litigation, because we knew we would be referring to it, and it just seemed like the very logical thing to do, to go through it and not just pass it over.

And in doing so, as I'll explain when I have an opportunity, Your Honor, we identified a number of problems with it that we immediately brought to Mr. Snyder's attention. But it was really just to make it easier to use within this case.

THE COURT: Why was the AppSec project not produced

with that?

MR. BERNARDO:  So, Your Honor, that was one of the issues we immediately came upon.  As we were going through the DOJ production to do our due diligence and make sure that they didn't raise issues, we saw a number of things that warranted discussion with Mr. Snyder because when you're responding to a civil investigative demand --

THE COURT:  What was the issue with regard to the AppSec?

MR. BERNARDO:  To take a step back, there was no recognition or acknowledgment or knowledge of AppSec.  What we saw in the production that was four years old that we were trying to put together was literally pages and pages and pages and pages just of data, right.  And we knew it was from eManager, which is this ginormous dataset that included, like, personnel files, *et cetera*.  And we knew it was from JIRA.

And what we immediately noticed was that there was patient health information, medical records, and things that were part of that, that we wanted to make sure we took appropriate steps to protect.  And we got an estimate from our vendor and said, like, what will it cost to do this?  And we --

THE COURT:  A hundred thousand dollars, I saw that.

MR. BERNARDO:  Okay.

THE COURT:  All right.  So why was the JIRA project not produced then?

MR. BERNARDO:  If you think of it, Your Honor -- I'm sorry if I am not doing a good job of explaining -- is the JIRA was probably thousands -- tens of thousands of just data.  It was not something that you can open up and look at and see AppSec or see anything else.

We understood it to be, at the time, a portion of the JIRA tickets because JIRA is used for many, many things in the company, not just the EHR.  So there was no conscious decision.  It was very much an, oh, we have an issue here with this dataset.

And, Your Honor, we knew that we were going to have to start from scratch because it was a 4-year-old dataset.  The tables have changed.  We were going to have to re-collect it, in any event.  So I reached out and said to Mr. Snyder:  You know what, I don't want to do a big data dump.  It doesn't help you, and it doesn't help us.  In every other litigation, I get complaints about producing things that aren't relevant.  Since we have to approach JIRA, why don't we work together to come up with a way to search it, to get you what you need that will bring it up to date.

So there was no recognition other than -- and I don't want to waste your time on it, but I'm telling you if you looked at the screens of data, you would scratch your head and say, like, how could you possibly make heads or tails of this to understand it included, you know, this project that became

relevant when it was brought to our attention.

THE COURT:  Okay.  I'm sure we'll come back to that.

Mr. Snyder?

MR. SNYDER:  Mr. Bernardo is correct that I did ask the company about the files that they had removed from the DOJ production; in particular, the JIRA files.  I did not -- we hadn't become experts in JIRA yet, Your Honor -- we have roughly since then -- and we actually had to retain an expert to deal with all these issues.  At the time I didn't understand the significance that they were .xml files, and that's why I asked the eClinicalWorks counsel on three separate occasions whether the full JIRA server had been produced to the DOJ and was told three separate times -- in that initial conference in April, again in May, and then again in August -- that they had never made a full production of the DOJ server -- of the JIRA server to the DOJ.

So --

THE COURT:  Let me pause.

Is that accurate, Mr. Bernardo?

MR. BERNARDO:  Your Honor, I don't want to get into what he said/he said.  I would not disagree that we had a discussion about that, but I want to highlight and I thought I'd made that --

THE COURT:  Okay.  You can qualify it, but did you tell plaintiffs counsel that the DOJ production did not

include -- did not include --

-- what did you say, Mr. Snyder?

MR. SNYDER:  A full copy of the company's JIRA server as of the date of production.

THE COURT:  -- a full copy of the JIRA server?

MR. BERNARDO:  As of that time, Your Honor, what I had understood -- and, again, you have to just understand this is just, like, data -- what I had understood was that it included a full dump, so to speak, from eManager and records from JIRA.  I didn't have an understanding that it was a full set at that time.  And that was something that we later learned as Mr. Snyder further pursued that.

THE COURT:  So, you confirm that plaintiffs counsel were told that the production to DOJ did not include the entire JIRA server?

MR. BERNARDO:  I -- I am not going to dispute that, Your Honor, although I wouldn't characterize it that way because I think that sounds a little bit more affirmative than the discussion we had.

THE COURT:  Okay.  I understand.

Go ahead, Mr. Snyder.

MR. SNYDER:  Your Honor, I will point out that I did a -- I do believe we did attach the email from August, 2023, where I specifically asked that question.  And I was told the same thing every time, which is that there was a portion --

some limited portion of JIRA tickets produced to the DOJ.

So, given that representation I didn't come back to the Court and ask -- "I need you to compel production of a smaller batch of documents," because we were having -- we were having these back-and-forth conversations about how do we get you the information that you need.

And I understand, I'm hesitant at times to accept something like that. I hear what Mr. Bernardo is saying, and sometimes defendants get accused of a document dump. And I was open to an idea of a narrowly tailored production of the JIRA tickets. And what I said was let's try it and see where we wind up.

MR. BERNARDO: (Nodding head in the affirmative.)

MR. SNYDER: We had several months of back-and-forth discussions about search terms. By the time we got to roughly August -- late July/August, there was a lot of conversations about fields in the JIRA server, attachments, whether there would be embedded PHI. And the company has said that on many occasions. I haven't looked at every JIRA ticket, Your Honor, but I haven't seen any PHI in there. It may be in there, but it certainly is not something that jumps out at you when you look at it.

The reason why I asked for the third time whether they had produced the full server to JIRA (sic), because in August we still didn't have it. And, frankly, I didn't believe

that the company had made the DOJ jump through this many hoops to get a copy of the JIRA tickets.  I just didn't believe it.  But when a defendant tells me that they haven't done something, I can't come to the Court and say compel production of a document that they deny exists.

When we received -- what we wound up getting in August, Your Honor, was 165 Excel spreadsheets, between twenty and a thousand entries each.  I think it's 180 columns.  We did attempt to review those spreadsheets.  We loaded them into our database that we've used to store the documents in the case.  We found that to be unwieldy and difficult and under-inclusive.  We knew that there were issues that the company had fixed, specifically because the relators had disclosed them in the course of this litigation, and we couldn't find corresponding tickets in the production.

THE COURT:  And you -- all right.  For some you could find the tickets and some you could not?

MR. SNYDER:  We found nothing in the production we got in August that clearly correlated to any issue that the relators had raised in the case that we knew had been fixed through patches to the software.

THE COURT:  And is it now your understanding that those tickets, at least before the retirement, would have been in that AppSec project?

MR. SNYDER:  Several of them were, yes, Your Honor.

The one that jumps out at me is their fix in roughly July or August of 2021 where they turned off the function within the software that was locally storing EKGs and other documents.  We talked about this two years ago.

After the relators had meetings with DOJ, they passed that information to the company.

THE COURT:  Excuse me, where were you finding those tickets that you did find?

MR. SNYDER:  That ticket specifically is in the AppSec database that we did not receive until -- the end of February.

THE COURT:  Right.  But at the time you're seeing -- you're not seeing tickets that you knew should have been in existence.

MR. SNYDER:  At least expected should.

THE COURT:  Yeah.  But you were seeing some tickets?

MR. SNYDER:  Yes.  So, I mean --

THE COURT:  And where were those tickets?  Were they in the file related to -- and "file" may not be the right word -- related to -- I don't have the terminology in front of me -- but the issues in this case?

MR. SNYDER:  So, the -- the -- what we got in August was search terms run against the EMR/PE Project within JIRA.  So, there were security tickets -- I mean, they were security-related tickets.  Not all of them had anything to do

with our case.  It was an over-inclusive pull.  We knew that that was probably going to be true.  But there was no -- when they ran their search terms -- we had all those months of discussions about search terms.  When they ran the search terms, they ran them only against the EMR and PE Project, so there was no AppSec tickets --

THE COURT:  You're talking about --

MR. SNYDER:  -- in that August --

THE COURT:  -- EMR and --

MR. SNYDER:  I think it's -- I don't know if it's EMR slash or --

MR. BERNARDO:  It's the project, Your Honor, that the company keeps their tickets for source code changes to their EHR software that's the subject of this case.  It's called, I believe, EMR/PE.

THE COURT:  I don't want to jump ahead, but it sounds like, Mr. Snyder, that would be consistent with -- and I'm certainly going to need help with this name -- Satya- --

MR. BERNARDO:  Satyanarayan.  I will spell it for the court reporter.  Satyanarayan is the --

THE COURT:  S-a-t-y-a-n-a-r-a-y-a-n.

MR. BERNARDO:  Correct.

THE COURT:  So, again, I don't want to get me off track.  I think I will clarify this point.  What I understand from Mr. Satyanarayan's affidavit, that up to a point these

tickets would have been in the AppSec file -- project.  But at that point, which I think was in 2020, they retired the AppSec file, and the tickets were then associated with the relevant issues in this case, EM/PE (sic).

MR. SNYDER:  What the company has told us, Your Honor, is that in -- I think it's in March or April, approximately, we had a witness on this who couldn't tell us a lot of the specifics, but that the company, you know, retired the AppSec project.  They migrated open tickets.  So, issues that were open and had not been resolved migrated to the PE server; and everything that was closed, which was the majority of the tickets, stayed in that AppSec retired project.

THE COURT:  So that in approximately 2020 a ticket for the EM/PE project would not have been in the AppSec file; it would be in the EM/PE file.

MR. SNYDER:  That's correct, Your Honor.

THE COURT:  That's your understanding.

MR. SNYDER:  That's my understanding.  I mean, what we --

THE COURT:  But yet the tickets in the AppSec file were still -- I mean, that's where the tickets relating to EM/PE would have gone, into the AppSec file, prior to that retirement.

MR. SNYDER:  To the extent it was a security-related ticket, yes, Your Honor.

MR. BERNARDO:  Your Honor, may I clarify, because I don't think that's exactly right.  And I know you want to get to the bottom of the facts.  And I don't -- it's up to Your Honor.  I have a sort of a demonstrative that I think might be helpful for Your Honor to understand, if I can provide that and explain it.  It will sort of give you a context of what these are.

THE COURT:  I may defer that.

MR. BERNARDO:  Okay.

THE COURT:  But broadly speaking, is my understanding correct that the tickets, as we are calling them, which up to a date would have been in the AppSec project, after that were associated or placed with the substantive projects they involved?

MR. BERNARDO:  That's what I'd like to clarify, Your Honor.  Because I think that's a very important distinction and I think it goes to why it just was out of mind of people at the company.

Since they started -- and this is in Mr. Satyanarayan's declaration.  Since they started using JIRA, which I believe was in around 2016, the place that the company put their tickets of changes for source code was in a project called -- I am going to mess it up, too, Your Honor, but let's just call it "the PE Project," okay.  So since the beginning of their use of JIRA, that's where tickets for the software

changes would go.  The other 8,900 projects related to different things.

At some limited period after that, for a couple of years, somebody had set up a separate project that had tickets not just for the EHR software, but for all of their software that dealt with certain security enhancements.  And that got put in this AppSec.  It wasn't a replacement of the original tracking of the tickets for the source code; it was just an additional place.  That stopped in 2020.

And after that, Your Honor is correct, some of the tickets that were active moved into -- back into the PE project.  But it was -- it was sort of like this blip in time when some of them for EHR and all of their other products were contained within it.  And then Your Honor also picked up correctly there's some overlap among those tickets.

THE COURT:  Okay.  All right.  Mr. Snyder, I just wanted to get an understanding of that.  I believe you were bringing us up, were we in August of 2023?

MR. SNYDER:  I believe that's where we stopped, Your Honor, yes.  At that point we had received these 165 spreadsheets.  They were unwieldy.  They were hard to work with.  Even in our database software, they were under-inclusive, we knew they were under-inclusive.  So I went back to the company and I said, "We need to revisit the original request for the full JIRA server."

And, again, that was in August.  The company agreed to do it sometime thereafter.  I can't remember exactly when.  They did ask that there be a modification to the protective order, um, because they had this concern about PHI in the software.

I will point out that the protective order that the company drafted, that we agreed to, and that was entered in January, 2023, includes specifically a HIPAA provision that allows the production of PHI as long as it's marked "highly confidential."  We always viewed that as sufficient and still do.  But nevertheless I agreed to the modifications.  We just wanted to get the information.

So, we had a hearing at the end of October.  And then this -- on December 7th, they produced to us what we believed to be the collection of all of the relevant JIRA tickets that would have anything to do with security in the case.  It was a single .xml file.

Mr. Wheeler, who is my client--he is very tech savvy--he attempted to use it to create a working JIRA database.  He was unable to do so but, given the timing and that we had agreed to produce our technical expert reports on December 15th, essentially tabled that project, and we got our reports out -- his and Mr. Rodighiero's report on the 15th, and then three weeks later Dr. Eric Cole, who is our other cybersecurity expert, produced his report.  The reason his was

delayed is because he was in the hospital with COVID for a period of time during that time period.

