UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* ALEX PERMENTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 5:18-cv-382-MTT |
| | ) | |
| v. | ) | |
| | ) | |
| eCLINICALWORKS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES' STATEMENT OF INTEREST IN RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The United States, the real party in interest in this *qui tam* action,[1] hereby submits this

Statement of Interest pursuant to 28 U.S.C. § 517 to address certain arguments set forth in

Defendant's Motion for Summary Judgment (ECF No. 216). The False Claims Act, 31 U.S.C.

3729, *et seq.*, (FCA) is the federal government's primary tool to combat fraud and recover losses

due to fraud in federal programs. Accordingly, the Department of Justice has a substantial

interest in the proper interpretation and application of the FCA in this and similar cases. Thus,

the government files this Statement to address three issues. First, the *qui tam* provisions of the

FCA are constitutional.[2] Second, fraudulent conduct in order to obtain certification is material to

the government's payment of claims dependent on certification. Finally, the United States suffers

damages when it pays money as a result of fraudulent conduct, even where it would have paid as

---

[1] The United States remains the real party in interest in this matter, even though it has not intervened in the action. *United States ex rel. Eisenstein v. City of N.Y.*, 556 U.S. 928, 933-35 (2009).

[2] If the court does not plan to reject the constitutional challenge, the United States requests that the court certify the question to the Attorney General pursuant to Federal Rule of Civil Procedure 5.1(b) and 28 U.S.C. § 2403(a) so that the Attorney General has the opportunity to consider whether to intervene in the action. *See* Fed. R. Civ. P. 5.1(c) (district court can "reject [a] constitutional challenge" without affording the government an opportunity to intervene, but cannot "enter a final judgment holding [a] statute unconstitutional" without providing that opportunity).

much or more to other parties had the fraud not occurred. The United States takes no position on the other arguments raised by Defendant in its Motion for Summary Judgment (Motion or MSJ).

## I.      The FCA's *Qui Tam* Provisions Are Constitutional

In the last two pages of its Motion, Defendant eClinicalWorks (eCW) argues that Relators' claims are barred because the *qui tam* provisions of the FCA are an unconstitutional delegation of executive power. MSJ at 48-49. This Court previously found a similar "argument citing dissenting and concurring Supreme Court opinions meritless." *United States ex rel. Fahn v. GardaWorld Fed. Servs., LLC*, No. 20-128, 2024 WL 1605313, at *7 n.5 (M.D. Ga. Apr. 12, 2024). The addition of a citation to a non-binding district court opinion (that is currently on appeal) does not lend the argument any further merit.

Defendant argues that Relators' prosecution of this declined *qui tam* case represents an impermissible delegation of Executive power to a private party. MSJ at 48-49 (citing *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 19-01236, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024) (appeal pending)). Defendant ignores the fact that every U.S. Circuit Court that has considered this issue has found the *qui tam* provisions constitutional. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993). And numerous district courts in the Eleventh Circuit have also rejected this argument. *See, e.g.*, *United States ex rel. Butler v. Shikara*, No. 20-cv-80483, at *23 (S.D. Fla. Sept. 6, 2024) ("[I]f the First Congress found the [*qui tam*] mechanism constitutionally appropriate, it would be difficult to justify reaching the opposite conclusion from the very

Framers themselves."); *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at \*4 (N.D. Ala. Nov. 20, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Beattie v. Comsat Corp.*, 2001 WL 35992080 (M.D. Fla. Apr. 18, 2001); *United States ex rel. Flanagan v. Baptist Health Sys., Inc.*, No. 97-B-3070-S (N.D. Ala. Mar. 30, 2001); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999). This Court should hold likewise.

When Congress enacted the FCA in 1863, it included *qui tam* provisions, following a "long tradition of [such] actions in England and the American Colonies." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000). These provisions allow private individuals, known as relators, to bring suit "for the person and for the United States Government" against "[a]ny person" who defrauds the government and to receive a share of any recovery. *Id.* at 769-70 (quoting 31 U.S.C. §§ 3729(a), 3730(b)(1)). The FCA has become "the government's 'primary litigative tool for combatting fraud,'" with the FCA's *qui tam* provisions serving "as a critical supplement to government enforcement." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014) (quoting S. Rep. No. 99-345, at 2, 4 (1986)).

At its core, the separation of powers doctrine focuses on "the allocation of official power among the three coequal branches of our Government." *See Clinton v. Jones*, 520 U.S. 681, 699 (1997). "[I]n determining whether [legislation] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). Courts repeatedly have held that *qui tam* actions do not upset such a balance.

