IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

_____

UNITED STATES OF AMERICA ex          )
rel., ALEX PERMENTER, ERIC           )
RODIGHIERO and CHRIS WHEELER,        )
                                     )
     Plaintiffs,                     )
                                     ) Case No. 5:18-CV-382
vs.                                  )
                                     ) Macon, Georgia
eCLINICAL WORKS, LLC,                )
                                     )
     Defendant.                      )
_____)


                    TELEPHONE CONFERENCE


                    December 12, 2023


          BEFORE THE HONORABLE MARC T. TREADWELL
               UNITED STATES DISTRICT JUDGE


Proceedings reported stenographically
_____

                    DARLENE D. FULLER, USCR
                  Registered Professional Reporter
                      Registered Merit Reporter
                      Certified Realtime Reporter
             Georgia Certified Reporter No. 5641-3440-5157-6832

APPEARANCES:

FOR THE PLAINTIFFS:          Robert H. Snyder
                             Hannah Drosky Amanuel
                             CANNELLA SNYDER
                             315 West Ponce de Leon Avenue
                             Suite 885
                             Decatur, Georgia 30030
                             rob@cannellasnyder.com
                             hannah@cannellasnyder.com

                             Brian P. Adams
                             Mary Beth Hand
                             ADAMS LAW FIRM
                             598 D.T. Walton Sr. Way
                             Macon, Georgia 31201
                             (478) 238-0231
                             brian@brianadamslaw.com
                             mbhand@brianadamslaw.com

FOR UNITED STATES:           Christelle Klovers
                             U.S. DEPARTMENT OF JUSTICE
                             Post Office Box 261
                             Ben Franklin Station
                             Washington, DC 20044
                             (202) 305-3656
                             christelle.klovers@usdoj.gov

FOR THE DEFENDANT:           Geoffrey M. Wyatt
                             SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM, LLP
                             1440 New York Avenue, N.W.
                             Washington, DC  20005
                             (202) 371-7000
                             geoffrey.wyatt@skadden.com

                             Richard T. Bernardo
                             SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM, LLP
                             One Manhattan West
                             Suite 42-128
                             New York, New York  10001
                             (212) 735-3453
                             richard.bernardo@skadden.com

APPEARANCES CONTINUED:

FOR DEFENDANT:                Julia B. Stone
                              CAPLAN COBB LLC
                              75 Fourteenth Street NE
                              Suite 2700
                              Atlanta, Georgia 30309
                              (404) 596-5600
                              jstone@caplancobb.com

                              Aaron Katz
                              ROPES & GRAY LLP
                              800 Boylston Street
                              Prudential Tower
                              Boston, Massachusetts 02199-3600
                              (617) 951-7000
                              aaron.katz@ropesgray.com

Macon, Georgia

Tuesday, December 12, 2023

4:01 p.m.

P R O C E E D I N G S

COURTROOM DEPUTY:  Good afternoon, this is Kim Tavalero.  I'm just going to do a quick roll call.  If you can, just let me know if you're on the line.  Mr. Snyder?

MR. SNYDER:  (No response.)

COURTROOM DEPUTY:  Maybe not yet.  Mr. Adams?

MR. ADAMS:  Yes, I'm here.

COURTROOM DEPUTY:  Okay.  Ms. Hand?

MS. HAND:  Yes, I'm here.

COURTROOM DEPUTY:  Ms. Amanuel?

MS. AMANUEL:  I'm here.

COURTROOM DEPUTY:  Ms. Klovers?

MS. KLOVERS:  I'm here.

COURTROOM DEPUTY:  Mr. Wyatt?

MR. WYATT:  I'm here.

COURTROOM DEPUTY:  Mr. Bernardo?

MR. BERNARDO:  I'm here.

COURTROOM DEPUTY:  Mr. Katz?

MR. KATZ:  Yes, here.

COURTROOM DEPUTY:  Okay.  Mr. Cobb?

MR. COBB:  (No response.)

COURTROOM DEPUTY:  Ms. Stone?

