UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, et al.<br><br>        Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>        Defendant. | CIVIL ACTION FILE<br><br><br>NUMBER 5:18-CV-382 |

## RELATORS' OMNIBUS RESPONSE TO ECLINICALWORKS' "DAMAGES" MOTIONS

Robert H. Snyder, Jr.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
Hannah D. Amanuel
  Georgia Bar No. 922743
  hannah@cannellasnyder.com
Alexandra "Sachi" Cole
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
Devin L. Mashman
  Georgia Bar No. 257588
  devin@cannellasnyder.com
Chase Lyndale
  Georgia Bar No. 183762
  chase@cannellasnyder.com
**CANNELLA SNYDER LLC**
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

Brian P. Adams
  Georgia Bar No. 142474
  brian@brianadamslaw.com
Mary Beth Hand
  Georgia Bar No. 322836
  mbhand@brianadamslaw.com
**ADAMS LAW FIRM**
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231


Anna Green Cross
  Georgia Bar No. 306674
  anna@crosskincaid.com
Meredith Kincaid
  Georgia Bar No. 148549
  meredith@crosskincaid.com
**CROSS KINCAID BASKAM LLC**
315 W. Ponce de Leon Ave., Ste. 715
Decatur, Georgia 30030
(404) 948-3022


***COUNSEL FOR RELATORS/PLAINTIFFS***

## INTRODUCTION

On August 25, 2025, eCW belatedly filed three new *Daubert* motions seeking to exclude or limit the opinions of Relators' MIPS payment expert Emily Wolfston. *See* Docs. 364, 365, 367 (collectively "the Motions").[1] In those motions, eCW recycles an argument the Court has already rejected about MIPS exceptions, raises concerns for the first time about the method Ms. Wolfston used to match eCW customers to public MIPS and CMS databases,[2] and criticizes Ms. Wolfston for not expecting that the scope of the case would narrow to Version 11 users after she produced her reports. Except for the Version 11 issue, eCW has not explained why it waited until the eve of the PTO submission to raise (or re-raise) these issues.

Relators produced Ms. Wolfston's report on August 2, 2024. That report described her MIPS methodology, and attached two damages models and a fifteen-paragraph explanation of the matching method she used. Doc. 192-3.[3] On August 30, 2024, eCW conducted a nearly 7-hour in-person deposition of Ms. Wolfston. *See gen.* Ex. 1, Dep. of Emily Wolfston. On September 16, 2024, eCW produced Drs. Baker and Grabowski's 34-page rebuttal report. Doc. 192-18.[4] While that report discussed MIPS exceptions it said nothing about the matching methodology Ms. Wolfston used.

On October 30, 2024, eCW moved to exclude Ms. Wolfston's opinions in their entirety. Doc. 192. In that first *Daubert* motion, eCW attacked Ms. Wolfston's qualifications, her

---

[1] Relators moved to strike the Motions. Doc. 372. eCW's response to the motion to strike is almost incomprehensibly hard to follow. Relators will address that further in their reply in support of the motion next week.
[2] As described below, matching eCW's incomplete customer list to the public databases was not a simple task.
[3] On August 13, 2024, Relators produced the computer scripts (written by Mr. Wheeler) that matched customers and performed the calculations per Ms. Wolfston's instructions. Those scripts could be used to build the database of public MIPS and Medicare data used in Ms. Wolfston's models. As an accommodation, Relators also provided a complete copy of the database on August 27, 2024.
[4] On October 15, 2024, Ms. Wolfston produced a revised report and damages spreadsheets to account for new data produced by eCW after her deposition that allowed her to match more eCW customers. Doc. 192-6. Drs. Baker and Grabowski produced a second rebuttal on November 14, 2024. Doc. 294-1.

methodology, and the alleged "fit" of her opinions to the case.  Doc. 192-1.  While it raised the MIPS exception issues, eCW said nothing about the matching method Ms. Wolfston used.  As Relators noted then: "Despite having [Ms. Wolfston's] data now for nearly four months, *eCW has not pointed out any example of calculation errors, or the inclusion of any claims that eCW says is incorrect*."  Doc. 291 at 3 (emphasis added).

Between October 30, 2024 and the June 4, 2025 hearing on eCW's motion, eCW again raised no issues with the matching methods Ms. Wolfston used.  It likely did not do so because, if correct, the argument only reduces the damages.  In other words, eCW made a strategic decision to seek the exclusion of Ms. Wolfston's opinions in their entirety.  The Court rightfully rejected that tactic, finding that "[i]n cases such as this, it is not necessary that you compute damages with mathematical precision" and ruling that Ms. Wolfston used "an appropriate way to provide reasonable estimates of damages."  Jun. 4, 2025 Hrg. Tr. at 98:1-5.

