UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, et al.<br><br>    Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>    Defendant. | CASE NO. 5:18-CV-382 |

**RELATORS' RESPONSE TO ECW'S MOTION IN LIMINE NO. 3 TO PRECLUDE RELATORS FROM INTRODUCING EVIDENCE AND ARGUMENTS REGARDING OTHER ECW SOFTWARE VERSIONS AND <u>CONDUCT UNRELATED TO CERTIFICATION CRITERIA</u>**

eCW claims that this Motion in Limine relates to "evidence about certification criteria other than criteria (d)(1) through (e)(2) and eCW software versions other than version 11." Doc. 393-1 at 6. That is true, in part. But eCW also attempts to have the Court exclude much of the circumstantial evidence Relators will tender (and the Court cited in its summary judgment order) to prove eCW's intent. eCW discusses SQOO reports, evidence about the Application Security department and repeated criticisms of that department by the SQOO, as well as investigations into misconduct and mismanagement of the department. As with many of eCW's other Motions, MIL No. 3 is far too vague to even be properly responded to. If granted, eCW will challenge every shred of evidence Relators present at trial to find a way to fit it into the broad, generalized categories it asks the Court to exclude. Because the Motion is overly broad and unspecific, it must be denied. *See Underwood v. Scarbrough*, No. 7:21-CV-00040 (WLS), 2023 WL 2392733, at *4 (M.D. Ga. Mar. 7, 2023) (quotation omitted) ("Motions in limine that are 'broad, vague,'

and include 'speculative categories of evidence and argument of which the Court cannot predetermine the admissibility' are due to be denied.").

Relators respond briefly to the two broad categories of evidence eCW references below. Both are admissible.

A. <u>Other Versions of eCW's Software</u>

eCW's EHR software is iterative. When creating new versions of its EHR, eCW did not create a new codebase for each version. After eCW released a certified version, it would periodically issue patches to that software. Once it had added new features or functions (beyond "bug fixes"), it would seek certification of the new version. But the new versions were largely built on the previous version's code, just with added features. Doc. 218-20, eCW 30(b)(6) (Laycob) at 70:11-71:14. Many features of a previous version (here, Version 10) were carried over into later versions (Versions 11 and 12), but so too were many security vulnerabilities, including those impacting certification criteria. *See, e.g.* Doc. 218-102 (Cole Rep.) at 52 ¶ 137 ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████

Evidence of vulnerabilities in earlier versions of the software that were carried over to Version 11 is undoubtedly relevant to establishing eCW's actual knowledge, reckless disregard, or deliberate ignorance of Version 11's non-compliance with regulatory requirements. Relators are required to show that eCW acted with the requisite scienter, which can be demonstrated

through actual knowledge[1], deliberate indifference[2], or reckless disregard[3] of the certification non-conformities of version 11 of its EHR software. 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). As the Court noted in its summary judgment order, before entering the CIA and before it attested to compliance with the certification regulations for Version 11, eCW knew about various security vulnerabilities in its software. Doc. 345 at 16-17. This evidence of actual knowledge of vulnerabilities dating as far back as 2010 necessarily implicates prior versions of eCW's software, but only because those vulnerabilities were also present in Version 11. Indeed, the only vulnerabilities Relators will discuss at trial are those that existed in Version 10 and remained in Version 11 despite it being released years later. eCW's knowledge of issues in its software that affected certification for a very long time before its false December 2017 attestations of compliance is clearly relevant to its intent to defraud the government.

     Relators intend to present only very limited evidence of vulnerabilities in Version 12 that also existed in Version 11. That evidence is relevant to show that eCW did not fix all the issues identified by Relators in Version 11, including vulnerabilities it specifically represented to the government had been or would be fixed. A fact independently confirmed by eCW's own expert in the "Litwak Report" which found that some of the high security vulnerabilities identified by Relators had not been remediated and still existed in version 12. Doc. 378-3 at 8, 11-12, 28-29, and 36-39. In addition, after an express inquiry from the ONC based on Relators' allegations, eCW represented to the SQOO that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] "Actual knowledge refers to whether a person is 'aware of' information." *U.S. v. SuperValu Inc*. 598 U.S. 739, 750 (2023).
[2] "Deliberate indifference" refers to defendants "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id*.
[3] "Reckless disregard" includes defendants "who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.*, *see also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F. 4th 1288, 1303 (11th Cir. 2021) (citing *Urquilla-Diaz v. Kaplan Univ*., 780 F.3d 1039, 1058 (11th Cir. 2015) ("Under the FCA, reckless disregard is tantamount to gross negligence.")).

