UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS LLC,<br><br>    Defendant. | No. 5:18-CV-382<br><br>Honorable Marc T. Treadwell |

**REPLY TO RELATORS' OMNIBUS OPPOSITION TO eCLINICALWORKS, LLC'S MOTIONS TO PRECLUDE WOLFSTON'S DAMAGES CALCULATIONS**

**TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................................1

**ARGUMENT**........................................................................................................................2

**I.      Relators Admit That Ms. Wolfston's Damages Model Does But Should Not Include Non-eCW Customers.** ........................................................................................2

**II.     Relators Admit That Ms. Wolfston's Damages Model Does But Should Not Include Versions Other Than Version 11.** .......................................................................7

**III.    Ms. Wolfston's Damages Model Does Not Account for MIPS Rules.** ..........................8

**CONCLUSION** ...................................................................................................................10

# TABLE OF AUTHORITIES
Page(s)

**Cases**

*Bell v. Guardian Auto. Corp.*,
  2021 WL 3017987 (N.D. Ga. Jan. 21, 2021) ................................................................. 8

*Camacho v. Soundwaves, Inc.*,
  2014 WL 12623011 (M.D. Fla. May 8, 2014) ............................................................... 3

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) .................................................................. 9

*FDIC v. Old Republic Nat'l Title Ins. Co.*,
  2013 WL 12096453 (S.D. Fla. Nov. 13, 2013) ............................................................... 3

*Fezzani v. Bear, Stearns & Co. Inc.*,
  2018 WL 11249124 (S.D.N.Y. Apr. 16, 2018) ............................................................... 3

*Hernandez v. Wilsonart Int'l Inc.*,
  2010 WL 11453520 (M.D. Fla. July 23, 2010) .............................................................. 3

*North v. LHB Realty, L.L.C.*,
  2013 WL 2371278 (M.D. Fla. May 30, 2013) ................................................................ 3

*United States v. City of Miami, Fla.*,
  115 F.3d 870 (11th Cir. 1997) ....................................................................................... 6

**Rules**

Rule 26(e) ............................................................................................................................ 8

**Other Authorities**

42 C.F.R. § 414.1415(a)(1)(i) ........................................................................................... 10

**INTRODUCTION**

Relators' opposition concedes that Ms. Wolfston's damages model suffers from the egregious errors that eCW recently identified. (ECF No. 429 at 3 (Relators "do not disagree with eCW's" arguments regarding version 11 and non-eCW customers "in principle.").) Relators' concession is not trivial—it is a direct acknowledgment that Ms. Wolfston's damages model inappropriately inflated the supposed "damages" to the federal fisc and is fundamentally unreliable. Thus, as requested in the three timely filed eCW damages motions (ECF Nos. 364, 365, 367 (the "eCW Motions")), Ms. Wolfston's damages opinions should be excluded.

***First***, Relators rightly "do not disagree" that Ms. Wolfston inappropriately included thousands of non-eCW customers in her damages model. (ECF No. 429 at 3.) The Merit-Based Incentive Payment System ("MIPS") payments received by non-eCW customers account for ~60% of her proffered single damages for the 2019-2021 period under Method 1, which is the period during which the precise magnitude of the error can be ascertained. (10/7/2025 Baker Decl. ¶ 18, Ex. D.) This alone is a sufficient reason for the Court to exclude Ms. Wolfston's opinions. Relators try to shift the blame to eCW, arguing that Ms. Wolfston's task was made difficult by "huge gaps and major mistakes" in eCW's "under-oath" customer list, and that she therefore should be allowed to craft a new method of calculating damages attributable to eCW customers. This finger-pointing is baseless. The customer list that eCW provided Relators was based on the exact data that eCW keeps in the ordinary course of its business. To the extent Relators or Ms. Wolfston believed that the customer list eCW provided was missing *thousands* of clinicians, they should have brought those concerns to eCW and asked for clarification, not concocted their own fact-free method of identifying additional clinicians to add to their damages pool.

