```
 1  basing his opinions on.  But I understand your point with
 2  regard to Mr. Wortman.  We don't know anything about Litwak or
 3  what he did.
 4          MS. CROSS:  And no data, none of the reports you
 5  would expect to see from the testing that was purportedly done.
 6  Without that information there's -- you know, there is just no
 7  way for us to effectively confirm or deny what Mr. Wortman
 8  purports to base his opinions on.
 9          There really has been no justification for why -- why
10  this data is missing, where it's gone.  No serious effort to
11  say it's -- it's not material or meaningful or would be -- it
12  certainly was a foundation of Mr. Wortman's report when he
13  issued the report.
14          The late declaration that, "No, no, you all have
15  misinterpreted the many times I referenced independent testing
16  under my -- or forming the basis my opinions," and I think that
17  is less credible than the initial report.
18          THE COURT:  Less credible than his sworn testimony
19  which seemed to go the other way, in my view, than his
20  supplemental report went.
21          Well, I know there was some discussion about further
22  discovery.  I guess that hasn't happened.
23          But, Mr. Bernardo, what do we do about this issue?
24          MR. BERNARDO:  Your Honor, let me take a step back
25  because I think there's some significant confusion that's been
```

DARLENE D. FULLER - FEDERAL COURT REPORTER - (478) 752-3497

created over Mr. Litwak's role and the testing that he did.  To be clear, Mr. Wortman spent 250-plus hours personally investigating these claims.  He sets out in a 71-page report all his steps, his personal review of the source code, his personal testing of the hypotheses that Plaintiffs raised, his work with eClinicalWorks to look at demonstrations.

Mr. Wortman is neither parroting an opinion of Mr. Litwak nor relying on anything that Mr. Litwak did.  This all arose because of four or five lines in a 71-page report and about a minute or two minutes of deposition testimony.  And to be fair, Your Honor, Mr. Wortman has never testified before, and Mr. Wortman and Mr. Snyder were clearly disconnecting.

What is at issue here and what Mr. Litwak did is very simple.  He used as sort of a gating function some off-the-shelf software to answer a question Mr. Wortman had before Mr. Wortman began his investigation which was, okay, Relators make the claims that there's SQL injection, Relators make claims that there's path traverse -- Relators make these claims.  I just want to know as a starting point is that correct.  Because if it's not correct, I am going to take my investigation one way; and if it is correct, well, then, okay, I will take that at face value and move on.

That's what those technologies were simply used for.  In an abundance of caution and transparency, he listed them out in his report.  But they are not anything he relies on.  They

1    are not anything that provided any bases for his opinion.  His
2    opinions are well based in his own personal work.
3            It's kind of like, by analogy, Your Honor, if a
4    client calls me up and says, hey, I -- you know, I've got this
5    problem or this regulatory issue because it appears we're not
6    in compliance with X, can you help us address it.  And I think,
7    okay, well, let me first make sure they are correct because
8    maybe they are in compliance.
9            So I ask an associate to go and just check out, and
10   they say, "Yep, there is an issue there."  Okay.  Done.  I
11   don't really need that.  Now I'm going to go on and address it.
12           It's the same kind of thing that's happening here.
13   But to be very, very clear, Mr. Litwak -- and it is kind of
14   like that *Hi-Tech* or *Farm Tech* case that we cite.  He worked as
15   an assistant.  At Mr. Wortman's request, he ran some tests.  He
16   showed Mr. Wortman the results.  The results confirmed, yep,
17   there's SQL injection, yep, there's this.
18           So then Mr. Wortman is like, okay, I'm not going to
19   need any of that, that is not going to be my opinion in this
20   case.  I am now going to go in and investigate each of those.
21           And I will agree, Your Honor, that there was some
22   confusion about that.  But that's why we said we didn't think
23   that Mr. -- that it was appropriate for Mr. Litwak to be
24   deposed.  And, in fact, that same case that Relators cite and
25   we cite makes this very same point.  Somebody who's merely

