UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>Defendant. | CASE NO. 5:18-CV-382 |

**RELATORS' DAMAGES PROPOSAL**

**I.   INTRODUCTION**

eCW has had three opportunities to challenge Ms. Wolfston's core opinions about the MIPS program, about how eCW customers' MIPS scores would be affected by its fraud, and about how CMS would have adjusted payments to eCW customers if eCW had not concealed the many vulnerabilities in its software. Despite those three "bites at the apple," eCW has offered no credible argument to support excluding Ms. Wolfston's core opinions.

Instead, eCW has now shifted to attacking Ms. Wolfston's detailed, multi-step, and conservative method of matching eCW's own Court-ordered customer list to publicly available MIPS and Medicare claims data. At the Court's instruction, eCW has now provided its "final" list of alleged criticisms of Ms. Wolfston's methods.[1] The alleged errors eCW identifies are either incorrect or vastly overstated. All but one could have been raised more than year ago.

---

[1] Relators understand that eCW's November 7, 2025 letter and attachments totaling 73-pages is the final and complete list of *all* eCW's criticisms of Ms. Wolfston's damages models despite eCW's repeated attempts to state otherwise. *See* Oct. 23, 2025 Hrg. Tr. at 125:12-23 (instructing eCW to "[v]ery specifically point out what the issues are…and this is the last time, by the way." *See* Oct. 23, 2025 Hrg. Tr. at 125:12-23. *See also Id*. at 126:2-4 ("[I]t's going to all come out on the table" so that the parties can "get it resolved with some finality this time around.").

Each also results from the incomplete and inaccurate customer list eCW provided to Relators during fact discovery, after the Court compelled its production.

Even after the Court ordered eCW to identify all alleged non-customers in Ms. Wolfston's models at the October 23, 2025 hearing,[2] eCW has refused to do so, presumably so it can continue to ambush Relators with issues that should have been raised years ago.

eCW's ever-changing arguments make clear that no matter what changes Relators make to their damages model, eCW will never be satisfied.[3]  Its only goal is to obtain wholesale exclusion of Relators' damages model—an improper result here given that eCW's own improper conduct and poorly constructed customer list have caused every issue about which eCW now complains.  If there is any imprecision in Ms. Wolfston's models, it is minimal, and at best is a proper area for cross-examination.  Her models remain reasonable and admissible estimates of the damage eCW has caused.  *See, e.g., U.S. v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988) (holding as long as the jury is presented with "relevant data" to calculate damages, "damages need not be calculated by mathematical precision.").

That is particularly true because any imprecision is the direct result of the flawed evidence eCW provided to Relators and the scope of its multi-year fraud.  In such instances, juries are allowed to "act upon probable and inferential as well as [upon] direct and positive proof."  *Id.* (citation omitted).  "Any other rule would enable the wrongdoer to profit by his wrongdoing" and would be "an inducement to make wrongdoing so effective and complete in

---

[2] Oct. 23, 2025 Hrg. Tr. at 129:8-131:8 ("But I mean, if it's just not a customer, and they are on the list, I am not too sympathetic to eCW saying, "Well, they are not our customer." Then tell them that. I don't see that to be an insurmountable problem. All right. That's our plan for now.)".  eCW provided only "examples" of alleged non-customers but has not provided the definitive list the Court ordered.

[3] In an effort to streamline this issue, following the October 23 hearing, Relators' counsel asked if eCW could provide its own customers' Taxpayer ID Numbers and CMS payment amounts.  eCW objected to producing that information but did not give a clear answer as to whether that information could be collected.  At the time of this filing, eCW has still not provided a clear response.  Relators believe that this information would be helpful in narrowing any data requests to CMS as well as verifying that eCW's customers are correct.

2

every case as to preclude any recovery, by rendering the measure of damages uncertain." *Id.* quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65 (1946); *see also Jot-Em-Down Store, Inc., v. Cotter & Co.*, 651 F.2d 245, 247 (5th Cir. 1981) ("Because the economic harm is intangible and dissection of its extent is difficult, the wrongdoer, rather than the victim should bear the risk of uncertainty that inheres in measuring the damage he causes.") (quotation omitted).

