UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

|  |  |
|---|---|
| UNITED STATES *ex rel.*, PERMENTER, et al.<br><br>　　　　Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>　　　　Defendant. | CIVIL ACTION FILE<br>NUMBER 5:18-CV-382 |

**RELATORS' CONSOLIDATED RESPONSE TO ECLINICALWORKS' REQUEST FOR JUDICIAL NOTICE REGARDING ONC'S DECEMBER 29, 2025 RULEMAKING[1] AND MOTION FOR LEAVE TO SUPPLEMENT MR. KYLE MEADORS' EXPERT REPORTS**

eCW knows this case has narrowed to the certification of Version 11 under ONC's 2015 Certification Standards.  ECF 345 at 6; *see also* ECF 474 (eCW Resp. to Rels.' Mot. to Supplement Wolfston) at 8 ("Relators narrowed their liability theory to Version 11 … in November 2024").  It is undisputed that Version 11 was certified on December 28, 2017, was the company's only certified software under the 2015 standards until December 2021, and was withdrawn by the company on June 3, 2022.  ECF 345 at 6*; see also* ECF 218-152 (eCW withdrawal from CHPL request form).  Thus, the time frame at issue ends around June 2022.

Despite that, eCW now seeks to reopen discovery so it can tell the jury about a prospective, proposed ONC rule change published three and half years after the relevant time frame.  On December 22, 2025, the ONC published a notice of proposed rulemaking ("ONC NPRM") proposing a complete rewrite of the certification requirements.  In the NPRM, ONC first cites President Trump's Executive Order 14192 "Unleashing Prosperity Through Deregulation," "which states that it is the policy of the Administration to significantly reduce the

---

[1] The rulemaking allegedly at issue is, thus far, only proposed rulemaking.

private expenditures required to comply with Federal regulations…".  90 Fed. Reg. 60,970-01 (Dec. 29, 2025), p. 60,971.  It continues that "[i]n order to implement the President's deregulatory initiatives, and to better promote the health and well-being of the American people, HHS intends to dramatically expand its deregulatory efforts." *Id.*  To further those deregulation goals, ONC proposes removing more than half of the current certification requirements, including all the security certifications.  The comment period ended late February 2026 and ONC is considering those comments now.  When a final rule will be published and what it will say is unknown.[2]

eCW wants to reconstruct history and revise the record by using the administration's policy priorities to argue the security requirements eCW violated were meaningless and unimportant to the ONC.  In doing so, eCW misleadingly argues the Court ***must*** take judicial notice of the ONC NPRM despite binding case law that the statute on which eCW relies does not eliminate other evidentiary rules, including Rules 401 (relevance) and 403 (prejudice, confusion, and delay).  *See Vallot v. Cent. Gulf Lines, Inc.*, 641 F.2d 347, 351 (5th Cir. Apr. 3, 1981) ("Although 44 U.S.C. § 1507 requires the contents of the Federal Register be judicially noticed, [a party] cannot demand admission of ... publications as evidence ... where they have no relevance.").[3]  The NPRM says nothing about what the regulations at issue required during the relevant time frame.  It does not even interpret the current regulatory requirements.  Instead, it is a prospective deregulatory initiative undertaken years after the relevant time to further this administration's priorities.  It is irrelevant to the issues the jury must decide.  Even if marginally

---

[2] As described below, ONC has modified or withdrawn previous proposed changes after the comment period.
[3] *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("[D]ecisions of the … Court of Appeals for the Fifth Circuit …as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit.")

relevant, introducing the NPRM would improperly inject politics into the trial, confuse the jury, and extend the trial.  It is inadmissible.

If the Court agrees, eCW's motion to supplement Mr. Meador's opinions is moot because the ONC NPRM is the only thing he addresses.  But eCW's proposed supplementation is improper for other reasons as well.  Most notably, eCW flouts this Court's *Daubert* ruling that no expert can testify about "what the government was thinking … or thought was important"[4] by seeking to have Mr. Meadors speculate about what he believes ONC was thinking by publishing the NPRM.[5]

eCW also ignores that the ONC was deposed about the applicable certifications and has agreed that Mr. Posnack may testify live at trial about the same topics on which ONC was deposed.  *See* ECF 218-17 (ONC Dep. (Posnack)) and Ex. 1 (Jul. 29, 2025, approving Mr. Posnack's testimony at trial).  Those topics included questions about the applicable regulations, ONC's enforcement tools, and whether certain allegations related to certification issues.  *See, e.g.,* ECF 218-17 at 47:14-50:8 (testifying in depth about (d)(1)); *id*. at 135:6-136:10 (testifying about ONC's enforcement tools); *id*. at 51:12-52:20 (questions about whether Relators' allegations (as construed by eCW) implicated (d)(6)).  Because the jury will hear from the ONC directly, there is no need to rely on the ONC NPRM, or improper expert testimony about the same, to understand the issues the jury must decide.  Both motions should be denied.

