**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ALEX PERMENTER, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> eCLINICALWORKS, LLC, <br><br> Defendant. | No. 5:18-CV-382 <br><br> Honorable Marc T. Treadwell |

<u>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE DAMAGES OPINIONS OF EMILY WOLFSTON**</u>

**TABLE OF CONTENTS**

**BACKGROUND** .................................................................................................................3

**LEGAL STANDARD** ........................................................................................................6

**ARGUMENT** ....................................................................................................................7

I. **MORE THAN 50 PERCENT OF THE DAMAGES IN MS. WOLFSTON'S LATEST MODEL ARE FOR SOFTWARE VERSIONS OTHER THAN VERSION 11.** .............................................................................................................7

II. **MS. WOLFSTON RADICALLY ALTERS HER METHOD OF CALCULATING CLAIMS, DIVORCED FROM THE FACTS OR LAW.** .............10

III. **MS. WOLFSTON'S DAMAGES MODEL REMAINS RIDDLED WITH DEFECTS, RENDERING IT UNRELIABLE.** ..............................................14

    A.    Ms. Wolfston's Attempted Use Of eCW's Customer List For Performance Year 2018 Does Not Employ A Reliable Methodology. .......................................14

    B.    Ms. Wolfston Ignores CMS Data And Rules For MIPS-Exempt Clinicians.........16

    C.    Ms. Wolfston Inflates Damages Where Clinicians Used Multiple EHRs. ............18

**CONCLUSION** ................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Allgas, Inc.*,
148 F. Supp. 2d 1222 (N.D. Ala. 2000) ...................................................................................11

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
582 F.3d 1227 (11th Cir. 2009) .........................................................................................8, 10

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) ..................................................................................................16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .....................................................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .........................................................................................................7, 8, 11

*Florida Virtual Sch. v. K12, Inc.*,
2026 WL 127063 (11th Cir. Jan. 15, 2026) ...........................................................................20

*Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*,
2011 WL 1004657 (N.D. Ga. Mar. 17, 2011) .........................................................................18

*Havana Docks Corp. v. Carnival Corp.*,
2022 WL 1642756 (S.D. Fla. Apr. 1, 2022) ...........................................................................14

*Hays v. Hoffman*,
325 F.3d 982 (8th Cir. 2003) ..................................................................................................14

*Jordan v. Celebrity Cruises, Inc.*,
2018 WL 3584702 (S.D. Fla. July 25, 2018) ..........................................................................13

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005) ......................................................................................11

*U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*,
2010 WL 3730894 (D. Colo. Sept. 16, 2010) .........................................................................12

*McCorvey v. Baxter Healthcare Corp.*,
298 F.3d 1253 (11th Cir. 2002) ................................................................................................7

*Oasis Int'l Waters, Inc. v. U.S.*,
134 Fed. Cl. 405 (2016) ...........................................................................................................12

*Siharath v. Sandoz Pharms. Corp.*,
131 F. Supp. 2d 1347 (N.D. Ga. 2001) ....................................................................7

*Simmons v. USI Ins. Servs., LLC*,
721 F. Supp. 3d 1333 (M.D. Fla. 2024) ..............................................................7, 18

*Soldo v. Sandoz Pharm.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003) ...................................................................16

*In re SRQ Taxi Mgmt., LLC*,
2023 WL 473225 (Bankr. M.D. Fla. Jan. 26, 2023) ..............................................18

*Superior Consulting Servs., Inc. v. Shaklee Corp.*,
2021 WL 4438518 (11th Cir. Sept. 28, 2021) .......................................................20

*U.S. for Use & Benefit of TSI Tri-State Painting, LLC v. Fed. Ins. Co.*,
2022 WL 135311 (S.D. Ga. Jan. 13, 2022).............................................................11

*U.S. v. Bornstein*,
423 U.S. 303 (1976).......................................................................12, 13, 14, 20

*U.S. v. Cameron-Ehlen Grp., Inc.*,
2023 WL 36174 (D. Minn. Jan. 4, 2023)................................................................18

*U.S. v. City of Miami*,
115 F.3d 870 (11th Cir. 1997) .........................................................................11, 14

*U.S. v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ...............................................................................7

*U.S. v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997).................................................................................14

*U.S. v. Long Grove Manor, Inc.*,
315 F. Supp. 3d 1107 (N.D. Ill. 2018) ....................................................................19

*U.S. v. Saavedra*,
661 F. App'x 37 (2d Cir. 2016) ...............................................................................14

*U.S. v. Woodbury*,
359 F.2d 370 (9th Cir. 1966) ..................................................................................12

**Rules**

Fed. R. Evid. 702(b)-(d).............................................................................................7

**Other Authorities**

42 C.F.R. § 414.1305...............................................................................................11

42 C.F.R. § 414.1310(a), (c), (e) ...................................................................................................5

42 C.F.R. § 414.1320 .................................................................................................................19

42 C.F.R. § 414.1325 ...................................................................................................................5

42 C.F.R. § 414.1375 .................................................................................................................19

42 C.F.R. § 414.1380(c)(2)(i) ....................................................................................................17

42 C.F.R § 414.1405 ..............................................................................................................6, 18

Emily Wolfston's third attempt to provide a reliable damages model fails, just like the last two. The Court granted Relators' request to seek CMS data to try to fix the pervasive problems with Ms. Wolfston's prior model, such as removing the tens of thousands of clinicians who never attested to using eCW Version 11—the only certified software at issue in this case. (ECF Nos. 364, 365, 366, 478-1, 488-1.) Instead, Ms. Wolfston produced a third model on May 15, 2026 that (1) *intentionally includes* other versions of eCW's software despite this Court's summary judgment opinion and Relators' past concessions; (2) *dramatically inflates* the number of claims for penalty purposes by fabricating claims that do not exist; and (3) *continues* the reliability defects from past models while *introducing* new ones that disregard the law. All of this is designed— under the guise of allegedly seeking "money owed to the Government and the taxpayers"—to present a bloated, legally erroneous damages and penalty estimate to the jury. (ECF No. 429 at 4.)