THE COURT:  So, let me ask you a question about this December 7th production.

MR. SNYDER:  Certainly.

THE COURT:  Up to that point, had you learned that -- or at that point had you learned that the JIRA server -- i.e., what had been produced to DOJ -- had not been produced to you?

MR. SNYDER:  No.  We did not learn that until I think it was roughly March or April, after the company disclosed the existence of these other projects and we revisited the issue again.  And when I asked the question the fourth time, the answer I got from Mr. Bernardo was there were multiple productions of JIRA to the DOJ, including I believe full copies of eManager and JIRA, which is the exact opposite of the answer that I was given previously.  That was a revelation to us.

And at that point I immediately asked them to produce to us those two files, which they did within a -- you know, a reasonable amount of time.  We were able to use those two files to create a working copy of the December -- it was roughly November, 2019 -- JIRA copy -- that JIRA server copy that went to the DOJ.  And what we saw in there, of course, was that all of the projects were included, including the AppSec project, the Faxing project, the Kiosk project, other projects that we -- that are relevant to the issues in this case.  But we

didn't know that until March or April of this year.

THE COURT:  And, Mr. Bernardo, when did you learn that the AppSec project that was produced to DOJ had not been produced to the plaintiffs?

MR. BERNARDO:  I'm sorry, there were a lot of nots in there, and I want to answer your question correctly.  Would you mind repeating the question?  I'm sorry.

THE COURT:  When did you learn that the AppSec project that was produced to DOJ was not produced to the plaintiff?

MR. BERNARDO:  After we learned about the AppSec project.  We didn't know anything about the AppSec project until the day we learned about it.  And on that very day -- the day the company reported it to us and said, "Oh, we now realize we missed this, and that there's an exception to our understanding of where all the tickets are," and they pointed it out to us.

I picked up the phone and called Mr. Snyder.  And then after that, when we were focusing on AppSec in particular, and Mr. Snyder continued to ask questions, and we continued to do further investigation on trying to put Humpty-Dumpty back together again from what was produced to the government, we learned it was in there.  So, it was after that whole circumstance.

///

THE COURT:  So, how did you learn about the AppSec project?

MR. BERNARDO:  Late February, I remember the afternoon, Mr. Satyanarayan called up Mr. Wyatt and said, "I just realized in some meeting I was having, when we were looking at something, that there is a project there we just hadn't remembered, because we haven't really -- the folks that were involved in this haven't focused on, and that would contain responsive information."

I learned about it from Mr. Wyatt, and the two of us, I think it was late in the afternoon, called up Mr. Snyder and said we just learned about this and let's take steps to work together and make sure we get that to you.

THE COURT:  And I understand from Mr. Satyanarayan that he realized this, according to him, when he was contacted -- and when I say "this," I mean the AppSec project had not been produced -- because he certainly was familiar with the AppSec project, was he not?

MR. BERNARDO:  To be honest, he -- once his recollection was refreshed, he remembered that it existed, but it was not something that he or any of the people he spoke with in trying to do the due diligence thought of.  Because everybody thinks of, "Oh, you want the EHR JIRA tickets, they are all in this project."

THE COURT:  All right.  But, his recollection was

refreshed --

MR. BERNARDO:  Correct.

THE COURT:  -- when he got an inquiry from one of eCW's experts; correct?

MR. BERNARDO:  My understanding, Your Honor, is -- is -- what had occurred -- I mean, there was apparently a discussion that one of our experts was on.  And the source code that we produced has references in it to changes, and it has references to JIRA tickets, and everybody was familiar with the JIRA numbers.  But it also has references to AppSec.  And somebody questioned that.

And then in connection with that meeting -- and to be honest, I've asked him, and he still is trying to recall exactly whether it was that piece of information or the answer to that question brought up in AppSec that made him realize, "oh, I completely forgot that this had existed."

THE COURT:  Well, let's go with what he said under oath.

MR. BERNARDO:  Of course.

THE COURT:  What he said under oath was -- or at least under penalty of perjury,

"An inquiry by one of eCW's experts in February, 2024, caused me to realize that the AppSec project would have included JIRA tickets responsive to relators' discovery."

MR. BERNARDO:  Correct.

THE COURT:  So my question is, who was the expert?

MR. BERNARDO:  Oh, I'm sorry.  It was -- it was, um, our expert, Sygnia, and it was a Mr. Wortman and a Mr. -- I'm sorry, I don't remember Dan's last name.  Litvak.

THE COURT:  I assumed it was Mr. Wortman.

Did you know that?

MR. SNYDER:  That's what they have said when I deposed Mr. Wortman.  His recollection of this was a little fuzzy.  Mr. Litvak was also a consulting expert who worked with the company and who was responsible for trying to get a working copy of the JIRA server up and running.  And so I assumed it was Mr. Wortman or Mr. Litvak.

I would also point out that -- Your Honor, that they did call me on the 20th of February.  I remembered it was after hours.  I don't tend to take defense lawyer calls after hours, but that night I did.  And what I was told was, is there are some -- there's a tranche of JIRA tickets that were just located, and we're going to look into it.  And also our expert has asked for a production of the December JIRA production in -- I think it was characterized as a different format. Would you also like that production?

And, of course, I said yes.

And what we now know is the different format was -- including the second .xml file.  That second .xml file has the

audit logs that show that all these projects were deleted.  So, certainly what the company knew on February 20th was that their expert had found a reference to AppSec tickets, and that they had asked for production of the JIRA server in a way that was going to include audit logs, whether -- there's a lot of things in these declarations that I can't test, Your Honor.  But those are the facts as I understand them.

THE COURT:  When was, Mr. Bernardo, Mr. Wortman retained?

MR. BERNARDO:  For this -- for the purposes of this, in --

Geoff, in early 2023?

MR. KATZ:  That's my guess.

MR. BERNARDO:  I'm sorry, Your Honor.  We're in 2024.  2023, yes.

THE COURT:  And when was he identified to the plaintiffs?

MR. BERNARDO:  I don't recall when the expert disclosures were.

Do you recall?

MR. SNYDER:  It was after -- after this entire discussion.  The way that we had originally agreed to, was these early technical reports, we had our December 15th deadline, I think we had 90 days from them to do the rebuttal.  So January, February, it would have been mid-March I think is

when we were expecting the disclosure. So all Mr. Bernardo -- and I can't remember if it was Mr. Bernardo or someone else -- said is that one of our experts noticed this issue and brought it to the company's attention. That's what we were told at the time.

THE COURT: So Mr. Wortman was retained, you believe -- I know this can be confirmed -- but early 2023.

MR. BERNARDO: Yeah. And the reason I'm fuzzy, Your Honor, is because, as Your Honor knows, the schedule for everything changed. And he was retained, and we literally didn't work with him again for, like, the better part of a year because there was just no expert activity.

THE COURT: Who was working with him?

MR. BERNARDO: He wasn't -- there was no -- there was no -- nobody was working with him.

THE COURT: He didn't just pick up the phone in February of 2024 --

MR. BERNARDO: No, I'm sorry, Your Honor.

THE COURT: -- with Mr. Satyanarayan and say, "I need the AppSec tickets."

MR. BERNARDO: I'm sorry. Of course, Your Honor. I meant to say the reason I'm not recalling is we retained him well before we started working with him. He was working, you know, diligently on looking at materials the latter part of 2023 into 2024.

THE COURT:  How did he know about the AppSec tickets?

MR. BERNARDO:  He -- our experts got the same things as Relators got.  They got a copy of all of the source code, and like their experts were looking at the source code, our experts were looking at the source code.  So it wasn't a matter of knowing about the tickets.  It was a matter of seeing a reference in the materials that both sides had that they didn't know what it meant.

THE COURT:  All right.  I haven't read his deposition, Mr. Snyder, but did you get any enlightenment about how the AppSec retired file surfaced in Mr. Wortman's mind?  Not that he knew it was a retired file.

MR. SNYDER:  Right.

THE COURT:  But the tickets at issue, do you know how they came to his mind?

MR. SNYDER:  No, because I don't think they came to his mind, Your Honor.  I think they came to Mr. Litvak's mind.  The -- what Mr. Bernardo left out of his description of this retention of Sygnia is that they retained Sygnia -- what they said is, "We retained two teams.  We retained a consulting team, and then Mr. Wortman was going to be on the testifying team."

Now, Mr. Litvak worked on both teams.  And I don't know when the consulting team was working with the lawyers, but they were working I think throughout 2023 at various times with

them.  Mr. Bernardo will have to answer that question.  And -- but Mr. Litvak is the -- he is a pillar in between the two teams.  He's the one that Mr. Wortman said did the testing and was responsible for getting a working JIRA server up.  So I assume it was him.  I don't know for sure.

His recollection was:  Essentially we learned about these AppSec tickets in late February and then we got a copy of them.

MR. BERNARDO:  And, Your Honor, may I just clarify something based on what you said.  It wasn't a matter of pointing out tickets.  It was a matter of asking what this -- this word "AppSec" that was in the source code meant.  Because nobody -- because they didn't understand what it meant.  So, it wasn't a matter of where are they.  They just wanted to understand what that referred to.

THE COURT:  Okay.  All right.

Mr. Snyder, you can continue.

MR. SNYDER:  So, I think we were through the end of the year.  We had disclosed, produced reports from Mr. Wheeler and Mr. Rodighiero and from our retained expert, Dr. Cole.  We were at the same time dealing with this last month rush of production of documents, something like 500,000 pages of materials produced to us in the month of January alone.

But we were working on -- I think we had started to discuss dates for depositions.  And roughly on the 20th of

February, Mr. Bernardo'd called me and said, "We have these new tickets in this other format from the December production." Eight days later, we had another phone call and they said, "This is what they are."

It was represented to us that this was a retired project or that it was archived, one or the other at various times. That the company had effectively forgotten about it. And were reminded of it by their expert.

And so then that February 20th production then began what has been -- I don't know -- still ongoing, roughly a 6- or 7-month process, trying to get to the bottom of what is the complete JIRA server, what weren't we provided, and what do we need to move the case forward.

So, we were provided files -- a revised file from December that included that second .xml file that allowed us to see the audit logs, and that was the complete EMR/PE group of tickets.

We were separately provided just the AppSec tickets. We immediately said what we'd been saying from the beginning: "We want the attachments." Which are uploaded into -- my understanding is they are uploaded into the system. They are kept on a different server. We produced the affidavit of Mr. Hogue, who is a recently departed employee from Atlassian, talking about the process of backing up the attachments.

We had been told along the way that producing

attachments was very burdensome and difficult.  Once this issue came out, we started getting -- to get productions pretty quickly.  I mean, we got the AppSec ticket attachments within two weeks.

We also, upon learning of the existence of these other projects and that they had never been searched, asked for a list of the other projects, which we got.  And in addition to AppSec, it included projects called Regulatory Requirements; a project related to the facts function inside the EMR, which was the -- the issue with the software that started this case from the beginning.  We saw there's a project in there related to the kiosks, which was mentioned in our Complaint.

So, there were other projects, not just AppSec, where there were at least potentially relevant issues or JIRA issues that needed to be searched.  And I -- I have a handout, Your Honor, if I can approach.

THE COURT:  You may.

MR. SNYDER:  I actually have two.  I'll just hand you both, give me a second.

(Documents were tendered to the Court at 10:45 a.m.)

MR. SNYDER:  Your Honor, if you look at the document that's labeled Exhibit 6 on the top page, the reason I think this is helpful is what this shows is how a JIRA user at the company would see the software.  This is the -- this is a copy that was given to the DOJ in 2019.

So, on the home page there's a button that -- you know, drop-down menu at the top called Projects. When you click that, it opens, and it will show projects that you've worked in recently or are looking at.

And then it says, "View all projects." If you click that button, it opens a screen that has every project within the system. And back in 2019, you would have to go to the third screen to see the security enhancements ticket. I think it's on the fourth screen now.

But the point is that in -- I don't think there's any dispute about this -- every single JIRA user at the company who had access to the JIRA server, these projects were all in full view throughout this entire time during which Mr. Satyanarayan has testified under oath that he forgot about the existence of these tickets.

I will point out, too, that Mr. Satyanarayan was also a declarant in connection with the motion to transfer. And what he said in that declaration was that he had reviewed the relators' Complaint and he understood the allegations.

So, if at any point during this process, this lengthy back-and-forth that we had with the company to get a -- you know, a working copy, a usable copy of these tickets, he had simply clicked the Projects link and just looked at the names of the projects, he would have been reminded about this project that he says now that he forgot.

The other handout -- this is a walk-through, starting from the home page.  And this is just to show how easy --

THE COURT:  Mr. Snyder, excuse me.  Again, yes, you referenced the affidavit or the declaration from Mr. Satyanarayan, which is on the docket at 49-4 filed January 14th.  And he says -- among other things, he makes a reference to the Application Security Team.  Is that what we're talking about here?