3

*Qui tam* relators are private litigants. The Supreme Court has expressly declined to adopt a theory that they sue as "agent[s] of the United States." *Stevens*, 529 U.S. at 772. Their Article III standing exists due to a "concrete *private* interest in the outcome of the suit" that arises from Congress's "partial assignment of the Government's damages claim" to them. *Id.* at 772-73 (alteration accepted and emphasis added). Relators bring *qui tam* actions "in the name of the Government," 31 U.S.C. § 3730(b)(1), but this is a procedural practice that does not alter their status as private litigants with private interests. *See Stevens*, 529 U.S. at 780-81 n.9, 786 n.17 (actions pursued by relators are "private suit[s]" brought by "private parties."). Relators are not transformed into "official[s] of the United States" merely because, in pursuit of their own interests, they further a federal interest in remedying and deterring fraud on the United States. *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) ("§ 3731(b)(2)'s use of the definite article 'the' suggests that Congress did not intend for any and all private relators to be considered 'the official of the United States.'").

The deep historical roots of *qui tam* provisions confirm that the FCA does not violate the separation of powers. As the Supreme Court previously recognized, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *See, Stevens*, 529 U.S. at 774-77. The Court found this evidence "well nigh conclusive" in establishing that *qui tam* relators have Article III standing. *Id.* at 777.

4

The historical evidence is also highly relevant to the constitutional question presented here. *See Riley*, 252 F.3d at 752 (finding it "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to *qui tam* lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute"). The First Congress enacted numerous *qui tam* provisions, thus making clear that the Framers did not believe relators were performing functions that only federal officers could properly perform. *See Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (acts of the First Congress "provide[] contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument") (quotation marks omitted). And the long tradition of *qui tam* actions in the United States after the Framing provides "additional evidence that the doctrine of separated powers does not prohibit" this unique practice, given that "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)); *see also NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014).[3]

Courts rejecting constitutional challenges to the FCA have also observed that the United States retains significant control over *qui tam* suits. *See Riley*, 252 F.3d at 753-57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 753-55; *Kreindler & Kreindler*, 985 F.2d at 1155. The Supreme Court recently underscored this point, noting that if the government intervenes in a *qui tam* suit, "the relator loses control" and the action is "'conducted by the

---

[3] The Supreme Court has a long history of allowing *qui tam* actions to proceed. *See, e.g.*, *United States ex rel. Escobar v. Universal Health Services*, 579 U.S. 176 (2016) (vacating dismissal of relators' suit)*; United States ex rel. Sanders v. Allison Engine Co.*, 553 U.S. 662 (2008) (remanding suit brought by a relator for further proceedings); *Stevens*, 529 U.S. 765 (holding that relators have Article III standing to pursue actions under the FCA); *Marcus*, 317 U.S. 537 (1943) (affirming district court judgment in favor of relator and noting the long history of *qui tam* statutes).

Government.'" *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023). Even where the government initially declines to intervene, the Supreme Court confirmed in *Polansky* that it may intervene at a later time and move to dismiss the relator's claims. *Id.* at 426, 432-33. Such motions are subject to highly deferential review under Federal Rule of Civil Procedure 41(a); indeed, the Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases"—"even if the relator presents a credible assessment to the contrary," *id.* at 437-38.

Beyond the government's broad dismissal authority, the FCA also provides the Executive with an array of tools for protecting the government's interests in cases where it does not intervene. The government can "elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). It can settle a *qui tam* action over the relator's objection. *See id.* § 3730(c)(2)(B). If it instead permits the *qui tam* action to proceed, the government is entitled to, among other things: (1) receive copies of all pleadings and deposition transcripts; (2) move to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts"; and (3) prevent the relator from dismissing or settling a case without the government's approval. *Id.* § 3730(b)(1), (c)(3), (4). And because the first-to-file bar and the public disclosure bar do not apply to the government, the government can bring its own action even after a relator's suit is dismissed, subject to principles of claim preclusion. *See id.* § 3730(b)(5), (e)(4). Courts rejecting separation-of-powers concerns like those raised by Defendant have noted all these mechanisms of "executive control." *Kelly*, 9 F.3d at 750-55; *see also, e.g.*, *Riley*, 252 F.3d at 753; *Taxpayers Against Fraud*, 41 F.3d at 1041.