MS. STONE:  He is not participating.

COURTROOM DEPUTY:  And again, Mr. Snyder, are you on the line?  Does anybody know about the status of his participation?

MS. STONE:  Yes, he is participating.  He is having some issues dialing in, but he should be here momentarily.

COURTROOM DEPUTY:  The next voice you hear will be Judge Treadwell.  I'm sorry, just a reminder, each time you speak please identify yourself.  Please state your name for the court reporter and for Judge Treadwell.  Thank you.

We're just going to sit here for a second to wait for Mr. Snyder to hopefully get connected.

Does anybody work in the same office as Mr. Snyder or no?

MS. STONE:  Yes, I do.  He's getting on right now.

COURTROOM DEPUTY:  He's saying he's having problems with the security code but you all used the same security code, so I don't know what the problem is.

(Conference began at 4:07 p.m.)

THE COURT:  Mr. Snyder, I understand you are taking the lead for the relators?

MR. SNYDER:  That's correct, Your Honor.

THE COURT:  And who's taking the lead for the defendant?

MR. BERNARDO:  Your Honor, this is Richard Bernardo.

We're going to divide it between myself, Mr. Wyatt, and Mr. Katz.  There's three different issues.

THE COURT:  Then who is addressing the customer list issue?

MR. BERNARDO:  This is Rich Bernardo again.  That would be me.

THE COURT:  All right.  I have reviewed your emails, and with regard to the customer list, I want to go directly to the defendant's email in which the defendant states that there's no need to address the specific issue of disclosing the customer list because the defendant has made a number of different proposals about how they can get the exact information and maybe even better information than they could from a customer list.

So, Mr. Snyder, have those options been explored?

MR. SNYDER:  They were discussed -- sir, this is Rob Snyder for Relators.  They were discussed at length and they are not acceptable for several different reasons, which I'm happy to explain if you would like to hear my explanation.

THE COURT:  All right.  Do so briefly.

MR. SNYDER:  The proposal that eClinicalWorks made is that they would have their outside litigation consultant collect all of the data that -- about the damages in the case. So, for each individual customer--there's a whole host of data that we're going to have to collect from publicly available

sources and the government--that they would do the task of gathering all that data and then provide it to us in some sort of anonymized fashion.

The problem with that is, one, it requires us to have extensive discussions with eClinicalWorks now about our -- the kind of work product, ins and outs of our damages theories.  It requires eClinicalWorks' outside consultant to be in charge of not only gathering the data but following up with the government and making sure that they are providing the appropriate data.

And it's just -- I have never had a case, Your Honor, where, um, the defendants get to collect the information about its own damages.  This is -- the only reason why eClinicalWorks has told us that we should not have a list of its customers is because they said that it's highly confidential.

Now, they have already produced to us in this case what they call their core trade secret -- the computer code, the code repository, as well as lists that include upward of 20,000 customers with customer identifying information.  We just need the complete list so we can go out there and gather the damages data, which is what they told us they were going to give us back in June before they suddenly decided that they were not going to actually provide this information.

THE COURT:  Now, that gets to my next question for you, Mr. Snyder.  What do you intend to do with their customer

list?

MR. SNYDER:  We're going to do a few things.  First, we're going to identify the publicly available sources of data about medical -- Medicare payments to the customers so that we can get them to our damages consultant for purposes of calculating the damages.

To the extent that there is not publicly available data, then we will send targeted *Touhy* requests to the government for the data.  We don't have any intention of doing anything with this list other than attempting to put together a damages calculation for this case.  We are not going to -- it would be held completely confidential within my law firm and our consultants, and we are not going to do anything with this list other than use it to calculate damages.  Which is what we've been telling eClinicalWorks back to June of this year.

THE COURT:  And so, you would not be contacting the customers?

MR. SNYDER:  We would -- well, so that's the -- I think that's the issue that caused the problem.  When -- what I said to eClinicalWorks is it is not our intent to take this list and to use it to contact eClinicalWorks' customers simply because they appear on this customer list.  We need this list to do damages.