Never willing to accept "no" as an answer and intent on causing as much disruption as possible, eCW has now pivoted to attacking the amount of damages Relators are seeking.  *See* Docs. 364, 365, 367.  eCW's Motions make essentially three arguments: (1) that Relators should "account" for automatic exceptions that might have applied to eCW users *if* eCW had admitted its software should not have been certified or *if* ONC had decertified the software; (2) that Relators should only be allowed to seek damages based on eCW Version 11 users; and (3) that Relators should omit non-eCW customers from their damages models

eCW's first argument should be summarily rejected because the Court already did so.  eCW concedes the argument is "somewhat overlapping conceptually" with the original motion it filed.  Doc. 426 at 6.  That is an understatement.  eCW's original *Daubert* motion argued that Ms. Wolfston's models allegedly failed to account for a hardship exception for decertified software.

Doc. 192-1 at 4-5, 16-17.  The Court rejected that argument at the hearing, finding that eCW's "thought experiment" of what might have happened *if* eCW's customers had submitted zero scores for promoting interoperability is not admissible or relevant to the damages in this case. Jun. 4, 2025, Hrg. Tr. at 101:16-102:2.  eCW's attempt to repackage that rejected argument is an untimely motion for reconsideration that should be denied in its entirety.[5]

Relators do not disagree with eCW's second and third arguments in principle, but, as described below, they dispute eCW's description and characterization of those issues.  Removing Version 11 from the damages models stems from the narrowing of the liability case after Ms. Wolfston wrote her reports.  It could have been dealt with, or substantially narrowed, through a conference.[6]  Any alleged inclusion of non-eCW customers in the models is the result of eCW's own customer list and limitations in the public data.  eCW's customer list had hundreds of thousands of entries, was incomplete, and inaccurate.  Ms. Wolfston created a reasonable and conservative method to match eCW customer list entries to multiple public databases over a period of 7 years.  In doing so, she was completely transparent in disclosing how she built her models.  In addition to fully disclosing the methodology, data, and computer scripts she used more than a year ago, Relators also offered (at least twice) to make Mr. Wheeler available for deposition.  Jun. 4, 2025 Hrg. Tr. at 81 (thanking Relators for offering Mr. Wheeler for deposition and noting that "if that's a concern, then discovery can certainly be done").  eCW declined.

Despite that transparency, eCW accuses Relators of intentional deception and makes wild accusations that Mr. Wheeler somehow attempted to pump up the damages numbers and conceal what he was doing.  If Relators were trying to pull the wool over eCW's eyes they surely would

---

[5] Despite that, Relators respond briefly herein to the substance of the rehashed exception argument.
[6] This case has had dozens of conferences.

not have disclosed in extraordinary detail how they were planning to do so.  eCW's over-the-top hyperbole is almost certainly a reaction to the Court sanctioning it once and to eCW recently being caught in repeated lies to Relators and the Court about its own experts.  As the saying goes, the hit dog hollers.

Regardless, Relators do not take the allegations in eCW's Motions lightly.  This case involves money owed to the Government and the taxpayers.  While quantification of the damages need not be done with mathematical precision, it must be reasonable.  At her deposition, Ms. Wolfston affirmed that her goal was to provide accurate opinions and expressly agreed to revise her models if new information was provided.  Ex. 1, Wolfston Dep. at 240:8-242:6.[7]  eCW never asked Relators whether they would be including non-Version 11 users in the models or raised any concerns about the matching methods Ms. Wolfston used before August 25, 2025, when it filed new *Daubert* motions.

But as soon as eCW filed its motions, Relators and Ms. Wolfston immediately began reviewing the allegations.  To the extent eCW has raised any valid concern, Relators and Ms. Wolfston have a duty to supplement their disclosures.  Fed. R. Civ. P. 26(e).[8]  They intend to do so.  As described below, Ms. Wolfston is revising her models to account for some of the issues eCW now raises.  Relators expect to produce the revised damages models to eCW before the

---

[7] She has already done so.  After eCW raised a legitimate issue with 27 entries in her models, Ms. Wolfston removed those entries.  Doc. 294-1 ¶ 7 (Baker & Grabowski Supp. Rebuttal Rep. (describing revision)).

[8] Besides being required by the rules, supplementation of damages models is quite frequent in cases that, like this one, are pending for a long time.  *See, e.g., Davis v. Little Giant Ladder Sys., LLC*, No. 2:19-CV-780-SPC-NPM, 2022 WL 2111499, at *1 (M.D. Fla. May 11, 2022) (denying motion to strike supplemental damages report and noting that "as a general matter, parties may supplement to update damages calculations").  It is also frequently done when the scope of the liability case narrows or to address criticisms of an opposing party's expert.  *See, e.g., Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 14 (2001) (permitting supplementation after court narrowed case)*; Negrete v. Allianz Life Ins. Co. of N. Am.*, No. CV 05-6838 CAS MANX, 2011 WL 4852305, at *4 (C.D. Cal. Oct. 13, 2011) (denying motion to exclude expert's declaration where expert updated damages model to address criticisms raised by opposing expert).