███ Doc. 266-2, ¶ 341. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. *Id.* ¶ 341. The actual vulnerabilities Mr. Wheeler demonstrated in Version 12 date back many years, to Version 10 and earlier, and were repeatedly marked as "fixed" internally. That eCW failed to fix persisting issues in Version 12, and misled the government about doing so, is relevant to eCW's intent and to what the government knew, and when, about Relators' allegations. Since eCW is dead set on arguing the lack of decertification is relevant, the jury should be allowed to consider whether the government might have taken different action if it knew that eCW was lying and had not corrected issues, the government expressly told it to fix.

The product liability cases eCW cites that excluded evidence about different products or problems are inapposite. In *Arevalo*, the testimony was excluded because it related to different devices and thus "would not be helpful to understanding the evidence or determining a fact at issue". *Arevalo v. Coloplast Corp.*, 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020). In *Ethicon*, evidence of the recall of a different device was not relevant to the device at issue and would require explanation of the complicated FDA 510(k) process. *In re Ethicon, Inc., Pelvic Repair Sys. Products Liab. Litig.*, 2:12-CV-4301, 2014 WL 505234, at *9 (S.D.W. Va. Feb. 5, 2014). And finally, in *Celestine*, the court excluded evidence about problems in different vehicles or configurations because they were not directly tied to the at issue product. *Celestine v. FCA US LLC*, 2:17-CV-00597 - JLT, 2019 WL 2615719, at *6-7 (E.D. Cal. June 26, 2019). Here, the different EHR versions are not different products, but iterations of the same product. Evidence of Versions 10 and 12 will help the jury understand Version 11, and will help it determine notice, intent, and materiality, as well.

Additionally, this evidence is not prejudicial under 403 and the cases eCW cites to suggest otherwise are inapposite for the same reasons stated above.  In *Bard*, evidence of deaths related to an earlier-generation filter was excluded because the defect alleged in the at-issue filter ***had been eliminated*** in design changes that occurred in between the releases of the two filters. *In re Bard IVC Filters Products Liab. Litig.*, CV-16-00893-PHX-DGC, 2018 WL 4279833, at *3 (D. Ariz. Sept. 7, 2018).  By contrast, security vulnerabilities in Versions 10 and 12 still appeared in Version 11.  *Dalbotten* actually supports the Relators' position.  In *Dalbotten*, portions of a prior warning letter related to other filters not at issue were excluded, but portions of a letter related to issues with the filter at issue were considered potentially relevant and the Court deferred ruling on admissibility until trial.  *Dalbotten v. C. R. Bard, Inc.*, 1:20-CV-00034-SPW, 2023 WL 1778793, at *2 (D. Mont. Feb. 6, 2023).

> B. <u>Allegations Unrelated to Relevant Certification Requirements and Allegations About eCW's Management, Operations, and Unrelated Software Functions</u>

While difficult to understand what exactly eCW seeks to exclude in these topics, eCW provides some broad, generalized categories of evidence that it believes are inadmissible, which include: eCW's management, how eCW tests its source code, training of eCW's software developers, its software development lifecycle, its software development and maintenance, the inefficiency or ineffectiveness of its AppSec department, how the AppSec department functions, and the two SQOO investigations of AppSec employees falsifying records.  The inclusion of some of these categories is simply mind boggling.  And much of the evidence eCW seeks to exclude was expressly relied on by this Court in denying eCW's motion for summary judgment. Doc. 345 at 18-27.

The evidence eCW asks the Court to exclude is the circumstantial evidence Relators will use to prove their case.  It shows eCW was a poorly run and managed company, with massive

gaps in leadership, a lack of policies, a reactive mindset that failed to adequately test its products before certification, and an overly siloed approach that prevented relevant information about the many security vulnerabilities in eCW's software from being discussed internally with eCW's certification team and externally with its regulators.

*eCW's Management and Organization*.  eCW's management and organization, as well as the SQOO's findings regarding the same, are relevant to eCW's intent to defraud the government and eCW's defenses.  At summary judgment, eCW argued it had a "robust compliance system that relied upon multiple employees as well as the independent advice of outside counsel" to negate the scienter element.  Doc. 216-1 at 37.  The Court found this argument unavailing, noting "'robust' is not an adjective that comes to mind when reviewing eCW's compliance 'system.'"  Doc. 345 at 41.  To assess this defense, the Court conducted a review of eCW's "compliance system" and concluded eCW had "no formal compliance structure before its CIA with OIG" and that "there is evidence that things did not significantly change after the CIA went into effect." *Id*.  These shortcomings in the management and operation of eCW bear directly on whether eCW acted with actual knowledge, deliberate indifference, or reckless disregard in fraudulently certifying Version 11.  Relators will show at trial that eCW's disorganization and mismanagement left severe gaps within their certification process that should have dissuaded it from pushing Version 11 through certification, but eCW either ignored those gaps or did not care they existed.