***Second***, as to Ms. Wolfston's erroneous inclusion in her damages model of MIPS payments made to clinicians who attested using Version 11 of eCW's software, Relators again concede that

1

they "do not disagree with eCW." (ECF No. 429 at 3, 8.) But they oppose exclusion on this ground as well, arguing once again that they should be allowed to revise Ms. Wolfston's model to fit it to their narrower theory of liability. (*Id.*) It is too late to do that. Relators act as though such adjustments of damages models are routine. But the circumstances of this case are not of the routine sort, where a party forthrightly calls attention to the fact that it narrowed its liability theory and sought leave to adjust their damages model to match it. To the contrary, Relators plainly had no intention of adjusting Ms. Wolfston's model to match their narrowed liability theory until eCW raised an objection—to which Relators' initial reaction was not agreement but a motion to strike that misleadingly suggested that eCW was at fault for not recognizing that "discovery in this case has always focused on Version 11." (ECF No. 372 at 1 n.3.) Regardless, the method by which they propose to revise their damages model is flawed and does not align with the MIPS rules and regulations. For this reason, too, the Court should exclude Ms. Wolfston's opinions. (ECF No. 364-1 at 1.)

*Third*, as to Ms. Wolfston's failure to account for basic MIPS rules, Relators contend that these arguments were presented by eCW before and that ignoring the MIPS rules "does not matter." (ECF No. 429 at 5.) Not so. As articulated in eCW's motion, automatic exceptions and exemptions differ from those arguments previously articulated by eCW, and Ms. Wolfston's failure to account for those automatic exceptions and exemptions cause her damages model to be misleading and her damages calculation inflated. (ECF No. 365-1.)

## ARGUMENT

I. **RELATORS ADMIT THAT MS. WOLFSTON'S DAMAGES MODEL DOES BUT SHOULD NOT INCLUDE NON-ECW CUSTOMERS.**

Relators admit that Ms. Wolfston's damages model includes non-eCW customers, and this amounts to tens of millions of dollars in Medicare "overpayments" of the $214 million in damages

that Relators claim under "method 1" of Ms. Wolfston's damages analysis. But Relators blame eCW, arguing that Ms. Wolfston's damages model does not include any customer that was not appropriately matched to eCW's customer list. Relators are wrong.

***First***, the basic premise of Relators' argument—that eCW is to blame because the customer list it maintains in the ordinary course of business did not make the accurate calculation of damages easy for Ms. Wolfston (*see* ECF No. 429 at 11-12)—is contrary to law. "It is the Plaintiffs' duty to establish [its alleged] damage[s]." *Fezzani v. Bear, Stearns & Co. Inc.*, 2018 WL 11249124, at *2 (S.D.N.Y. Apr. 16, 2018) (citation omitted); *North v. LHB Realty, L.L.C.*, 2013 WL 2371278, at *1 (M.D. Fla. May 30, 2013) ("Defendants . . . are not required to offer affirmative proof [of damages] because Plaintiffs bear the burden of proving damages at trial").

eCW is under no obligation to provide data that is perfectly tailored to use by Relators or their damages expert, and it does not violate any "oath" in not doing so. Rather, eCW only has an obligation to produce data as it maintains it in the ordinary course. *See Hernandez v. Wilsonart Int'l Inc.,* 2010 WL 11453520, at *3 (M.D. Fla. July 23, 2010) ("The Defendant only has to produce the documents as they are normally kept[.]"); *FDIC v. Old Republic Nat'l Title Ins. Co.*, 2013 WL 12096453, at *6 (S.D. Fla. Nov. 13, 2013) (holding that a party "is not required to produce or reproduce electronically stored information in a format different than the format in which it is kept in the ordinary course of business"); *Camacho v. Soundwaves, Inc.*, 2014 WL 12623011, at *1 (M.D. Fla. May 8, 2014) ("The producing party is not obligated to rearrange or reorganize . . . documents within their possession as they are kept in the usual course of business").

eCW did that much here—and more. On December 20, 2023, eCW produced a detailed Excel spreadsheet identifying eCW's providers and their associated NPI numbers.[1] This multi-tab