     1    doing sort of an administrative, more ministerial task
     2    typically isn't deposed.  But I also said, okay, let's take a
     3    look at what he has, and if you still think a deposition is
     4    necessary, we can discuss it.
     5           I also want to point out, because I should be
     6    complete here, Your Honor, there's one exception.  And that
     7    exception was -- and I am not making up the names of these
     8    technologies -- called Burp Suite.  And that was one that in
     9    part was used by Mr. Wortman as, oh, Burp Suite is showing that
    10    CAPTCHA works.  But he didn't leave it there.  First of all, he
    11    included in his reports screenshots, but then he personally
    12    went and evaluated it.  He did a -- he had a demo done of the
    13    CAPTCHA software so he could investigate it.  He looked at the
    14    source code so he could opine on that.
    15           So, there's no reason for Mr. Litwak to have
    16    presented any issue, as Your Honor said, because he simply was
    17    providing a ministerial task as a sort of gateway for
    18    Mr. Wortman to do his analysis.
    19           THE COURT:  It seems to me, then, that there's three
    20    options here.  One, of course, would be to grant the motion.
    21           MR. BERNARDO:  I would like to reject that option,
    22    Your Honor.
    23           THE COURT:  I assumed you would.
    24           MS. CROSS:  That's my favorite.
    25           THE COURT:  The second is to do nothing and allow --

```
 1  and which means, of course, the relators on cross-examination
 2  would score some -- what I think would be some pretty telling
 3  points about the missing evidence.  Or, given the narrow role
 4  that Mr. Litwak played in this, simply let him be deposed,
 5  establish that, and the issue goes away.  Unless something
 6  comes up new.
 7           MR. BERNARDO:  I'm fairly certain nothing will come
 8  up, Your Honor.  And we -- we obviously prefer Option Number 2.
 9  But we're also open to Option Number 3.
10           I will just say, Your Honor, I would need to confirm
11  that with Sygnia.  To be honest, I have not spoken to
12  Mr. Litwak probably in a year.  I am assuming he still works
13  there.  I just don't know that fact.  If he doesn't work there,
14  I am assuming he might still be willing to cooperate, but I --
15  I make that agreement with that qualification.
16           THE COURT:  Ms. Cross?
17           MS. CROSS:  I flagged something for Option Number 3,
18  Your Honor.  As we talked about, Mr. Litwak has a foot in two
19  camps here.  What would be I think counterproductive would be
20  to have a deposition that is getting lots of responses of that
21  shielded by my consulting role:  "I am not able to talk about
22  that, that's consulting."
23           Mr. Wortman testified that, um, he relied -- I
24  believe his phrase was, "hands on keyboard."  It was Mr. Litwak
25  that had the hands on the keyboard.  So any testing that was
```

1  done was done by this individual.
2          But if Mr. Litwak had done that same testing in a
3  consulting role, that he wouldn't have redone it, he would have
4  just provided that information to Mr. Wortman and gone on.  I
5  foresee difficulty that that maybe is not the cleanest
6  solution.
7          I will note, too, that something happened to these
8  test results.  They did exist.  They are no longer in existence
9  per the representation made by defense counsel, and I don't
10 have any reason to dispute that.  But if Mr. Litwak is a person
11 who would be deposed, we'd also want some assurance that
12 Mr. Litwak has an explanation for where the testing went.
13         MR. BERNARDO:  I can address that.  First, I -- I --
14 I am fearful to even say this, but I don't really anticipate
15 that the work product issue or the consulting role will be a
16 problem because it was a fairly clean line.  And as I think we
17 said in our papers, Mr. Litwak was kind of like Mr. Wyatt and
18 Mr. Katz are my Geek Squad.  We don't come to the table with
19 inherent knowledge of some of these issues, and, you know, we
20 have frequent phone calls, "What does this mean?"  "Can you
21 help us understand?"  That was his role.
22         To the extent that this testing had been done as part
23 of his consulting and was leveraged in connection with
24 Mr. Wortman for purposes of his sort of gating function, we are
25 not going to raise work product on that, either.  So, I don't

```
 1   anticipate that that is going to be an issue.
 2             But I also just want to clarify something.  Everyone
 3   keeps talking about where the testing went.  It's -- it -- it
 4   went the same place as if, you know, somebody does Westlaw
 5   research and says, "Here, I found these couple of cases, here,
 6   come take a look," I look at their screen and I'm like, "Yeah,
 7   I am not interested in that," and they move on.  That is where
 8   it went.
 9             It was never reduced to a report that somebody, you
10   know, ended up -- ended up discarding is my understanding.  In
11   any event, I think we can work cooperatively to cut through any
12   work product issues.  And if there are any, we can certainly
13   raise them with Your Honor.
14             THE COURT:  Well, I think what I'm hearing is that
15   subject to where Mr. Litwak is these days, the plan is to
16   convene his deposition at which he will testify fully about the
17   work that he did in connection with Mr. Wortman's work.  And
18   that likely -- we will see -- will resolve the issue.
19             MR. BERNARDO:  I will work with Mr. Snyder to -- I am
20   assuming it would be Bob who will coordinate this.
21             MS. CROSS:  Your Honor, should that not resolve the
22   issue, would we have permission to bring that back to the
23   Court?
24             THE COURT:  Oh, yeah.
25             MS. CROSS:  Thank you.
```