Even so, and as Relators have continually stressed, this case is about public money. It is important for the jury to be presented with complete damages evidence that is not subject to any reasonable challenge. eCW agrees that the issues it is now raising would have been eliminated (or at least clarified) with confirmatory data from CMS. *See* eCW's Nov. 07, 2025 Letter to Relators re Damages, attached as Ex. A, at 2; ("Relators should have sought discovery from CMS"); *id.* at 3 ("Attestation evidence for 2018 (at a minimum) should have been sought in discovery from CMS"); *id.* at 7 ("these data would have been available to Relators long ago had they timely sought data directly from CMS in discovery."). Given the Court's questions at the hearing and its instruction that Relators propose a detailed path forward, Relators have been in communication with HHS-OGC and the DOJ since the hearing to determine what information CMS could provide to eliminate any concerns the Court may have. HHS-OGC has been very responsive and has stated that much of the relevant CMS data should be available upon request.

As a result, and solely to eliminate any further criticisms of Relators' damages models, Relators propose to send a detailed data request to CMS, to use the results of that request to identify (and confirm) all practices that received a MIPS payment adjustment while using eCW Version 11, and to apply Ms. Wolfston's MIPS methodology to revise (if necessary) the amount of damages calculated in her models. While Relators do not presently know how long it will

take CMS to respond to their data request, they expect that gathering the information and producing a supplemental model likely can be completed without excessive delay. If eCW had raised these issues before, or had produced a complete and accurate customer list, these issues could have been avoided or dealt with long before now. But given the importance of presenting the full range of damages caused by eCW in this case, Relators submit that any delay caused by this limited additional discovery is, unfortunately, necessary.

eCW has stated repeatedly that Relators should not be allowed to send any additional discovery on these issues, even after the Court suggested it might be necessary at the hearing. But it was eCW who produced the inaccurate and incomplete customer list and who did not raise any matching issues until a year after discovery closed and after it had already lost its *Daubert* attack on Ms. Wolfston. eCW should not be allowed to use its own misconduct and repeated sandbagging to prevent Relators from confirming and supplementing their damages models with the very information eCW now argues Relators should have relied on instead of its own under-oath customer list. If eCW is allowed a second attempt to criticize Ms. Wolfston's models, Relators should be allowed to respond through targeted discovery and supplementation.

If the Court does not believe that a CMS data request is appropriate under the circumstances, wholesale exclusion of Ms. Wolfston's models is not the answer. eCW's criticisms apply to a small portion of the entries in Ms. Wolfston's models. If no more data can be gathered to clarify and confirm those entries, Relators propose that they be allowed to provide one further supplement to Ms. Wolfston's models, with the information presently available to them, that removes or clarifies certain entries. While doing so will improperly and artificially reduce the damages that can be collected on behalf of the United States and harm the taxpayers,

4

Relators respectfully submit that, at a minimum, further revision should be allowed given the circumstances.

## II. PROCEDURAL HISTORY & FACTUAL UPDATE

As the Court knows, on October 20, 2025, Relators produced a second supplemental damages report, that removed non-Version 11 users and responded to some of eCW's belated criticisms of Ms. Wolfston's models. At the hearing, eCW argued that Relators' supplement had not cured the alleged deficiencies in Ms. Wolfston's models.

After hearing argument, the Court ordered eCW to provide a final list of criticisms that "[v]ery specifically point[s] out what the issues are" with Relators' models within two weeks. *See* Oct. 23, 2025 Hrg. Tr. at 125:12-23. The Court warned eCW that "it's going to all come out on the table" so that the parties can "get it resolved with some finality this time around." *Id.* at 126:2-4. At Relators' request, the Court also ordered eCW to identify all practices and providers in Ms. Wolfston's models that eCW contends are not its customers. *Id.* 131:3-7 ("if it's just not a customer, and they are on the list, I am not too sympathetic to eCW saying, 'Well, they are not our customer.' Then tell them that. I don't see that to be an insurmountable problem."). Relators made that request to try to narrow the scope of this dispute to only those practices that eCW claims are not its customers or were improperly matched.