---

[4] *See* Jun. 4, 2025 Hrg. Tr. at 79:2-7 ("But no expert is going to testify about what they think the government was thinking or not thinking. Or what they think the government thought was important. That's a matter of fact that is subject to proof by evidence of those facts. If it can be obtained. But expert testimony is not a substitute for those facts.").

[5] Mr. Meadors also seeks to add new opinions about penetration testing and "defense in depth" that he never previously expressed and that do not rebut anything said by Relators' experts.  That too is improper.

### A.  Judicial Notice of the ONC NPRM is Inappropriate

eCW's argument relies solely on 44 U.S.C. § 1507.  Relators do not dispute that section states "[t]he contents of the Federal Register shall be judicially noticed."  *Id.*  But that does not mean judicial notice is mandatory.  Instead, a court's "taking of judicial notice of facts is, as a matter of evidence law, a highly limited process."  *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).  Courts are cautious about doing so because "judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence."  *Id.*  Facts that may be subject to judicial notice are also subject to the rules of evidence.  *See Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 289 (11th Cir. 2009) ("However, merely because a fact may be subject to judicial notice, it is not insulated from other rules of evidence such as Rule 403").  As a result, this Circuit has expressly held that a party cannot demand the admission of irrelevant Federal Register evidence under 44 U.S.C. § 1507.  *See Vallot*, 641 F.2d 347 at 351 ("Although 44 U.S.C. § 1507 requires the contents of the Federal Register be judicially noticed, [a party] cannot demand admission of ... publications as evidence ... where they have no relevance.").  Other Circuits agree.  *E.g.*, *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998) ("We cannot imagine that, in enacting § 1507, Congress intended to override Rule 402, and make judicial notice mandatory, when a matter that appeared in the Federal Register is irrelevant.").

Indeed, this Circuit has consistently refused to take judicial notice of irrelevant and prejudicial facts and affirmed such refusals by district courts.  *See, e.g., Vallot*, 641 F.2d at 351 (judicial notice statute did not supersede relevance); *Tambourine Comercio Internacional SA*, 312 F. App'x at 289 (judicial notice did not supersede Rule 403), *Philippeaux v. Miami Apartments Invs., LLC*, No. 22-11692, 2023 WL 2989831, at *2 n.1 (11th Cir. Apr. 18, 2023)

4

(denying judicial notice "because the documents at issue are not relevant"); *Berber v. Wells Fargo, NA*, 798 F. App'x 476, 483 n.7 (11th Cir. 2020) (same); *United States v. Alindor*, 799 F. App'x 678, 684 (11th Cir. 2020) (same); *United States v. Mayer*, 760 F. App'x 793, 798 (11th Cir. 2019) (same); *BRE Mariner Marco Town Ctr., LLC v. Zoom Tan, Inc.*, 682 F. App'x 744, 748 n.3 (11th Cir. 2017) (same).

As the party seeking judicial notice, eCW has the burden of establishing its admissibility. *Fields v. United Network for Organ Sharing*, No. 6:24-CV-1434-JSS-DCI, 2025 WL 1309807, at *2 (M.D. Fla. May 6, 2025) ("party seeking judicial notice of facts bears the burden of establishing the facts' relevance"), citing *Vallot*, 641 F.2d at 351.  eCW cannot meet that burden and, indeed, barely tries.  Instead, it argues the admission of the ONC NPRM is mandatory under 44 U.S.C. § 1507.  ECF 508 at 1 ("Respectfully, the Federal Register Act's statutory mandate requires the Court to take judicial notice.").  It is not.  And, as argued below, the ONC NPRM is irrelevant, prejudicial, and nearly certain to cause both confusion and delay.

### a.   The ONC NPRM excerpts do not relate to Relators' allegations

It is important that the Court understand the scope of what eCW seeks to have judicially noticed from the NPRM.  The NPRM spans 65 pages.  Yet eCW only asks the Court to judicially notice 9 sentences which have been carefully cherry-picked to manufacture the appearance of relevance.  eCW would like to give the impression that the NPRM is proposing changes directly because of the Relators' allegations in this case.  But that is not supported by the text of the NPRM.  The NPRM does not mention Relators or this case, nor does it specifically disavow or reject any of Relators' allegations.  Any attempt by eCW to suggest the language it quotes from the ONC NPRM has anything to do with this case is rank speculation, unsupported by the actual record.