As the Court knows, Ms. Wolfston's damages estimates have fallen ███████████████ ███████████████████████████████████ (ECF No. 218-108 at 2-3; ECF No. 552-1.) ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████ Her model invites legal error and is inadmissible as a matter of law.

*First*, Ms. Wolfston *still* includes certified software versions other than Version 11 in her model, even though Relators told the Court that "every single entry in [Ms. Wolfston's] overpayment calculation is a provider who attested to using eCW Version 11." (ECF No. 551 at 1.) This was no accident. Ms. Wolfston testified ███████████████████████████████

██████████████████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 150:5-7.)  The reason for the request is no mystery.  Including only Version 11 damages reduces her estimate ████████████████████████████████████████████

**Second**, Ms. Wolfston has inserted a **new** fatal flaw by changing her method for counting "claims," contrary to Relators' assurance that her "supplemental report fundamentally uses the same method as before."  (ECF No. 551 at 1.)  In past reports, Ms. Wolfston calculated "claims" based on the attesting entity.  For example, even though her 2024 models wrongly included damages for **thousands** of providers at ████████████████████████, she counted this as **one** claim because ████ attests as a group.  Consistent with that approach, her October 2024 model estimated ██████ claims.  She now takes the opposite approach by disaggregating every individual who attested as a group as a separate, distinct "claim"—inventing attestations that do not exist.  Thus, while her latest (still-inflated) damages estimate is at least ████████ than 2024, she has reimagined the number of claims as █████████████  This method lacks any factual basis, violates clear precedent, and is irreconcilable with Relators' summary judgment theory.

**Third**, even if these problems could be fixed, Ms. Wolfston's model would remain unreliable.  While Relators represented to the Court that "Ms. Wolfston is no longer relying on eCW's … customer list" (ECF No. 551 at 1), she continues to ████████████████████ (ECF No. 552-1 ¶¶ 24-26.)  Her calculations are also contrary to law:  she ignores CMS data

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████—errors inflating her damages by tens of millions of dollars.

This Court has given Relators every chance—over eCW's objections—to present a relevant, reliable, and legally valid damages and claims calculation.  Ms. Wolfston's third strike

should be her last.  Having failed three times to produce a reliable report, Ms. Wolfston should be "out"—and her unreliable opinions excluded from trial.

## BACKGROUND

Ms. Wolfston purports ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ (*See* ECF No. 552-1 ¶ 23.)  In October 2024, Ms. Wolfston opined that ███████████████████████

███████████████████████ (ECF No. 218-108 at 2-3.)  eCW, however, uncovered that Ms. Wolfston had included thousands of clinicians who did not attest to Version 11 of eCW's software.  Relators  "agree[d]" with eCW that she should "[r]emove non-Version 11 users from the models" and "remove practices that reported using some other software."  (ECF No. 434 at 3.)

Over eCW's objection, Relators served a supplemental model in October 2025, reducing Ms. Wolfston's original estimates by ██████████ but adding new ████████████████

████████████████████████ (*Id.*)  eCW showed that she continued to include thousands of clinicians who had never attested to Version 11.  (ECF No. 478-1.)  The Court agreed, observing there are "substantial issues with regard to the damages calculations" that "go to the heart" of her models.  (ECF No. 482, 10/23/25 Hr'g Tr. 124:3-9.)  Although discovery had closed 18 months earlier, the Court granted (again, over eCW's objection) Relators' request to seek CMS data to try to fix these issues.  (ECF No. 494.)  Relators told the Court that they requested CMS data to "remove any entries where the CMS data contradicts their inclusion in the models," "revise entries where the available data was insufficient to make a direct match," and "make additional payment matches that were previously impossible."  (ECF No. 488 at 7-8.)  CMS ultimately produced ██

████████████████████████████████████████████████████████



3

██████████████████████████ (ECF No. 552-1 ¶¶ 13, 16.)

After CMS produced this data, Ms. Wolfston provided her third supplemental report on May 15, 2026. As Ms. Wolfston put it, she used CMS-produced data ████████████████

████████████████████████████████████████████████████████

████ (ECF No. 552-1 ¶¶ 9, 11.) Relators similarly claim that Ms. Wolfston's 2026 "supplemental report fundamentally uses the same method as" her prior models, except she "is no longer relying on eCW's incomplete and at times inaccurate customer list to locate eCW users and claims in the public MIPS and CMS data." (ECF No. 551 at 1.)

In reality, however, Ms. Wolfston's May 2026 report did not fix these problems. *First*, more than 50% of her damages estimate relates to software versions *other than* Version 11. In fact, Ms. Wolfston does not seem to know what versions are in her model. At her deposition, she

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (Ex. 1, 6/3/26 Wolfston Dep. at 79:11-14, 83:1-6, 85:2-16.) ███████████████████████████████████

████████████████████████████████████████████████████████

other versions in the model ████████████████ even though they were ████████████

████████████████████████ (*Id.* at 149:14-150:11, 151:24-152:2.)