MR. SNYDER:  One of the reasons why the phrase "AppSec" never jumped out at us in any way is that the department that is in charge of security inside the company is called Application Security and is frequently referred to in the documents as "AppSec."

So, the AppSec team had a project called -- the official title was Security -- I'm sorry, I lost it here.  The official title was "Security Enhancements," but when you opened a ticket inside that project it was -- it's "APPSEC," dash, and then a number.  That's how the tickets were -- were kept and stored.

All Mr. Satyanarayan would have had to do -- or any of the lawyers who had an opportunity to look at the server to do -- was to just click that button that said, "View All Projects."

The second handout is something that I just -- I looked at yesterday --

THE COURT:  Let me be clear on the first one, which is in the record as Doc 182-12.  This is the dashboard from what was -- the server produced to DOJ?

MR. SNYDER:  In 2019, yes, sir.

Looking at the second handout that I gave you, this is from the server that we built in April, 2024, that includes the tickets that were produced in 2019 and the application security tickets.  This is what we've been using since all the production has been done to do the searches.

And I just wanted to point out one thing with this. You start on the home page.  There's also an Issues tab, which you can click and it creates a drop-down.

THE COURT:  You say you built this?

MR. SNYDER:  This is -- this is what -- we took the files that were produced to us and loaded them into the JIRA software, and -- to create a copy of the database that was produced to us.  So, this is what was produced to us by eClinicalWorks.  I think we got the final batch of attachments in roughly June, 2024.

So, if you go to the Issues tab and click the down issue, there's a -- there's a possibility to search for issues.

The next page, the default, when you search for "issues" is across all the projects, not just one.  And if you type the word "security" into the box, it pulls roughly 154,000 tickets, across a number of different projects, all related to

security.

And at the bottom there's numbered pages to click through.  And by the time you get to the third page of that, you can see that there are tickets related to the faxing function and there are the AppSec tickets.

So, if the company at any point had simply just run a search for the word "security" across its projects, it would have seen -- not every ticket related to security is in that PE database, the EMR/PE database that they searched, and here's -- here's a database AppSec, let's look into that more.

Now, I -- Mr. Satyanarayan's testimony that he forgot about this project --

THE COURT:  Has he been deposed?

MR. SNYDER:  He has not been deposed, Your Honor.

He's not -- he works in Quality -- I think it's Quality Assessment.  He is a QA person.  He doesn't work in Application Security.  There's a department called Application Security that's headed by a man named Rahul Jaiswal, who I have deposed.  Mr. Jaiswal is shown on the Security Enhancements AppSec Project as the project lead.  Mr. Satyanarayan never spoke to Mr. Jaiswal.  Nobody spoke to Mr. Jaiswal about where should we look in our JIRA server to find security tickets.

He wasn't consulted until after we learned about this issue.  We added a topic to our 30(b)(6) notice asking for a witness to speak about the AppSec database in particular and

about the productions that were made by eClinicalWorks.  And that's when lawyers representing eClinicalWorks hired a guy named James Mittenthal.  He works for Triality, which is the discovery vendor that eClinicalWorks has been using.  He is a go-to testifyer in cases where there's an allegation that the defendant failed to produce documents.  He's testified something like 30 times in cases in which Skadden was involved.  Not surprisingly, his conclusion is always that the searches were reasonable.

He was not able to answer very many specific tickets about the database itself:

Who made the decision to create it?

It was a committee, I am not sure who was on it.

When was it retired?

Sometime in 2020, I don't know exactly when.

Why was it retired?

They made a decision to move the tickets.  I can't be more specific than that.

He -- one of the topics was work on the AppSec tickets after, quote, unquote, retirement.  And we put in an affidavit or declaration that was attached, I think it was to Mr. Wheeler's declaration in our opening motion, pointing out that from the time of retirement up to roughly the time that we served our first requests, there have been something like 42,000 actions taken in the database.  In the AppSec project

tickets.  By 600 employees or more.

From the time we served our requests until roughly the time that they made their copy to produce to us in December, there was another several hundred actions taken, including in mid-November a search that was run by an eClinicalWorks project manager named Mark Rowan.  He is not a low-level developer; he's a more senior person who actually interacted with the SQOO in this case.  Ran a search in JIRA -- and we saw it in the audit logs when we finally had them -- for tickets in EMR/PE and in the AppSec database that were effectively tagged with the word "security," and then that search was shared with the JIRA users.

THE COURT:  November when?

MR. SNYDER:  November, 2023, before the production to us in early December.  Now, what -- the explanation of the production in December I think also makes little sense.  What they have said is, we created a copy of the server, and then Mr. Satyanarayan or Mr. Singh, I think his name is, the other person who is involved, instructed a -- an employee who works in India to go in and manually delete every project from that database except for the EMR/PE project.

We pointed out there was what appeared to us to be an anomalous issue with the timing.  He was going through and deleting databases about once every five minutes.  When we got to the AppSec database, it was roughly an hour.  It was the

longest delay throughout the entire time that he spent deleting all these projects. His explanation was I might have been eating or I might have been sleeping or maybe I was in a meeting. He said in his declaration, "I didn't know anything about the case. I didn't know what it was for. I was just told that this was my task."

But, you know, so that means either Mr. Satyanarayan or Mr. Singh created a copy of the server, didn't then look at the projects to be reminded of the existence of this AppSec database, told an employee, "Go in and delete all of them," but it's undisputed that at the end of November there was an eClinicalWorks employee looking at a list of the projects, including the one that's called "Application Security," and then pressing the "delete" button before it was produced to us.

THE COURT: November of 2023?

MR. SNYDER: It was the end of November, 2023, and that's the production that we got on December 7th.

THE COURT: Mr. Bernardo, do you know what was going on then?

MR. BERNARDO: That was -- that was the production that was provided that we understood to be complete.

THE COURT: Now, maybe I'm confused. Mr. Snyder, this involved the AppSec project?

MR. SNYDER: It did not.

THE COURT: I'm sorry.

MR. SNYDER:  After we'd given up on the spreadsheets that were unusable, we said we want a copy of the full server, every ticket that has anything to do with the issues in this case.  And they said, "We'll work on it."  And what they gave -- they gave it to us in December, early December.  It was one file instead of two.  We had a hard time using it.  But that file was just a copy of the EMR database -- EMR/PE database.

THE COURT:  Okay.

MR. SNYDER:  It did not include AppSec or any other projects.  And what I'm saying is before they produced it to us, they had to create a copy of their server and then instruct one of their employees, "Go in and manually delete every project except for EMR/PE."

So, to the extent that they say everybody in the company -- the whole company forgot that this project existed, Mr. Satyanarayan didn't bother to speak to the AppSec director and ask him where he should look.  He forgot about it, even though he knew what this case was about.  He forgot about it even though he was the person at the company who made the production that went to the DOJ in 2019 that included every project.  But somehow he forgot about it throughout months of back-and-forth and all of this work to get a working copy of this information to us.

THE COURT:  All right.  So, you didn't learn much

from Mr. Mittenthal in April, 2024, about what had happened, although you did learn -- you got confirmation that the full JIRA back-up had been produced to DOJ in December, 2019?

MR. SNYDER:  That's correct, Your Honor.

THE COURT:  And then Mr. Laycob was deposed as a 30(b)(6) witness in April of 2024.  Was he questioned about this?

MR. SNYDER:  I don't recall specifically if he was. We actually deposed Mr. Laycob twice.  I think the April, 2024, deposition focused on certification issues.  eClinicalWorks took our 30(b)(6) notice and divided it among six different witnesses.  So -- and they wanted -- Mr. Laycob was going to testify towards the end of the discovery period, and we wanted him at least on certification earlier, so my recollection is that that deposition focused on certification, and I don't recall whether I asked him specifically about those tickets.  I know that the Mittenthal deposition was within a week or so of that, and so we knew that we were going to have a witness specifically on that topic.

THE COURT:  All right.  April of 2024, April 27th specifically, you deposed Wortman.  What did you learn from him about the AppSec files?

MR. SNYDER:  Mr. Wortman?

THE COURT:  Yes.

MR. SNYDER:  We actually didn't depose Mr. Wortman

until July, is my recollection.

MR. BERNARDO:  I think that's right.

THE COURT:  You got the report, that's right.

MR. SNYDER:  We got his report.  What he -- he didn't specifically discuss AppSec at any -- at any length in his report.  What he did talk about was he created charts showing opening and closing of JIRA tickets.  I know he created charts related to the speed with which the company was resolving issues flagged by their contract security server.  And he did have a -- by the time his report came out, he also had a full copy of the -- of the EMR/PE and AppSec tickets, but he didn't speak specifically about the circumstances of the production or anything like that in April.  In his report.

THE COURT:  When you deposed him, did you learn anything about -- the -- issue we're talking about now?  What happened to this AppSec file?

MR. SNYDER:  Nothing more than he confirmed that there was a period in time -- and he couldn't remember I think exactly -- February or March where he learned of the existence of these tickets, and they were provided, and then they looked through them.

That was it, is my recollection.  I don't want to -- I can't remember specifically exactly what I asked him about that.  He was -- he said that he was not the person on his team who was responsible for building the JIRA database, that that

was Mr. Litvak.  And I feel sure that he said that Litvak was the one who recognized that the December production was incomplete, that they couldn't create a server with it.  And his recollection of how he heard about it and the circumstances was very much, "I learned about some additional tickets in late February and I believe they've been produced."

THE COURT:  All right.  And as of today, what more, if anything, have you learned about why the AppSec project -- or file, we've called it both -- only surfaced when it did?

MR. SNYDER:  Everything that I have learned, other than what Mr. Mittenthal said in his deposition, was essentially confirmed in the declarations attached to the response to the motion, is what I know.

The testimony from eClinicalWorks is that they consulted with Mr. Satyanarayan about the JIRA productions, that he told them that the relevant tickets would be in the EMR/PE database, and that's effectively all they did.

I've never seen anyone say anything under oath about asking further questions, looking into other projects.  I know that Mr. Mittenthal did testify at his deposition that Mr. Jaiswal, the AppSec director, was not consulted with respect to the production of JIRA tickets.  Which still doesn't make much sense to me.

So, that's all I know now, is that their story is that they forgot about the tickets.  When they learned about

them, they produced them to us.  And that none of it was intentional.

THE COURT:  Okay.  Thank you, Mr. Snyder.

All right.  Mr. Bernardo, I'll let you fill in the gaps as you see them.  I will probe on specific points, but I will let you have your say on our factual picture, if you will.

MR. BERNARDO:  Thank you, Your Honor.  I appreciate that.

Your Honor, if I may now provide a demonstrative.

THE COURT:  You may.

MR. BERNARDO:  So, Your Honor, I first want to state out of the gate, and I think we said that in our brief, we have acknowledged from the very beginning that we made a mistake.  And I also want to say, Your Honor, I take responsibility for that mistake.  I've been doing this for 35 years.  I've overseen discovery in major national litigation.  And I take that role very, very serious.  I am probably more of a micromanager than most.

And I just want to represent and have Your Honor hear it from me that at every step of this process we tried to do what we thought was the right way to respond to discovery.  We hired external people to help us to make sure what we were doing was correct, and what we tried to do was address a problem that we saw when we -- when we got the government production, which was the estimate that our vendor, the same

one who's here, called me up and said, "Our vendor told us it's going to cost over a hundred thousand dollars to redact PII." And I understand --

THE COURT:  Excuse me, you said when you got the government production.  What do you mean by that?

MR. BERNARDO:  What we -- when we pulled it to look at it to make sure that -- I mean, we are not going to just push something across the table without looking at it and trying to make sure that what we are providing was appropriate. So we went through just to make sure there were no issues.  We spotted a few.  We pointed them out to Mr. Snyder.

And when we got that, and when we noticed the eManager issue, which was just this ginormous, massive amount of data, including personnel files and all of that that we knew wasn't relevant here, and when we saw all of the JIRA information that was just, like, pages and pages --

THE COURT:  Okay.  Okay.  I'm sorry, I'm going to interrupt you.

MR. BERNARDO:  No, no, I want you to understand, Your Honor.

THE COURT:  I understand the issues you say you were dealing with.  Who did you get the government production from, as you call it?

MR. BERNARDO:  Oh, I think we had to put it together from various pieces that existed over time.  In other words, it

was not just like a sort of press-and-play.  So, we had copies.  We worked with Mr. Katz.  We worked with our own internal folks because it was produced in pieces, as I understand.

THE COURT:  Who produced the JIRA server to the government?

MR. BERNARDO:  Interesting you ask that.  That goes back pretty far in time.

Aaron, that goes back before you were involved.

MR. KATZ:  Your Honor, just so you have an understanding about the chronology, before there was a civil investigative demand, there was an informal request made by DOJ --

THE COURT:  Give us your name again.