6

Defendant's citation to the recent non-binding decision of a single district court provides no basis to depart from the longstanding consensus among the courts of appeals. The district court based its analysis on the premise that, when relators bring FCA suits, they are suing on behalf of the United States in the exercise of "core executive power." *Zafirov* at *8. But as described above, *qui tam* suits are private claims, pursuing the relator's interest in a share of the recovery as partially assigned by the government. The *Zafirov* court further erred in concluding that relators occupy an "office" akin to that of the Attorney General, which may vary from occupant to occupant. *Id.* at *11. Whereas only one person holds the office of Attorney General at any given time, there are many relators, and a statute empowering an indeterminate number of private citizens to exercise certain powers does not create an "office." This error of the district court is further underscored by the fact that when a relator dies, his estate may be substituted in his place, *id.* at *14, which is obviously not true for an "office" in the United States government. Finally, even while acknowledging that "early Congresses enacted at least some statutes containing an enforcement mechanism roughly analogous to the FCA." *id.* at *17, the court improperly discounted the weight of this Founding-era evidence and failed to square it with the Supreme Court's reliance on those early statutes in *Stevens*.

For these reasons, the FCA's *qui tam* provisions are consistent with the Constitution's separation of powers. Accordingly, if the Court reaches the Defendant's constitutional arguments, it should reject them, like every federal Circuit Court to decide the issue.

II. **Fraudulently Obtaining Certification Under a Government Program Is Material to the Government's Payment of Claims Dependent on that Certification**

In their Complaint, Relators allege that eCW falsely attested to compliance with various requirements necessary for certification under the ONC Health IT Certification Program. In its Motion, eCW focuses on the fact that the company's certifying body (Drummond) conducted

limited testing and found no violations that precluded certifications. On that basis, eCW argues that Relators have adduced no evidence that "any allegedly withheld information affected the certification decision." MSJ at 16. However, when submitting its attestations, EHR technology vendors such as eCW are not simply attesting that their EHR technology will pass the limited testing that ONC has prescribed. Instead, the EHR technology vendors make a broader claim that their technology complies with the certification requirement, whether or not it is tested. *See* ONC Health IT, ONC Health IT Certification Program Test Method, https://www.healthit.gov/topic/certification-ehrs/onc-health-it-certification-program-test-method (last visited Dec. 3, 2024).

Moreover, even if – as eCW argues – the Corporate Integrity Agreement (CIA) might have provided the government "with virtually unlimited access to review and audit all of eCW's corporate records, including source code," *id.* at 16, n.6, participation in government programs is not a game of catch-me-if-you-can. Those who wish to do business with the government – in this case by obtaining certification for a product where the government relies on the certification in making payments to healthcare providers – must deal honestly with the government. *See United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("[M]en must turn square corners when they deal with the Government.") (internal citation omitted). The onus of complying with the government's program requirements rests squarely on participants' shoulders. It was not the government's obligation to ferret out the alleged lie.

eCW argues that certification was not material because CMS continued to make enhanced payments to healthcare providers that used eCW's technology. MSJ at 17-23. However, the government's continued payment is not dispositive under *Escobar*. *See United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1350 (11th Cir. 2021). To the

8

contrary, *Escobar*'s holistic approach to materiality confirms that no one factor disposes of the fact-intensive inquiry. In this case, the enhanced payments that CMS makes to providers under the MIPS program are dependent, in part, on the provider attesting to the use of a certified EHR. *See* Def. Statement of Facts ¶ 116, ECF No. 216-2 (to be eligible for points in one of the four categories, "clinicians must attest to the use of 'Certified EHR Technology'"). Thus, if Relators can prove that eCW's alleged fraud affected certification, then materiality would be nearly assured since CMS conditions at least some of its MIPS adjustments on the existence of certification. *See Escobar*, 579 U.S. at 194 (noting that the fraud in *Marcus*, 317 U.S. 537 – where companies fraudulently induced the government to contract with them – was material because the government "would never have . . . placed [money] in the joint fund for payment" had the government known the truth).

Moreover, under *Escobar*, CMS's payment of "particular claim[s] in full" is only relevant to the materiality inquiry if the payments were made "despite [CMS's] actual knowledge that certain requirements were violated." *Escobar*, 579 U.S. at 195. Here, eCW fails to square its contention that the government knew of the **allegations** with the requirement of actual knowledge of a violation, and particularly so with regard to CMS, the agency making the payments. *See, e.g.*, MSJ at 18 (stating that the government knew about the allegations and then citing *Escobar*'s statement that payment despite actual knowledge of a violation is probative of materiality).