Now, eClinicalWorks has also produced to us hundreds of thousands of documents, some of which include communications

by their customers where they are raising issues that are relevant to the case. And, um, those documents may cause us to want to talk to some of those customers. That's a totally separate issue.

But this customer list is only to be used for the purposes of the damages calculation, which is another thing that I have been telling eClinicalWorks for several months, Your Honor.

THE COURT: So, in terms of customer contacts, you would base those contacts on information you already have?

MR. SNYDER: That's correct, Your Honor. And that's already been produced by eClinicalWorks. And I can't even say today whether we actually will reach out to any of eClinicalWorks' customers to talk to them if we believe that they have relevant information. We have not done so yet. And I told the lawyers for eClinicalWorks that before we ever did anything like that, we would give them the opportunity to go to the Court and seek a protective order.

What I've been trying to do since June is to get this customer list so we can get the damages issue rolling, and it's particularly more important now that we've got the scheduling order set, and we've got to get all this stuff done by next April is when we're supposedly supposed to be disclosing our experts.

THE COURT: Thank you. Now, Mr. Bernardo, what's

wrong with that?

MR. BERNARDO:  Well, first, Your Honor, if I can go back to the first question you asked and perhaps answer it slightly differently than Mr. Snyder did.  You asked whether we explored the various proposals that I had made, and I would say we really didn't.

What I simply proposed was that we would work with Relators and, as Mr. Snyder explained, have our third-party consultant obtain the information.  But we've not set down to explore why that wouldn't work or the specificity of how that would happen.  And I can tell you that we don't want to calculate Relators' damages model; what we simply want to do is not provide a list of 150,000 names that represents, all in one place, a very valuable trade secret for ECW; different from the 20,000, the tiny fraction of the list that we provided.

And what we simply want to do is say, "Relators, tell us the information that you want to get from the government."  And you can even -- we can even have somebody from Relators look over our shoulder during the process.  We don't want to be mysterious about it, but we want to be able to ensure and control our client's data and just match up.

Your Honor, it's simply a matter of saying, okay, I want these data.  Then our consultant can go in, with an observer that's not the relator, to work with the government and pull that data.  And I would say, Your Honor, there's a

benefit to that. Because the last thing I think Your Honor wants is for the parties to be disputing either the authenticity or any other necessary issues with respect to the core data. Undoubtedly, I expect we're going to have disputes over how the data is used and how the damages model is calculated, but we should at least have a set of data that the parties both agree was appropriately obtained and, you know, we would stipulate as to its authenticity and use.

So, it is not only something that we proposed to protect our client's trade secret, but also to hopefully streamline. And, you know, I -- I do want to point out, Your Honor, this -- I agree with Mr. Snyder, this isn't about contacting customers. That is not the concern. I take Mr. Snyder for his word and for the agreement we have that they are not going to use this to make any improper communications.

This is more -- Your Honor, we live in a world where stuff happens. Despite the best intentions, inadvertent errors occur. We have all hit the wrong key on a -- "send" on a computer sending information. And these data are going to exchange in multiple hands. It's going to go to their experts. It is going to go back and forth. All we want to do is not have that data linked up with every last name of every single one of ECW's current customers.

So, I would ask that Your Honor instruct the parties at least to make a good faith effort to try and devise a plan

to see if our proposal would work before having it rejected outright because it somehow is claimed that we're performing their damage calculation. Which, again, I promise you we're not going to perform Relators' damages calculation. I think that would probably be against our interest.

THE COURT: Well, thank you for anticipating my question, and that is what is your specific concern. And it is not customer contacts; it is, as I understood it, that the customer list would be linked with data that the relators would generate. And then that list -- or that data might be hacked somehow. Is that right?

MR. BERNARDO: That's right, Your Honor. And even if not hacked, I mean, we've all made inadvertent errors. And, look, I trust that Relators are being very careful with our information. And, you know, this just falls in the category that there's certain types of information -- I am not equating this necessarily to the Kentucky Fried Chicken Formula or to the Coca-Cola Formula or something, but there's certain types of information that a protective order can't sufficiently protect. And absent any need for the names, which I have not yet heard, I don't understand or we don't understand why we should even be taking chances.