Court's October 23rd hearing on the Motions.[9]  That supplement will address every *valid* concern.  As a result, all three motions will be moot and should be denied.

Relators briefly provide a further response to each motion below.

### A.  Ms. Wolfston's Damages Models Account for Applicable MIPS Rules, Doc. 365

eCW's "MIPS rules" motion either rehashes arguments eCW made and lost in its first *Daubert* motion or raises issues that it clearly could have raised earlier.  Doc. 365-1.  As argued in Relators' motion to strike, Doc. 372, that is improper.[10]  If the Court allows eCW to retread old ground and wants a response, eCW's arguments fail for the same reason as before.  eCW claims Ms. Wolfston "failed" to consider MIPS exceptions or exemptions that would allow a clinician's PI score to be reweighted to 0%.  Unlike the hardship exception argued in eCW's first motion that required an application by the clinician, Doc. 192-1 at 4-5, 16-17, eCW cites other exceptions and exemptions that it claims are automatic and therefore somehow different.  That is wrong.  It does not matter if an exemption or exception is automatic or requires an application.  If a provider submitted a score for the Promoting Interoperability category (which every provider in Ms. Wolfston's damages model did), then that voluntary submission "***overrides any sort of hardship exemption they were granted.***"  Ex. 1, Wolfston Dep. at 69:4-6 (emphasis added); *id*. at 99:19-20 ("if they submitted any score ***it overrides the hardship that they received***…") (emphasis added); *id*. at 232:16-20 ("And the reason why you submit data and get scored, when you don't have to, in most cases is because you want to get an incentive. ***So, they overrode the re-weighting by submitting data.***") (emphasis added).  eCW agrees.  Doc. 365-1, p. 3 (noting

---

[9] The revised models will not change Ms. Wolfston's methodology.  Instead, Ms. Wolfston will remove entries that she agrees should be removed.  She also will include additional damages information for 2023 payments that was not available last year and use the database eCW argues she should have used before to match additional eCW users.
[10] In its response to Relators' Motion to Strike, eCW argues that since Ms. Wolfston will be revising her damages models because of the other Motions it filed, eCW can "clarify" the operation of MIPS exemptions and it "should be permitted to re-raise challenges" that it already lost.  Doc. 426 at 6-7 and n. 2.  eCW offers no support for the idea that a party can provoke a supplementation, then use the supplement to re-raise issues it has previously lost.

exception "automatically applies *unless the clinician voluntarily submitted PI documentation*…") (emphasis added); *id*. at p. 5 ("CMS's Automatic EUC policy meant that any performance category for which a MIPS eligible clinician *did not submit data* was automatically reweighted to 0%.") (emphasis added).

The existence of these exceptions and exemptions is not disputed, but it is irrelevant. None of eCW's customers in Ms. Wolfston's damages model were granted an exception or exemption. For eCW's counterfactual argument to work, its fraud would have to have been discovered, its software decertified, its customers notified, and then the exemptions or exceptions applied. That is not what happened. eCW's continued arguments to exclude Ms. Wolfston for not considering scenarios that *did not happen* are just more baseless "thought experiments." This Court agreed, finding "the fact that if the fraud had been discovered and if the software had been decertified, then some providers would have been able to get hardship exceptions and thus get the MIPS incentive payments nonetheless, that doesn't preclude [Ms. Wolfston's] testimony." *See* Jun. 4, 2025 Hrg. Tr. at 82:14-18. Despite that ruling, eCW asks the Court to compel Ms. Wolfston to base her opinions on what might have happened, instead of what actually happened. That "fanciful thought experiment" should be rejected, *again*. Doc. 345, Jun. 25, 2025 Order on Mot. For Summ. Judg; Jun. 4, 2025 Hrg. Tr. at 101:16-102:2.

eCW also makes three perfunctory new arguments that it could have raised in its first *Daubert* motion. *First*, eCW argues that Ms. Wolfston's damages models should not include "clinicians affiliated with Alternative Payment Models" (APMs)[11] because only a percentage of APM users must use CEHRT. Doc. 365-1 at 6-7. eCW is wrong. To support its argument, eCW

---

[11] APMs are groups of clinicians and practices that report MIPS scores collectively. *See* How MIPS Eligibility is Determined, Centers for Medicare & Medicaid Services, https://qpp.cms.gov/mips/how-eligibility-is-determined (last visited Sept. 19, 2025). eCW questioned Ms. Wolfston about her inclusion of APMs in her deposition more than a year ago. Ex. 1, Wolfston Dep. at 35:3-13.