*SQOO Reports*.  Just as the *Delaney* allegations and SQOO settlement are relevant to Relators' claims (and eCW's defenses), so too are the SQOO's Reports and its analysis of eCW's management and compliance structures.  The timing of all of this is important: immediately following eCW settling *Delaney*, eCW was preparing to seek certification of Version 11.  Doc.

345 at 17.  At the same time, eCW was alerted to various security flaws by both eCW's own employees as well as external penetration testing.  *Id*. at 17 citing Docs. 266-51 at 7; 266-52 at 2-4; 322-3; 322-4 at 7, 13, 15.  eCW's knowledge of and notice of these flaws, in the shadow of *Delaney*, are highly relevant to scienter.  That eCW chose to ignore these flaws and continue to push Version 11 through certification, without overhauling its development or certification process, is a fact the jury may consider in considering whether eCW intended to defraud the government.

*AppSec*.  eCW's Application Security team "is responsible for scanning eCW's code for vulnerabilities and identifying issues, which are then documented and reported to development." Doc. 345 at 17 n. 24 citing Docs. 218-59; 266-2 ⁋ 39, 300-9 ⁋ 39.  Relators will show at trial that eCW's AppSec department knew about massive security flaws, including that the software could not authenticate users, could not control access, and stored PHI locally and never raised those issues with the certification department to confirm they did not impact eCW's certification status.  Evidence of what the AppSec department did and did not do in terms of software security is highly relevant to notice and intent.

Additionally, the fact that the very oversight organization that eCW argues had full knowledge and access to all of eCW's inner workings, also accused its AppSec department of falsifying reports *twice*, with one of those investigations involving the *Head* of the AppSec Department, is highly relevant.  The SQOO's investigation revealed that eCW staff generated and delivered falsified reports for months.  Doc. 266-101.  These investigations are not "generalized allegations about the conduct of eCW employees" but specific, documented instances of eCW employees refusing to work cooperatively with the SQOO and hiding the full extent of issues within its EHR software – facts that again tie directly to scienter.

7

Finally, even if the SQOO documents and reports were not otherwise admissible (they are), eCW has opened the door by relying on this evidence in its defense. This Circuit recognizes the concept of "curative admissibility"—also called "opening the door" or "fighting fire with fire." *Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004) (citation omitted). Under this doctrine, when a party offers inadmissible evidence before a jury, the court may in its discretion, allow the opposing party to offer otherwise inadmissible evidence on the same matter to rebut any unfair prejudice created. *Id*. Consequently, the extent to which otherwise inadmissible evidence is permitted must correspond to the unfair prejudice created. *Id*. Further, the trial court must also weigh the need for and value of the rebuttal evidence against the potential for undue delay, confusion, and prejudice. *Id*.

Here, during the trial video depositions, eCW has repeatedly opened the door regarding the SQOO reports and its general corporate culture and "compliance culture." *See* Ex. 1, Dep. of Jordan Madhusudhan at 136:23-137:6 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████"). Even in its summary judgment brief, eCW flaunted its "robust" compliance program as a defense to the scienter element, albeit unsuccessfully. *See* Docs. 216-1 at 37; 345 at 41. eCW has opened the door to more generalized evidence about "eCW's management, operations and [allegedly] unrelated software functions." Doc. 393-1 at 4.

Motion in Limine Number 3 should be denied.

Respectfully submitted this 3rd day of October, 2025.

*/s/ Robert H. Snyder, Jr.*
Robert H. Snyder, Jr.

Georgia Bar No. 404522
rob@cannellasnyder.com
Alexandra "Sachi" Cole
Georgia Bar No. 696892
sachi@cannellasnyder.com
Hannah Drosky Amanuel
Georgia Bar No. 922743
hannah@cannellasnyder.com
Chase Lyndale
Georgia Bar No. 183762
chase@cannellasnyder.com

CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave, Suite 885
Decatur, Georgia 30030
Tel: (404) 800-4828
Fax: (404) 393-0365

Brian P. Adams
Georgia Bar No. 142474
brian@brianadamslaw.com
Mary Beth Hand
Georgia Bar No. 322836
mbhand@brianadamslaw.com
ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
Tel: (478) 238-0231
Fax: (478) 216-9188

Anna Green Cross
Georgia Bar No. 306674
anna@crosskincaid.com
Meredith C. Kincaid
Georgia Bar No. 148549
meredith@crosskincaid.com
CROSS KINCAID BASKAM LLC
315 W. Ponce de Leon Ave, Suite 715
Decatur, Georgia 30030
Tel: (404) 948-3022

*Counsel for Relators/Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 3rd day of October, 2025.

/s/ *Robert H. Snyder, Jr.*
Robert H. Snyder, Jr.
Georgia Bar No. 404522

*Counsel for Relators/Plaintiffs*