---

[1] Relators have acknowledged that eCW did not maintain a detailed clinician-by-clinician customer list in the ordinary course of its business and had to create one for the purposes of litigation. (*See* Email from Rob Snyder to

3

spreadsheet organized eCW's current customers ("LiveCustomers"), former customers ("CancelledCustomers"), and miscellaneous customers ("MiscCustomers"), and included NPI numbers for each provider using eCW's software. (*See* 12/20/2023 eCW Prod. Ltr. at 1; ECW_PER001453049.) This spreadsheet also identified approximately 6,300 former and miscellaneous customers for which eCW did not have NPI numbers. (*See* ECW_PER001453049 (sum of "CancelledCustomers" and "MiscCustomers" tabs).) And on August 22, 2024, eCW supplemented this list by providing the addresses of all of its customers so that Relators could find the payment information of these former eCW-using customers through the ONC's publicly available MIPS attestation data. (*See* 8/22/2024 eCW Prod. Ltr. at 1; ECW_PER002081093.) In total, eCW disclosed over ***180,000*** provider NPIs and over ***6,300*** customer names and addresses, giving Relators an abundance of information with which to construct a damages model. (*See* ECW_PER001453049 ("Provider Names & NPI" tab reflects 180,001 entries).)

***Second***, Relators' attempt to justify the "matching" effort undertaken by Ms. Wolfston and Mr. Wheeler to address such matters as disparities in legal names of entities, missing NPI numbers, and incorrect addresses (ECF No. 429 at 13) papers over the enormous impact of the erroneous process they adopted in that effort. As noted in eCW's opening brief, for five hospitals alone Ms. Wolfston attributed ***over $30 million*** in damages despite their attestation to the use of Epic or

---

Richard Bernardo et al re Permenter v. eCW – customer list issue (Jul. 22, 2024) (acknowledging "eCW may not have [the] specific information" that Relators request concerning a customer list), Ex. E.) eCW produced its initial customer list as retained in the course of ordinary business on September 22, 2023. Relators took issue with the fact that the initial customer list used "internal eCW number[s]" to identify customers and did not include "customer names and NPU [sic] ID numbers." (Email from Robert Snyder to Amy St. Amand re eCW Production (Oct. 12, 2023), Ex. F.) In response, eCW agreed to revise the list showing the NPI numbers for "individual health care providers (HCPs) within practice groups." (Email from Amy St. Amand to Robert Snyder re eCW Production (Oct. 18, 2023), Ex. F.) On July 22, 2024, Relators again notified eCW that while "eCW provided NPI numbers and current practice affiliations for providers … [t]hat information does not tell us when any provider may have joined a particular practice." (Email from Rob Snyder to Richard Bernardo et al re Permenter v. eCW – customer list issue (Jul. 22, 2024), Ex. E.) eCW again revised the list consistent with Relators' wishes (eCW_PER049; eCW_PER002081092) and later supplemented with the addresses of eCW's customers (eCW_PER050; eCW_PER002081093).

4

Cerner rather than eCW. (ECF No. 367-1 at 5-6 & n.6.) Relators assert that these five examples "represent an error rate of 0.14%" because they comprise only "25 out of 18,431 entries" in Ms. Wolfston's spreadsheet. (ECF No. 429 at 13 & n.32.) That is wildly misleading at multiple levels. For one thing, $30 million would represent **14%** of Ms. Wolfston's total damages estimate—an impact that is **one hundred times greater** than what Relators represent in their motion. (When focusing solely on Version 11, the proportion rises, and these five examples account for **17%** ($15 million) of Ms. Wolfston's total Version 11 damages estimate. (10/7/2025 Baker Decl. ¶ 17, Ex. D.) Moreover, of the more than **9,000** unique NPIs that Ms. Wolfston attributed to these five entities, **only five** unique NPIs were actual eCW customers, and the damages associated with those actual eCW customers amount to just **$12,407**—which is **0.08%** of the **$15 million** she attributes to these five examples when limited to Version 11. (10/7/2025 Baker Decl. ¶ 17, Ex. D.) And ultimately, these five examples are just that—examples. And when the full list is compiled, the overstatement rises further. (ECF No. 367-1 at 6.) [2]