The Court ordered Relators to consider eCW's final list of criticisms and to provide a proposal to the Court "regarding precisely what needs to be done" including, potentially, "more investigation" or revised calculations based on what eCW disclosed followed by depositions. *Id.* at 128:1-4. On November 7, 2025, eCW sent a letter to Relators' counsel identifying 10 alleged deficiencies in Ms. Wolfston's models. Ex. A. eCW had previously raised seven of the alleged deficiencies in its August 2025 motions, its response to Relators' motion to supplement, or at the

5

October 23rd hearing.[4] eCW had never raised three of the issues before November 7th even though each alleged issue is based on entries present in Ms. Wolfston's October 202**4** supplement.[5] For each issue, eCW provided a handful of examples, while also representing for some that there are "thousands" of additional examples that were not provided. *E.g.*, *compare* Ex. A at 5-6 (stating Model 1 includes "thousands" of NPIs that lack an accompanying MIPS attestation) with Attachment #6 (PDF Page 70) (listing 45 NPIs).

eCW ***did not*** provide a list of all practices included in the models that it claims are not a current or former customer. Oct. 23, 2025 Hrg. Tr. at 131:3-8. Because eCW did not do as the Court ordered, Relators are still in the dark about which practices included in Ms. Wolfston's models eCW claims are not actually its customers. Every single entry in Ms. Wolfston's models is either a practice that matched directly to eCW's customer list or attested to CMS that it was using eCW. Ms. Wolfston's October 20, 2025 models include 18,860 entries. 16,917 of those entries (or 90%) were matched to eCW's customers lists by name, address, and/or eCW provided NPI number.[6] Nearly 7,000 practices in the models are a 100% match to the NPI number list eCW provided in December 2023, meaning that nearly half of the entries only include damages calculations for providers that eCW specifically identified as its users.[7] More than 14,000 entries match the name of a practice on eCW's customer list and almost 10,000 match an address on the

---

[4] The issues previously raised by eCW were Numbers: 1 ("Inclusion of Non-CEHRT IDs"); 2 ("Inclusion of Blank CEHRT IDs"); 3 ("Overstating MIPS Incentive Payments"); 5 ("Inclusion of NPIs in APMs Attesting as Entities"); 6 ("Overstatement of Payment Amounts Using Multiple TINs Associated with the Same Clinician"); 8 ("Inclusion of 'N/A' Designations"); and 10 ("Inclusion of New Data"). Ex. A.
[5] Those newly raised issues are Numbers: 4 ("Duplicate Entries"); 7 ("Inclusion of NPIs with No Associated MIPS Attestations"); and 9 ("Mixing and Matching Errors"). Ex. A.
[6] The remaining entries were identified and added because at least one provider at the practice told CMS they were using eCW Version 11.
[7] As described before, eCW's NPI list was vastly incomplete because it excluded all of eCW's 6,000 former customers, or former users who were no longer actively using the software as of December 2023. Relators' damages models now include practices using the software from 2018 to 2023.

list. And almost half of the entries in both models—48%—match a name, address, and an associated eCW disclosed NPI number on the customer list. In short, Ms. Wolfston's current models reliably estimate the damages that eCW has caused the taxpayers.

Despite that, immediately after the hearing Relators began considering whether a data request to CMS could effectively eliminate any concerns raised by the Court. On October 27, Relators' counsel emailed the DOJ to coordinate a call about a possible CMS request. On October 29, Relators' counsel and the DOJ spoke and the DOJ agreed to contact CMS to coordinate discussion of a possible data request. On November 10, the DOJ emailed Relators' counsel and copied HHS-OGC to begin the discussion. On November 12 at DOJ's request, Relators' counsel sent DOJ a detailed summary of the information they would be seeking. Since then, Relators and HHS-OGC have continued their discussions about the potential request. As of yesterday, November 20, 2025, HHS-OGC is ready for Relators to send a list of practices about which they are seeking additional MIPS information so the data pull can begin.