*First*, eCW seeks judicial notice of the paragraph on the scope and policy purpose of the Certification Program.  ECF 508 at 2.  In this paragraph, ONC notes that "stakeholders" have "overinterpreted" the Program's limited scope and policy purpose with respect to health IT security.  ONC references stakeholders' "incorrect expectations" of developers to conduct penetration testing of certified health IT or to ensure that certified health IT is hackproof.

But Relators have never expressed either expectation.  In fact, it is quite the opposite.  Relators have relied on the penetration testing that eCW *did* as evidence that it had actual knowledge its software did not meet the certification requirements.  *See, e.g.*, ECF 322-6, Relators' Stmt. Of Addt. Disp. Mat. Facts, ¶¶ 115, 146, 160, 169, 171.  Relators have also repeatedly disavowed any position that eCW's software had to be hackproof or totally free of vulnerabilities.  *See, e.g.*, ECF 266-87, Wheeler Reb. Rep. ¶¶ 8-9.  Relators contend that attesting to compliance with the requirements while knowing about flaws that render the software noncompliant is improper.  Relators have also never argued (d)(1) requires more than basic authentication and access control—requiring a username and password to access PHI and checking a user is authorized to view information.  eCW's software did not do either and it knew it.  eCW's argument that this paragraph proves the ONC has "squarely rejected" Relators' interpretation of the certifications is unfounded.  It cannot manufacture relevance by mischaracterizing Relators' allegations and pointing to a proposed policy document that rejects positions no one has taken in this case.

*Second*, eCW seeks judicial notice of a passage stating that CEHRT, when deployed in large health systems or cloud-based platforms, cannot provide all the privacy and security capabilities necessary for compliance with the HIPAA Security Rule.  ECF 508 at 3.  Relators have never claimed that eCW's software was required to ensure enterprise-wide HIPAA

compliance.[6]  Mr. Meadors tries to use this passage to suggest that security concerns involving other applications within a broader enterprise do not bear on a software's compliance with the certification criteria.  That is not what the NPRM says.  The NPRM addresses the unremarkable point that no single application can ensure HIPAA compliance.  It does not suggest that CEHRT is excused from meeting the certification criteria simply because a non-conformity may arise from an integration with a third-party application.  The ONC has specifically addressed that issue and expressly told developers that non-conformities arising from third-party integrations *are* within the scope of the program if the developer has control over the issue.[7]

*Third*, eCW seeks judicial notice of ONC's conclusion that the "costs and burdens" of the privacy and security certification criteria "far exceed their intended purpose and benefits."  ECF 508, p. 3.  To use eCW's preferred refrain, context matters.  This conclusion does not appear in isolation.  It is the lead-in to ONC's discussion of why it believes the privacy and security requirements should be removed in light of the administration's deregulatory policy goals.  And while that statement is relevant to whether the rules should continue, it says nothing about whether eCW was required to follow the rules, or whether ONC believed the rules were important and material years ago.

*Fourth*, eCW seeks judicial notice of a passage explaining that while CEHRT has always been linked to the MIPS Program, participating providers were not required to *use* the privacy and security capabilities outlined in the (d) criteria.  ECF 508 at 3.  eCW argues, without any real analysis, that this passage is relevant to materiality.  The NPRM does not suggest that developers

---

[6] The Court dismissed Relators' HIPAA based allegations.  ECF 354 at 59 (granting summary judgment on Relators' HIPAA compliance theory).  But even those allegations did not suggest eCW's software had to make a practice HIPAA compliant.  Instead, Relators alleged that no practice using eCW's software could be HIPAA compliant because the software is and was terribly insecure.

[7] ECF 266-31 at 23-24 ("Developers are required to take reasonable steps to ensure that third-party products that the developer anticipates will be used with its certified product perform in accordance with the requirements of the product's certification.").

were free to disregard the certification criteria while they remained in effect.  Instead, the paragraph confirms that providers could not participate in the MIPS Program and receive an incentive payment if they were not using certified health IT, just as Relators have alleged.

*Finally*, eCW asks the Court to judicially notice a statement about the 2011 Edition certification criteria.  ECF 508 at 3.  In its historical background section on the privacy and security requirements, ONC notes a statement it made about the 2011 Edition certification criteria that the capabilities provided by CEHRT do not affect the independent HIPAA security analysis that regulated entities must perform.  90 Fed. Reg. 60,970 (Dec. 29, 2025), p. 60,989.  That is an undisputed fact that eCW has repeatedly stressed.  *See* Top 10 Myths of Security Risk Analysis*,* ECF 218-9 ("Even with a certified EHR, you must perform a full security risk analysis.  Security requirements address all electronic protected health information you maintain, not just what is in your EHR.").  The ONC NPRM thus adds nothing to the evidence in the case.  And because Relators have never alleged that eCW's software must independently satisfy an entity's HIPAA obligations, it does not relate to any issue here.