*Second*, Ms. Wolfston uses a "fundamentally" *different* method to count "claims" for civil penalty purposes. Her prior reports reflected that clinicians can "participate in MIPS as an

individual or as a group," and if they participate as a group, they attest "as a group."  42 C.F.R. § 414.1310(a), (c), (e); (Ex. 1, 6/3/2026 Wolfston Dep. at 135:19-22).  Her August 2024 report, for example, stated ███████████████████████████████████ ████████████ if eCW's EHR had been decertified.  (Ex. 2, Wolfston Aug. 2024 Rpt. ¶ 28.) Her May 2026 report, by contrast, counts each clinician as if they were a separate ██████ even if that clinician *never* submits any attestation—inflating her count to ██████.  (ECF No. 552-1 ¶ 23.)

Third, Relators' representation to the Court that Ms. Wolfston is "no longer relying on" eCW's customer list is wrong.  (ECF No. 551 at 1.)  CMS ████████████████████████ ████████████  (ECF No. 552-1 ¶ 24.)  Rather than exclude damages for 2018, Ms. Wolfston *continued to use* eCW's customer list ██████████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 120:6-8.)  To qualify for MIPS, a clinician must use certified software "for a minimum of a continuous 90-day period" within each year.  (42 C.F.R. § 414.1320(b)(2); Ex. 2, Wolfston Aug. 2024 Rpt. ¶ 18.)  Ms. Wolfston relied on the ████████



████████ across the 90-day period.  (ECF No. 552-1 ¶¶ 24-26; ECF No. 552-4 at 4.)

Fourth, Ms. Wolfston ignored CMS-produced data ████████████████ ██████████████████████████, meaning they would have been unaffected by decertification. Ms. Wolfston's model depends on calculating each provider's MIPS score ████████████ ██████████████████████████  (ECF No. 552-1 ¶ 19.)  Ordinarily, a "MIPS eligible clinician" qualifies for points in the PI category only by "attest[ing]" to using CEHRT for a given performance period.  42 C.F.R. §§ 414.1325, 414.1375(b).  But some clinicians are automatically

exempted from reporting PI data, meaning there is no penalty if they do not use certified EHR. *Id.*; § 414.1405. In that case, clinicians' PI scores are not counted toward their overall MIPS scores because the PI category was reweighted to 0% and the PI category's weight is "redistributed" to other categories. (42 C.F.R. § 414.1380(c)(2)(i)(C).) Thus, a PI score of 0 from lack of certified EHR would have *no* impact. Although Ms. Wolfston , she ignored this data and the MIPS's mandatory, automatic adjustments and did not consider ██████████████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 90:25-91:4.) Instead, she still treats an exempted ████████████████████████ (ECF No. 552-1 ¶ 23.)

*Fifth*, Ms. Wolfston's May 2026 model still attributes damages to eCW for clinicians who used a competitor's software. Under MIPS regulations, a group can use multiple certified EHRs, and the CMS dataset provides only a combined CEHRT ID—offering no data to differentiate which clinician in a group used which certified EHR product. As CMS told Relators, "[w]hen a provider certifies to using certain products, they may indicate more than one product. A CEHRT ID having eCW v11 may also include other [certified EHR] products." (ECF No. 492-2 Ex. A, 11/21/2025 Email from C. Reinartz to R. Snyder.) For multi-vendor CEHRT IDs containing both eCW and competitor products, Ms. Wolfston testified that ██████████████████ ████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. 69:1-8.) By her reasoning, ██████████████████████████████████████ ██████████████████████████████████████ ████████████ (*Id.* at 80:19-25.) Still, Ms. Wolfston counts those as damages against eCW.

## LEGAL STANDARD

Rule 702 permits expert testimony only if it is "based on sufficient facts or data" and is "the product of reliable principles and methods" reliably applied "to the facts of the case." Fed.

R. Evid. 702(b)-(d).  "The Court's gatekeeper role under *Daubert* and Rule 702 requires the Court to ensure that a jury is not presented with expert testimony that applies a legally incorrect measure of damages."  *Simmons v. USI Ins. Servs., LLC*, 721 F. Supp. 3d 1333, 1340 (M.D. Fla. 2024). The expert's opinion must be "sufficiently tied to the facts of the case" and have a "valid scientific connection to the pertinent inquiry"—a fit requirement.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 591-92 (1993).  Their testimony must also be "properly grounded, well-reasoned, and not speculative."  *U.S. v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).  The Court must conduct an "exacting analysis" of the expert's method, and Relators bear the burden to make that showing.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). "Where the burden has not been satisfied, [Rule 702] precludes expert testimony."  *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001).

**ARGUMENT**

Ms. Wolfston's opinions should be excluded for three independent reasons: (1) her model again includes certified versions beyond Version 11—violating this Court's summary judgment order and Relators' representations that only Version 11 is at issue; (2) she invents a new method for counting "claims"—inflating penalties to potentially more than a billion dollars—without any factual or legal basis; and (3) she has introduced new flaws based on CMS data she ignores.  The Court's decisions, Relators' concessions, and the law make these problems unambiguous.