MR. KATZ:  Mr. Katz.  Aaron Katz.  Before -- about a year before the civil investigative demand issued, there was an informal request for information that DOJ made to the company.  We now know that informal request was precipitated by this *qui tam* lawsuit.  Skadden Arps produced some documents, including these .xml files, informally to the government at that point.

A year later, when the civil investigative demand issued, eClinicalWorks hired my former lawfirm, Ropes & Gray, where I was a partner.  We then did the collection, review, production of, like, the formal Bates-stamped documents to DOJ in response to the civil investigative demand.  That did not include a reissuance of the .xml file.

So, when we produced the DOJ production back to the relators in this case, in the unsealed *qui tam*, Skadden had to go get the documents from Ropes & Gray that Ropes & Gray had produced. And then there were these .xml files and a smattering of other documents that Skadden had that they had informally produced a year prior to the CID. And that's why Mr. Bernardo was saying it's sort of bits and pieces coming from various places.

MR. BERNARDO: And, Your Honor, we had trouble even putting together or unpacking what had been produced four years ago because people have left, people didn't have a recollection of exactly how that was assembled, and we made our best efforts to pull everything together. But that's one of the reasons we went through it, because we didn't just want to just say, "Here's this pile of stuff." And particularly because we had this issue that we were grappling with with the PHI.

THE COURT: Let me get this straight. You agreed to produce the DOJ production without knowing what the DOJ production was?

MR. BERNARDO: Well, no, we understood generally that it was materials that were provided to the government in response to discovery that was done in connection with the CID.

MR. KATZ: Your Honor, there is no doubt that I was aware, because I led --

THE COURT: Were you at Ropes & Gray --

MR. KATZ:  So, I was with --

THE COURT:  -- then?

MR. KATZ:  So, I was at Ropes & Gray during the entire CID period.  I then left Ropes & Gray after the unsealing, but before Your Honor had ruled on the motion to dismiss.  So, by the time discovery started, I was no longer at Ropes & Gray.

THE COURT:  You were there when the DOJ production was made?

MR. KATZ:  When the CID came through the door, the company hired me.

THE COURT:  No, you were there when the DOJ production was made?

MR. KATZ:  I was.  I was at Ropes & Gray.

MR. COBB:  That was the question.

MR. KATZ:  Yes.  So, I knew everything that Ropes & Gray had produced was absolutely going to be responsive to their *qui tam*.  I didn't know whether it had material that needed to be additionally redacted because of HIPAA reasons. But we knew that the documents themselves -- and I am not talking about the .xml file -- but the documents themselves that we collected from custodians would be responsive to sort of any reasonable discovery request that Relators might make.

MR. BERNARDO:  So, Your Honor -- I'm sorry, were you going to ask a question?

THE COURT: Well, let me get us back to where I think you were, which is that in this case you agreed to produce to the relators the DOJ production. At the time you incurred and assumed that obligation, you didn't know what the DOJ production was. After that, you got the DOJ production, and you said, "Oh, we can't produce all this." Is that right so far?

MR. BERNARDO: Yes, Your Honor. But I think the way you described it I think doesn't really fairly characterize it. We produced 99-whatever percent of the DOJ production that were the two structured datasets, and then there was also a set of contracts that we appreciated had provisions. And that's why we raised our hand and sought out to work with Mr. Snyder and try and resolve an issue we had.

And one thing to be clear, Your Honor, is this was not like the keystroke that it's made to seem in terms of the production. We hired our own technical person, Ms. Downs, who's been producing eManager and JIRA tickets for 29 years from companies. And I will say, the first reaction she had is: Do you realize this is, like, just some massive data dump?

And I think if Your Honor looks at what I just provided to you, that's sort of just to give you a little bit of context. The JIRA is all in blue on the right-hand side, and the green column is the eClinicalWorks production of 4.3 million pages of information. And I think it's really

important to say that this information included many, many, many, many versions of source code, going all the way back to whatever version is at the beginning here, plus a repository of all of the changes and the history of what's been changed. That's the source -- the source code is the source of truth with respect to the documents that are critical and relevant to this litigation. The -- the JIRA system is simply a means of tracking information that is in this source code. That's one of the reasons why there's tickets annotated in here.

But I just sort of want to contextualize what we're talking about and why when we looked at this, to be honest, my first reaction was -- and I said that to Mr. Snyder -- "I don't think you want all of this." I mean, I know it was made available. I don't think you want all of it, and I don't think we want to produce it, because it's going to cost a lot to redact, number one; and, number two, giving you three-quarters of a million records, the vast majority of which have nothing to do with the claims and defenses in this case -- I mean, frankly, I would probably get sanctioned in another court if I did that. That's why we raised our hand and said, "Let's look at it."

And if you look at the next page, Your Honor, just again by way of context, you'll see that all the way on the right is that 672,000 number. That's all of the JIRA records that have -- like, that exist. But you can see just from the

comparison, the overwhelming majority of them have nothing to do with the EHR software that is the subject of this litigation.  That's why we reasonably said, "Let's focus on that."  Let's get you what we thought -- and we took --

And, again, it's easy to go back when a mistake has been made and you see that and say, well, but if you had done this or you had done that it would have been different.  But I think Your Honor needs to consider the fact that there's not a step of this process that wasn't taken in good faith.  There's not a step of this process that was intended to deceive everybody -- anybody.

I think if you read -- I'm sure you did read all of the submissions, Your Honor.  I think you can see the course of conduct of the parties.  You can see our communications. Everything was spelled out very clear.  I am very proud of the effort we made and what we did.

A mistake was made.  Absolutely.  But I think taking that and going back and trying to create this impression, Your Honor, that we were doing anything other than trying to get information to Relators that was relevant I think is not fair. And I think it's very incorrect and contradicted by the record.

So, if you look at --

THE COURT:  Let me ask you this --

MR. BERNARDO:  Sure.

THE COURT:  -- Mr. Bernardo.  I know you're familiar

with the handout that Mr. Snyder gave me.  It's the dashboard. It's labeled Exhibit 6.  Am I correct that this is something that can be pulled up from the JIRA file that was produced to DOJ?

MR. BERNARDO:  Not without effort of taking that data that's in there, exporting it to a live instance of JIRA, standing it up, and reviewing it.  So it's not a matter of -- I use the analogy, going back to when I first started this, you can't flip a box open, look at it and say, "Oh!"  It's a matter of you need to go through it.

And that was one of the problems we were having with that 4-year-old production, is trying to navigate the JIRA and the eManager ticket, which is why we said we know we have to start from scratch here, so why don't we do that and work together to make sure we can get you -- we also knew that the tables and everything had changed over time.

THE COURT:  This retirement took place in 2020 --

MR. BERNARDO:  Correct, Your Honor.

THE COURT:  -- is that correct?  Did anybody ever recognize that -- during the process of extracting this information to get it to a way that you were comfortable producing it to the relators, that there were no security tickets before the retirement of AppSec on the EM-whatever-it-is?

MR. BERNARDO:  We didn't have that knowledge, Your

Honor.  At every moment until the end of February, when we got that phone call, we were under the understanding, as were the people -- and by the way, it wasn't just Mr. Satyanarayan who we consulted with.  There were many, many discussions with eClinicalWorks, Mr. Satyanarayan.  He says that, that he talked with other people to make sure that what we were getting was the right thing.  So, we all were going into this thinking that the relevant tickets, the tickets pertaining to the EHR software that are part of this case, were contained in that project.  That was the -- the understanding that everybody who we were working with and ourselves had until February.

THE COURT:  I get that.  So, if somebody had thought to look and said, "Well, I want to see if there's any security tickets from 1919 (sic)," with the database you were working with for the EHR software, they would have not found any security tickets?  Is that correct?

MR. BERNARDO:  I apologize, Your Honor.  I am not understanding your question.

THE COURT:  Well, as I learned from Mr. Satyanarayan's declaration, that the AppSec project was retired, and so the tickets related to the EHR software, up until that point, got retired with them -- with the AppSec project; right?

MR. BERNARDO:  That is correct, yes.

THE COURT:  And now those security tickets, after I

think it was February, 2020, would be associated directly with the EHR project?

MR. BERNARDO:  That's also correct, Your Honor, yes.

THE COURT:  So, if somebody had said, well, I want to see -- using the database you were looking at -- and "database" may not be the right word -- if I want to see security tickets with the EHR software before 2020, they wouldn't have found any in the database you were looking at.

MR. BERNARDO:  I see what you're saying.  That's not correct.  It's in Mr. Satyanarayan's declaration.  Going back to the beginning of using JIRA, the JIRA project that we pulled from was the repository for EHR tickets.

It just so happened that for a period of time, between I believe it was '17 or '18 and '20, they set up this other project that they were putting those other tickets in.  So, it wasn't a matter of, oh, there's no -- which I think is your question -- there's no tickets before that, where would they be.  From the beginning that was the project that the company had always utilized.

It's sort of -- I mean, I kind of analogize it to my own folder structure on Outlook, right.  I'm sure Your Honor may have some as well.  I have different case files, and when somebody says, "Where's your materials pertaining to eClinicalWorks?" I go there.

THE COURT:  Let me ask you this way.  Somebody trying

to find a security ticket for the EHR software in the database you were looking at would not have seen any security tickets that were in the AppSec project?

MR. BERNARDO:  That is correct.

THE COURT:  Thank you.

MR. BERNARDO:  I'm sorry if I -- if I misunderstood your question.  That's correct.

But I guess I want to go back to looking at what -- what I provided Your Honor.  Because I think if you see on the right, you can see why, I think, the idea was to try and provide the EHR tickets as opposed to doing -- and just so you're with me, Your Honor, it is this page that I'm looking at (displaying document).

THE COURT:  Um-hum.

MR. BERNARDO:  Because as you see, there's close to 700,000 tickets.  Only roughly 200,000 of those are EHR tickets -- or 220 if you add the -- actually, not all of the AppSec pertain to EHR.

That's the whole other thing.  It wasn't just an EHR project.  So, we were in good faith trying to make it usable for both sides to be able to get it.  We hired Ms. Downs.

And I know Mr. Snyder has continued to say that what was provided was unusable, and I have to take issue with that because, again, having done this for many years and dealt with structured dataset in litigation, this is literally the first

time in my experience in litigation that we have provided a live, stand-up version of a structured dataset. Because that's just not the way that discovery is conducted.

So, for example, it would be like saying, "eClinicalWorks, I want your entire Outlook, even though I recognize that most of the emails in there would have nothing to do with this case."

It's just -- it -- and Ms. Downs says the same thing in her declaration: That's just very, very, very unusual. Which is why the way we produced it, in a flattened file, that can be loaded into a database and can be searched, was produced that way. It wasn't unusable. It was the way in which this type of structured dataset is typically produced in litigation. And I can say that having done that many, many times.

We ultimately agreed, as we kept going on, to work with Relators. And that's why we came to Your Honor. Because at one point we said, "You know what, we disagree with that but we'll work with you. I just need something that focuses on these JIRA tickets so if somebody's PHI gets out or something like that, I have some protection."

And that's why we came to you. And right after that we ended up producing -- and we made this very clear, and we may not have had a meeting of the minds, but we made this very clear in our correspondence -- we were providing what they thought were all of the tickets for the electronic health

records software.  Again, didn't realize that we were missing the ten-or-so thousand when we produced the 200,000.  But it was our expectation.

As to the .xml file, again we -- we understood -- and I think there's a subsequent communication from Mr. Wheeler to Mr. Snyder -- that the active objects file is the file that includes the data.  That's what we produced.  And that's the file that can get uploaded.

The -- the notion of creating this live instance of JIRA was something that wasn't what we had been -- at least understood from our end we were doing.  Because what we were trying to do was a work-around from an issue we had.  Again, in hindsight, can you look back and say, "Well, why would you do it that way?"  Sure, Your Honor.  But you -- I want to try and communicate that it was done with absolute good faith in an absolute effort to try to work with Relators, be very transparent about what we were doing, and give them what we all thought was relevant to the litigation.

The -- the issue with respect to the deposition, I also want to take issue with.  Because we understood that the deposition was to be discussing the discovery in this action, including AppSec.  And the person most qualified to do that was Ms. Downs because she had worked with me and with Ms. St. Amand and everybody for many, many months and there was no --

THE COURT:  Is she well now?

MR. BERNARDO: She's -- she's -- yes, she is. Thank you for asking.

THE COURT: Good.

MR. BERNARDO: There's no one person you could put in a seat who could have addressed all of that. And that's why -- and, yes, I've used Mr. Mittenthal many times in litigation, and I use him for this very purpose. Because instead of saying, "Here, let me have you talk to 11 different people," we want to say, "Here, here's a person who can try and synthesize a lot of information, a lot of it technical, from the various, different people."