*Escobar*'s holistic analysis also considers whether an alleged misrepresentation goes to the essence of the bargain. *Bibby*, 987 F.3d at 1347 (citing *Escobar*). Relators assert that eCW's conduct in allegedly falsely attesting to compliance with certain security-related certification criteria goes to the essence of the bargain. Here, the government, through CMS, makes enhanced

9

payments to healthcare providers who adopt EHR technology that has been certified under ONC's program. And, the government, and ONC specifically, has an interest in protecting Americans' private health information. *See, e.g.*, 42 U.S. Code § 300jj–11(b)(1) (enumerating as the first purpose of ONC that it "ensure that each patient's health information is secure and protected, in accordance with applicable law").

eCW argues that security requirements cannot go to the essence of the bargain if there is no evidence that failure to meet them had a "real-world impact." But evidence of bad actors hacking into a healthcare providers' records is not required where Relators can prove that the EHR technology did not meet the security requirements to which it attested compliance. eCW's reliance on a non-binding district court opinion for its proposition is unavailing. *See* MSJ at 21 (discussing *United States ex rel. Bonzani v. United Techs. Corp.*, 662 F. Supp. 3d 217 (D. Conn. 2023)). In *Bonzani*, the government had averred that the specific characteristic that was not tested was not a "critical safety characteristic," and the district court stated that the lack of evidence of failure of the parts "renders irrelevant speculation about the severity of the consequences of failure." *Bonzani* at 232. However, the district court also observed that if consequences were severe enough, then it could be "presumed that the condition *would be material* to the government's decision to pay," providing as authority for this view the Fourth Circuit, *Triple Canopy* case. *Id.* at 233 (citing *United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017) (where a defendant-contractor falsified marksmanship tests of guards for a U.S. military base in Iraq)). The *Bonzani* court noted that *Triple Canopy* "relied on a 'common sense' approach in determining that supplying unqualified guards to protect U.S. personnel in warzones, and certifying them to the government as qualified, was a material falsehood." *Id.* at 234. Here, Relators allege that eCW made false statements that caused the government to certify EHR

technology that would be managing the personal health information of Americans when that EHR technology did not meet basic security requirements. Unsurprisingly, at least one court has recognized the materiality of government cybersecurity requirements. *See United States ex rel. Markus v. Aerojet Rocketdyne Holdings, Inc.*, No. 2:15-cv-02245, 2022 WL 214085, at *7 (E.D. Cal., Feb. 1, 2022) (denying a motion for summary judgment on materiality where "[i]t may be reasonably inferred that compliance was significant to the government because without complete knowledge about compliance, or noncompliance, with the clauses, the government cannot adequately protect its information.")

Another part of the holistic materiality test is whether the "Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement." *Escobar*, 579 U.S. at 195. eCW seemingly touches on this factor when it states that "CMS has never denied or reduced any clinician's MIPS payment as a result of nonconformities or security vulnerabilities in the clinicians CEHRT." MSJ at 20. But eCW has not pointed in its motion to any evidence that CMS was ever aware of EHR technology vendors that made false certifications of compliance with the security requirements in order to obtain certification and, with actual knowledge of a continuing violation, continued to pay.

Additionally, it should be noted that in *Escobar,* the Supreme Court recognized that even payment of a claim despite knowledge of a violation is not dispositive but only "very strong evidence that those requirements are not material." 579 U.S. at 195. Materiality can be found even if the agency paid claims despite knowledge of a violation. *Bibby*, 987 F.3d at 1350. Here, CMS was arguably required to make payments as long as the software remained certified. Even if the Court were to look beyond CMS's knowledge and look to ONC's knowledge and continued certification of the EHR technology, Relators argue there are facts from which a trier

11

of fact could find that ONC's decision not to revoke certification does not foreclose a finding that the security requirements were material to certification.[4] Relators' Resp. to MSJ 20, ECF No. 266. Furthermore, the fact that the government views certification as material is evidenced by the numerous FCA cases in which the government has pursued allegations that EHR technology vendors fraudulently obtained certification. *See id.* at 24.

### III.    Damages Accrue Even When the Government May Have Spent the Same Amount of Money Absent the Fraud

Finally, eCW argues that it is entitled to summary judgment on damages because "the government has not lost any money" and "eCW's EHR software indisputably provided significant benefits to the U.S. government."[5] MSJ at 46. However, if a defendant violates the terms of a government program and prevents the government from obtaining the benefit for which it bargained, then the government is harmed. Any claim that the government suffers no FCA damages if it makes payments that it would not have made had it known of the alleged fraud conflicts with the purpose of the FCA and ignores the vast case law to the contrary. In this case, Relators have offered evidence that CMS made enhanced payments to healthcare providers based on those providers' attestations that they had adopted and used EHR technology that was properly certified. And Relators have offered evidence that the attestations by eCW's customers were false because the technology was not properly certified. The fact that eCW's customers

---

[4] eCW also claims that materiality is negated by the fact that the Office of Inspector General of the Department of Health and Human Services did not impose stipulated penalties on it under the CIA due to allegations of deficient security made by the Relators. MSJ at 16. But the CIA only provides for stipulated penalties if eCW failed to meet the specific requirements of the CIA. Failure to comply with any certification requirement – even those settled by *Delaney* – was not, on its own, a basis for imposing stipulated penalties under the CIA.