And again, happy to work with Relators to come up with an agreed-upon methodology to satisfy their concerns about the accuracy of the matching and all of that, but we're going

to have to do that in any event from a standpoint of, you know, getting this stuff into evidence if we want to.

THE COURT:  And what would be matched, as you call it, would be what?

MR. BERNARDO:  So, there's certain financial payment information and other information that, as Mr. Snyder explained, is maintained in databases, some of which are publicly available, others of which you've got to request from the government.  And the key to link up the -- the names of the recipients of this information is what's referred to as a -- an NPI or National -- I apologize, I forget what it even stands for.  But there's a particular number that ECW has with respect to each customer name, so ECW can take that number and match it up or work with the government to match it up; and then once it's matched up, to anonymize it so everybody's name just becomes a number or something.

So, it would be pulling all of the data and it would be matching it up with numbers that ECW has and that the government has.  And they are actually National Provider Identifiers.

THE COURT:  All right.  Thank you.

The customer list is discoverable.  Your concern -- and I am not saying it's not legitimate.  Your concern doesn't relate to the interest of maintaining customer lists in an appropriate fashion; your concern is a general but

understandable concern that we all have today that whatever data we are looking at, there is a risk that that data can be hacked, as we have said.

Appropriate protections need to be and I'm sure already are being taken in that regard. But the -- again, the concern that you're raising is not a concern that warrants withholding the customer list, which would be produced only pursuant to the appropriate confidentiality order. And if you think that the order in place doesn't do that, we can talk about what else may need to be done.

But, the customer list is discoverable.

Next issue, history of hacking by the relators. Who's covering that for the defendant?

MR. WYATT:  Geoff Wyatt, Your Honor.

THE COURT:  Mr. Wyatt, all right. First, I'm curious, this may or may not relate to the issue, what is the unclean hands affirmative defense all about?

MR. WYATT:  Sure, Your Honor. It's not related to this issue, but it is a defense that we've asserted in our Answer that will be a defense to liability based on the equitable doctrine of unclean hands. That is not the basis for the discovery requests here. And to date, you know, we haven't -- we haven't engaged in litigation. Relators have raised questions about that defense but, as I understand it, that's not the basis for their refusal to produce it here. It

is simply something that they have mentioned as part of their response.

THE COURT:  All right.  Now, Mr. Snyder, are you addressing this issue as well?

MR. SNYDER:  Yes, Your Honor.

THE COURT:  You know, I'm sure I don't have to say this, but part of being a party to litigation, particularly being a plaintiff, means that you sometimes have to disclose information that you would rather not.  But it has to be disclosed.  Not that it's going to be admissible.  This seems a bit tenuous to me, but I see no reason why the defendant cannot inquire into the details of this matter that -- the only matter that's mentioned, and that is one of the relator's criminal charges that I understand resulted in a first offender resolution.  So, again, where it's going to go, probably not very far.  But these are the type questions that parties sometimes have to answer.  And I expect them to be answered.

Now, the communications with government issue, who's addressing that for the defendant?  Mr. Katz?

MR. KATZ:  Yes.  This is Aaron Katz, Your Honor.

THE COURT:  Now, this is kind of -- reminds me of our first issue in a way.  The plaintiffs now contend that, well, you've got all the information, or you can get the information, you don't need our correspondence with the government because we've given it to you.  So, Mr. Katz, what do you say about

that?

MR. KATZ:  Yeah, it is sort of a mirror image of the first issue, Your Honor.  I take Mr. Snyder at his word that he has attempted in good faith to give his best description of, um, what was either a meeting with the government that sort of commenced the *qui tam* investigation or is a description of the disclosure statement that the relators gave to the government pursuant to the False Claims Act procedural provisions which require the relators at the outset of the case, I think prior to filing the Complaint, to make a material disclosure statement to the government.