cites 42 C.F.R. § 414.1415(a)(1)(i), a code section dealing with "Advanced APM" criteria.[12]  But eCW ignores the fact that there is more than one type of APM and Advanced APMs are not at issue here.[13]  Instead, Ms. Wolfston only included data from MIPS APMs in her models.[14]  Unlike Advanced APMS that do not participate in MIPS, "[c]linicians who participate in MIPS APMs are evaluated for MIPS eligibility at the individual and group level, just like any other clinician."[15]  And all participants in MIPS APMs are ***required*** to use CEHRT.[16]  Ms. Wolfston included MIPS APM participants in her models because they receive payment adjustments based on MIPS scores just like individual or group MIPS participants.[17]  In short, eCW's citation to a code section that does not apply to the damages in this case is wrong and its argument should be rejected.[18]

*Second*, eCW argues that Ms. Wolfston's damages models do not account for clinicians who submitted Medicare claims at multiple practices.  Again, this is untrue.  Ms. Wolfston used a matching method to ensure she included the payments could be reasonably matched to an eCW user.  Doc. 192-3, Wolfston Rep., Ex. 3 ¶ 11.  In some instances, the provider only submitted claims from one practice, so no matching was necessary.  *Id.*  When a provider submitted claims

---

[12] Ex. 2, Decl. of Emily Wolfston, ¶ 7.

[13] *Id*. at ¶ 7.

[14] *Id*. at ¶ 5.

[15] *Id*. at ¶¶ 8-9.

[16] *Id.* at ¶ 10.

[17] *Id*. at ¶ 11.  Advanced APM participants are paid a flat percentage incentive payment each year.  42 C.F.R. § 414.14(b)(1) ("For payment years 2019 through 2024, the amount of the APM Incentive Payment is equal to 5 percent").

[18] eCW and Dr. Baker knew that the only APMs in the model were MIPS APMS.  The Quality Payment Program Experience website expressly states how clinicians are reporting their MIPS scores.  There are only three choices: individual, group, or MIPS APM. *See* https://data.cms.gov/quality-of-care/quality-payment-program-experience/data/2020.  A screenshot from the website showing this is below:

| npi | engaged | participation type | medicare patients | allowed charges | services |
|---|---|---|---|---|---|
| 1912019118 | True | Individual | 1499 | 317079 | |
| 1144545799 | True | Group | 5763 | 4785402 | |
| 1588103667 | True | MIPS APM | 48208 | 35487534 | |

from more than one practice, Ms. Wolfston referenced additional CMS data that could be used in some cases to identify charges for the known eCW user only. *Id.* That was impossible in many instances. So, when Ms. Wolfston could not rule out non-eCW related charges, she did not include specific payment numbers but relied on charges reported on the MIPS website. *Id.*

*Third*, eCW argues that Ms. Wolfston should have used the "Total Medical Medicare Payment Amount" in her damages model instead of the "Total Medicare Payment Amount" to exclude including reimbursements for drugs and non-clinician services. After considering this argument and investigating the issue, Relators agree, even though this reduces the damages by approximately 15%. Ms. Wolfston will revise her Known Payments model as eCW requests, so the issue is moot.

### B.  Relators do not intend to seek damages for any non-Version 11 eCW users, Doc. 364

Relators do not intend to seek MIPS incentive payment damages for any non-version 11 eCW users. Ms. Wolfston is revising her models to remove any such users. While that moots this issue, Relators offer some explanation for context. Relators filed this case in 2018. They initially explored the possibility that Meaningful Use incentive payments might be recoverable but eventually decided not to pursue any such recovery. They did so largely to avoid an argument that the claims were released by the $155 million *Delaney* settlement. *See* Doc. 218-39 ¶ C (defining released "Covered Conduct" as incentive payments before February 1, 2017).[19]

To avoid even the accusation of overlap with *Delaney*, Relators have focused their damages model on the MIPS scoring and payment incentive system. Providers taking part in that system were required to first report MIPS scores for performance year 2017. Under the MIPS

---

[19] In addition to the *Delaney* issue, Meaningful Use payments made after February 1, 2017, were largely trailing payments under the Medicaid program that Relators ultimately concluded would be too difficult to quantify.

program, a provider's MIPS score is used to adjust Medicare reimbursement rates for the calendar year two years after the score is reported. As a result, the models prepared by Ms. Wolfston in 2024 included adjustments to known MIPS scores for eCW users from 2017 to 2021 and payment adjustments for those users from 2019 to 2022. Her exclusion of MIPS scores and payment adjustments for later years was not based on any liability issue—it reflected the practical reality that Medicare payment data is not available until two years after the payments are made. Thus, when Ms. Wolfston disclosed her initial report in August 2024, Medicare payment data was only available through 2022.[20]