Relators' attempt to explain how Ms. Wolfston and Mr. Wheeler made this mistake only crystallizes the unreliability of their methods. They note that eCW's customer list contained reference to these hospitals—but also note that each hospital customer was associated with only one or two NPIs in the list. (ECF No. 429 at 14.) Ms. Wolfston and Mr. Wheeler made the assumption that this was an error—that eCW must have **1,000** customers at the NYU College of

---

[2] eCW's expert Dr. Laurence Baker estimates that damages calculated by Ms. Wolfston that are attributable to non-eCW customers is $69 million for Performance Years 2019 to 2021. (10/7/2025 Baker Decl. ¶ 18, Ex. D.) A precise assessment for the entire damages period was not possible due to data limitations. (*Id.*) eCW's opening brief referenced the $125 million amount, which represents a different error in Ms. Wolfston's model—the overstatement of damages attributable to Ms. Wolfston's failure to restrict her analysis to Version 11 (rather than non-eCW customers)—as Dr. Baker's prior declaration makes clear. (*See* 8/25/2025 Baker Decl. ¶ 25 (explaining that "[l]imiting Ms. Wolfston's damages analysis to only version 11 . . . reduces her damages to a maximum of $89 million," i.e., $125 million less than $214 million).) Nevertheless, the impact of the error related to inclusion of non-eCW customers is also substantial. For the period from Performance Year 2019 to 2021, for example, non-eCW customers account for **60%** of damages estimated by Ms. Wolfston's method (i.e., $69 million of $115 million). (10/7/2025 Baker Decl. ¶ 18, Ex. D.)

5

Nursing Facility, for example, rather than just the two clinicians whose NPIs were included on its customer list.  That is not a reasonable assumption—especially since eCW *told Relators in discovery* to focus on the NPI numbers rather than practice information.  (ECF No. 367-1 at 3 n.2.) Even if Relators chose to ignore this advice, they should have at least validated their assumptions before turning one or two NPIs into a thousand—validation they easily could have done using publicly available websites.  (*See id.* at 4-5 & nn.3-4.)

Relators also seek to justify their broad sweep of new NPIs into Ms. Wolfston's analysis on the ground that "most providers report their MIPS scores as part of a group, not individually." (ECF No. 429 at 16.)  That makes no sense, either.  Under MIPS rules, even when reporting is done at the group level, MIPS scores are assigned to individual clinicians.  Thus, only those clinicians who were eCW customers should be included in any damages calculation against eCW. Here, the eCW customer list specifically identified which clinicians were associated with eCW. Despite this clear delineation, Relators attributed damages to eCW not only for those clinicians who were actual eCW customers, but also for clinicians who had no such association with eCW.

***Third***, Relators' assertion that limiting their calculations to validated eCW customers would have unduly cramped their damages estimate (*e.g.*, ECF No. 429 at 16-17) misses the point. The reliable answer to gaps in information is not to fill those gaps with unverified guesses that just so happen to inflate the damages estimate upward.  It is well established that where, as here, there is no data supporting a conclusion, the inclusion of erroneous or irrelevant data means the expert's model lacks probative value as a matter of law.  *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997) (excluding expert opinions because his opinions were derived from "erroneous and incomplete data" and therefore his opinions "lacked probative value as a matter of law").

6

In any event, Relators overstate the gaps they identify. For example, Relators claim the eCW customer list contained more than 6,000 customers who were cancelled and for which eCW could not provide names and NPIs. (ECF No. 429 at 12, 16.) But of the supposed 6,000 cancelled customers, more than 2,000 of those customers did not use Version 11 and therefore would be irrelevant here. Similarly, Relators point to Tier 2 customers that they claim were eCW customers who were missing from the eCW customer list (ECF No. 429 at 12 n. 30), but these omissions from the customer list do not appear to be erroneous or consequential. Either the providers had licenses that expired before 2019 or, if they had an active license, they did not have a MIPS score or had a MIPS promoting inoperability score of zero—and therefore are also irrelevant here.