### III. RELATORS' PROPOSAL

Relators maintain that Ms. Wolfston's models are admissible and reasonable estimates of the damages eCW has caused given the evidence available to Relators when the models were produced. But given the Court's stated concern about some of the issues eCW has now raised, Relators propose to have Ms. Wolfston further revise her models to fully address any remaining matching issues that eCW has raised in its November 7 Letter. Relators believe that many, if not all, the issues eCW raised can be eliminated (or substantially reduced) through a data request to CMS. As noted above, eCW agrees.

A CMS data request will confirm that Ms. Wolfston has identified and properly matched eCW customers to the publicly available MIPS scores and has properly matched payments to providers associated with those customers. After the data is obtained, Ms. Wolfston would

7

remove any entries where the CMS data contradicts their inclusion in the models, revise entries where the available data was insufficient to make a direct match (and thus resulted in the use of the lowest possible number or exclusion altogether), and make additional payment matches that were previously impossible.  Relators respectfully submit that doing so will satisfy the Court's concerns about the matching and payment issues eCW has now raised.

Relators propose the following path forward to fully and finally address eCW's criticisms:

- Within 21 days, Relators will submit a detailed data request to CMS seeking additional information about eCW users, MIPS scores and payment adjustments associated with those users, and claims paid by CMS to those users that were subject to the MIPS payment adjustment for the years 2018-2023;

- Within 30 days of receipt of the final CMS data, Relators will serve a final supplemental damages report that incorporates the CMS data (as needed);

- Relators will produce Ms. Wolfston and Mr. Wheeler (if requested) for deposition within 30 days of producing the final supplemental report; and

- eCW will then have 30 days from the date of the last deposition to produce its own final supplemental rebuttal report.

Relators do not yet know how long it will take CMS to produce final responsive data.  As described above, Relators' counsel have been in almost constant contact with DOJ and HHS-OGC since the hearing to coordinate a potential data request, if the Court allows Relators to submit such a request.  While Relators do not want to prolong this case any further, no trial date has been set.  eCW's counsel represented during the PTO exchange phase in September that its lead trial counsel is unavailable to try this case until at least April 2026.  The parties can use that time to fully and finally resolve these issues.

### IV.     RELATORS' RESPONSE TO ECW'S NOVEMBER 7TH LETTER

The Court did not instruct Relators to provide a detailed response to eCW's final list of criticisms.  Even so, Relators briefly respond to each issue below.

#### 1.     (and 2) "Inclusion of Non-eClinicalWorks CEHRT IDs" and "Inclusion of Blank CEHRT IDs"

Relators agree that Ms. Wolfston's damages models should only include practices that were using Version 11 of eCW's software during a year when the practice received a Promoting Interoperability score.  Relators disagree, however, with eCW's description and characterization of this issue.  Ms. Wolfston's methodology remains a reasonable and conservative method to match eCW's customer list entries to multiple public databases over a period of seven years.  As stated in the motion to supplement, Ms. Wolfston accounted for providers who reported using another EHR in her second supplemental models by using the ASTP CEHRT ID database to confirm, where she could, that providers she matched to the eCW customer list reported to CMS they were using Version 11 of eCW's EHR.  She removed practices that reported using some other EHR where appropriate and, in such cases, only included damages for individual providers that eCW identified as its customers.

There are several reasons why a provider working at an eCW customer would not appear in the ASTP database at all or might attest to the use of a different EHR.  The database is largely incomplete.  For example, the ASTP database does not include MIPS APM participants.  And many providers submit claims from more than one practice.  Thus, a provider who works at an eCW customer that takes part in a MIPS APM would not appear in the ASTP database as attesting to using eCW but could appear as attesting to using another EHR for their work at another, non-eCW customer.  That makes it look like the provider did not attest to eCW's EHR when they did but the attestation is not captured in the MIPS or ASTP databases.