### b.  The ONC NPRM is Prospective and Post-Dates the Relevant Conduct

As noted above, this case is about eCW's compliance with the ONC certification criteria governing Version 11 from 2017 to 2022.  The ONC NPRM was not proposed until December 22, 2025, nearly three and a half years later.  That timing alone should end this analysis.

The jury will be asked to determine whether eCW fraudulently obtained and maintained ONC certification of Version 11.  To do so, it will consider what the certification criteria were and what eCW knew about the criteria during the time when Version 11 was certified.  The ONC NPRM does not purport to retroactively change the existing criteria and it does not affect what eCW knew about the criteria when Version 11 was certified.

That is especially true here because the ONC NPRM is not interpretive guidance. Instead, it is proposed prospective rulemaking document about what the criteria **should be** going forward, considering this administration's emphasis on deregulation. Agencies routinely issue interpretive guidance when they intend to clarify existing requirements. The ONC itself has done so. *See, e.g.,* ECF 266-31 (ONC Health IT certification Program Policy Resource #18-01 (Post-certification Assessment of Program Requirements)). But the ONC NPRM makes clear, by its own text, that its purpose is not to explain the certification criteria, but to implement the administration's policy of deregulation by removing most of the requirements. *See* 90 Fed. Reg. 60,970-01 (Dec. 29, 2025), p. 60,971 ("In order to implement the President's deregulatory initiatives, and to better promote the health and well-being of the American people, HHS intends to dramatically expand its deregulatory efforts."); *id*. ("As we look to the future, there is an opportunity to review the existing requirements and make updates as needed."). A change in administration comes with an expected accompanying change in policy. But that does not and cannot rewrite existing regulations. And it cannot be used by eCW to avoid liability for its fraud.

### c.  The ONC NPRM Does Not Bear on Materiality

eCW's argument that ONC NPRM is relevant to materiality is not only misplaced, it is fundamentally inconsistent with how materiality is assessed under the False Claims Act. eCW wants to argue to the jury that the ONC NPRM's proposed removal of security criteria shows that the government did not consider compliance with the (d) criteria to be material. Materiality is decided at the time of the relevant decision, not years later. *See United States v. Care Alternatives*, 81 F.4th 361, 375 (3d Cir. 2023) quoting *Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 195 (2016) ("*Escobar* focuses on whether the government had actual knowledge of a violation **when it made a payment**…") (cleaned up and emphasis added); *U.S. ex rel. Montcrieff*

9

*v. Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404, 418 (W.D. Tex. 2023), aff'd in part, vacated in part, remanded sub nom. 133 F.4th 395 (5th Cir. 2025) ("[M]ateriality should be decided at the time of the payment decision, not after-the-fact.").

New policy proposals do not speak to what the government considered material years earlier. Indeed, rule updates like those proposed in the ONC NPRM are common. The ONC NPRM sections eCW seeks to admit are part of ONC's HTI-5 proposed rule. In August 2024, before the election, ONC issued the Health Data, Technology, and Interoperability: Patient Engagement, Information Sharing, and Public Health Interoperability (HTI-2) proposed rule ("HTI-2") which proposed strengthening the security criteria. ONC proposed: (1) making compliance with (d)(1) mandatory for additional Health IT Modules (89 Fed. Reg. 63,498 (Aug. 5, 2024), p. 63,798), (2) expanding (d)(7) to include Personally Identifiable Information and adding a requirement for server-side encryption of sensitive data (*id*. at 63,504-63,505), (3) revising (d)(12) to make encryption of authentication credentials mandatory (*id*. at 63,536), and (4) revising (d)(13) to make multi-factor authentication mandatory (*id*. at 63,747).

One week after ONC published the ONC NPRM, it withdrew the non-finalized portions of HTI-2, including the proposed enhancements to the security criteria. *See* 90 Fed. Reg. 60,602 (Dec. 29, 2025), p. 60,602. In doing so, ONC cited Executive Order 14192 and noted that given the Executive Order and the administration's deregulation focus, ONC was withdrawing the non-finalized proposals in HTI-2. *Id*. at 60,602-60,603. In short, before the new administration expressed a deregulation priority, ONC had proposed to strengthen the security criteria it now seeks to abolish. There is no conclusion that should be drawn other than elections have consequences. But a change in policy priorities is irrelevant to non-compliance with regulations years earlier.

Finally, the ONC NPRM is not a final statement by ONC.  It remains a proposed rule. ONC received thousands of comments, including many objecting to the proposed changes.[8]  As seen with HTI-2, just because a rule is proposed does not mean that all its provisions will be finalized.  Allowing eCW to use a proposed rule to challenge materiality years after the relevant time elevates a policy based proposal above the actual regulations that governed eCW's conduct. That is improper.