**I.**   ██████████████████████   **OF THE DAMAGES IN MS. WOLFSTON'S LATEST MODEL ARE FOR SOFTWARE VERSIONS OTHER THAN VERSION 11.**

Only one version of "eCW's software is at issue" in this case:  "Version 11."  (ECF No. 345 at 6.)  As this Court held at summary judgment, "[f]rom December 28, 2017 to December 28, 2021, Version 11 was eCW's only relevant software certified under the ONC's 2015 Certification Standards," and "eCW ultimately withdrew Version 11 on June 3, 2022."  (*Id.* at 6, 27.)  The

7

federal Certified Health IT Product List registry (the "CHPL registry"), which tracks every certified software, confirms this objective fact:  Version 11 was certified on December 28, 2017, and withdrawn on June 3, 2022.  *See* www.chpl.healthit.gov.  No other certified eCW software shares this date; other versions were certified on different dates with their own unique CHPL IDs.[1] Because Ms. Wolfston continues to include damages associated with later, legally independent certified software versions, her model does not fit this case and must be excluded.

*Daubert* requires that an expert's opinions be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  509 U.S. at 591-92.  For damages, an expert's model "must be consistent with [a plaintiff's] liability case" and cannot "cover[] too much" by including damages that "do not fit its liability theory."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 28, 35 (2013); *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1231-32 (11th Cir. 2009) (affirming exclusion of a damages model fitting like an "oversized coat").

Relators have repeatedly conceded they should count damages only for Version 11.[2]  (ECF No. 345 at 6; ECF No. 266-2 ¶ 133.)  But because standing by that concession would cause their damages estimate to plummet, they continue to try to smuggle in other versions.  Approximately ███████ of Ms. Wolfston's May 2026 model relates to the separately certified Version 11.52.153 ("Version 153") or later.  (Ex. 3, Baker & Grabowski 2d Supp. Rpt. ¶ 15.)

---

[1]    The CHPL ID is the identification number the Office of the National Coordinator for Health Information Technology ("ONC") creates for each specific version of EHR certified pursuant to ONC's certification criteria.

[2]    ECF No. 429 at 8-9 ("Relators do not intend to seek damages for any non-Version 11 eCW users. … Ms. Wolfston will revise her model to exclude known non-Version 11 users"); ECF No. 434 at 3 ("Ms. Wolfston agrees that she should (a) Remove non-Version 11 users from the models"); ECF No. 488 at 3, 9 ("Relators agree that Ms. Wolfston's damages models should only include practices that were using Version 11 of eCW's software during a year when the practice received a Promoting Interoperability score," and they will use CMS data to "identify (and confirm) all practices that received a MIPS payment adjustment while using eCW Version 11"); ECF No. 482, 10/23/25 Hr'g Tr. 115:18-21 (Mr. Snyder: "And removing those version -- non-Version 11 users, which I think was appropriate to do after the Court's ruling on summary judgment, and we agreed to do it, that's the biggest change to the overall damages model").

Relators have no good-faith argument that any of these versions are Version 11, including Version 153.  At summary judgment, it was *undisputed* that Version 153 was not Version 11. Relators conceded that Version 153 was certified on December 28, *2021* (not 2017) and has its own CHPL ID.  (ECF No. 266-1 ¶¶ 89, 90 ("eCW's V 11 was certified on December 28, 2017. … Response: Undisputed."  "eCW's V 11.52.153 was certified on December 28, 2021. … Response: Undisputed.").)  Relators know this is not like a security patch to Version 11 given that they submitted their own chart distinguishing "V11" and "11.52.153," noting the four-year gap in certification dates and distinct CHPL IDs.  (ECF No. 266-58.)  They know that "eCW withdrew Version 11 as certified software on June 3, 2022," while Version 153 was withdrawn on "December 31, 2022."  (ECF No. 266 at 13; Ex. 4, Posnack Dep. Ex. 12.)  They conceded that by March 22, 2022, "eCW no longer supported electronic prescribing for V.11," "the issues with V11 were resolved," and "Version 11 [was] being retired"—concessions that make no sense if Version 153 is a "subversion" of Version 11.  (ECF No. 266-1 ¶¶ 376, 378.)  They even deposed eCW's corporate representative ███████████████████████████████ (*See* Ex. 5, Laycob 7/16/24 30(b)(6) Dep. at 26:9-20 (noting that, as of March 2022, the company's ████████ ████████████████████████████████████).)

This is not some hyper-technical distinction.  It is fundamentally different from the theory that survived summary judgment: Relators argued "eCW obtained certification of its version 11 software by fraudulently attesting to compliance with the certification requirements *in December 2017*."  (ECF No. 266 at 15; *id.* at 32 ("Relators' claims here are about Version 11 of eCW's software certified in December 2017.").)  Relators have expressly argued that "[t]his case is about eCW's conduct between 2016 and the end of 2021," and that ██████████████████████ ████████████████████████████████████████████████████████

9

████████████████████████ (ECF No. 386 at 17.)  They had no argument as to how the government's decision to certify Version 153 in December 2021—*three years* after Relators filed this lawsuit, and *three months* after the government declined to intervene and the complaint was unsealed in this case—could be false; if anything, the government's decision to certify after full knowledge and investigation of Relators' allegations proves the opposite.  Indeed, the Court found that eCW's argument that it "passed the required certification tests … in April of 2021" was not "dispositive" at summary judgment *because* Version 11 "was certified on December 28, 2017" (ECF No. 345 at 32 n.40)—which does not apply to Version 153, certified in December 2021.