And Ms. Downs was going to do it, and before the deposition she told me, "Rich, I'm really sorry, I just can't." And she explained in her affidavit, and I got on the phone, and I got her express permission. I said, "May I tell Mr. Snyder because it's going to look a little bit odd because we're bringing somebody in completely different who has not been here." And I made that point.

And that's why Mr. Mittenthal was deposed. And, Your Honor, the kinds of questions that he was unable to answer were of such a level of detail that, frankly, anybody else would similarly have had difficulty in answering. And the -- the deposition was to be much broader. So, it was not only not bad faith in terms of bringing in Mr. Mittenthal; it was actually the opposite -- it was an attempt to get somebody who was very

good at going around, collecting information, synthesizing information, and being able to communicate it.

It would have been better and it probably would have been a better deposition if Ms. Downs was able to do it, but the circumstances were such that she couldn't, and she explained in her affidavit she spent considerable time with Mr. Mittenthal.

I also want to -- so, without belaboring, because we've talked about a lot of the issues of how we got through the year. We tried to work -- we tried to do it through search terms. We provided what we thought was an appropriate production. We genuinely didn't have an idea. Could we have gone back in hindsight and realized that? Absolutely, Your Honor. I am not walking away from that. What I'm saying is, we literally had no reason to know that.

Because you also have to step back and say, producing four and a half million pages of discovery -- and if you look at Relators' reports -- and, sir, that's another thing to turn to, the next page, the blue are the tickets that come out of the data that we produced in August of 2023, the yellow is from data that was only produced in December, and then the green are the other ones. I mean, the bulk of the information was produced. I think it's fair to look at these additional 11,000 as being cumulative.

And, Your Honor, just to go back to the 57,000 chart.

That number represents tickets that were looked at that refer to the very issues in this case. They refer to "security" or to "breach" or to all of those different things. So, it really is important to kind of put this in context, both in terms of what these tickets that we're all talking about really are in the overall context of the litigation, which is a small portion, but also what they really are in the context of tickets that relate to the claims and defenses in this case.

So --

THE COURT: It's amazing how discovery missteps can have consequences all out of proportion --

MR. BERNARDO: And, Your Honor, look --

THE COURT: -- to what the case is about.

MR. BERNARDO: -- we -- we apologize for that.

THE COURT: I get that.

MR. BERNARDO: I apologize for that. I wish we all weren't here discussing that. But just sort of taking a step back, we're all here discussing, as you point out, a mistake that occurred. That nobody is disclaiming. But I just don't think it's fair, reasonable, or appropriate to look back at that and think that people were trying to deceive or not to produce.

I don't think you can derive that through any of my communications, Your Honor. If you take a look at the discovery responses, we served them -- I'm sure Your Honor has

seen a lot of written discovery responses in a lot of cases and a lot of objections. What do eCW's look like?

"Here are the people we think have the key information."

"These are the words -- look at Exhibit 2 -- that we're going to use to search for materials."

We're also going to -- it literally told them every step, because we wanted to be an open book, we wanted to be transparent.

But going back to a comment Your Honor made, yes, look at what one mistake can do, but that's not the basis for the kinds of sanctions that Plaintiffs are asking for here.

THE COURT: Let me ask you this. Do you have any other Facts that we have not discussed that bear on the question of why the AppSec file or project was not produced before it was?

MR. BERNARDO: No, Your Honor. I think I've -- I've spoken my piece, as it were, as to that mistake. I assume you're not also saying Contrast, because I think, unfortunately, that's a whole other issue where I don't believe any mistake was made at all. But I think you're just asking about GR for Fax; correct?

THE COURT: Yes. Thank you, Mr. Bernardo.

MR. BERNARDO: Thank you, Your Honor. I appreciate

the opportunity to be heard on that.

THE COURT:  I am going to move on, and I hope this will move a little more quickly.  Mr. Snyder, who can help us get out the Facts relating to the settlement with --

MR. SNYDER:  Yes, Your Honor.  I will go back to the podium, if that's okay.

THE COURT:  Yeah.  I keep wanting to say "Brandon Peak."  I know that's not right.

MR. SNYDER:  I'm aware of the Brandon Peak, Quandary Peak, yes.  It's the company that was hired by eClinicalWorks to serve as its software quality oversight organization, which is either SQOO (sk-woe) or SQOO (skwoo) depending on who you ask.

This is I think a simpler issue.  We included it because we thought it was a clear illustration of the kind of narrowed interpretations of discovery that were being taken that we weren't aware of.

So, the company hired Quandary Peak to serve as its software quality oversight organization, and it worked with -- worked with them before their settlement in the *Delaney* case and until I think mid-2022, so throughout the entire time period that this case was under seal and through a little time after it was unsealed.

There was an administrative proceeding filed against the company by HHS OIG.  That's not correct, I'm sorry.  The

HHS OIG sent a stipulated penalties demand to the company, and we talked about this a couple years ago after the motion to dismiss hearing.  That was something we didn't know about when we argued the motion to dismiss and learned about subsequently.

And so as part of our discovery requests, we asked for communications with the SQOO, documents sent to or received from the SQOO relating to certification of the software or allegations in the case.  We asked for communications with ONC, and we asked for all documents or documents relating to the administrative proceeding.

What we got initially was the docket entries.

THE COURT:  That was on March 29th, 2023?

MR. SNYDER:  Yes, Your Honor.  I think we served 16 discovery requests -- document requests.  I think it was the 15th or 16th one, we got the docket entries in the administrative proceeding.  That was the first non-DOJ production we got in the case.  It was about 300 pages.  The defendants served subpoenas on agencies -- ONC, HHS OIG -- and we started to get documents from those governmental agencies.

And we started to see some more documents related to the administrative proceeding, including a letter from Mr. Katz where he asked -- I believe it was from Mr. Katz to HHS OIG where he made a settlement offer, and he asked that HHS OIG allow the company to fire Quandary Peak as a SQOO.  This was made in 2020, I think, approximately in the fall.

THE COURT:  When did you learn about the settlement agreement?

MR. SNYDER:  I learned about the settlement agreement live during Mr. Ulrich's deposition.  So, Brad Ulrich was the team leader for the SQOO.

THE COURT:  So, let me back up.

MR. SNYDER:  Sure.

THE COURT:  You mentioned the first indication I guess you had was something you got from a government source?

MR. SNYDER:  Well, what we knew from the government source was that there was an -- a request by eClinicalWorks to fire the SQOO.  And that the government declined that request.  So that -- that's all we knew about at that point.

We know that there was a resolution of the administrative proceeding.  There was -- the proceeding was dismissed.  The company agreed to some additional compliance obligations.

We at the same time had subpoenaed Quandary Peak for documents, and we eventually had agreed to start with two depositions; one of a man named Brad Ulrich, who was the team leader for the SQOO from roughly 2016 until about March, 2021.

In preparation for his deposition, I did a -- I searched through the privilege log for the words "Quandary Peak," and I found three or four entries referencing communications with Mr. Katz, referencing a draft settlement

agreement between the company and Quandary Peak.

So, what I knew heading into Mr. Ulrich's deposition was that the company had asked HHS OIG if they could fire them. HHS OIG said no. Around the same time there were some emails talking about a draft settlement agreement. That's all I knew.

During his deposition -- I don't know how far in we were -- I asked Mr. Ulrich if he knew anything about a settlement agreement between the company and Quandary Peak, and that's when -- Mr. Katz was on the call, Quandary Peak had its counsel, and we had a discussion about what Mr. Ulrich could say about this settlement agreement that I had only known maybe there was a draft of at some point.

And the questions were: "Was there a settlement agreement?" He answered that. And, "Was your departure from the company pursuant to the terms of that settlement agreement?" The answer to both of those was yes and yes.

I hadn't seen the agreement. I didn't know what it said. And then subsequently, of course, I asked for them to produce it to us. And when we got it, we saw that it was an agreement between eClinicalWorks and the SQOO that required the departure of Mr. Ulrich and others from the SQOO team. It obligated them not to express any opinions about the company. You've seen those --

THE COURT: We all know about those.

MR. SNYDER: -- and read those.

THE COURT:  Yes.  Let's focus on what happened.

MR. SNYDER:  I did not know that there was a settlement agreement until the middle of Mr. Ulrich's deposition live.

THE COURT:  Now, I'm looking at Tab 60 of the privilege log that was given to me.  Is that what you were talking about?

MR. SNYDER:  I have to consult with my partner on that one.  I think it was -- what I looked at was the full log that we had at that time.  And I -- I just ran a word search for the words "Quandary Peak."  Now, I did attach to the reply brief the relevant entries, and that's -- indulge me (moving back to counsel table).

Oh, yep, you're right, you're right, Your Honor, I think we did include those on our request for *in camera* review on the documents that we wanted the Court to take a look at.

THE COURT:  But what I'm looking at at Tab 60 of the spreadsheet that you jointly provided me for *in camera* review, which I am told is the -- includes the applicable entries from the privilege log.  Are we all looking at the same thing?

MR. SNYDER:  We are.

THE COURT:  All right.

MR. SNYDER:  Your Honor, standing here right now, I can't say for sure that those are the Quandary Peak emails.  I think they are.  I am not positive.  I need to -- because this

is missing some columns. This isn't every column that's in the privilege log, and I don't want to say something that's incorrect.

In our reply brief that we filed, I excerpted from the main log that was attached to my declaration. I can tell you the exhibit number if you give me one moment. (Returning to counsel table, consulting file.)

And I think we also provided this in native format. It would have been -- it's Document Number 182-13, I believe. Honestly, I can't read it. It's too small to read. I think that's what those are, but I am not positive.

(Returning to podium) But I can certainly let you know as soon as I have access to a computer that I can actually read this.

THE COURT: Let me see if I can read it.

LAW CLERK: (Printing and providing document.)

THE COURT: No, not from that.

MR. SNYDER: I am opening the native document, Your Honor, which should hopefully tell us the answer to that question. I'm sorry, those are the -- some of the entries that I saw on the privilege log. What I was missing was the subject from the email, which was "Re: eCW settlement agreement with Quandary Peak."

So, all I knew was that there were several emails on the privilege log that discussed legal advice from outside

counsel Alison Fethke, Hannah Fraley, and outside counsel Aaron Katz regarding negotiation of an agreement.

Those are all in approximately the November, 2020, time period, which was around the time that they were communicating with HHS OIG and asking for permission to fire the SQOO.  The actual agreements that were produced to us eventually were not signed I think until March of 2021.

THE COURT:  Was the settlement agreement itself -- and I don't mean a draft agreement -- but the settlement agreement itself identified in the privilege log?

MR. SNYDER:  Not to my knowledge, no, Your Honor.

THE COURT:  Mr. Bernardo?  Is this your issue?

MR. BERNARDO:  Actually, I can answer this question.  Mr. Katz is going to address it more generally.  But the settlement agreement -- I just want to make sure I am not revealing privileged information -- there were documents that discussed it with drafts of it, but they also discuss other matters beyond that that would hit on terms that were relevant to the claims and defenses.

THE COURT:  Was the final settlement agreement --

MR. BERNARDO:  I'm sorry, no.  I misunderstood your question.  The final settlement agreement was not -- the final settlement agreement, as far as I understood, was not among any of the materials that had been collected from the various people we went to.  Mr. Katz got that from his law firm.

THE COURT:  Mr. Snyder, have you gotten an explanation as to why the settlement agreement was not produced in response to your request?

MR. SNYDER:  The explanation I've gotten was that it was not within what they believed the request was asking for, which is why I'm confused as to why there are entries on the privilege log related to discussions relating to the negotiation of the agreement.  I think its falls squarely within the requests.

I think I've heard variously at times that they didn't believe that the request called for communications between outside counsel.  It is a document related to the SQOO's work in the case.  It relates to the removal of the team leader, someone who was very critical of the company in his assessments.  It changed the way that the corporate integrity agreement was enforced.  They had to retrain all of the Quandary Peak --

THE COURT:  No, I appreciate the significance of it.

MR. SNYDER:  I do think it's highly relevant and I do think it was responsive.  What I've been told is that the lawyers did not believe this to be within the scope of the requested documents.

THE COURT:  Well, let me make sure I understand.  The agreement itself was not listed on the privilege log.  We know that much.  A draft agreement is, and you're going to see that

if you haven't already.  Again, I am only looking at what is at Tab 60.

MR. SNYDER:  When we made our -- I believe that when we made the proposal of documents that we asked to be included in the *in camera* submission, we included that email chain as one.  Because we knew that it was relevant to other issues.

And then when we did that several times, the company said, well, we -- you know, it's a family of documents.  We said we want the email and all the family.  And so I think that's why Tab 60 is actually an email and then multiple different versions of the draft agreement.  Which we'd never seen and which we didn't know existed until Mr. Ulrich was allowed to testify that it did.

THE COURT:  All right.  Thank you, Mr. Snyder.

MR. SNYDER:  You're welcome.

THE COURT:  Mr. Katz, this is your issue?