[5] Of course, damages are not an essential element of an FCA case and a defendant can be subject to FCA penalties even when FCA damages are not proven. *See, e.g., United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009).

might have used different software that was properly certified and received the same enhanced payments does not mean the government was not damaged by the fraud.

In FCA procurement cases where bid rigging or fraud in the inducement occurred, the government generally would still have paid money to purchase the good or service. And in some cases, the government might have paid an even higher price had the defendant not submitted its fraudulent bid. But courts recognize that the government's interests extend beyond simply obtaining the lowest price, and that when a defendant's fraud prevents the government from obtaining the benefit for which it has bargained, the defendant is liable for FCA damages. *See, e.g., United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (rejecting argument that because it was the lowest bid, the government suffered no damages where defendant paid kickbacks in order to induce the award of a contract).

Here, Relators have alleged that eCW fraudulently obtained certification under the ONC Health IT Certification Program by providing false statements regarding its compliance with security requirements, and that the government thus paid premiums to healthcare providers using eCW's EHR technology that it would not have paid had eCW been truthful. As *Rogan* observed, "The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due." *Rogan*, 517 F.3d at 453. *See also United States v. Anghaie*, 633 F. App'x 514, 519 (11th Cir. 2015) (affirming FCA damages calculated as three times the full amount the government paid where defendants "deprived the government of the benefit of funding deserving and eligible research"); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 472 (5th Cir. 2009) (same); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (D.C.Cir.2010) (remanding on damages while noting that "where the defendant fraudulently sought payments for participating in programs

13

designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages").

eCW argues that in *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021), the government was only damaged because it received no benefit as a result of the defendant's fraud. MSJ at 47 n.19. eCW then attempts to distinguish the present case by asserting that the government was not deprived of any benefit. Instead, the government received the benefit of healthcare providers adopting an EHR that met some, if not all, of the certification requirements. However, *Yates* states that damages are "the difference between what the United States paid and what it would have paid had the claims been truthful and accurate." *Yates*, 21 F.4th at 1305. In *Yates*, the government would not have paid the claims because the laboratory that did the testing was not certified – a requirement that the government had instituted to benefit patients. *See id.; see also* CMS, Clinical Laboratory Improvement Amendments (CLIA), https://www.cms.gov/medicare/quality/clinical-laboratory-improvement-amendments (last visited Dec. 3, 2024) ("The objective of the CLIA program is to ensure quality laboratory testing"). The fact that the government paid for a laboratory test that may well have been accurate and facilitated further treatment of the patient did not cure the fraud or eliminate damages. *Yates*, 21 F.4th at 1304-05. The Eleventh Circuit's view on this is even clearer in *Anghaie*. There, the district court had noted that the defendant "delivered cutting-edge innovative ideas" under the grant, but the Eleventh Circuit still affirmed damages based on the entire amount the government paid because the defendants' fraud intangibly harmed the government by depriving it "of the benefit of funding deserving and eligible research." *Anghaie*, 633 F. App'x at

14

519. Defendant has offered no rational basis for departing from Eleventh Circuit precedent on the calculation of damages in this case.

### CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court should reject Defendant's arguments that conflict with the correct application of the FCA, as described above, but otherwise it takes no position on the remaining arguments in Defendant's Motion for Summary Judgment.

\*   \*   \*

Dated: December 4, 2024              Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
United States Department of Justice

JAMIE ANN YAVELBERG
EDWARD CROOKE
CHRISTELLE KLOVERS
U.S. Department of Justice
Civil Division, Fraud Section
175 N Street, NE, Room 10-121
Washington, DC 20002
Telephone No.: (202) 305-3656
E-mail: Christelle.klovers@usdoj.gov

PETER D. LEARY
UNITED STATES ATTORNEY

By:   *s/ Todd P. Swanson*
TODD P. SWANSON
Georgia Bar No. 496989
Assistant United States Attorney
E. BOWEN REICHERT SHOEMAKER
Georgia Bar No. 222443
Assistant United States Attorney
United States Attorney's Office
P. O. Box 1702
Macon, GA 31702

15

Telephone: (478) 752-3511

*Attorneys for the United States of America*

16