Mr. Snyder's description of the material disclosure statement or the meeting that they had with the government contemporaneously or shortly thereafter to go over the material disclosure statement is not a substitute for the material disclosure statement itself.

I do agree with Mr. Snyder that there have been courts that have held that there is a common interest privilege between relators and the government.  That doctrine is typically used to defeat an argument that there's been a waiver of the attorney-client privilege when the relator and the government engage in communications.

We're not arguing waiver.  We are arguing that if there is a document, whether it constitutes staff work product or is not work product at all, it is so relevant to the

materiality issue and so impossible to replicate in any other form that we have a substantial need for, at a minimum, that document.

Now, we don't know how many communications there were between the relators and the government that would constitute a discussion of the underlying facts of the case or at least Relators' view of the facts of the case. We know, however, that there was definitely a material disclosure statement -- that's required by law -- and that there was a meeting that followed shortly thereafter.

In an ideal world, we would have something like the privilege log that identifies all of the communications between the relators and the government. But at the outset I think we're at least entitled -- where materiality is such a critical issue and disputed issue in this case, at a minimum I think we're entitled to get the actual material disclosure statements that the relators gave to the Department of Justice, and, you know, any sort of communications, documentary evidence relating to the meeting that followed shortly thereafter.

THE COURT:  Mr. Snyder, on those two subjects or parts of this issue, the material disclosure statement and the -- "THE," I think was how Mr. Katz put it, "THE meeting," what's the relators' position on those two matters?

MR. SNYDER:  Okay.  So, as to the disclosure statement, Your Honor, it's a -- it's a document that was

drafted by counsel, by myself, that includes both fact and opinion work product.  So, we have to separate between the two. Because substantial need is not a reason to even get to opinion work product.

There are pieces of that disclosure statement that relate to the relators' factual conclusions about the security flaws in the eClinicalWorks software.  And eClinicalWorks already has all of that information.  We gave -- the Court entered an order several months ago that said that we could produce to the defendants screenshots and descriptions of the technical analyses that the relators had done and given to the government while the case was under seal.

We gave to eClinicalWorks an 86-page-long interrogatory response.  That interrogatory response includes all of the factual information about the software that the relators gave to the government in their disclosure statement. So, they already have that information.

The rest of the letter is a description of the case by me, as their lawyer, a description of the legal theories of the case, a description of the reasons why we believe it was a strong False Claims Act case that the government should investigate.  All of that is core opinion work product that eClinicalWorks doesn't get even if they have a substantial need.

Now, stepping back, what we're talking about here is

the disclosure of the relators to the DOJ.  The DOJ's knowledge is not the same as the knowledge of the agencies that are at issue in this case -- the ONC, HHS, and CMS.  Those are the agencies who make decisions about this program, about whether they want to certify the software, whether they want to keep -- whether they want to keep money from eClinicalWorks or whether they want to contend that they violated the CIA.  Those are agency decisions.

The DOJ is the government agency that's investigating the False Claims Act case.  The only thing the DOJ is going to make a decision about is whether they want to intervene or not, and the intervention decision is not relevant to materiality.

But if you step back even further, eClinicalWorks has served subpoenas and *Tuohy* requests on HHS OIG, on ONC and CMS and has received tens of thousands of pages of documents from them all about what those agencies knew about the security flaws in this case, including what it knew about what the DOJ was telling them about the case.  So, they have not even come close to meeting their burden of getting these materials.

And courts -- it's -- it's not unanimous, but there are -- the majority of courts that have considered this have not allowed courts -- or not allowed defendants to get copies of these disclosure statements because they are core work product.  And I don't know if anyone from the DOJ's on the call, but the DOJ has an interest in this as well because these

materials are protected by the joint prosecution privilege and by the common interest doctrine, and the DOJ hasn't waived anything with respect to these documents. So, I am not aware if Ms. Klover from DOJ is on, but I know that she was potentially going to join and may have something else to say.