Relators (and Ms. Wolfston) have stressed that she is not offering opinions about whether eCW fraudulently obtained or maintained certification. That is for other experts. The case's liability focus has narrowed (for too many reasons to recount herein) to the eCW versions certified under the 2015 certification standards. That includes Version 11 and all versions thereafter.[21] Relators have not focused on Version 12 because it was certified in 2022 and thus Medicare payment data will not be available until May 2026 at the earliest.[22]

At her deposition, eCW counsel asked Ms. Wolfston whether she had accounted for different versions of the software. She had not, but she expressly stated that she could if asked. Ex. 1, Wolfston Dep. at 241:14-242:6. Given the status of the case, Ms. Wolfston will revise her model to exclude known non-Version 11 users. That revision will be reflected in her supplemental damages report and spreadsheets.[23]

---

[20] Because Medicare data is now available for 2023, Ms. Wolfston will be including that data in her revised models.

[21] Relators requested (and eCW produced without objection) earlier versions of the source code because each new version is an iteration of the previous. That makes the code relevant to both the current versions and to establishing a historical record of when various changes were made.

[22] At this point, it seems possible that the trial of this matter may not be before May 2026, but that was not the case in late 2023 and in 2024 when Relators were making strategic decisions about the focus of their expert opinions.

[23] Ms. Wolfston's supplemental damages report will identify the changes made to her models as described herein. This supplemental report will be produced concurrent with the revised spreadsheets.

eCW includes revised damages numbers that Dr. Baker calculated for non-Version 11 users. Relators have studied those numbers (to the extent possible) and disagree with removing all the customers Dr. Baker identified. As Ms. Wolfston previously explained, to earn a Promoting Interoperability performance category score, eligible clinicians must use CEHRT for a minimum of a continuous 90-day period during the year for which scores are submitted. Doc. 192-3, Wolfston Rep. ¶ 21. Although not clear, Dr. Baker's revised model appears to remove every eCW customer that used more than one version of eCW's software during the same calendar year, because in Dr. Baker's view the customer "***could have*** premised MIPS submissions on versions of the software other than version 11 in those performance years." Doc. 364-3, Baker Decl. ¶ 16 (emphasis added). Ms. Wolfston disagrees that all such customers should be excluded. She will instead include customers that were using Version 11 for at least 90 days during the year and did not otherwise report using Version 10 or 12. That very specific dispute mostly affects eCW customer MIPS scores in 2018 and is not an issue the Court needs to resolve.[24] And it is an issue that could have been resolved, or at least substantially narrowed, if eCW had raised it with Relators before August 25, 2025.

In its Version 11 motion, eCW also includes a throw away argument unrelated to the software version that Ms. Wolfston allegedly fails to consider that eCW resolved some of the vulnerabilities identified by the Relators. eCW makes that argument while also arguing in a motion in limine that all evidence related to eCW's fixes to the software should be excluded from evidence. Doc. 408-1 (eCW MIL 9).[25] Assuming that eCW settles on a position and makes a

---

[24] Nor is the question of whether evidence related to Versions 10 and 12 is admissible at trial. Proof of vulnerabilities and non-conformities in Versions 10 and 12 is admissible for several reasons—*e.g.*, to prove the existence of a Version 11 non-conformity, to impeach eCW, and to prove its fraudulent intent. That issue is raised in the parties' motions in limine and will be fully briefed for the Court's consideration.
[25] eCW is wrong about that, but that will be covered in the MIL briefing.

software fix argument at trial, that argument is irrelevant and has nothing to do with the *Daubert* standard.  Even if eCW can prove that it resolved certification non-conformities after the government told it to do so, that does not change the fact that the software would not have been certified if eCW was truthful about those non-conformities.  And even if eCW can prove it resolved some of the vulnerabilities identified by the Relators, Relators can and will prove that other certification non-conformities persisted throughout the entirety of the damages period.  At most, this is an issue for cross and there is no basis to exclude or limit Ms. Wolfston's testimony.

### C. Ms. Wolfston's Damages Models Do Not Include Any Customer That Was Not Appropriately Matched to eCW's Own Customer List, Doc. 367.

Relators asked Ms. Wolfston to determine: (1) the amount of MIPS incentive payments that eCW users were paid for using certified EHR technology; and (2) assuming Relators' liability theory is correct, how much the government overpaid those eCW users in incentive payments.  To form her opinions, Ms. Wolfston created formulas to calculate MIPS scores, calculated scaling factors that correspond to those scores, and applied those calculations to eCW users she matched to public MIPS and CMS databases.  The formulas Ms. Wolfston used are not complicated and largely are not in dispute.  Until August 25, 2025, eCW had lodged no criticism of the matching methods Ms. Wolfston used, other than to argue that it was inappropriate for her to delegate the computational tasks to Mr. Wheeler.