In short, Relators concede that Ms. Wolfston's model wrongly includes non-eCW customers. The impact is very substantial—these clinicians account for more than half of its value. On that ground alone, the Court should exclude her opinions.

## II. RELATORS ADMIT THAT MS. WOLFSTON'S DAMAGES MODEL DOES BUT SHOULD NOT INCLUDE VERSIONS OTHER THAN VERSION 11.

Relators acknowledge that Ms. Wolfston's damages model should exclude all users of eCW versions other than Version 11. (ECF No. 429 at 8.) But Relators argue that their unilateral decision to revise the damages model at this stage "moots this issue." (*Id.*) They are wrong.

*First*, the issue is not moot because eCW opposes supplementation. Its response to Relators' motion for leave to supplement (ECF No. 434) will elaborate the grounds for eCW's opposition. But for purposes of the Version 11 question, it suffices for purposes of this reply to say that it is too late. eCW asked Ms. Wolfston at her deposition whether she could adjust her model to specific versions, and she said she could not; she should not be granted leave to do so now. (Wolfston Dep. 163-164.) That is particularly true where, as here, Relators did not take any steps to narrow her model on these grounds despite narrowing their liability theory until eCW

7

objected—and even then, Relators' initial response was to attempt to quash eCW's objection, not revise Ms. Wolfston's model. Such gamesmanship should not be rewarded with a second bite at the apple.[3]

*Second*, Relators' proposed method of revising Ms. Wolfston's damages model would unreliably "include customers that were using Version 11 for at least 90 days during the year and did not otherwise report using Version 10 or 12." (ECF No. 429 at 10.) That makes no sense. A clinician who used another version of eCW's software for at least 90 days during a Performance Year would have had the option to attest on the basis of that use. Accordingly, the government lost nothing as to such clinicians, even if (by happenstance) they attested to use of Version 11 rather than some other version. (*See* ECF No. 364.) For both reasons, Ms. Wolfston's opinion should be excluded on this ground as well.

### III. MS. WOLFSTON'S DAMAGES MODEL DOES NOT ACCOUNT FOR MIPS RULES.

Relators do not concede all of the errors as to eCW's motion based on MIPS rules (ECF No. 429 at 5-8), but their arguments in response lack merit.

*First*, Relators *do* concede that Ms. Wolfston's damages model overstates damages by including Medicare payments for services that are not "Covered Professional Services." (ECF No. 429 at 8.) Although Relators now propose to "revise [Ms. Wolfston's] Known Payments model as eCW requests" (*id*.), they offer no explanation for Ms. Wolfston's failure to exclude drug, lab, and other non-covered services in the first instance. Nor do they explain why Ms. Wolfston chose

---

[3]  eCW's opposition will show that Relators are not entitled to supplement Ms. Wolfston's report based on errors in methodology that they should have known about during briefing for summary judgment. *See, e.g.*, *Bell v. Guardian Auto. Corp.*, 2021 WL 3017987, at *3 (N.D. Ga. Jan. 21, 2021) (holding that "Rule 26(e), supplementation cannot be used to remedy a deficient expert report."). eCW has always sought full exclusion of Ms. Wolfston's damages model to account for the fatal errors in her methodology and calculations, as prescribed by the law.

to inflate her damages estimate by relying on the "Total Medicare Payment Amount" rather than the more accurate "Total *Medical* Medicare Payment Amount," which would have excluded irrelevant payments. These errors underscore Ms. Wolfston's lack of qualifications in navigating Medicare data and show her methods to be unreliable, and her opinions should be excluded.

**Second**, although Relators contend that Ms. Wolfston's damages model considers clinicians splitting time at multiple practices, they effectively admit that she included payment from non-eCW users. (ECF No. 429 at 7-8.) Relators claim that when a provider submitted claims from more than one practice, Ms. Wolfston "referenced additional CMS data" to limit charges to known eCW customers. (*Id.*) But where she "could not rule out non-eCW related charges," Ms. Wolfston **still** "relied on [the] charges reported on the MIPS website." (*Id.* at 8.) Therefore, Ms. Wolfston's model necessarily includes payments that are unrelated to any eCW user.