The same is true with providers who have "blank" CEHRT IDs in the databases. Because the publicly available MIPS database does not include a CEHRT ID for every provider that has a MIPS score, including practices participating in MIPS APMs, there are hundreds of thousands of entries where there is no reported CEHRT ID at all. That does not mean that the practices where those providers were working were not using eCW during a performance year where the practice obtained a Promoting Interoperability score.

For those providers, Ms. Wolfston has and can continue to rely on eCW's customer list to match providers and practices in the MIPS database. For example, the first entry in eCW's Attachment #2 is for ▮▮▮▮▮ eCW's own customer list shows that it has a former customer called ▮▮▮▮▮. located in Wisconsin. Because it was a former customer, eCW did not provide any NPIs for users at ▮▮▮▮▮. Relators matched that name to an entity in the MIPS and CMS databases called ▮▮▮▮▮ located in Wisconsin and reasonably included damages related to that practice for the years eCW reported that it was a customer.

Like the ▮▮▮▮▮, every practice included in Ms. Wolfston's models has been reasonably matched to eCW's own customer list and identified by eCW as a Version 11 user for at least 90 days in the relevant years. They have also all been reasonably matched to CMS data as a MIPS participant with associated NPIs who received a Promoting Interoperability score and payment adjustment. That is more than enough evidence for the jury to conclude that these practices and providers attested to using Version 11 of eCW's EHR. Ms. Wolfston and Relators are prepared to defend the inclusion of all remaining practices at trial.

Relators believe that a data request to CMS will largely resolve any alleged doubts about inclusion of this limited group of practices in Ms. Wolfston's models.

3. **"Overstating MIPS Incentive Payments"**

Ms. Wolfston has created two damages models in an attempt to provide evidence of a reasonable range of damages. Model 1 collects known Medicare payments to providers associated with eCW customers and adjusts the total of those payments after modifying the MIPS score. Model 2 uses publicly available CMS data for Allowed MIPS charges to calculate the amount of the overpayment. Importantly, issue 3 in eCW's letter only relates to Model 1.

eCW can't help changing its positions. eCW previously argued that Ms. Wolfston should have used the "Total Medical Medicare Payment Amount" instead of the "Total Medicare Payment Amount" in her Model 1 calculations. Doc. 365-1 at 8. Relators agreed to do as eCW suggested and incorporated the "Total Medical Medicare Payment Amount" in Ms. Wolfston's October 20, 2025 supplement. Refusing to take "yes" for an answer, eCW now contends that the "Total Medical Medicare Payment Amount" is not the correct figure and has identified a third type of claims data (that is not publicly available) instead. Ms. Wolfston need not use any payment amount other than the Total Medical Medicare Payment Amount, which remains a reasonable estimate of the damages eCW has caused.

Even so, Relators will request from CMS the claims data eCW now says Ms. Wolfston should have used and she will consider and incorporate those data if she concludes it is reasonable to do so.

4. **"Duplicate Entries"**

Although eCW claims this issue was raised before, it was not. And, again, this issue only affects Ms. Wolfston's Model 1. eCW identified a limited number of duplicative payments that were included in more than one customer's damages entry in Model 1. In each case, the doctor worked at and reported a MIPS score at more than one matched eCW customer. When pulling

payment data for these NPIs, Ms. Wolfston excluded non-eCW customer payment data, but since the data did not differentiate by location, she could not identify which charges were submitted under each eCW customer. She inadvertently overlooked the possibility that a provider might be working at two different eCW customers. Thus, the total amount of charges was used for both entries, when they should have been split between the two customers. The public data is not specific enough to allow that splitting, but Ms. Wolfston can address this issue by determining which customer has the lower payment adjustment and including the payments in just that customer's entry. That results in a necessarily conservative model that favors eCW.

While this limited issue can be addressed without any new data, Relators' data request to CMS should identify how much each eCW customer billed to CMS and avoid arbitrarily giving eCW the benefit of the doubt by artificially lowering the damages.