### d. The Non-Existent Relevance is Outweighed by the Substantial Risk of Confusion, Unfair Prejudice, and Delay

Even if the ONC NPRM was relevant, it still should not be admitted given the real risks of confusion, prejudice, and delay it presents.  Fed. R. Evid. 403.

### i. Confusion

Judicially noticing the ONC NPRM will create exactly the kind of confusion that Rule 403 is designed to prevent.  *First*, it invites the jury to apply the wrong standard.  The jury's job is to determine what the certification criteria required during the relevant period and whether eCW complied.  The ONC NPRM poses a different question: should those requirements be maintained going forward considering the new administration's deregulation priority?  If the jury hears about the ONC NPRM, it may erroneously assume that the (d) criteria have been withdrawn and that eCW can no longer be held accountable to compliance with those criteria regarding certification of Version 11.  The relevant rules, and the only thing the jury should

---

[8] Drummond Group, eCW's Authorized Certification Body and Mr. Meadors' former company, objected to the ONC NPRM's proposal to remove all security certifications.  *See* Drummond HTI-5 Public Comment at 3, available at https://www.regulations.gov/comment/HHS-ONC-2025-0005-0112 ("The removal of the privacy and security certification criteria raises concerns"). The Healthcare Information and Management Systems Society Electronic Health Record Association ("HIMSS") also published a comment.  *See* HTI 5 Proposed Rule Public Comment Letter, available at https://www.regulations.gov/comment/HHS-ONC-2025-0005-0168.   HIMSS is an association of nearly 30 member companies (including eCW) that develop, implement, and support certified health IT for most of the hospital and ambulatory providers nationwide.  In its comment, HIMSS noted there were differences of opinions among its members about removing the privacy and security certification criteria.  *Id*.

consider, are the certification criteria in place from 2017 to 2022. The jury will already have a tough job interpreting the ONC regulations that were in place. Asking it to also consider and balance a proposal to modify those regulations will make their job harder.

### ii.   Unfair Prejudice

The prejudice here is not subtle. The ONC NPRM carries the imprimatur of a federal agency and will be presented to the jury as an official government document discussing the very regulations at issue. That alone creates a significant risk that the jury will assign weight to the ONC NPRM beyond what it deserves. That is eCW's strategy. eCW wants to cherry-pick supposedly favorable statements, have them judicially noticed, and present them to the jury as definitive agency conclusions about this case, when the NPRM says nothing about the allegations here.

The ONC NPRM also improperly injects policy and politics into this case. The NPRM expressly advances this administration's deregulatory agenda. Jurors who support this administration or those policy goals, may be swayed to find for eCW even if they believe eCW defrauded the taxpayers under the application regulations. Alternatively, those who disagree with the administration may be motivated to find for Relators. Both are inappropriate and inject political, policy based decisions into a case that should be free from such issues.

### iii.   Delay

If the ONC NPRM is admitted, Relators will have to respond. They will need to present evidence of the broader regulatory history, discuss the proposals in HTI-2 that were withdrawn, and why they were withdrawn. Relators will also need to obtain discovery about eCW's lobbying efforts for the changes it now seeks to capitalize on, which eCW has opposed. If eCW can put the ONC NPRM in front of the jury and represent the rule change reflects ONC's

12

position on the certification criteria, then the jury is entitled to know if eCW has lobbied ONC to take those positions.  Relators sent eCW targeted discovery requests aimed at understanding any lobbying efforts it participated in.  In response, eCW stated the requested discovery would be irrelevant and would seek "inadmissible First Amendment-protected activity."  Ex. 2, 2026-03-11 G. Wyatt to R. Snyder.  Relators can't infringe on eCW's First Amendment rights, but there can be no dispute that this information would be relevant, would require additional discovery, and will add time and complexity to an already complicated trial.

In short, the ONC NPRM is not relevant to any issue in the case and its admission is likely to confuse the jury, prejudice Relators, and delay and extend the trial.  The motion for judicial notice should be denied.

## B.  Mr. Meadors' Proposed Supplemental Testimony is Inadmissible

If the Court decides the ONC NPRM is inadmissible, as Relators argue, the issue of Mr. Meadors' supplement is an easy one.  Supplementation should be denied.  Mr. Meadors' proposed supplement is not a true supplement.  It is an attempt to reframe his expert opinions around the ONC NPRM and put the proposed rule in front of the jury by another name.