In short, Relators know Ms. Wolfston's third model ████████████████████████

████████████████████████████████████████████

██████ (*See* Ex. 1, 6/3/2026 Wolfston Dep. at 149:14-150:11; ECF No. 482 at 100:19-20 (The Court: "But we've already established, without question, she's got to redo the report based upon Version 11.").)  They simply refuse to remove these alleged damages because it would reduce their estimate by ██████████████ That alone requires exclusion.  *Boca Raton*, 582 F.3d at 1233.

## II.    MS. WOLFSTON RADICALLY ALTERS HER METHOD OF CALCULATING CLAIMS, DIVORCED FROM THE FACTS OR LAW.

Faced with steadily declining damages across successive models, Ms. Wolfston now sharply pivots her methodology for calculating "claims" on the eve of trial.  Her past reports

████████████████████████████████████████████

████████████████ (*See* Ex. 2, Wolfston Aug. 2024 Rpt. ¶ 28.)  Without any justification, Ms. Wolfston abandons that framework and instead counts every individual clinician associated with a group as its own separate attestation, even though *none* of those clinicians, in fact, submitted separate attestations to the government.  Using ████████████████████ as an example, her model turns one organization-level attestation into ████████████████

10

███████████████████████████████████████ (Ex. 3, Baker & Grabowski 2d Supp. Rpt. tbl. 5.)  In doing so, she invents ████████████ of claims out of thin air—unbundling a single group attestation into imaginary NPI-level attestations that were never submitted to CMS. By fabricating ████████████ of fictional claims, she skyrockets her total to ████████████, all to try to inflate any potential civil penalties award by potentially more than a billion dollars.

This approach violates *Daubert* twice over:  First, "the facts relied upon by an expert must find some support … in the record" and "must be supported by more than subjective belief and unsupported speculation." *U.S. for Use & Benefit of TSI Tri-State Painting, LLC v. Fed. Ins. Co.*, 2022 WL 135311, at *4 (S.D. Ga. Jan. 13, 2022) (cleaned up).  "Opinions derived from erroneous data are appropriately excluded." *U.S. v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997).  And second, "[e]xpert opinions that are contrary to law are inadmissible." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1245-46 (N.D. Ala. 2000) (excluding expert opinions "contrary to the law").

Factually, Ms. Wolfston's claims calculation is divorced from reality.   Under the government MIPS regulations, a "group" is a single, legally indivisible entity that reports to MIPs at the Taxpayer Identification Number ("TIN") level.  MIPS defines a "group" as "a single TIN with two or more eligible clinicians (including at least one MIPS eligible clinician), as identified by their individual NPI, who have reassigned their billing rights to the TIN." 42 C.F.R. § 414.1305. The submission regulation confirms this unified structure where the group, collectively, attests in one transaction: "Groups" may submit PI data through "the direct, login and upload, or login and attest submission types."  42 C.F.R. § 414.1325(c)(2).  *Id.*  An "[a]ttestation" is a CMS-specified mechanism by which "a MIPS eligible clinician, subgroup, or ***group*** may submit the required data for the Promoting Interoperability or the improvement activities performance categories of MIPS."

11

42 C.F.R. § 414.1305 (emphasis added).  Individual clinicians are not listed or broken out if they report as a group. Instead, these clinicians "aggregate their performance data across the group's TIN"; the clinicians are then "assessed at the group level across all four MIPS performance categories"; and "each MIPS eligible clinician in the group receives a final score based on the group's combined performance assessment."  42 C.F.R. § 414.1310(e)(1). ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮: its clients, including individual physicians, ▮▮▮▮▮▮▮▮▮ meaning ▮▮▮▮▮▮ is treated together, where ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (ECF No. 34 ¶ 144.)

Even if the data were not aggregated, multiplying a single transaction into separate "claims" based on its internal components violates clear FCA law.  "[T]he submission of an aggregate claim, rather than its individual components, is the act that creates liability under the False Claims Act."  *Oasis Int'l Waters, Inc. v. U.S.*, 134 Fed. Cl. 405, 453 (2016); *U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 2010 WL 3730894, at *5 (D. Colo. Sept. 16, 2010) (monthly royalty report was the claim, not each lease-level calculation); *U.S. v. Woodbury*, 359 F.2d 370, 378 (9th Cir. 1966) (rejecting separate penalties for supporting documents attached to payment applications).  In *Bornstein*, the subcontractor supplied falsely marked parts in three shipments, and the prime contractor later used those parts in equipment sold to the government through 35 invoices.  *U.S. v. Bornstein*, 423 U.S. 303, 307-08 (1976).  The Supreme Court held that the subcontractor was liable for only three statutory penalties—one per false shipment—not 35 penalties based on others' invoices.  *Id.* at 313.  Just as a contractor submitting a single bulk invoice for 100 industrial pipes has submitted *one* FCA claim—not 100 separate claims—a group submitting a single MIPS group attestation performs a single transaction.