MR. KATZ:  Yes, Your Honor.  And I'm happy to answer any questions Your Honor has, but let me just start with the question about why the settlement agreement wasn't produced.  I can stand here in front of the Court today and say I still don't think that the settlement agreement is responsive to any of the requests the relators made and certainly not to the requests that the relators quote on Page 8 of the brief that is filed at -- I think it's ECF 182.

I mean, this settlement agreement in my view is not

related to the matters alleged in this lawsuit, including but not limited to the relators' allegations, the securities of eCW's software, and ONC certification of eCW's software.

Number one, the settlement agreement itself was not precipitated by security issues; it was indeed precipitated by allegations of ethnic bias, and that is why Mr. Ulrich was removed from the project.

Mr. Ulrich was not in charge of the security chapters of the SQOO reports. He's not, frankly, a security expert. Those issues were delegated to other members of his team. Mr. Singh similarly was not a security expert. He was not in charge of the security chapters in the SQOO reports.

The security team at the SQOO was untouched by this settlement agreement. There is no way for anyone on our team and certainly not me to think that this was responsive to any document request. The reason we provided it on the privilege log is because --

THE COURT: Well, you didn't provide it on the privilege log. You provided communications --

MR. KATZ: Correct.

THE COURT: -- about the settlement agreement.

MR. KATZ: Correct.

THE COURT: You did not identify the privilege -- the agreement itself as being privileged.

MR. KATZ: That is fair, Your Honor. And the reason

those documents get on the privilege log is because what we did here was what we do in any discovery, we go and find custodians that may have relevant information.  One of those custodians was Mr. Laycob.

There's keyword searches that are done on the documents.  Those keywords are used to tag potentially responsive documents and potentially privileged documents. These documents were undoubtedly correctly identified as privileged.

An individual who makes a decision to untag or tag a document as potentially responsive is not a member of this team.  We're talking about contract attorneys.  By the time this thing gets on a privilege log and is reviewed by the attorneys that are in the thick of the case, we're looking at it --

THE COURT:  Well, again, we're not --

MR. KATZ:  -- for privilege purposes.

THE COURT:  -- talking about a privilege log.  We're talking about somebody who made a decision that a non-privileged document was not subject to discovery.  Who made that decision?  Because the agreement itself is not privileged. You have not claimed it's privileged.

MR. KATZ:  Correct.  I -- I --

THE COURT:  Who made that decision?

MR. KATZ:  I'm -- Your Honor, I don't think there was

a particular decision made.  There is a settlement agreement. We're looking at it and we're deciding it is not responsive. But I can tell you that I read every one of the relators' discovery requests.  I knew about the settlement agreement.  I was obviously involved in the settlement agreement.  And I definitely did not think this document, this settlement agreement, is responsive to any of these requests.

If I had, I would have given it to the relators immediately.  I would have called up Ropes & Gray and asked for my old emails and pulled it out of my emails and given the settlement agreement to them.  I did not view it as responsive to any of these requests.

The first time that it occurred to me that Mr. Snyder might want to see the settlement agreement is when he referenced it during Mr. Ulrich's deposition.  What did I do? I talked with Quandary Peaks' outside counsel, and that same day emailed Quandary Peaks' in-house counsel saying can we please get your permission to provide the settlement agreement to the relators, because there is a mutual confidentiality provision.  We were not going to enforce it, but we wanted to get permission from Quandary Peak to provide it over.  But it was literally hours after Mr. Snyder said "I think this is a relevant document and I want it" that I asked Quandary Peak to provide it.

THE COURT:  Okay.  I saw all that.  And one

interpretation of that is having been caught.  You did -- you moved quickly.

But, I have this question now.  Again, the determination -- my word, not yours -- was that it -- the agreement itself was not subject to discovery.  It had nothing to do with the issues in this case.

MR. KATZ:  Correct.

THE COURT:  So, why were communications about the agreement included on the privilege log?

MR. KATZ:  So, this is just a creature of how privilege logs are created, Your Honor.  And, again, you first go to a custodian, you pull their entire email files.  You then run a keyword search.  Anything that hits on a very broad set of keyword searches is going to be reviewed by a human lawyer, a contract attorney.  If it has a privileged term like "Ropes & Gray" or "Skadden," it's going to get on a privilege log.

And when something that is clearly privileged makes it on a privilege log, frankly, Your Honor, you are not making fine-grain distinctions about whether we should pull that document off for nonresponsiveness.

But Your Honor also has the underlying emails, and I think Your Honor might determine that it's responsive to some other requests.  There are references to the DOJ investigation, for example, in some of those emails.  Oblique references.  But

you can see how a contract attorney or a junior associate might decide that this is close enough that I'm not going to pull it off the log, in which case no one would have seen these communications, even in privilege log form, and just leave them on the log.  Why not make logs over-inclusive rather than under-inclusive.  That's my practice.  That's many lawyers' practices.  And I think that is the practice that was used here.

If I had been looking at this privilege log and saying can we pull things off of it as nonresponsive, would I have decided to pull those four emails off as nonresponsive?  I may very well have.  I wasn't the one who made the decision to put that on the privilege log.

But I can tell you right now that I definitely did not view the settlement agreement at any time as responsive to any of the relators' discovery requests.  And, frankly, the minute that Mr. Snyder -- it wasn't getting caught; it was him indicating that he wanted to see it.  I had no problem providing it.  And I asked Quandary Peak for permission to provide it.

I just don't think it could be any more clear than that.  But if I had thought this was responsive, Your Honor, they would have gotten it, you know, in December, 2023, or whenever we started producing documents.

THE COURT:  Well, assuming that everything you say is

correct; and that is, somebody made the decision, as you say they did, and you say it was you, that the settlement agreement, pursuant to which eCW secured the removal of Quandary Peak employees who, you say -- and I've seen the documents now that I understand came from the government -- used inappropriate language, but who also had been critical of things that they say they discovered during their -- in the discharge of their responsibilities as SQOO pursuant to this government investigation, to think that not producing that document would not raise all sorts of questions about whether eCW was being forthcoming in their discovery obligations -- I mean, even if you thought it wasn't discoverable, it has now become what it's become.

MR. KATZ:  And in hindsight, Your Honor --

THE COURT:  eCW wanted these SQOO employees removed. That's how it's going to get played if it gets played, and anybody who reads this would know that.

MR. KATZ:  So, Your Honor, this issue has become, frankly, surprising to us.  An apparently key element of their trial theory or their summary judgment theory.  We understand that.  And certainly now that we know that they are going on that angle, we're prepared to confront that at summary judgment, at trial.  And we had no problem giving Mr. Snyder the document once it was clear that he was trying to chase down this thread.

But at the time that discovery decisions were being made, number one, the final settlement agreement was in my personal files, Skadden lawyer personal files.  I do not believe the final settlement agreement was in any of the custodians' that we collected from.

THE COURT:  That is not an excuse.

MR. KATZ:  But, Your Honor --

THE COURT:  That is not an excuse.

MR. KATZ:  And I am not using it as an excuse.

THE COURT:  Then why are you using it?

MR. KATZ:  Because I am just flagging why the final settlement agreement would not have, for example, hit on search terms.

THE COURT:  It's kind of like why the JIRA information didn't surface until much later.  I mean, that's the way it looks.  You understand that.  I mean, all of you for eCW understand how it looks, I assume.

MR. KATZ:  We understand how Mr. Snyder is trying to make it look, and we're prepared to respond to that in summary judgment and at trial.

But in terms of a discovery violation, I am going to say it again.  I am looking at the discovery requests that were issued to us, and I am standing here before the Court saying I still do not believe the settlement agreement is responsive to any of those requests.

Now, in a counter-factual, if THE person responsible for writing the security chapters, the person who was in charge of the security aspect of the SQOO project had been removed, would that have made the settlement agreement responsive? Potentially.  It gets -- it at least gets it closer.  But that is not what occurred here.

The Quandary Peak personnel that were removed were not the people in charge of reviewing the company's security, interfacing with the company's security personnel.  Brad Ulrich, yes, was the head of the SQOO project at the time, but he was not in the weeds of security issues, let alone the security issues from which this lawsuit emanated.

So, we made a very reasonable determination -- I will take it on myself.  I made a reasonable, defensible determination, one I still think is correct, that this settlement agreement was not responsive to any of these discovery requests.

If I could have seen six, nine, twelve months in advance how Mr. Snyder might try to use this document after having learned of it, would we have produced it, been over-inclusive?  Perhaps.  But our job in responding to initial discovery requests is to provide documents that are responsive. And this was not.  This was not, Your Honor.

THE COURT:  Thank you, Mr. Katz.

Mr. Snyder, I want you to talk briefly on the

question of the consequences in terms of the plaintiffs' case of the delayed production of the JIRA information.

MR. SNYDER:  Yes, Your Honor.  Thank you.  I think it has to be both the misstatements about the DOJ 2019 JIRA production and the delayed production of the AppSec tickets. The AppSec late production was the precipitating event that caused them to finally go back and make sure that what they were telling us was correct, after three requests, and say we hadn't given them the full server.

So, to start from the beginning, my clients insisted that they wanted a full copy of the server.  The JIRA server. We're going to need to look at that.  It is a key piece of evidence.  That's why we asked for a complete copy.

THE COURT:  Here's what I'm trying to get to.  As you stand here today, where are you because of the late production of the JIRA --

MR. SNYDER:  Um, where we are --

THE COURT:  -- information?

MR. SNYDER:  I'm sorry, Your Honor.  I didn't mean to cut you off.

THE COURT:  Go ahead.

MR. SNYDER:  Where we are is 20 days away from summary judgment, 5 days from the close of expert discovery. We have produced -- I have to count them -- nine or ten expert reports.  Eight of them reasonably might touch on issues that

would have been more fully explored if we'd had access to this information.  When we asked for it.

We have completed the company's 6-step 30(b)(6) deposition.  We have taken individual depositions of Mr. Laycob and Mr. Lewis, the company's --

THE COURT:  Have you now reviewed all of the relevant information from the AppSec?

MR. SNYDER:  That's the problem, Your Honor, is that the answer to that is no.  And that's the -- what we saw once we had finally what we'd asked for--a full copy of the JIRA server--was that not only had we been missing a lot of tickets, we were not provided access to the Contrast server in a way that was usable.  Contrast is an integrated security tracking system in their system.  It creates JIRA tickets, and then the developers go back in and they mark them open or closed.

We had been given an export -- we weren't told about Contrast until November.  And then we got an export in December that excluded kind of the key pieces of information.  And they've said in their filings that that was a factor of the way that they had to do the export.

But it wasn't until we saw in April -- and this is why in April we returned to this Contrast issue and said we need a full copy of your Contrast server.

What we have now is enough I think to go forward.  But there's thousands of issues.  And that's why in the reply

brief I pointed out that Mr. Wheeler, since the end of July -- or end of June, when we had access to Contrast and all the JIRA tickets, has spent something like 70 hours going through about two dozen issues and has located two new -- the company I'm sure will dispute this -- high-severity security issues that we think do relate to the certification.  They allow access to PHI without authentication.

That's information that if we had been -- if -- we've got to rewind the clock.  When I asked in April, 2023, did you give a full copy of the JIRA server to the DOJ, and they say no -- let's say they said yes.  My immediate response is going to be, "Well, we want that copy and if you won't give it to us we're going to the Court to get an order."

If we had that, that tells us about the existence of these other projects.  It gives us all of -- almost the entirety of the AppSec database.  It would have highlighted the kind of integrated nature of Contrast and JIRA in a way that was not apparent until we had a full copy of the server.  And it would have guided our technical analysis of the software in a way that was -- we were deprived of.

THE COURT:  Okay.  Let me -- you have the handout with the bar chart showing the relative number of tickets we're talking about.

MR. SNYDER:  Are you talking about the one that I've handed up?

THE COURT:  Let's make sure that is correct.  We will put this in the record as Defendant's Exhibit 1.

(Defense Exhibit 1 admitted into evidence at 12:02 p.m.)

THE COURT:  According to this, there were 210,232 EHR tickets produced in December 2023.  Do you have any reason to doubt that?

MR. SNYDER:  I have no reason to doubt that the active objects file containing that data was produced to us. We have said -- Mr. Wheeler has said under oath, and Mr. Hogue, our affiant from Atlassian, has said under oath that that file on its own is not sufficient to create a working JIRA copy and that actually searching it would be very difficult, which is what we found.  But that -- that -- I think that is the correct number of tickets that were included in that production.

THE COURT:  Okay.  So the answer was yes?

MR. SNYDER:  I'm sorry, Your Honor, yes.  The answer is yes.

THE COURT:  And then in February, 2024, according to this, when they discovered the AppSec file or project, they produced -- eCW produced 11,009 AppSec tickets.

MR. SNYDER:  That -- I don't have any reason to think that that number is incorrect, Your Honor.

THE COURT:  And the "all" category in April, 2024, what does that represent?