But we do not believe and I just don't think eClinicalWorks has even come close to meeting its burden that we have to give them this disclosure statement. As to anything else, what we gave to the government at our meeting was a copy of the disclosure statement and the Complaint.

eClinicalWorks has the factual information from the disclosure statement that's been produced to them under separate order. They have a copy of the Complaint in its unredacted format. The only thing that they don't have is the rest of our statement, which is the core opinion attorney work product.

THE COURT: Well, what you just said confused me a bit. I mean, have you produced a redacted version of the disclosure statement?

MR. SNYDER: What we gave to eClinicalWorks was -- so, the disclosure statement was -- it's a -- you know, it's in the format of a letter, and there was an attachment to that letter that was the relators' tactical analysis of the security issues in the software.

And what we give to eClinicalWorks was that technical

disclosure that was attached to the -- I'm sorry, the technical description of the security issues that was attached to the disclosure statement.  eClinicalWorks has that.  That was a portion of the 86-page interrogatory response we gave them several months ago.

They also have a copy of the Complaint.  The only thing they're missing is that letter, which is the letter describing the facts, describing the relators, and describing my work product and core attorney work product/opinion work product that -- description of the case.

THE COURT:  So, are you saying all this is about one document?

MR. SNYDER:  Pretty much.  That's what -- that was my understanding of what Mr. Katz is talking about.  What we're talking about is our disclosure statement which was in the form of the letter which had an attachment which includes the facts that the relators were relaying to the government about the security issues in the case.  And those facts have already been given to eClinicalWorks in not the exact same format it was given to the government, but with the same information.

THE COURT:  And you contend that the entire letter, as opposed to the attachment, is work product?

MR. SNYDER:  It is.  And I would be happy to provide it to the Court *in camera* if you would like to review it so you could see what I'm telling you is the truth.

THE COURT:  Well, I do want you to do that.  That's where I'm going with this.  I want to make sure --

MR. SNYDER:  Okay.

THE COURT:  -- what our universe is first.  So, let's do this.  This shouldn't be a burden.  Apparently there's been no privilege log prepared on this issue because of the understanding that it's not currently required.  But whether it is or not, it is now.

It sounds like we're talking about one document.  But nonetheless, any documents withheld that involve communications with the government on the basis of attorney-client privilege will be entered into a privilege log.

Now, given that you say we're talking about only one document, and that's the cover letter, yes, submit that *ex-parte*, and we can take a look at that.

MR. SNYDER:  Your Honor, the -- the request was for all communications between the relators and any government agency about the case.  Um, so, that is -- that is a much broader request than just the disclosure statement.

When Mr. Katz was making the argument earlier, he said that they were focusing on the disclosure statement, and that's why I was focusing on it, and we exchanged emails and various correspondence with the DOJ over the roughly -- you know, it was three years that the case was under seal.

I can prepare a privilege log of all of those

communications. It will take some time, but it's -- the -- those communications were all done pursuant to the DOJ's investigation of this case. And also work product from me and are protected under the joint interests and common interest privilege.

So I just want to make sure I understand what you're asking us to do. We can provide a log of all of our communications with the DOJ. We can provide a log that identifies just this disclosure statement and the attachment. And I could certainly get you the disclosure statement *in camera* if not today then tomorrow with no issue.

MR. KATZ: Your Honor, this is Mr. Katz. If I may just to make clear what we are requesting. I mentioned the disclosure statement in particular because I know that that exists for sure. It has to exist, because of the False Claims Act statutory procedural provisions.

I don't know how many other communications there are between the relators and the DOJ or the relators and other agencies in which the relators provide factual information to the Department of Justice. So, we're not seeking Mr. Snyder's opinions, for example, about why a particular set of facts constitutes a legal violation. We are not asking for Mr. Snyder's opinions about how you would calculate damages in a case like this.

We are seeking, at least at a minimum to start, an

identification -- and I think Your Honor's idea of, you know, a very full log makes a lot of sense -- an identification of at a minimum at least all of those communications between the relators or relators' counsel and the Department of Justice or any other government agency in which there is a disclosure or discussion of the underlying technical facts that are the predicate for the False Claims Act causes of action in this case.