Because eCW now argues that the matching method Ms. Wolfston used allegedly has a flaw in it, Relators offer the following explanation of Ms. Wolfston's process.  Ms. Wolfston started her matching process with eCW's customer list.[26]  That list was not "a comprehensive list

---

[26] eCW seemingly faults Relators for relying on the information contained in its own customer list.  But eCW produced its customer list in response to Relators' Interrogatory No. 2 and it was accompanied by a sworn verification from eCW's Vice President of Technology & Quality Assurance declaring under penalty of perjury that it was true.  *See* Ex. 3, 2023-06-29 B. Satyanarayan First Interrog. Ver.

of all U.S.-based clinicians who used eCW's software during the relevant time period" as eCW now claims.  Doc. 367-1 at 2.  Instead, the list was long delayed, incomplete, and incorrect in many ways.  eCW did not produce any customer list until August 2023.  But that first list identified customers only by an internal eCW identifier (called an APU ID).  The APU ID could not be matched to publicly available MIPS and CMS data because the public data is collected by National Provider Identifier (NPI) numbers.[27]  After months of eCW stonewalling, Relators asked the Court to compel eCW to produce a customer list that included customer names and NPI numbers.  After the Court did so, eCW produced a new list on December 20, 2023.

But the December 2023 customer list also had huge gaps and major mistakes.  It identified eCW customers by practice name, which does not identify the individual providers working in the practices.  eCW included provider names and NPIs for some current customers (as of December 2023) but proclaimed that it could not do so for more than 6,000 former eCW customers who used eCW during the relevant time period.[28]  Even that "current" customer list had entries that were completely missing NPIs or contained fake NPIs.[29]  The list also omitted NPI numbers of Tier2 Technologies customers known to be using eCW in their practice.[30]

---

[27] NPI numbers are unique numbers assigned to providers by the federal government.

[28] Ex. 4, Oct. 18, 2023 Email from A. St. Amand to R. Snyder.  Because the damages period was for 2017-2023, eCW had thousands of former customers who attested to using eCW's EHR and received an incentive payment

[30] This included missing NPI numbers from Tier 2 customers at Burton Medical Group (missing: 1386840841, 1942210612), Macon Surgical Associates (missing: 1891074464), Gastroenterology Associates (missing: 1043410798, 1104276708, 1114222668, and others), Internal Medicine Associates (missing: 1134101199, 1154421279, 1326043688, and others), Urology Specialists of Georgia (missing: 1114309515, 1174654651, 1376734533, and others), OBGYN Specialists (missing: 1255366969, 1346314069, 1386965598), and Physician Consultants of Georgia (missing: 1114484201, 1154676377, 1215471479).  Ex. 6, Decl. of Chris Wheeler.

eCW's customer list could not be easily matched to MIPS users and CMS data in many instances. The customer names eCW provided were not the legal name of the entity in many cases, NPI numbers were missing or wrong, and addresses were missing or incorrect. To account for the gaps in eCW's customer list, Ms. Wolfston crafted a reasonable methodology to match eCW customers to the MIPS scores and CMS databases. That 15-step methodology is detailed in Exhibit 3 to Ms. Wolfston's report. Doc. 192-3, Wolfston Rep. at Ex. 3.[31] Given the large data set (thousands of customers and millions of entries in public databases over a seven-year time period), the matching and calculations could not be done manually, so Ms. Wolfston asked Mr. Wheeler to write simple computer scripts to gather the data and run the calculations. eCW baselessly asserts that Ms. Wolfston created her matching method to inflate the damages figure, because otherwise the damages would not be "high-enough for [Mr. Wheeler's] liking." That is pure nonsense. Ms. Wolfston did not consider the damages output and then adjust her matching method to inflate that number. The damages calculation is the last step in the methodology and occurs only **after** the MIPS data is matched to an eCW customer.

eCW's motion identifies only five specific practices that it contends were non-eCW customers. Even assuming eCW is correct and each practice was present in all damages years, that would represent an error rate of 0.14%.[32] While eCW claims there are more such examples, it did not provide a list of all the alleged non-eCW customers it claims to have identified.[33]

---

[31] eCW claims the matching methodology description is "opaque." Doc. 367-1, pp. 3-4. eCW asked Ms. Wolfston about it at her deposition. And Relators twice offered Mr. Wheeler for deposition about the work he did at Ms. Wolfston's instruction, but eCW declined.

[32] Ms. Wolfston's allowed charges model had 18,431 entries for damages years 2019-2023. Doc. 192-5, Allowed Charges Spreadsheet (25 out of 18431 entries affected is roughly .00135, or 0.14%).

[33] After Relators requested it, eCW produced Dr. Baker's spreadsheet that was referenced in, but not attached, to the motion. That spreadsheet does not explain why Dr. Baker removed entries and figuring that out has not been possible over the last three weeks.

All the "issues" eCW now raises are the result of Relators relying on eCW's own customer list or are the product of a reasonable assumption used to fill in gaps in eCW's own data. Relators address each of the five practices below.