**Third**, Relators' argument that exceptions and exemptions are irrelevant because the clinicians in questions submitted scores in the Promoting Interoperability category and thereby overrode their eligibility for such exceptions and exemptions (*id.* at 5-6) ignores the fact that Ms. Wolfston's damages model is premised on a "but-for" world in which eCW's EHR did not qualify as a Certified EHR Technology ("CEHRT"). (*See* Wolfston Rep. ¶ 1.) A damages expert whose model estimates damages based on how events would have unfolded differently in a but-for world must account for the other facts that would have correspondingly changed in that but-for world. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *7 (N.D. Ill. Mar. 29, 2024) (excluding damages expert after identifying problems in the "assumptions that undergird [the expert's model] and [] the factors not accounted for in arriving at the putative but-for price").

Ms. Wolfston's opinions fail to do this by omitting automatic exemptions and exceptions. These exemptions and exceptions are different from the voluntary exemptions and exceptions on

9

which the Court previously ruled because they would have executed automatically in a world in which eCW's EHR was not considered a CEHRT. That is because the clinicians would have no CEHRT ID to submit, and the various automatic exemptions and exceptions for which they were eligible would have taken effect automatically—without any further decisions made by the clinicians or the government. (*See* Wolfston Dep. 218:3-24 (acknowledging that if no promoting interoperability data is submitted, as her model assumes is the case, clinicians would still qualify for automatic exemptions).) Ms. Wolfston therefore needed to account for the fact that certain eligible clinicians would necessarily have received automatic exemptions. Because she did not, her opinions lack a reliable basis and should be excluded

*Fourth*, Relators' contention that Ms. Wolfston accurately accounted for clinicians affiliated with Alternative Payment Models ("APMs") (ECF No. 429 at 6-7) is also wrong. They argue that eCW's citation to 42 C.F.R. § 414.1415(a)(1)(i) is incorrect because that regulation deals with the "Advanced APM" criteria, which they claim is not at issue in Ms. Wolfston's model. But "[m]ost Advanced APMs are also MIPS APMs," and "[e]ligible clinicians participating in Advanced APMs are MIPS eligible clinicians if they do not meet either the payment amount or patient count threshold…." APMs Overview, http://qpp.cms.gov/apms/overiew (last accessed Sept. 29, 2025). Ms. Wolfston does not account the fact that at least some of the MIPS APMs in her model are also Advanced APMs subject to the requirements of 42 C.F.R. § 414.1415(a)(1)(i).

## CONCLUSION

For the foregoing reasons, the Court should exclude Ms. Wolfston's damages calculations in their entirety.

Dated: October 7, 2025

                        Respectfully submitted,

*/s/ Duke R. Groover*
Duke R. Groover
Georgia Bar No. 313225
dgroover@jamesbatesllp.com
JAMES BATES BRANNAN GROOVER LLP
231 Riverside Drive
Suite 100
Macon, Georgia 31201
Tel: (478) 742-4280
Fax: (478) 742-8720

Allison M. Brown (*pro hac vice*)
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103
Tel: (215) 268-5000

Geoffrey M. Wyatt (*pro hac vice)*
geoffrey.wyatt@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 389-3393

Martin L. Roth (*pro hac vice*)
martin.roth@kirkland.com
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Tel: (312) 862-7170

Aaron Katz (*pro hac vice)*
akatz@aaronkatzlaw.com
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, Massachusetts 02116
Tel: (617) 915-6305

*Counsel for Defendant eClinicalWorks, LLC*

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 7, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants in this matter.

/s/ *Duke R. Groover*
Duke R. Groover
Georgia Bar No. 313225
dgroover@jamesbatesllp.com
JAMES BATES BRANNAN
GROOVER LLP
231 Riverside Drive
Suite 100
Macon, Georgia 31201
Tel: (478) 742-4280
Fax: (478) 742-8720