5. **"Inclusion of NPIs in APMs Attesting as Entities"**

This alleged deficiency is a non-issue. Inclusion of MIPS APM participants or those who reported as a "group" is appropriate and supported by sufficient evidence. Every provider included in Ms. Wolfston's models who submitted to MIPS as part of an APM was in a MIPS APM. As argued before, providers who participate in a MIPS APM are required to participate in the MIPS program and to use CEHRT. Doc. 429 at 6-7. Because MIPS APM participants are required to submit MIPS scores and they receive payment incentives based on those scores, it is appropriate to include them in Ms. Wolfston's models. *Id.*

6. **"Overstatement of Payment Amounts Using Multiple TINs Associated with the Same Clinician"**

This alleged deficiency is also wrong. As Relators have explained, Ms. Wolfston used an extensive matching protocol to ensure that payments included in her model could be matched to an eCW customer. When she encountered a provider who submitted claims from more than one

12

practice, she took steps to identify the charges for the known eCW user only. For example, Ms. Wolfston would examine the attributes of the practices (territory, practice size, etc.) and eliminate payments to practices that did not have those attributes. If Ms. Wolfston could not determine which MIPS group was the known eCW user, she would exclude that customer entirely from her models.

Additionally, if a provider worked at more than one practice and Ms. Wolfston could not rule out non-eCW-related claims for that provider, she did not include specific payment amounts but instead used the minimum amount required for a provider to be MIPS eligible. So, while Ms. Wolfston's models include providers who worked at multiple practices, she accounted for that by ensuring that payment data for only the known eCW user was used. Failing that, she conservatively used the *minimum* MIPS payment amount ($90,000 per year) associated with that provider.

Although no revisions are necessary, this issue can be fully and finally resolved with the data request to CMS.

    7.    **"Inclusion of NPIs with No Associated MIPS Attestations"**

Again, this issue only affects Ms. Wolfston's Model 1. eCW points out that some providers who were practicing at matched eCW customers during the relevant Payment Years do not have a MIPS score for the corresponding Performance Year two years earlier. While that is correct in a limited number of circumstances, it ignores the reality of this situation.

Providers frequently change jobs. And MIPS scores modify Medicare payments two years *after* the score is received. When a provider changes practices, their MIPS score typically follows them to the new practice. So while some practitioners included in Model 1 might not have been working at an eCW customer when the MIPS score was obtained that then modified

payments two years later, there is also a group of eCW users who obtained a MIPS score and then left the eCW customer before the Payment Year. For those practitioners, the incentive payments they received during the Payment Years are reasonably tied to eCW's fraudulent certification of its software but are not included in Model 1 because the model only includes eCW customers. Given that, Relators do not believe any further revision of Ms. Wolfston's models is necessary to account for this issue. The data request to CMS may also be able to resolve this issue.

Additionally, while Relators do not agree that affiliation with an FQHC should automatically exclude an NPI from inclusion in Ms. Wolfston's damages models, in an effort to compromise Relators can exclude the four practices eCW identified in Attachment #7.

8. **"Inclusion of 'N/A' Designations"**

This again is a non-issue. Each entry where the customer name is denoted as "N/A" was added to the list because the practice attested to using eCW. There is no "customer name" because Ms. Wolfston was unable to match these entries to eCW's customer list. Each practice added, however, was associated with a practitioner (or practitioners) that reported using Version 11 of eCW's EHR and who reported their MIPS scores as part of a group. To match these customers, Ms. Wolfston had Mr. Wheeler identify practitioners who reported using eCW in the ASTP database and then match those practitioners to a practice group in the MIPS and CMS databases.

eCW identified ten groups matched this way where it says a corresponding entry in the ASTP database could not be located. After studying the list, Relators agree that there was a limited number of times where the matching protocol matched to the wrong practice because a

provider failed to report that he worked at more than one practice. Ms. Wolfston can address this very limited issue by adding additional checks to ensure the matches are correct.