### a.  Mr. Meadors' Proposed Supplement

In his initial reports, Mr. Meadors set out his opinions based on his experience as a test proctor, his role at Drummond, and his understanding of how certification works in practice.  At no point did he conclude that his interpretations of the certification criteria were correct because they mirrored ONC's own interpretation of the certification criteria.  Instead, he explained the certification framework, the purpose and operation of the criteria, his opinion on the meaning of each criterion, and why he believed the Relators' allegations were incorrect.  All of which the Court already deemed appropriate expert testimony.  ECF 333.

In his proposed supplemental report, however, Mr. Meadors abandons that foundation and instead refocuses his opinions around the ONC NPRM.  The entire purpose of his supplemental report is to provide his interpretation of what ONC meant in the ONC NPRM and then use that self-serving interpretation to suggest ONC agrees with his opinions.  *See* Meadors Supp. Rep. at 2-3 (alleging statements about incorrect expectations of certified health IT to ensure authentication and authorization capabilities protect against known or unknown vulnerabilities supports his opinion that Relators' allegations "have nothing to do with the privacy and security criteria"); *id*. at 6 ("These comments provide further support for my opinion that relators' and Mr. Arrigo's claim that existence of software vulnerability [sic] reflects a violation of privacy and security criteria is unfounded and inconsistent with the criteria's limited purpose.").

Throughout his report, Mr. Meadors doesn't simply quote the ONC NPRM, he interprets it and purports to explain what ONC actually meant.  *See id*. at 6 (ONC NPRM reflects "ONC's position that developers may be focused on meeting the certification requirements, which is distinct from providing a technology that meets all of the specific security needs that defense-in-depth technology might provide…").

In some instances, Mr. Meadors also ventures into entirely new subject matter not addressed in his prior reports and simply adopts what the ONC NPRM says wholesale.  *See id*. at 3-4 (discussing his opinion that "penetration testing has never been a factor relevant to certification"); *id*. at 4-5 (discussing his opinion that the "privacy and security criteria are not designed to bring full depth of defense security to a provider, but to be one piece in that effort").  The words penetration testing and "defense in depth" do not appear anywhere in Mr. Meadors'

initial reports.  Relators have never alleged that eCW failed to meet the certification criteria because it did not perform penetration testing or have a full "defense in depth" strategy.

### b.  The Proposed Supplement Does Not Simply Build on Prior Opinions

"The only purpose of Rule 26(e) supplementation is for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Molbogot v. MarineMax E., Inc.*, No. 20-CV-81254, 2022 WL 2132105, at *3 (S.D. Fla. Jun. 14, 2022) (quotation omitted).  "Rule 26(e) … is not a device to allow a party's expert to engage in additional work, or to annul opinions or to offer new ones to perfect a litigating strategy." *Coward v. Forestar Realty, Inc.*, 282 F. Supp. 3d 1317, 1329 (N.D. Ga. 2017) (citations omitted). "[A] supplemental expert report setting out additional opinions or rationales or seeking to strengthen opinions expressed in the original expert report exceeds the bound of Rule 26 supplementation and is subject to exclusion under Rule 37(c)(1)."  *Scott v. Remington Arms Co., LLC*, No. 2:19-CV-1891-GMB, 2024 WL 2981179, at *5 (N.D. Ala. Jun. 13, 2024).[9]  eCW itself argued that adding new opinions after the deadline is improper when it opposed Relators' motion to supplement.  ECF 474 at 3 ("[W]hen experts propose not merely to supplement but to expand, fix, or redo their analyses, courts routinely reject invocation of Rule 26(e)'s supplementation provisions.").

eCW relies on two cases to support its argument that Mr. Meadors' supplement should be permitted because it simply builds on his prior opinions.  But in each case, the untimely supplemental reports did not change the core opinions of the expert and amounted to little more

---

[9] eCW misleadingly cites *Crawford* for the proposition that "Rule 26 contemplates that experts should be permitted to supplement their reports" to add information that was unavailable at the time of initial disclosure.  ECF 512 at 6, citing *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1341 (11th Cir. 2020).  But the court in *Crawford* did not decide "whether there was a violation of Rule 26" and instead issued a "narrow holding" that "the district court did not abuse its discretion in finding" untimely supplemental affidavit harmless.  *Id*.

than an update to the expert's prior opinions. *See Lanzi v. Yamaha Motor Corp.*, No. 8:17-CV-2020-T-36AEP, 2019 WL 9553066, at *9 (M.D. Fla. Sept. 26, 2019) (untimely supplement "[built] upon the original, without significantly changing the core conclusions or opinions found therein" and merely "shed[] light" on the expert's qualifications, methodology, and rationale supporting original conclusions); *In re Accutane Prods. Liab. Litig.*, No. 8:04-MD-2523T30TBM, 2007 WL 201091, at *1 (M.D. Fla. Jan. 24, 2007) (untimely supplement simply updated "further literature review that was prompted, in part, by the Defendants' attacks on the witness's methods and research, and in any event, offers no new opinions").[10]