This is the approach of all Ms. Wolfston's prior models: █████████████

████████████████████████████████ (*i.e.*, one claim) █████████████

█████████████████████████████████████████ (Ex. 3, Baker & Grabowski 2d

Supp. Rpt. ¶ 31; *see* Ex. 2, Wolfston August 2024 Rpt. ¶ 28 ████████████████████;

Ex. 6, Wolfston Oct. 2024 Rpt. Ex. A (18,431 claims); Ex. 7, Wolfston Oct. 2025 Rpt. Ex. A

(██████████); *see also* Ex. 8, 8/12/25 Navani Dep. 143:9-14 (Relators' counsel asking, █████

████████████████████████████████████████████████████████████████

███████████████████████████████).) Had Ms. Wolfston counted real-

world attestations, she could not have counted more than █████████ *Id.* Had she counted only

Version 11, she should have counted only approximately █████████ *Id.* Instead, she ballooned

the claims to ████ by fabricating "attestations" no one ever submitted. "Expert evidence based

on a fictitious set of facts is just as unreliable as evidence based on no research at all." *Jordan v.*

*Celebrity Cruises, Inc.*, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018).

In addition to these legal flaws, Ms. Wolfston is measuring the wrong attestation. The

determination of FCA penalties "focus[es] in each case [] upon the specific conduct of the person

from whom the Government seeks to collect the statutory forfeitures." *U.S. v. Bornstein*, 423 U.S.

303, 313 (1976). If statutory penalties are available at all, they should be measured based on "the

***specific conduct*** of the person ***from whom*** the Government seeks to collect the statutory

forfeitures." *Bornstein*, 423 U.S. at 313 (emphases added). To match Relators' allegation, the

claim would be that ███████████████████████████████████████

██████████████████████████████████████████████████ (ECF No. 266 at

15; ECF No. 266-2 ¶ 134.) ████████████████████████████████████

eCW allegedly violated the FCA because ██████████████████████

(ECF No. 75 at 4 (emphasis added).)   And that is how this Court has explained the relevant attestation: "[t]o obtain ONC certification for Version 11 of its software, eCW represented that its EHR software complied with [the certification criteria]" and "the question is whether, based upon attestations, … there were misrepresentations regarding whether the software met the criteria." (ECF No. 345 at 32; ECF No. 334 at 46:25-47:2.)   Courts applying *Bornstein* follow this same approach to count "claims" for civil penalty purposes.   *See*, *e.g.*, *U.S. v. Saavedra*, 661 F. App'x 37, 45-46 (2d Cir. 2016) (assessing civil penalties for false statements defendant made, not the claims that later resulted); *Hays v. Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003) (rejecting penalty count unrelated to defendant's misconduct); *U.S. v. Krizek*, 111 F.3d 934, 939-40 (D.C. Cir. 1997) (counting forms submitted to government, not each billing code listed within those forms).

The only legally relevant "claims" for penalty purposes could be ***eCW's*** allegedly false attestations to ONC.   (ECF No. 345 at 32-33.)   It cannot be fictitious, litigation-invented attestations that do not exist in the real world.   *See Havana Docks Corp. v. Carnival Corp.*, 2022 WL 1642756, at *15 (S.D. Fla. Apr. 1, 2022) (excluding damages opinions "based on an erroneous reading of the law" because a "[r]eliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable").   Ms. Wolfston's decision to change her method on the eve of trial to create potentially ██████████████████ of fabricated claims has no place before any jury.   *Miami*, 115 F.3d at 873.   This, too, requires exclusion of her opinions.

## III.   MS. WOLFSTON'S DAMAGES MODEL REMAINS RIDDLED WITH DEFECTS, RENDERING IT UNRELIABLE.

Ms. Wolfston's opinions should also be excluded because she failed to fix many of her models' past problems and introduced new ones.

### A.   Ms. Wolfston's Attempted Use Of eCW's Customer List For Performance Year 2018 Does Not Employ A Reliable Methodology.

After spending six months obtaining CMS data, Ms. Wolfston continues to rely on eCW's

14

customer list for her damages model.  The reason is simple:  ███████████████████

█████████████████████████  (ECF No. 552-1 ¶ 24.)  Rather than remove damages

for 2018, Relators' approach was that Ms. Wolfston should continue using eCW's customer list

for that year only (notwithstanding the problems eCW has repeatedly identified with that

approach), while Relators represent to the Court that "Ms. Wolfston is no longer relying on eCW's

incomplete and at times inaccurate customer list."  (ECF No. 551 at 1.)

But Ms. Wolfston's approach is not reliable.   When using eCW's customer list,

Ms. Wolfston falsely assumes that if the list shows the clinician's upgrade date to Version 11 left

90 days in the year, then that is sufficient to establish that the clinician in question ***attested*** to use

of Version 11 to the government.  (Ex. 2, 8/2/2024 Wolfston Rpt. ¶ 18 (identifying ████████

█████████████████ ███████████████████████████████ ).)  But the

same logic means ██████████████████████████████████████████

███  Ms. Wolfston has zero evidence—and cites none—that could support a finding that it is

more likely than not that a clinician attested to using Version 11 based solely on a date of upgrade.[3]

Relators know extrapolating from eCW's customer list is unreliable: Ms. Wolfston does

not follow this approach for any other performance year; the problems inherent in doing so was

the entire justification for seeking CMS data; and Relators now agree it is "inaccurate."  (ECF No.

551 at 1.)  eCW repeatedly advised Relators that ████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████  (ECF No. 488-1 at 3; *see*

*also*, *e.g.*, ECF No. 492 at 10-11.)  Ms. Wolfston requires some reliable basis to opine which

---

3  ████████████████████████████████████████████████████  (Ex. 3, Baker &
Grabowski 2d Supp. Rpt. 21.)  For 2018, she assumes that all clinicians who upgraded to Version 11 had CEHRT
IDs that ***only included*** eCW Version 11 and no other EHR—an assumption not true for any other year.

provider attested to which year.  She has none.  Instead,

(Ex. 3, Baker & Grabowski 2d Supp. Rpt. 21.)