MR. BERNARDO:  Your Honor, that's every JIRA ticket pertaining to every project that the company has.  As you can see, it's above and beyond the 210 that relate to EHR.  So, it's -- like, you see some of the titles on the projects are "Seaworld," so it's literally every ticket, but it's not tickets that are relevant to the EHR software.

MR. SNYDER:  To be clear, we don't have all those tickets, either.  We didn't get all the project tickets, I don't believe, did we?

MR. BERNARDO:  Yes, you did.  You got the whole dataset.

MR. SNYDER:  Then I will stand corrected on that.  So, we got attachments to certain projects, but not all the tickets.

Just one quick clarifying point.  This EHR ticket production in December that we have said is unusable or was unusable, I think they have said in their briefing included about 30,000 security tickets.  And then we got another 11,000 security tickets in February.  So, even if they are right that we could have used that file for anything, that means we're still missing roughly 25 percent of the relevant security tickets until we get the AppSec production.  I mean, that's my recollection, and if I am wrong about that, I will stand corrected.

Not all of those 210,000 EHR tickets related to

security.  The reason we asked for them all is because we didn't think we were getting a good search, and we wanted to run our own searches.

THE COURT:  All right.  Let's take a break.  We'll take about 15 minutes.

COURT OFFICER:  All rise.

(Court in recess from 12:05 p.m. to 12:23 p.m.)

COURT OFFICER:  All rise.  This Court is now in session.  Please be seated and come to order.

THE COURT:  eCW's explanation for why it failed to produce the AppSec file is simply not credible.  I don't believe it.  I believe that some lawyers were surprised when they learned of it, but on -- in the whole, and as we look at the Factss we've walked through this morning, it's simply not credible to me that eCW should not have recognized that this clearly discoverable information had not been produced.

The best light that you can put on it is recklessness almost beyond comprehension.  But that's the best light.  I don't know, obviously, precisely what happened, but we all have the benefit of hindsight.  And with hindsight, I think everybody recognizes this was a huge foul-up.  There is no way it should have happened.  There's no possible way that teams of attorneys and experienced clients, particularly experienced with litigation of this sort, would not have recognized that this information had not been produced.

Your expert -- one of your experts obviously recognized the significance of it.  A cynical person would say that, well, once he scoped it out and told Mr. Satyanarayan that he knew about them or knew about the information, the decision was made, well, we've got to come clean.  A cynic would say that.  I am not concluding that.  All I am saying is the explanation is not credible, and the best light you can put on it is that it was reckless to the extreme.

Now, the sanctions, the severe sanctions that the plaintiff asked for are not warranted based upon what I see now.

Without question, the issue of attorneys fees has to be resolved.  I think eCW effectively recognized that.

So, Mr. Snyder, what you need to do is put together a reasonable and detailed bill, if you will, and allow -- and then you can go to work with eCW's lawyers and see what you can do about that.

I'll tell you, next to motions to compel, my least favorite activity is trying to figure out fee awards.  In the end, I think they usually should be resolved without the aid of the Court.  You have probably seen what I've done with some.  I am not extravagant in that regard.  I look at it closely.

And related to that is it's -- Mr. Snyder, in terms of other sanctions--and there may be none--I am not seeing yet the harm that might lead me to think that such sanctions

were -- are necessary.  And maybe your detailed statement of fees and explanation of the time might enlighten me further on that.  And as we move through the summary judgment motion and *Daubert* motion process, we may see there's other issues.

But, I suspect that if this had been -- well, if eCW had done what they said they were going to do at the outset, we would have rocked along and what was actually in the AppSec project might not have turned out to have made much difference after all.  I appreciate the chart that Mr. Bernardo gives me, and that gives me some perspective.

So, that is the resolution for now of that issue.

With regard to the Quandary Peak settlement agreement, the good news is it's a smaller issue.  The bad news is, my gosh, it's a worse issue in terms of the look.  I disagree that the settlement agreement was not within the scope.  I mean, you've got an agency charged with the responsibility, as a result of a significant settlement with the government, of monitoring and recommending and discovering whether eCW is doing what it's supposed to and reporting if they're not.

And the look is, to any reasonable person, that eCW didn't like what they were doing, and they took the action they took.  And that look is reinforced by the fact that it wasn't produced.  I mean, the reasonable and I think obvious approach to this was you get it out -- you get out in front of it.  You

know if it comes up, when it comes up, it's going to be something the other side is going to try and do something with, whether it's warranted or not. And what you have done is made sure it came up in the worst possible way.

And, again, you knew -- had to have known that the plaintiffs were going to talk to the people at Quandary Peak and it was going to come up. It's just a question of when it was going to come up.

The question that raises, to me, at this point -- and, again, I am not drawing the conclusions that I've just outlined from the settlement. I understand what eCW's position was, and I have no reason -- I can't pass on that. I am just talking about the look.

MR. KATZ: Understood.

THE COURT: The problem -- in fact, here's the problem. I am not even saying that this is going to be an issue at trial. It should have been produced. We could try this issue -- spend a week trying it, that's the problem. And I think both sides have something to lose if we were to walk down that road.

So, it was a bad decision. It was a breach of eCW's discovery obligations. What the consequences of it will be -- well, here's one consequence. The -- do you have your spreadsheets? I've talked about Tab 60. I've -- well, let me -- the spreadsheet you sent me, as I understand it -- I

think Kim asked y'all to pull that up -- what it is is the relevant privilege log entries for the documents that were submitted for *in camera* inspection. Is that correct?

(No response from counsel.)

THE COURT: And we'll talk about everything else on that. But because of the breach of eCW's discovery obligations with regard to the Quandary Peak, the documents identified as privileged at Tab 60 will be produced to the plaintiffs. And no surprise, Mr. Snyder, what you'll see is they were concerned about the very thing we're talking about: How is it going to look when you're telling these employees -- or these SQOO people that they can't talk.

Now, let's look at that privilege log. We're going to deal with this I think with some dispatch. The documents that I requested and that are at the beginning of the spreadsheet, all those were appropriately withheld.

Now, that gives us -- brings us to Category 1(A), they were appropriately withheld.

1(B) and 1(C) and 1(D) were also appropriately withheld.

2(A) -- we're moving on now to third-party consultants, but as I understand it in 2(A) -- and I am separating third-party consultants who have been designated as experts and those who have not. But the documents in Category 2(A) are -- were appropriately withheld with the exception of

Document 16 or Item 16 in 2(A).  There's nothing to it that I could see, but it was just -- there was no reason why it needed to be withheld.

The documents at 2(B) were appropriately withheld.

2(C), with the exception of -- well, let me back up. 2(C), 2(D), 2(E), 2(F) were all appropriately withheld.

Turning to Tab 3(A), Item 37 was not -- well, let me ask this question.  I didn't see anything in Document 37 that indicated why it was being withheld other than the fact that it was on the Ropes & Gray listserv.  And I don't know the ins and outs of this listserv.

If there's something about this listserv that I need to know -- I was looking more at the substance.  The mere fact that it was on the listserv didn't tell me that it was privileged.  There may be an argument that you would want to make about that.  But of the two documents that are in Category 3(A), I didn't see any basis for 37 being withheld. 38, I did.

Anything about the listserv that I need to know?

MR. KATZ:  I don't know if we're looking at the same document.  The document I'm looking at, I don't see an address in the listserv, I don't think.

THE COURT:  Well, the category is titled, "communications involving a Ropes & Gray Listserv."  Titled, "Ropes BRG Listserv."

MR. KATZ: Yeah, I'm -- I don't know if we're looking at -- I'm sorry, Your Honor, I don't know if we're looking at the same tab here. I'm sorry, are you looking at Tab 38? I think I have a Tab 38 listserv. I think I see the issue, Your Honor. I think Tab 38 --

THE COURT: No, it's Tab 37. 38 I said was properly withheld.

MR. KATZ: Yeah, 37. If it is in a listserv categorization, Your Honor, I do not believe that that would be correct.

THE COURT: Okay. Well, I didn't see anything in there that warranted withholding.

MR. KATZ: I don't think we disagree with Your Honor. I think that's fine.

THE COURT: Okay. Now, a more difficult category is 38, because it involves Drummond Group. Now, as I understand it, one of your expert witnesses was with Drummond Group. So, Mr. Snyder, I will let you speak to that issue. What impact does that have on documents withheld because they involve communications with Drummond Group?

MR. SNYDER: Your Honor, you're looking at the Category 3(B), Communications involving communications with Drummond?

THE COURT: Right.

MR. SNYDER: Can I speak from here?

THE COURT:  Pull the microphone, please.

MR. SNYDER:  Oh, the Drummond Group is the authorized certification body for eClinicalWorks.  Mr. Meadors was the president of Drummond until roughly 2016, when he left to start consulting with eClinicalWorks and other companies.

The communications related -- one of the defenses that eClinicalWorks has asserted in the case is that, you know, the software was properly certified, and we shouldn't be in here second-guessing what Drummond said or did.  So, these emails and these communications wound up on this privilege log because we do believe that the -- what Drummond knew and when and communications about that are relevant and discoverable given the course of this litigation.

Mr. Meadors, he doesn't work for Drummond anymore, but in essence his expert report is this is just what Drummond would have done.  He's, you know, retested the software and said I followed the same scripts that I wrote for Drummond and everything is hunky-dory.  He's effectively offering the opinion I think that Drummond would say again that the software is properly certified.

MS. COLE:  And, Your Honor, if I may.

THE COURT:  Yes.

MS. COLE:  I would add to this, so, by the time that this sample got to the Court, this -- you know, this has been curated over and over and over again.  And so these -- these

sample documents -- originally, the Drummond Group sample had communications that also were between Drummond Group.

We now know, we have deposed Mr. Meadors, we have received his expert report, and so these documents -- again, we have not received the benefit of looking at them so the Court may know more than we do, but a lot of these documents we believe, you know, Mr. Meadors is offering opinions related to certification of eCW's software.

But we believe that the documents withheld based on the descriptions provided by eCW are -- appear to be related to business advice.  So, even if they are related to documents that include lawyers on the communications and eCW lawyers, whether they be internal or outside counsel, if they are direct draft documents -- you know, for example if you look at 40, 41, 42 -- providing legal advice with outside counsel, with Michael DiMaio, Mr. Burby -- these draft documents alone, if they are business related, related to certification alone, even though they are going to say, you know, "that's legal," you know, certification is -- is regulatory, and regulatory advice is not in and of itself going to be automatically privileged and entitled to attorney-client privilege based on third-party information.

We also believe that, you know, because Mr. Meadors is an expert, that puts it at the -- at waiver defense, as well.  That's what we briefed in our supplemental briefing.

MS. ROSE:  Your Honor, may I respond?

THE COURT:  You may.

MS. ROSE:  Thank you so much.  There were -- a lot of things were said there, and I am not sure if it was exactly what Your Honor was asking.  Just to clarify, we're talking about Tab 38; is that correct?  Is that what you're looking at?

THE COURT:  No.  We're talking about Category 3(B), communications eCW claims involve legal advice regarding communications with Drummond Group.

MS. ROSE:  Okay.  Starting with 39.  Perfect.  There you go.  So, Your Honor, to be clear, there's no -- nothing is being withheld that is a communication between Drummond and eCW.  To the extent communications that relate to legal advice, um, related to communications with Drummond, it's typically, um, situations in which a lawyer is commenting on submissions to be made to the government, making sure that the information provided is -- is accurate, and giving legal advice on government submissions, which is a privileged purpose.  And I think that's clear from looking at the documents.

The waiver argument that Plaintiffs are asserting is simply that -- there's no support in the law for it.  That because, um, communications with Drummond or because we have an expert that worked for Drummond years ago, suddenly any communications between the attorney and client related to any, um, interaction with Drummond is no longer privileged, that's a

very, very broad argument.  And there just isn't support in the case law for it.

THE COURT:  Well, I agree with that.  But when did -- is -- Meadors, is that his name?

MS. ROSE:  Yes, Your Honor.

THE COURT:  M-e-a-d-o-r-s, I think.  When did he leave Drummond?

MS. ROSE:  I believe he left Drummond in 2016.  Around 2016.  That's my understanding.

THE COURT:  Let's do this.  If any document has been withheld because it's a communication with or concerning or relating to Mr. Meadors while he was at Drummond Group, then submit that for my review.

MS. ROSE:  Will do, Your Honor.

THE COURT:  But for now, the documents at Category 3(B) were properly withheld.

Now, Category 3(C) involves two lawyers.  You know, the first, generally the lawyer is either a witness or a lawyer.  He is not -- or she is not both.  I gather from your briefs you are no longer planning on using these lawyers as witnesses?  Is that right?

MS. ROSE:  Your Honor, the -- the attorneys were placed on the potential witness list out of an abundance of caution depending on how Plaintiffs' case came in and how they developed their case, in case there was some dispute about what

occurred with meetings with the SQOO where the attorney was present. We don't at this time see any need to -- based on where the case has gone thus far, to include them. But, again, we don't know how Plaintiffs' case is going to come in.