That would certainly be a start.  And it may be all we need to then identify, you know, which of those communications on the log we have a substantial need for.  We don't object to redacting out pure attorney opinion statements from any of that work product, just to be clear.

THE COURT:  Well, I assumed that we were going to end up talking about many more documents and, yes, I still think it's appropriate that the privilege log be prepared, and that will give the relators an opportunity to look at these documents that they have withheld on the grounds of attorney-client privilege and be sure that there's not factual information that should be disclosed.

But I think clearly we need to know or the defendant is entitled to know what has been withheld on that basis.  Is that clear enough, Mr. Wyatt?  I'm sorry, Mr. Snyder? Mr. Snyder?

MR. SNYDER:  It is, Your Honor.  I just -- I will --

I would be remiss if I didn't go on the record in saying that when we reached an agreement earlier about giving to eClinicalWorks all of the factual information that the relators had conveyed to the DOJ, that I went back through all of the relators' communications with the DOJ, without communicating with any other agencies, and I gathered from those communications all of the facts about the technical disclosures made by the relators to the DOJ and included them in that 86-page interrogatory response.

So, if I am understanding what the Court and what the defendants are asking me to do, it's to log -- create a log of communications with the DOJ where the relators disclosed facts about the underlying allegations in the case.  Not my opinion work product about damages or theories of liability.  Just those communications about -- that included facts.  If it's every communication that I've had -- that I had with the DOJ, that's a bigger task.  I just want to make sure that I am complying with the Court's direction.

THE COURT:  Well, bear in mind that when we're talking about communications addressing facts, we're talking probably about a broader meaning of "facts" than what you've been operating under.  With that understanding, I am for now willing to say that, yes, what must be logged are communications addressing facts.

MR. SNYDER:  Okay.

THE COURT:  And maybe that will narrow the scope. So, let's do that and see where that leads us.

Now, one place it may lead us, Mr. Snyder, the correspondence may include facts that you say have already been disclosed in your interrogatory response or in some other method.  That doesn't necessarily mean that a redacted version of the correspondence or communication might not be discoverable.  But for now let's get the log done.

MR. SNYDER:  Yes, Your Honor.  What's the time frame by which we should finish that?

THE COURT:  Well, I can't judge that.  What do you think?  I will judge it if I have to, but you tell me first.

MR. SNYDER:  Well, it is a difficult time of year, but, um, by the end of the year for sure and sooner if not -- if not possible, but certainly by the end of the year.

THE COURT:  Well, let's get started on it.  Be in contact with the defendants.  I am more interested in getting this done, and I don't know -- let's see what your task is. But if you run into a problem, let me know.

MR. SNYDER:  Okay, Your Honor.  We will certainly do that.  And is there a deadline for eClinicalWorks to get us that customer list?

THE COURT:  I assume that can be done quickly?

MR. KATZ:  Yes, Your Honor, we can do that in the next week or two.

THE COURT:  All right.  Let's shoot, then, for next Friday for that.

All right.  I think that covers the list of things we needed to address.  So, thank you very much.  And you have a good afternoon.

MR. KATZ:  Thank you, Your Honor.

MR. SNYDER:  You, too.

MR. BERNARDO:  Thank you, Judge.

(Proceedings concluded at 4:43 p.m.)

                    END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

            I, Darlene D. Fuller, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Middle District of Georgia, do hereby certify that pursuant to
Section 753, Title 28, United States Code, that the foregoing
is a true and correct transcript of the stenographically
reported proceedings held in the above-entitled matter and that
the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


                              Dated this 18th day of Feb., 2025


                              _Darlene D. Fuller_____
                              Darlene D. Fuller, RPR, CRR, RMR
                              NCRA No. 5803
                              Federal Official Court Reporter
                              Georgia CCR 5641-3440-5157-6832
                              Michigan Certification CSR-0929