Three of the five practices matched a customer name on eCW's list and an eCW produced provider NPI number (or numbers). Specifically:

- Madeleine Lloyd, ██████████ and the ██████████████:[34] eCW's customer list includes ████████████████ as a current customer. For that customer, eCW provided NPI numbers for Ms. Lloyd and ██████████ The publicly available MIPS data states that both Ms. Lloyd and ██████████ reported their MIPS scores as part of the New York University group, which matched the name of the eCW customer.[35] As a result, the NYU group MIPS scores were used to calculate a revised incentive payment for NYU group participants. *See* Ex. 7, Rels' Resp. to eCW Examples, pp. 1-4.

- Northwestern Medical: eCW's customer list includes ██████████████ ████████ as a current customer. For that provider, eCW provided a single NPI number for ██████████ The publicly available MIPS data states that ████ reported her MIPS score as part of the Northwestern Medical Faculty Foundation group, which matched the eCW customer name. As a result, the Northwestern Medical MIPS scores were used to calculate a revised incentive payment for Northwestern Medical group participants. *See* Ex. 7, Rels' Resp. to eCW Examples, pp. 4-5.

- Main Line Healthcare: eCW's customer list includes Main Line Healthcare ████ ████████ as a current customer. For that provider, eCW provided a single NPI number for ██████████████ The publicly available MIPS data states that ████ reported to MIPS under Main Line Healthcare. As a result, the Main Line Healthcare MIPS scores were used to calculate a revised incentive payment for Main Line Healthcare participants. *See* Ex. 7, Rels' Resp. to eCW Examples, pp. 7-8.

The final examples eCW cites were matched using customer addresses. In some instances, Ms. Wolfston could not identify MIPS scores that corresponded to a customer on eCW's customer list using the customer name, provider names, or NPI numbers. Often, this was

---

[34] Based on further investigation, Relators believe this name is a typo and the actual customer is the ████ ████████ *See* ██████████████ (identifying ████ as a practitioner).
[35] Providers can report scores individually or as part of a group. If reporting scores as a group, then the scores of all clinicians are aggregated and the payment adjustment is based on the group's final score. *See, e.g.,* Quality Payment Program, Individual or Group Participation, https://qpp.cms.gov/mips/individual-or-group-participation?py=2022.

due to CMS listing several businesses with the same (or similar) names but non-identical addresses.  After eCW eventually produced addresses for its customers, Ms. Wolfston used the address data to match additional eCW customers.  Specifically:

- Washington University: eCW's customer list identifies a customer called ███████ ██████████████████████ that was located at ████████████ ████████████████████  The CMS data included only one entry with that same address and suite number: Washington University.  CMS data also states that Washington University is affiliated with an entity called ██████████████████████████  Because there was a positive address match to Washington University, the Washington University group MIPS scores were used to calculate a revised incentive payment for Washington University group members.  *See* Ex. 7, Rels' Resp. to eCW Examples, pp. 5-7.

- Baptist Memorial Medical Group: eCW's customer list identifies ████████████ ██████████ located at ████████████████████████████.  The CMS data included only one entry with that same address and suite number: Baptist Memorial Medical Group.  Since this was a confirmed address match, the Baptist Memorial Medical Group MIPS scores were used to calculate a revised incentive payment for Baptist Medical group members.  *See* Ex. 7, Rels' Resp. to eCW Examples, pp. 8-10.

The matching methods used for these five customers were fully disclosed to eCW more than a year ago.  Drs. Baker and Grabowski said nothing about that method in their rebuttal reports and eCW never raised any issue with it until August 25, 2025.  Now rather than relying on eCW's under-oath customer list, eCW argues that Ms. Wolfston should have double-checked that a matched eCW customer was actually using eCW's EHR by referencing an ONC database that identified the CEHRT used by some MIPS participants.  Ms. Wolfston considered that database when forming her opinions but ultimately decided not to use it.  The database is vastly under inclusive.  It does not include customers who took part in a MIPS APM and is only available for the years 2019 forward.  In addition, the database appears to state that several practices identified by eCW itself as its customers allegedly reported that they were using a different EHR.[36]

---

[36] The NYU users are a perfect example.  eCW told Relators that the ████████████████ had been its customer since 2014 and provided NPI numbers for two users as of December 2023.  Both of those users reported as part of

Rather than using that ONC database, Ms. Wolfston instead directed Mr. Wheeler to match customers using the eCW customer list and the highly detailed and extensive matching method explained in her report.  In essence, eCW criticizes Ms. Wolfston for relying on an under-oath customer list that eCW swore to and states that Ms. Wolfston should have confirmed that eCW's own customer list was correct.  That was neither required nor reasonable.  Nevertheless, and in an attempt to compromise, Ms. Wolfston is reviewing the ONC database eCW now claims she should have relied upon and will remove entries in the model that are clearly contradicted by the ONC database.  Since eCW now agrees that the ONC database is reliable, she will also use it to identify additional clinicians who reported using eCW that she was previously unable to match.