And the data request from CMS should eliminate this limited issue by confirming all matches made from the ASTP database.

9. **"Mixing and Matching Errors"**

This is another non-issue. eCW's customers are medical practices not individual providers. To calculate damages for eCW customers, Ms. Wolfston determined all NPIs associated with each customer and then collected payment information for those NPIs if possible. eCW has identified one alleged example of a matching error caused by this method. Ex. A at 6. It is wrong. The practice at issue is ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ eCW identified ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ as its customer and provided one NPI for a user named ▄▄ ▄▄ as of December 2023. Ms. Wolfston matched ▄▄▄▄▄▄ to the public databases by an exact name match and then confirmed that the 2023 NPI number provided by eCW was associated with ▄▄▄▄▄▄. To obtain the MIPS score, Ms. Wolfston then searched all associated providers with ▄▄▄▄▄▄ in 201**8** to determine the practice's MIPS score. Using an iterative process that has been fully disclosed to eCW for more than a year, the score was found by identifying an associated provider with only one MIPS score. The first NPI in the list of associated ▄▄▄▄▄▄ providers that the computer script confirmed was only associated with one MIPS eligible organization was Dr. Isaac Vaisman. Since Dr. Vaisman's NPI was associated with ▄▄▄▄▄▄ and only one MIPS eligible organization, Ms. Wolfston was able to match the MIPS score for ▄▄▄▄▄▄ and include that information in Model 1. This MIPS matching methodology is reasonable and requires no changes.

That said, the data request to CMS will confirm that the correct MIPS scores for all included eCW customers were properly matched.

**10.    "Inclusion of New Data"**

Finally, eCW objects to Relators adding a limited number of additional eCW customers identified in the ASTP database and to updating payment data for 2023. Including that supplemental data does not render Ms. Wolfston's models unreliable or require their exclusion. The supplement to Ms. Wolfston's models improves the accuracy of the damages calculations by substituting actual payment information for 2023 and including additional eCW customers who reported using eCW Version 11. As Relators' Motion to Supplement explains (Doc. 434), inclusion of this data is allowed, substantially justified, and harmless.

**V.    CONCLUSION**

Relators respectfully request that the Court accept their proposal and allow them to engage in "more investigations" through the proposed data request to CMS and to supplement Ms. Wolfston's models to include such data. Doing so will result in the most accurate and complete damages model for the jury.

If the Court does not agree that seeking more information is allowable, Relators can instruct Ms. Wolfston to further revise her models by removing some of the entries eCW disputes. Doing so will artificially and improperly reduce the damages that Relators can collect on behalf of the United States and its taxpayers. Given the circumstances here, Relators respectfully submit that doing so is not necessary and revising Ms. Wolfston's models to include additional CMS data is appropriate.

Respectfully submitted this 21st day of November, 2025.

/s/ *Robert H. Snyder, Jr.*
ROBERT H. SNYDER, JR.
  Georgia Bar. No. 404522
  rob@cannellasnyder.com
HANNAH D. AMANUEL
  Georgia Bar No. 922743
  hannah@cannellansnyder.com
ALEXANDRA "SACHI" COLE
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
CHASE LYNDALE
  Georgia Bar No. 183762
  chase@cannellasnyder.com

CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

BRIAN P. ADAMS
  Georgia Bar. No. 142474
  brian@brianadamslaw.com
MARY BETH HAND
  Georgia Bar No. 322836
  mbhand@brianadamsalaw.com

ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231

ANNA GREEN CROSS
  Georgia Bar No. 306674
  anna@crosskincaid.com
MEREDITH KINCAID
  Georgia Bar No. 148549
  meredith@crosskincaid.com

CROSS KINCAID BASKAM LLC
315 W. Ponce de Leon Ave., Suite 715
Decatur, GA 30030
(404) 948-3022

*Counsel for Relators/Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 21st day of November, 2025.

/s/ Robert H. Snyder Jr.
Robert H. Snyder Jr.
Georgia Bar No. 404522