That is not the case with Mr. Meadors' proposed supplement. As described above, Mr. Meadors' supplement largely does one thing: it seeks to use ONC's recent statements about a proposed rule to support Mr. Meadors' interpretation of the existing rules. That is not proper expert testimony. It is just rampant speculation which the Court has deemed inadmissible. *See* Jun. 4, 2025 Hearing Tr. at 79:2-9 ("But no expert is going to testify about what they think the government was thinking or not thinking. Or what they think the government thought was important. That's a matter of fact that is subject to proof by evidence of those facts. If it can be obtained. But expert testimony is not a substitute for those facts."); *id*. at 75:22-25 (noting that eCW can "get a witness from [the agency] to come testify instead of an expert to speculate").

---

[10] eCW also misleadingly cites two cases in an attempt to support this same argument. First, eCW cites *Lighting* to assert that supplementation is appropriate where "additional factual grounds" become available after an expert's initial disclosure. But the court in *Lighting* only permitted the untimely supplementation based on additional factual background because both parties agreed that would be appropriate. *Lighting v. Manus Prods., Inc.*, No. 1:19-CV-2852-AT, 2021 WL 5024365, at *2 (N.D. Ga. June 17, 2021). There is no such agreement related to Mr. Meadors' supplement. Additionally, eCW cites *Tejeda* for the proposition that a defendant is entitled to produce an untimely supplement to address "new records" received after the initial disclosure. But, in *Tejeda*, the court only permitted the untimely supplement based on new records because the plaintiff produced the new records only one day before the discovery cutoff. *Tejeda v. Costco Wholesale Corp.*, No. 1:20-CV-24790-JEM, 2022 WL 2116710, at *2 (S.D. Fla. May 20, 2022). While the plaintiff was entitled to produce newly received medical records, the untimely supplement was only permitted because it was unreasonable to think a supplemental report could be put together in one day. So, contrary to eCW's suggestion, *Tejeda* does not provide a clear-cut rule that supplementation is appropriate where there are new records available.

16

Not only is it inappropriate for Mr. Meadors to explain what ONC thinks about anything, it is also unnecessary.  ONC is producing a witness for trial.  If the agency has a position on the certification criteria, its witness can testify about that under oath, subject to cross-examination, and the limits of the government's authorization.

What eCW proposes is to have Mr. Meadors interpret a proposed prospective rule and to present his interpretation as if it were ONC's.  As with its request for judicial notice, this is an attempt by eCW to bypass the evidentiary safeguards that apply to actual agency testimony and substitute expert speculation for admissible evidence.  eCW wants the jury to hear about the ONC NPRM.  If it cannot introduce it directly through judicial notice, it will introduce it through its expert.  Either way, the goal is the same: to replace the regulatory framework that governed eCW's conduct with a later policy proposal and ask the jury to decide the case on that basis.

Mr. Meadors also seeks to use the ONC NPRM to add opinions he never previously expressed.  He did not opine that penetration testing or security "defense in depth" is unnecessary for certification compliance—likely because Relators did not offer the opposite opinions.  But if Mr. Meadors believed those issues were relevant here, he could have said so in 2024.  He did not.  ONC speaking on those issues after the deadlines does not allow Mr. Meadors the opportunity to revise his report to include something he chose not to raise earlier.

### c.  The Proposed Supplement is Not Harmless or Justified

The Federal Rules state that if a party fails to properly "provide information … as required by Rule 26(a) or (e)" then that party "is not allowed to use that information … to supply evidence at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Mr. Meadors' supplemental report is neither.

In determining whether an untimely disclosure was substantially justified or harmless, "a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Wynn v. Henry Cnty. Sch. Dist.*, No. 1:18-CV-2638-CAP, 2021 WL 4817815, at *3 (N.D. Ga. Mar. 25, 2021) (quotation omitted). Each factor favors exclusion of Mr. Meadors' supplement.

*First*, Mr. Meadors' supplement is prejudicial. As outlined above, any introduction of ONC NPRM is likely to result in prejudice. Referring to the ONC NPRM in Mr. Meadors' supplement is no different. If Mr. Meadors' supplemental opinions are permitted, the jury will mistakenly believe that Mr. Meadors is speaking for ONC and assign his testimony about the meaning and importance of the certification criteria more weight than it is due. eCW tries to minimize these concerns by alleging Mr. Meadors' supplement is substantially the same as his initial opinions. But, as described above, that is not the case. Mr. Meadors' supplement discusses topics that were not addressed in his initial reports and purports to speak for ONC in a way he did not before and in a way the Court has already said was impermissible.