That Ms. Wolfston "failed to follow [her] own stated methods" for 2018 damages confirms she "failed to follow any reliable method" at all.  *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014); *accord Soldo v. Sandoz Pharm.*, 244 F. Supp. 2d 434, 560 (W.D. Pa. 2003) ("The reliability of plaintiff's experts' opinions is significantly undermined by the fact that they abandon the method that they themselves have defined").  This too requires exclusion.

**B.    Ms. Wolfston Ignores CMS ▮▮▮▮▮ Rules For MIPS-Exempt Clinicians.**

Ms. Wolfston's May 2026 model also selectively ignores ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that MIPS regulations mandate must be treated differently.  She ignored those regulations because following them would substantially reduce Relators' damages estimates.

Ms. Wolfston calculates damages ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (ECF No. 552-1 ¶ 19.)  But ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ "Special Statuses" and "Clinician Types" that are automatically exempted from MIPS and entitled to reweighting.  (Ex. 9, MIPS 2021 Performance Category Hardship Exception Application Guide, Appendix A.)  Moreover, CMS's "Automatic Extreme and Uncontrollable Circumstances" policy—which applied as a blanket policy to all MIPS-eligible clinicians in certain performance years, such as those impacted by COVID-19—entitled individual clinicians to automatic reweighting regardless of circumstance.  (Ex. 10, The 2020 MIPS Automatic Extreme and Uncontrollable Circumstances Policy.)  If a clinician had MIPS-exempt or automatic-reweighting status and the clinician had no certified EHR to attest, CMS would not

16

assign a zero in PI and leave the remaining performance categories unchanged. Rather, CMS *automatically reweights* the PI category to have no weight and *automatically redistributes* that weight to other categories: "If you have an approved [exemption] or qualify for automatic reweighting, we'll reweight the category to 0% and assign the 25% to the Quality performance category so you can earn up to 100 points in your MIPS final score." (ECF No. 218-156 at 53; ECF No. 218-157 at 52-53; ECF No. 218-158 at 45-46; ECF No. 218-159 at 53-54; ECF No. 218-160 at 65-67); *see also* 42 C.F.R. § 414.1380(c)(2)(i)-(ii).)

CMS is clear that reweighting for exempt clinicians is automatic and mandatory. Section 414.1380(c)(2)(i) provides that "a scoring weight different from the weights specified in paragraph (c)(1) of this section *will be assigned* to a performance category," and its weight "*will be redistributed*" when "a significant hardship exception or other type of exception is granted to a MIPS eligible clinician … for the Promoting Interoperability performance category." 42 C.F.R. § 414.1380(c)(2)(i) (emphases added). Paragraph (c)(2)(ii) repeats the command—"[a] scoring weight different from the weights specified in paragraph (c)(1) … *will be assigned* … and … *redistributed*"—and supplies reweighting tables listing the "No Promoting Interoperability" scenario with PI weighted at 0%. *Id.* § 414.1380(c)(2)(ii) (emphases added). CMS guidance says the same thing: reweighting is "automatic" and does not "requir[e the provider] to submit an application to reweight the performance categories for MIPS." (Ex. 11, 2019 Exceptions: Frequently Asked Questions at 4.)

Ms. Wolfston's 2026 model disregards these regulations for thousands of clinicians—a problem she has known about since at least last August. (*See* ECF No. 365-1.) She still chose not to take ███████████████████████████████████████████████ ████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 90:25-91:4.) Instead, she reduced

17

them all to ████████████████████████████████████[4] (*Id.* at 91:14-17.) Because § 414.1380 requires reweighting rather than zero-scoring, her model adopts a legally erroneous calculation for MIPS-exempt clinicians. *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, 2011 WL 1004657, at *3 (N.D. Ga. Mar. 17, 2011) (damages expert's testimony "inadmissible" because he "ensured his calculations would be particularly inaccurate by ignoring 'factors that could be significant to his analysis'"); *In re SRQ Taxi Mgmt., LLC*, 2023 WL 473225, at *12 (Bankr. M.D. Fla. Jan. 26, 2023) (damages expert's "testimony is largely *ipse dixit*" where it "fails to consider" relevant state law). ██████████████████████████████████████████

████████████████████████ (Ex. 3, Baker & Grabowski 2d Supp. Rpt. ¶ 16.)

To be clear, this issue is distinct from the one this Court rejected at summary judgment about ***discretionary*** MIPS exemptions that clinicians apply for, which the Court labeled a "fanciful thought experiment." (ECF No. 345 at 52.) ████████████████████████

███████████████████████████████████████████████████

██████████ Ms. Wolfston's choice to disregard the law and apply a "legally incorrect measure of damages" further requires her exclusion. *Simmons*, 721 F. Supp. 3d at 1340; *see also U.S. v. Cameron-Ehlen Grp., Inc.*, 2023 WL 36174, at *20 (D. Minn. Jan. 4, 2023) (excluding Medicare expert opinions "as irrelevant and contrary to the applicable legal standard for damages").