THE COURT: Let me tell you something. If a lawyer is going to be a fact witness, they need to withdraw from this case.

MS. ROSE: Yeah, so they are not lawyers in this case. These are -- sorry.

THE COURT: They are not --

MS. ROSE: They are Ropes & Gray.

THE COURT: Okay. I didn't understand that.

MS. ROSE: Right. No, they do not currently represent eCW, so they are not lawyers in this case. They are previous counsel. And to the extent they would testify -- and, again, I want to state we do not see there's any need to, but, again, we don't know how Plaintiffs' case is going to come in -- to the extent they would, anything they would talk about would be non-privileged. It would just be about interactions with SQOO. That is not a privileged interaction. It would just be what was said at the time.

But, again, Plaintiffs are basically asking for a preemptive waiver based on witnesses that we have said we don't intend to call unless Plaintiffs somehow inject them into the case in a way we need to respond.

THE COURT:  That gets us back to the settlement agreement.  So, these are lawyers involved with Quandary Peak?

MR. KATZ:  So, they are non-litigators.  They are healthcare regulatory lawyers.  They were assisting the company with corporate integrity agreement compliance.  They would on occasion -- actually, upon regular occasion, on regular cadence be involved in small group meetings with Quandary Peak -- phone calls, zoom meetings.

But they were on the witness list solely if there was a lack of recollection or dispute about what happened at a particularly meeting and they were the only ones with knowledge, with personal recollection.  That has not been the case.  There's no disagreements about what happened at any of these meetings, and that's why we have -- I would say zero expectation that they are going to be called as witnesses.

We're not -- we don't have affidavits from them.  Not planning on submitting anything from them for summary judgment.  So I think the Court can safely assume that they are not going to be witnesses in this matter.

MS. COLE:  And, Your Honor, if I may, they have made that representation in their brief.  But, you know, it's Relators' position that that alone is not sufficient.  What would be sufficient would be to simply remove them from their initial disclosures as identifying them as witnesses.

And also their disclosure, what Mr. Katz just alluded

to, that's only part of their disclosure.  So, they have been identified as fact witnesses as relevant to eCW's communications with Quandary Peak during the course of the CIA, that's correct.  But they have also been identified as fact witnesses as to eCW's efforts to comply with the CIA.  So, that's where it gets into a much more substantive and potentially much more important area, where they are both potentially fact witnesses as well as attorneys.

MR. KATZ:  Your Honor, that second category was simply another way of describing the first category.  Just to make clear that those -- that's what those meetings pertained to.  So, I think you can view that first category as gobbling up any testimony they would have provided.

But, again, at this point -- if what relators' counsel is asking is for us to amend our initial disclosures to remove them, we're happy to do that.  I have never gone back and done something like that in a case where I've represented that they are not going to be witnesses.  I mean, at this point I can tell the Court there is a zero percent chance that they are going to be called as witnesses.  There would have to be new evidence injected from some witness that we've never heard of from the relators' side that would make them even potentially at play at this point.

THE COURT:  Well, one example could be -- that you weren't thinking about, but they may know something about and

undoubtedly do know something about -- as I look at the descriptions on the privilege log, and that is the settlement agreement.

MR. KATZ:  I don't think they would, Your Honor. They were not -- Ms. Fraley obviously was on a couple of the emails, but she was -- that would have been her only involvement at all.

THE COURT:  Well, I am not saying that they were involved in the negotiation of the settlement agreement, leading to the removal of Brandon/Quandary Peak employees.  I am just looking at descriptions that talk about Quandary Peak recommendations and responses to communications from Quandary Peak.

MS. COLE:  Your Honor, at least as it relates to the SQOO, for this challenge category, this is the largest by far. There are over 2,000 entries for Mr. -- Ms. Romig and Mr. DiMaio.  And, you know, the SQOO, which is, you know, essentially synonymous with Quandary Peak, and I can go back and pull anything specific to the settlement agreement.  But for the SQOO term alone, that term appears over -- it's 1,152 times and in over 800 privilege log descriptions regarding implementation of SQOO interval assessment recommendations in that challenge log.  And that's in our brief.

THE COURT:  Well, of course, Mr. Katz, you fall in this category, too.  Not as somebody who's been identified as a

witness, but somebody who we see, as you would expect, considerable --

MR. KATZ:  Your Honor, so, I was the client relationship partner.  I put together the healthcare regulatory team, so I would be courtesy copied on certain communications.  I was not involved in the day-to-day of CIA compliance.

THE COURT:  Well, I think that all we can do on that is this.  At least at this point.  If either of these attorneys testify, they will have to produce in advance documents concerning their work on the subject matter of their testimony --

MR. KATZ:  Understood.

THE COURT:  -- notwithstanding any claim of privilege.  It's kind of like the old days when the defense lawyer got the prosecution's evidence the night before.  It won't be the night before, but...

And, yes, Category 3(D) concerning communications with Mr. Katz, for now I see no reason that those documents that I've looked at or that are on the privilege log were not properly withheld.

So, based upon what I know now, other than as I have stated, the documents submitted for *in camera* inspection do not have to be produced.  What I do want to see, similar to what you sent me here, a spreadsheet of all withheld documents that in any way concern the AppSec file or project or the

information on the AppSec -- information in the AppSec file or project through July of 2024.

Now, that may not be apparent from the description on the privilege log, but if a document is being withheld on the basis of privilege, and if the document concerns in any way either the AppSec file or information on the AppSec file/project/whatever, then I want to review the entries for that document and the document itself.

Mr. Bernardo, is that clear enough?

MR. BERNARDO:  Yes, it is, Your Honor.

MR. SNYDER:  May I ask a clarifying question, Your Honor?

THE COURT:  Yes.

MR. SNYDER:  One of the agreements that we reached early on in this case is that we were not going to ask counsel to log their communications with their clients subsequent to learning about the existence of the case.  So, the logs that are -- that have been filed with the Court, short of any communications that would have predated 2018, are not going to have any communications internal or external or otherwise relating to the collection of the JIRA database or the AppSec file or anything like that.

So, I think it's likely that if it's just based on the logs that we have currently, that you're not going to get to see any of those documents related to the decision by the

attorneys and the company to produce or not produce the information.

THE COURT:  Well, fair point.  Thank you for that information.  So, disregard that.  You know, I have made my ruling on the substantive issue, and that is that there was a breach of discovery obligations with regard to the AppSec file.

For now, I will let it go at that and look forward to see if further remedial action is necessary.  At the time, I don't see it, but we'll see.

So, what that means is that for now we have resolved the motion for sanctions to the extent we can resolve it today, and we have resolved the motion to compel.

Mr. Snyder, do you see it that way?

MR. SNYDER:  I do.  May I ask one more clarifying question before we leave?

THE COURT:  You may.

MR. SNYDER:  Because I expect this will come up.  You have ordered them to produce to us Entry Number 60 on their log, which relates to the communications about the draft settlement agreement.  There are three other emails that were on the log that was provided to us relating to that draft settlement agreement, and those entries were attached, I believe -- I know they were attached to the reply brief as Exhibit --

THE COURT:  You mentioned that.

MR. SNYDER:  -- F.

THE COURT:  Yes, let me look at that.

MR. SNYDER:  I would ask about the inclusion of those documents, which are all roughly contemporaneous in time to the one that was submitted to the Court.  And then I have one other question.

MR. BERNARDO:  Your Honor, I -- we interpreted your ruling to call for the production of all of those.

MR. SNYDER:  Okay.

MR. BERNARDO:  In other words, I just want to clarify, Rob.  All of the documents on the privilege log that reference the settlement agreement, I interpreted Judge Treadwell's order to mean that we have to produce those and we will.

THE COURT:  Fair enough.  Thank you, Mr. Bernardo.

MR. SNYDER:  The second clarifying question is based on what Mr. Katz said, it sounds like they did not do a full search for communications about the drafting of the settlement agreement.  The settlement agreement was actually signed in March of 2021.

So, my guess is, if this is accidentally on there because of some contract attorney foul-up, that there are other communications regarding the settlement agreement with Quandary Peak that have not been produced and have not been logged.  I may be wrong, but I can't imagine they only sent four emails

five months before they signed the agreement about it.

I don't know what the remedy is.  Perhaps it's a log of those documents that can be produced to chambers, and you can then decide whether you want to see them and what further relief might be appropriate.  But, I would ask the Court to consider that since that is something --

THE COURT:  Well, here's the --

MR. SNYDER:  -- it has ordered.

THE COURT:  -- I think the first question, Mr. Snyder.  You need to think about if -- and if so, how -- you might use this settlement agreement.  And I know the answer to that could depend upon what unfolds as we move along.  Right now I see it as a quagmire.  Again, the look is bad, there is no question about that.  But a bad look doesn't make it admissible.  There's got to be more there.

So, I think the -- how far we go with this in the first instance turns on what you want to do.  You don't have to tell me now.

MR. SNYDER:  I will think about it, Your Honor.  I mean, it is not our intention to have a week-long mini-trial about these accusations against Quandary Peak.  I think if it is -- if it does come up at trial, it can be handled fairly quickly.

The -- as we see it is as the Court suggested, the look.  There was an accusation made.  Very detailed submissions

to HHS OIG.  HHS OIG summarily rejected those accusations.  And then the company negotiated an agreement that, by its terms, was not to be provided to the government, that accomplished some of what they were trying to accomplish by having Quandary Peak fired.

And I take exception to Mr. Katz' statement that Mr. Ulrich was not involved with security.  He was the team leader.  He was copied on thousands of emails about security with the software.  What exactly we might do it with it, I am not sure.  But I can tell you there is a marked difference in the tone and content of the interm assessment agreements after Mr. Ulrich left the team.  And you can draw whatever conclusion about that you'd want to.  And I think we are entitled to explore that issue.  And perhaps this supplemental production of documents may help clarify that issue for us, whether it's something we want to push forward with or not.

THE COURT:  Well, yes, perhaps the direct examination would take five minutes.

MR. SNYDER:  Right.

THE COURT:  I doubt the cross --

MR. SNYDER:  Fair enough.

THE COURT:  -- would only take five minutes.  Therein lies the problem.  And you've got a witness who's going to be interrogated about what eCW views to be the full story.

MR. SNYDER:  Understood.

MR. BERNARDO:  Your Honor, if I may just say -- and I'm happy to work with Mr. Snyder -- but, you know, we put this very issue on the table before, as we said -- and I know you don't believe that to be credible -- we did not interpret that allegations of the kinds of discrimination that took place had any relevance to this trial.

But if somehow in this year somebody is going to get in front of a jury and claim that eClinicalWorks made up these allegations, as Your Honor points out, we've got a bit of a quagmire, because then we need to be dealing with discovery on that, because there's no way in which eClinicalWorks isn't going to defend the good faith nature in which they addressed what was fairly egregious conduct that was ultimately corrected.

So, I think you've used the right word, "quagmire." But I just want to point out that it is not a one-minute explanation, and we would want an opportunity to deal with that issue as we put on the table with Mr. Snyder when he pointed out that somehow they're going to claim that these allegations were made up.

THE COURT:  That's a much longer statement of what I just said.  But thank you.

So, any further questions or comments from eCW?

MR. BERNARDO:  None here.

THE COURT:  All right.  I think we accomplished a

lot.  Obviously, there's much to do.  And maybe now the focus can turn on those issues.

MR. KATZ:  I'm sorry, Your Honor, we do have one other issue just to put on your radar, and that's in terms of trial date.  Obviously, we still have summary judgment motions to brief, and we're going to argue that this case should not go to trial.

The trial date does look like it will pose a conflict for potentially lead trial counsel.  I know it poses at least presently a conflict for me.  That may resolve on Friday with a plea hearing in the SDNY, but for Skadden it poses an irreconcilable conflict is my understanding.

THE COURT:  You mean a trial setting?

MR. KATZ:  Correct.  Correct.

THE COURT:  Well, we'll deal with that.  You know, funny thing about trial settings, that they often go away.

MR. KATZ:  They often do.  For this particular lawyer they seem very rarely to, but I hear Your Honor.

THE COURT:  Well, there are people of that sort, I recognize.  Okay.  Well, that's on my radar, and we'll deal with those issues.

Okay.  Well, I'm glad we accomplished what we did today, and I'll look for those additional things we talked about, and we'll go from here.  Thank you.

COUNSEL COLLECTIVELY:  Thank you, Your Honor.

                    COURT OFFICER:  All rise.

          (Proceedings concluded at 1:07 p.m.)

                         END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

I, Darlene D. Fuller, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of October, 2024

*Darlene D. Fuller*
_____
Darlene D. Fuller, RPR, CRR, RMR
NCRA No. 5803
Federal Official Court Reporter
Georgia CCR 5641-3440-5157-6832
Michigan Certification CSR-0929