eCW also criticizes Ms. Wolfston's decision to calculate damages at the practice level, *i.e.*, by including all NPI numbers associated with a practice matched to eCW's customer list.  eCW claims that she should have instead calculated the damages on a clinician-by-clinician basis, thus only including the clinicians that eCW provided NPI numbers for instead of all clinicians associated with the practice.  There are many, many reasons why that is not reasonable.  As noted above, NPI numbers provided by eCW were only for current users (as of December 2023).  So, using those NPI numbers would necessarily exclude more than 6,000 practices that eCW itself admits were formerly its customers.  In addition, the NPI numbers eCW provided were riddled with mistakes, and were missing known users.

More fundamentally, most providers report their MIPS scores as part of a group, not individually.  To report as a group, data is collected and submitted on behalf of all MIPS eligible clinicians in a practice.  Everyone in the group must report to Medicare under the same taxpayer

---

the NYU group that they were using a different EHR.  Either NYU was wrong, or eCW is wrong.  Relators are still attempting to sort through that inconsistency, but relying on eCW's under oath statement was reasonable.

identification number.  When reporting as a group, the MIPS score is aggregated and applied to the whole group.[37]  As a result, the payment adjustments applied to each group member's Medicare reimbursements are based not only on their own performance, but on the performance of the group as a whole.  Since every member of a group is from the same practice and billing under the same TIN, Ms. Wolfston reasonably assumed that if a practice was identified on eCW's customer list and was also listed by CMS as a group, then all MIPS-reporting clinicians at that practice should be included in the damages model.[38]

Finally, eCW raises an issue related to Ms. Wolfston attributing the same overpayment to multiple practices.  That issue affects only 381 of more than 18,000 entries.  And it is not a consequence of a mistake by Ms. Wolfston or Relators but is instead a result of gaps in the CMS data.  There were instances when the CMS database associated multiple MIPS scores for a known eCW customer and there was no obvious way to determine which score was correct.  In that scenario, the damages calculation was done for all reported scores and the score that resulted in the lowest damages number was included.  As a result, the models listed the same overpayment amount for a small percentage of eCW customers.  That approach was reasonable given the CMS data.  These are matched eCW customers who received a payment adjustment. The model simply selected the lowest possible adjustment as that is the minimum amount of damage eCW caused.  Ms. Wolfston will attempt to resolve that issue manually, though that may result in an increase in the damages, instead of a reduction.  If she cannot do so, she will leave the entries in the model as they remain a reasonable, conservative estimate of damages.

---

[37] *See* Individual or Group Participation, available at https://qpp.cms.gov/mips/individual-or-group-participation?py=2022.
[38] The median practice size for the eCW customers included in the damages model is five.  It is not reasonable to assume that five person practices matched to eCW's customer would be using more than one EHR software.

In short, any accusation that Relators or Ms. Wolfston intentionally inflated the damages models is plainly incorrect and should be summarily rejected. Ms. Wolfston will review and revise the damages models as described above to ensure that the customers included are those that can be reasonably tied to an eCW customer. If any of these issues had been raised in a rebuttal report, or by eCW before August 25, 2025, she would already have done so.

## CONCLUSION

The issues eCW raises in the Motions were either previously rejected or will be mooted by Ms. Wolfston's revised damages model. None of the issues affect the admissibility of her testimony. Relators respectfully ask the Court to deny eCW's Motions.

Respectfully submitted this 23rd day of September, 2025.

/s/ Robert H. Snyder, Jr.
ROBERT H. SNYDER, JR.
  Georgia Bar. No. 404522
  rob@cannellasnyder.com
ALEXANDRA "SACHI" COLE
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
HANNAH D. AMANUEL
  Georgia Bar No. 922743
  hannah@cannellansnyder.com
CHASE LYNDALE
  Georgia Bar No. 183762
  chase@cannellasnyder.com

CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

BRIAN P. ADAMS
  Georgia Bar. No. 142474
  brian@brianadamslaw.com
MARY BETH HAND
  Georgia Bar No. 322836
  mbhand@brianadamslaw.com

ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231

ANNA GREEN CROSS
  Georgia Bar No. 306674
  anna@crosskincaid.com
MEREDITH KINCAID
  Georgia Bar No. 148549
  meredith@crosskincaid.com

CROSS KINCAID BASKAM LLC
315 W. Ponce de Leon Avenue, Suite 715
Decatur, GA 30030
(404) 948-3022

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 23rd day of September, 2025.

/s/ Robert H. Snyder Jr.
Robert H. Snyder Jr.
Georgia Bar No. 404522