*Second*, Relators have no reasonable ability to cure that prejudice. Relators could reopen expert discovery to re-depose Mr. Meadors, engage experts to prepare rebuttals, and then re-litigate the admissibility and scope of this new testimony. Doing so would cause Relators to incur additional expenses and waste the limited time before trial running down an issue that is ultimately irrelevant to any of the issues here. *See Jones Creek Invs., LLC v. Columbia Cnty., Georgia*, No. CV 111-174, 2014 WL 12618171, at *8 (S.D. Ga. Oct. 29, 2014) (excluding untimely supplement in part because "the surprise is curable but only by reopening discovery and

18

restarting the expensive and time-consuming six-step discovery process…").  And even then, the prejudice cannot be fully cured.  Once the ONC NPRM is in the record, Relators will be forced to gather and present evidence about this proposed rule that is far outside the bounds of the actual issues here.

*Third*, as discussed above, any introduction of the ONC NPRM, through judicial notice or Mr. Meadors' supplement, will significantly disrupt the trial.  eCW focuses only on the effect of Mr. Meadors' supplement on the trial timeline.  It fails to consider that admission of Mr. Meadors' supplemental testimony will result in a mini-trial solely on the ONC NPRM, what it means, and what weight, if any, the jury should give it.

*Fourth*, eCW claims the supplement is important because it explains the meaning of the certification criteria through the lens of the ONC NPRM.  But that argument assumes something that has not been proven: that the ONC NPRM is relevant and admissible.  As discussed above, it is not.  The ONC NPRM is a proposed regulatory update that reflects the current administration's deregulation initiative and says nothing about what the certification criteria were or what the government deemed material during the relevant time.  eCW wants to use the supplement to argue the ONC agrees with its positions and has "squarely rejected" Relators' purported overinterpretation of the criteria.  That is improper.

*Fifth,* and finally, eCW's explanation for its untimely disclosure of Mr. Meadors' supplemental report is insufficient.  eCW solely relies on the timing of the ONC NPRM to support its late disclosure, but that does not justify supplementation.  The relevant question is not simply whether the information was unavailable, but also whether the new information justifies reopening expert disclosures.  And here, it does not.  The ONC NPRM does not change the facts.  It is a policy proposal issued years after the relevant events.  eCW wants to incorporate it into

19

Mr. Meadors' opinions because it believes it helps their case, not because it was necessary for a fair trial.

### C. Conclusion

Viewed in isolation, each motion is flawed.  Together, they reveal the extent of eCW's improper strategy.  eCW wants the ONC NRPM in front of the jury.  If it cannot do that through judicial notice, it will introduce it through expert testimony.  If it cannot force ONC to testify about the ONC NPRM, it will have Mr. Meadors speak for ONC.  If it cannot defend its conduct under the rules that applied, it will ask the jury to apply different proposed rules.  That is not litigation on the merits.  It is changing the playing field midgame.  The Federal Rules do not permit a party to substitute a proposed rule expressly based on policy priorities of a new administration for the governing regulatory scheme or to replace agency testimony with expert speculation.  Relators respectfully request that the Court deny eCW's request for judicial notice and its motion for leave to supplement Mr. Meadors' reports.

Respectfully submitted this 3rd day of April, 2026

s/ Robert H. Snyder, Jr.
ROBERT H. SNYDER, JR.
  Georgia Bar. No. 404522
  rob@cannellasnyder.com
ALEXANDRA "SACHI" COLE
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
HANNAH D. AMANUEL
  Georgia Bar No. 922743
  hannah@cannellansnyder.com
CHASE LYNDALE
  Georgia Bar No. 183762
  chase@cannellasnyder.com
CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave.
Suite 885
Decatur, Georgia 30030
(404) 800-4828

20

BRIAN P. ADAMS
  Georgia Bar. No. 142474
  brian@brianadamslaw.com
MARY BETH HAND
  Georgia Bar No. 322836
  mbhand@brianadamslaw.com
ADAMS LAW FIRM
598 D.T. Walton Sr. Way
Post Office Box 142
Macon, Georgia 31202
(478) 238-0231

ANNA GREEN CROSS
  Georgia Bar No. 306674
  anna@crosskincaid.com
MEREDITH KINCAID
  Georgia Bar No. 148549
  meredith@crosskincaid.com
CROSS KINCAID BASKAM LLC
315 W. Ponce de Leon Avenue, Suite 715
Decatur, GA 30030
(404) 948-3022

*Counsel for Relators*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 3rd day of April, 2026.

/s/ Robert H. Snyder Jr.
Robert H. Snyder Jr.
Georgia Bar No. 404522

22