## C.    Ms. Wolfston Inflates Damages Where Clinicians Used Multiple EHRs.

At its core, Ms. Wolfston's damages model depends on the premise that a ████████

████████ would have been ████████████████████████ because they had no alternative. (ECF No. 552-1 ¶ 23; ECF No. 345 at 52 n.60.) But clinicians

---

[4]    At one point, ████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 91:4-7.) But ████████████████████████████—clinicians could not submit data for the PI category at all, which is when the automatic exemption applies. *See* 42 C.F.R § 414.1405.

18

may use more than one certified software, any of which could earn PI points.  When the practice group attests as a group, different doctors might use different software, but the performance data from all clinicians utilizing various certified systems are blended together to create the group's unified score.  The only requirement is they use that at least one certified EHR for at least 90 days. 42 C.F.R. § 414.1375 (explaining the PI score requires use of the certified software for the performance period); 42 C.F.R. § 414.1320 (defining the performance period as "a minimum of a continuous 90-day period within the calendar year").  But there is no mechanism to unbundle them.

Ms. Wolfston ignored this MIPS rule too, and instead ████████████████████████ ██████████████████████████████████████████████████████ ███████████  Ms. Wolfston understands that when there are ████████████████ ██████████████████████████████████████████████████████ ████████████████████████████ (Ex. 1, 6/3/2026 Wolfston Dep. at 76:15-21.)  Yet her model ██████████████████████████████████████████████████████ █████████████████████████████████ (*Id.* at 97:15-20.) ████████████ ████████████████████████████ (*Id.* at 99:2-10); *see U.S. v. Long Grove Manor, Inc.*, 315 F. Supp. 3d 1107, 1114-18 (N.D. Ill. 2018) (excluding Medicare FCA damages calculation where the expert's assumption had no factual basis and damages could not reliably be calculated without patient-specific information).  In fact, she ████████████████████████████ to understand ██████████████████████████████████████████████████████ ████████████████████████████████████ (Ex. 12, 8/30/2024 Wolfston Dep. at 234:14-23; Ex. 1, 6/3/2026 Wolfston Dep. at 68:1-4.)  Indeed, ████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

███ (*Id.*; Ex. 1, 6/3/2026 Wolfston Dep. at 73:6-74:20, 80:12-82:6.)

None of this is reliable. Because Ms. Wolfston lacks any reliable basis to determine the alternative PI score when a group is using ***another*** company's software alongside Version 11, her damages assignment "rest[s] on an untenable assumption," is "unreliable," and is "therefore inadmissible." *Florida Virtual Sch. v. K12, Inc.*, 2026 WL 127063, at *5 (11th Cir. Jan. 15, 2026).[5]

## CONCLUSION

"[A]t some point, an expert's methodology becomes so flawed that it is unreliable." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2021 WL 4438518, at *12 (11th Cir. Sept. 28, 2021). We are well past that point. After three supplementations, Ms. Wolfston's persistent efforts to artificially inflate Relators' damages and penalties estimates in ways divorced from Relators' allegations, real-world facts, and governing law render her opinions inadmissible. To ensure a fair trial and avoid the uncurable prejudice from her opinions, the Court should expressly order that:

(1) Ms. Wolfston's model must be limited to estimating alleged damages for "Version 11" of eCW's certified software, which was certified on December 28, 2017 and withdrawn on June 3, 2022 (CHPL Product Number 15.04.04.2883.eCli.11.00.1.171228), as required by this Court's summary judgment opinion (ECF No. 345 at 6);

(2) Ms. Wolfston's calculation of FCA claims for penalty purposes must be based on "the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures," not legally invalid, fictitious claims Relators have unbundled from the single group submissions that exist in the real world, *Bornstein*, 423 U.S. at 313; any penalties calculation based on Ms. Wolfston's approach would be legal error; and

(3) Ms. Wolfston's model must be reliable, meaning she cannot selectively ignore CMS data and CMS regulations to avoid eliminating 2018 damages (for which she has no attestation data), applying mandatory automatic reweighting adjustments for exempt providers, and removing clinicians who used a competitor's EHR software.

Since Ms. Wolfston refuses to fix these defects, the Court should exclude her opinions.

---

[5] Because Ms. Wolfston's model still does not distinguish between Relators' different technical allegations, there is a material risk that the jury will have no legitimate evidence in the record to calculate damages if Relators fail to prove their case as to all technical allegations and the entire time period at issue.

Dated: June 17, 2026

Respectfully submitted,

*/s/ Duke R. Groover*
Duke R. Groover
Georgia Bar No. 313225
dgroover@jamesbatesllp.com
JAMES BATES BRANNAN GROOVER
LLP
231 Riverside Drive
Suite 100
Macon, Georgia 31201
Tel: (478) 742-4280
Fax: (478) 742-8720

Allison M. Brown (*pro hac vice*)
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, Pennsylvania 19103
Tel: (215) 268-5000

Martin L. Roth (*pro hac vice*)
martin.roth@kirkland.com
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Tel: (312) 862-7170

Aaron Katz (*pro hac vice*)
akatz@aaronkatzlaw.com
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, Massachusetts 02116
Tel: (617) 915-6305

*Counsel for Defendant eClinicalWorks, LLC*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 17, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants in this matter.

/s/ *Duke R. Groover*
Duke R. Groover
Georgia Bar No. 313225
dgroover@jamesbatesllp.com
JAMES BATES BRANNAN
GROOVER LLP
231 Riverside Drive
Suite 100
Macon, Georgia 31201
Tel: (478) 742-4280
Fax: (478) 742-8720

22