**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., ALEX PERMENTER, ERIC RODIGHIERO, and CHRIS WHEELER<br><br>    Plaintiffs,<br><br>v.<br><br>eCLINICALWORKS, LLC,<br><br>    Defendant. | **CIVIL ACTION FILE NO.**<br><br>**Case No. 5:18-CV-382** |

**<u>RELATORS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE</u>**
**<u>DAMAGES OPINIONS OF EMILY WOLFSTON</u>**

At the June 24, 2026 hearing, the Court denied eCW's sixth attempt to exclude the testimony of Relators' expert Emily Wolfston on every issue except one.  The Court directed Relators to respond only to eCW's new argument that Ms. Wolfston's damages model should not include users who attested to using eCW Versions 11.52.153, 11.52.225, 11.52.241, 11.52.301, 11.52.305, and 11.52.399 (the "Version 11 subversions").  All of which were certified in 2021 and 2022, then fully withdrawn by eCW at the end of 2022.  Specifically, the Court asked Relators to explain why the "new certification" of Version 11 subversions "was not a substantive change in any way and doesn't raise any new issues."  Jun. 24, 2026 Hrg. Tr. at 151:22-25.  Relators do so below.[1]

eCW's newly raised Version 11 subversion argument is wholly contradicted by the record.  As Relators made clear *last fall* in response to eCW's untimely *Daubert* motions, this case's "liability focus has narrowed (for too many reasons to recount herein) ***to the eCW versions certified under the 2015 certification standards***" including "***Version 11 and all versions thereafter.***"  ECF 428 at 9 (emphasis added).  Ms. Wolfston's damages model has consistently reflected that understanding and has included Version 11 subversion users since October 2024—before eCW filed its first motion to exclude her testimony and its motion for summary judgment. Her May 15, 2026 revised model does not include unspecified "other versions" of eCW's software out of nowhere as eCW suggests.  Instead, Ms. Wolfston's revised model includes all versions of Version 11 that were certified to the 2015 standards ***just like her previous models***.

eCW attempts to characterize the Version 11 subversions as legally distinct software products based on the fact that they ultimately received separate Certified Health IT Product List

---

[1] As Relators noted at the hearing, eCW's last remaining argument is not a motion to exclude under Rule 702 at all because it has nothing to do with Ms. Wolfston's qualifications, methodology, or actual calculation of overpayments. Thus, if the Court concludes damages arising from Version 11 subversions should be excluded, Ms. Wolfston can remove those entries from her model and limit her testimony to providers who attested to Version 11 only.

("CHPL") entries.  But that position is inconsistent with virtually every position eCW has taken to this point.  Its own corporate representative described, in testimony binding on the company, the Version 11 subversions as versions of Version 11.  eCW's compelled customer list did not distinguish between Version 11 and any subversions.  And eCW's own damages rebuttal expert agreed that claims related to Version 11 subversion users were properly included in the case when he prepared eCW's "corrected" damages calculations last fall.

Most importantly, eCW never argued during discovery, summary judgment, or the first two rounds of *Daubert* briefing that Version 11 subversions fell outside the scope of this case.  Instead, eCW affirmatively relied on testing performed and certification of the subversions as part of its motion to dismiss and summary judgment arguments.  Having tried, and failed, to use evidence related to the Version 11 subversions to obtain outright dismissal, eCW now claims the Version 11 subversions are not part of the case.  Although that argument is factually and legally wrong, eCW should have raised it in October 2024 or August 2025, not on the eve of trial.

In short, the Version 11 subversions have always been a part of this case, were consistently treated as Version 11 by the parties, and are still properly included in Ms. Wolfston's damages model.  Even if eCW incorrectly believed otherwise, it waived any such arguments by failing to raise them despite having almost two years and multiple opportunities to do so.

## ARGUMENT

### I.    Version 11 Subversions Have Always Been at Issue

eCW accuses Relators of attempting to "smuggle in other versions" of Version 11 into Ms. Wolfston's damages model by claiming those versions involved "distinct certifications, time periods, and legal arguments not before the Court at summary judgment."  ECF 573 at 8, 10.  It is impossible to "smuggle" an issue into a case that has been openly included for years and consistently treated by all participants as within the scope of the case.

2

### A. Relevant certification facts

eCW first obtained certification of Version 11 of its software on December 28, 2017. ECF 216-2 ¶ 89 (eCW Statement of Undis. Mat. Facts (SUMF)). It is undisputed that from "December 28, 2017 to December 28, 2021 Version 11 of eCW's software was the only eCW version certified under the 2015 Standards." ECF 300-9 ¶ 133 (eCW Resp. to Rels.' Stat. of Mat. Facts). eCW frequently patched, updated, and pushed out new subversions of Version 11 during that four year time. By early 2021 many of eCW's customers were on different subversions of Version 11. Ex. 1, Mar. 10, 2021 Drummond Email to ONC. At that time, Drummond Group and the SQOO had grown concerned that eCW was not fixing patient safety issues in all versions of the software in use by its customers. *Id.* So, while "it is permissible for Developers to have minor sub-releases that are not independently listed on the CHPL … [Drummond] was concerned that simply having a V11 on the CHPL is not the best representation of the product, particularly given the volume of corrective actions and resolutions that must be fixed and represented on the CHPL." *Id.* Drummond therefore asked eCW to create "independent CHPL listings for 11.40, 11.50 and 11.52 to provide more efficient tracking of corrections and for greater transparency to their end users." *Id.*

Around that same time in the spring of 2021, Drummond also performed surveillance testing of eCW's software. ECF 216-2 ¶¶ 262-265. That testing was performed on a subversion of Version 11 called Version 11.52.153. Ex. 1, Mar. 10, 2021 Drummond Email to ONC.[2] A few months later and at Drummond's express request, "eCW agreed to list version 11.52.153 [on CHPL] since this is what [Drummond] tested." *Id*. eCW obtained that new CHPL listing by submitting a letter to Drummond requesting "one new ONC CHPL listing for eClinicalWorks

---

[2] Despite relying on the Drummond 2021 testing in many motions and briefs, eCW has never produced any documentation of the actual testing done or any test results for the relevant certification criteria.

Version 11.52.153." Ex. 2, Oct. 15, 2021 V. Ginjupalli to Drummond.  In that letter, eCW's director of certification stated "*this product version* was previously certified by Drummond Group as eClinicalWorks Version 11."  *Id.* (emphasis added); *see also* Ex. 3, Sept. 29, 2021 Drummond Email to V. Ginjupalli ("To initiate the product-version update [to 11.52.153], you can submit the request via your next quarterly attestation.").

Drummond added a CHPL listing for Version 11.52.153 on December 28, 2021.  ECF 216-2 ¶ 90.  Drummond then immediately told eCW that "given the ONC's interest regarding this matter, eCW will need to submit CHPL listing requests for versions 225, 244, and 301" by January 28, 2021.  Ex. 4, Jan. 20, 2022 Drummond Email to V. Ginjupalli.  Again, eCW only needed to submit an attestation form and pay $2,000 to obtain CHPL listings for those three subversions. *Id.*; ECF 216-2 ¶¶ 91-93 (Drummond added CHPL listings for Versions 11.52.225, 11.52.241, and 11.52.301 on February 1, 2022.).  eCW obtained CHPL listings in a similar fashion for Versions 11.52.305 and 11.52.399 in April and September 2022.  *Id.* ¶¶ 94-95.  In December 2022, eCW voluntarily withdraw all CHPL listings for Version 11 subversions certified to the 2015 ONC standards.  Ex. 5, Dec. 8, 2022 A. Desilets Email to Drummond.

## B.  eCW Affirmatively Included Version 11 Subversions Within the Case

Throughout discovery, summary judgment briefing, and after, eCW never treated Version 11 subversions as distinct from Version 11.  For example, when eCW produced its customer list to Relators, eCW did not differentiate between Version 11 and the Version 11 subversions.  Instead, eCW only provided its upgrade dates for Versions 10, 11, and 12.  *See* Ex. 6, Subversion Inclusion Example.  Then, at the very first deposition of an eCW employee in this case, eCW's Compliance Officer Michael Laycob testified for the company on certification issues and was asked which version of eCW's software Drummond tested in 2021.  Mr. Laycob stated that "it was *a version of Version 11*, but as – as you saw from the grid *we had multiple versions of*

4

***Version 11 certified*.**"  ECF 218-20 at 94:7-13 (emphasis added).  That admission is significant.

It is not isolated commentary by a fact witness, but a binding admission from eCW that the

dividing line in this case was between Versions 10, 11, and 12, not between Version 11 and the

Version subversions.  Relators reasonably relied on eCW's representations that Version 11 meant

Version 11 – regardless of the string of numbers appended to the end.  Even now, eCW has not

produced any information about when any of its customers upgraded to a Version 11 subversion.

eCW also affirmatively relied on the certification and testing of Version 11 subversions

throughout its defense of this case.  In its April 2022 motion to dismiss, eCW argued eCW's

continued certifications (*i.e.* the Version 11 subversions) despite Relators' allegations foreclosed

materiality. ECF 69-1 at 30-31.  In 2024, in support of its summary judgment arguments, eCW

argued that "in the period following commencement of this action, Drummond certified eCW's

EHR software at least five times."  ECF 216-1 at 10 (citing ECF 216-2 ¶¶ 90-99 (listing

certification dates for Version 11 subversions).  And eCW relied on the 2021 Drummond testing

of Version 11.52.153, arguing: "[m]ost critically, in a 2021 comprehensive audit that ONC was

invited to attend, Drummond … tested eCW's EHR against nearly every one of the criteria that

relators claim are violated and found that there were no non-conformities with the criteria." ECF

216-1 at 14.

After making its discovery productions and disclosures without differentiation between

Version 11 and subversions, and after relying on the testing and certification of those subversions

in its affirmative arguments, eCW should not be allowed to suddenly claim on the eve of trial

that Version 11 subversions are outside the scope of this case.  eCW sought summary judgment

based on evidence related to the subversions and the Court denied eCW's motion.  That should

be the end of this issue.  If it isn't and the Court excludes the subversions from Ms. Wolfston's

damages model, any reference to the 2021 Drummond surveillance testing or the testing and certification of the Version 11 subversions must be excluded.

### C.  eCW Admitted Version 11 Subversions Were Properly Included in Ms. Wolfston's Model Last Fall

In October 2024, Ms. Wolfston provided a supplemental damages model that added payments made to 1,722 eCW using medical practices in 2021.  ECF 192-6 (Wolfston Oct. 15, 2024 report noting "[i]n addition to adding additional matched customers, I have also calculated new MIPS scores and overpayment amounts for known eCW customers using Damages Method 1 for the 2021 performance year.").  More than half of those practices—approximately 900—attested to using a Version 11 subversion.  Ex. 7, Decl. Robert Snyder ¶¶ 6-7, Ex. A.  As noted above, eCW relied on subversion testing and certification on summary judgment and said nothing about the issue in its first motion to exclude Ms. Wolfston, both filed on October 30, 2024.[3]

Almost a year later and after the Court denied both motions, eCW filed a second round of *Daubert* motions against Ms. Wolfston.  In one of those motions, eCW criticized Ms. Wolfston for including Version 10 and 12 users in her models.  ECF 364-1 at 2-3.  Again, eCW said nothing about the inclusion of Version 11 subversion users.  Instead, after eCW instructed Dr. Baker to "isolate those [customers] who used version 11 for the relevant time periods," *id.* at 3-4, Dr. Baker did not exclude Version 11 subversion users,[4] instead he identified them as using Version 11.[5]  A sample of some of those entries is attached as Ex. 8, Baker Fall Analysis

---

[3] eCW also criticized Relators' expert Michael Arrigo for not "attempt[ing] to reconcile his findings with Drummond's 2021 audit of eCW's EHR software, which was completed after ONC became aware of relators' claims and found no nonconformities with the criteria at issue."  ECF 200-1 at 12.

[4] At Relators' request, eCW produced Dr. Baker's full analysis of this issue, which revealed that just like Ms. Wolfston and eCW before, Dr. Baker did not differentiate between Version 11 and Version 11 subversion users.

[5] eCW criticized Ms. Wolfston for allegedly not consulting the "ONC's publicly available MIPS attestation data," ECF 367-1 at 3, but that data shows that many of the 2021 eCW practices that Dr. Baker called Version 11 users attested to using a subversion.

Subversion Example.  Thus, eCW admitted last fall that Version 11 subversion users were appropriately included in Ms. Wolfston's damages model.

eCW suggests Relators themselves limited this case to conduct occurring through the end of 2021.  That is not true.  At summary judgment, Relators noted that Ms. Wolfston's model calculated overpayments in 2019-2023, for MIPS performance years 2017-2021.  ECF 266 at 14.  That was a true statement based solely on the release time for Medicare data.  In October 2024, Ms. Wolfston's damages models ended with 2023 payments that were based on 2021 MIPS scores.  ECF 434 at 4 (claims data trails payment years by at least 16 months).  But that was only because the 2024 claims payment data was unavailable in October 2024.  *Id.*  Ms. Wolfston has consistently noted that she would supplement her models as new payment data became available.  ECF 192-6 ¶ 6, 2024-10-15 Wolfston Supp. Rep. (noting she would update her analysis for 2023 if specific claims data became available); ECF 434 (requesting leave to supplement model with "claims payments data for 2023 that was not publicly available when she produced her first reports.").  When Relators sought data from CMS in response to eCW's belated 2025 criticisms, the payment data for 2024 was available and included in Wolfston's May 2026 supplement.  If eCW had not twice concealed critical evidence in this case or delayed in raising issues with the Court, this case could have been tried last year.  But, eCW should not be heard to complain that the passage of time has made it possible for Relators to quantify the results of its fraud.

### D.  Relators' Experts

Relators' technical experts Dr. Eric Cole and Chris Wheeler also included Version 11 subversions in their technical analysis of eCW's software.  In several places throughout their reports, Dr. Cole and Mr. Wheeler identified security vulnerabilities that existed in Version 11 subversions and even into Version 12.  *See* ECF 218-134, Rels. Supp. Interrog. Resp. at 62-66

7

(May 2021 analysis of Version 11.52 update); *id*. at 69 (September 2021 further analysis of Version 11.52 update); ECF 266-9, Wheeler Supp. APPSEC Rep. at 15-17 (security keys vulnerability that eCW knew about since September 2019 existed in Version 12); ECF 575-4, Cole Supp. JIRA Rep. at 16-20 (demonstrating security key vulnerability existed after first subversion was certified); *id*. at 24-28 (discussing access control vulnerability in subversion); *id*. at 45 (hardcoded keys in Version 12 despite repeated notifications of issue).  Those opinions were disclosed long before summary judgment and have been part of Relators' liability case without objection for years.

**II.    eCW Waived Any Arguments About Inclusion of Version 11 Subversions**

Even if eCW's current argument had merit, it comes far too late.  Despite knowing about Relators' evidence related to Version 11 subversions and the inclusion of damages related to those subversions in 2024, eCW failed to raise this argument at summary judgment, in its first motion to exclude Ms. Wolfston, or in its three *Daubert* motions filed last fall (despite one of those motions being specifically directed at removing non-Version 11 users).  Instead, eCW relied on the subversions in its liability arguments and produced a "corrected" damages spreadsheet from its own expert that included users who attested to these very subversions.  In short, eCW had at least three opportunities to raise this issue before the eve of trial.  Instead of doing so, it relied on evidence related to the Version 11 subversions in its attempt to win summary judgment and dismissal.[6]

---

[6] Relators anticipate that eCW will argue this issue was not raised at summary judgment because it was unaware Relators were narrowing the scope of this case to just Version 11 and not Version 10 or 12.  eCW, however, would've been plainly aware of that after reviewing Relators' response brief, and in its reply it maintained its position that Relators' case was "undermined by the fact that Drummond recertified eCW's software dozens of times and … put eCW 'through its paces' in a 2021 audit—on full notice of relators' claims—and found no nonconformities with the security certification criteria."  ECF 300 at 10.

eCW's current position is not properly characterized as a *Daubert* argument,[7] but an untimely second summary judgment argument that should have been raised earlier. Rule 56 provides that when a court order sets the time for filing a motion for summary judgment, that deadline controls. *See* Fed. R. Civ. P. 56(b). The Court's Scheduling Order set the deadline for summary judgment motions for October 30, 2024. ECF 136. eCW's October 2024 motion included 50 pages of briefing, 81 pages of allegedly "undisputed" material facts, and 171 exhibits, ECF 216, but never argued Version 11 subversions should be treated different than Version 11. Instead, eCW relied on testing and certification of those subversions to support of its arguments. The Court properly denied that motion and eCW should not be allowed to reopen briefing on issues that were fully resolved more than a year ago.

While this Circuit does not forbid consideration of subsequent motions for summary judgment, it "do[es] not approve in general the piecemeal consideration of successive motions for summary judgment, since defendants might well normally be held to the requirement that they present their strongest case for summary judgment when the matter is first raised[.]" *See Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990) (internal quotation marks and citation omitted). Generally, courts entertain successive motions for summary judgment only when there are exceptional circumstances present. *See, e.g., Stinson v. Receivables Mgmt. Bureau Inc.*, No. 2:12-CV-02558-AKK, 2013 WL 1278966, at *4 (N.D. Ala. Mar. 26, 2013) (remanding claims to state court for consideration of second motion for summary judgment that raised argument for the first time based on new claims added after first motion for summary judgment).

---

[7] Ms. Wolfston expresses no opinions about whether to include Version 11 subversions. That is a legal and factual issue that has nothing to do with her opinions.

But where, as here, a defendant "could have asserted all of their arguments from the outset" but did not, "the defendant['s] approach has wasted [its] own resources and those of the plaintiff and the court," and a court is within its authority to decline to entertain such belated summary judgment arguments. *See Welch v. Theodorides-Bustle*, 753 F. Supp. 2d 1223, 1227 (N.D. Fla. 2010) (striking second motion for summary judgment on theory not presented earlier); *Middlegate Dev., LLP v. Beede*, No. CIV.A. 10-0565-WS-C, 2011 WL 3475474, at *11 n. 26 (S.D. Ala. Aug. 9, 2011) (defendant "will not be afforded a second bite at the summary judgment apple to raise arguments and present evidence that they could and should have submitted earlier, but did not"). "To proceed otherwise would be to allow litigants to treat their initial summary judgment motions as a 'dry run' which they would have an opportunity to redo or supplement— at considerable additional cost to opposing parties and at a considerable drain to scarce judicial resources—via a new Rule 56 motion later on to correct any deficiencies identified by opposing counsel or the court in processing the initial motion." *Middlegate Dev.*, 2011 WL 3475474 at * 11 n. 26 (collecting cases). That is precisely what eCW did here. It relied on the subversions in October 2024 to support its summary judgment arguments. It should not be allowed a second chance to obtain summary judgment on an issue it first tried to leverage for an advantage and now claims is outside the scope of the case. This is improper for multiple reasons but has become eCW's modus operandi.

### III.   The Version 11 Subversions Do Not Affect the Court's Conclusion that Disputed Issues of Material Fact Require a Trial

Even if eCW had timely raised this argument, that still would be no basis to preclude Relators from presenting evidence of the government's full damages. eCW argues the subversions are legally distinct simply because they received separate CHPL listings and

certification dates.  Relators disagree.[8]  As described fully above, those separate CHPL listings and certification dates do not reflect a new, independent product, but rather an administrative decision by eCW's governing bodies to improve transparency around eCW's Version 11 releases. Drummond was concerned that eCW was not fixing safety and certification issues in all its releases, and that eCW's practice of maintaining numerous internal subversions under a single CHPL listing made it difficult for customers to know what issues existed in the software they were using.  To increase transparency, Drummond asked eCW to begin obtaining separate CHPL listings for its Version 11 subversions.  Additionally, as eCW well knows, obtaining separate CHPL entries and certifications for the subversions did not require the development of a fundamentally new software platform.  All eCW did was follow the same certification process it employed for Version 11 which was to check off boxes on the attestation form and pay the $2,000 fee.  *See* Ex. 4, Jan. 20, 2022 Drummond Email to V. Ginjupalli; Ex. 9, Aug. 30, 2022 A. Desilets Email to Drummond.

When it benefitted eCW to characterize the subversions as Version 11, eCW sought to capitalize on their inclusion.  But nothing in the ONC regulations, the CHPL listings, the certification documents, or the evidentiary record establishes that the separate administrative CHPL listing of Version 11 subversions transformed them into software products unrelated to Version 11.  The evidence instead shows that they remained precisely what eCW repeatedly called them throughout discovery: versions of Version 11.  The later certifications of the Version 11 subversions do not undermine this Court's prior conclusion that genuine issues of material fact regarding falsity and materiality must be resolved by the jury.

---

[8] eCW argues Relators agreed the subversions were not Version 11. That is not true.  Relators admitted that the subversions had different certification dates.  Additionally, the chart eCW claims was created by Relators which notes the four-year gap in certification dates and distinct CHPL IDs was not created by Relators.  ECF 573 at 9. eCW created that chart for the deposition of its corporate representative in April 2024.  ECF 266-58.

### a.  eCW Fraudulently Obtained Certification of the Version 11 Subversions

At the recent hearing, eCW alleged that Relators had no evidence "that the company did anything fraudulent" to obtain certification of the subversions.  Jun. 24, 2026 Hrg. Tr. at 137:14-17.  That is false.  Relators have consistently alleged that eCW made false and misleading representations to the government, the SQOO, and Drummond about the conformity of its software to ONC certification criteria while seeking and maintaining certification of its software under the 2015 standards.  Those allegations were never limited to Version 11.  Relators presented evidence that security vulnerabilities persisted in Version 11, the subversions, and even into Version 12 and eCW either lied about them, misrepresented their severity, or withheld information about them all.

For falsity, even "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181-82; *see also Marsteller v. Tilton*, 880 F.3d 1302, 1315 (11th Cir. 2018) ("the concern is whether the pricing data was misleadingly incomplete such that it amounted to fraud, and whether that data was material to the Government's decisions on the contracts.  As *Escobar* reminds us, 'fraud' at common law has long included 'misrepresentations by omission' such as the above.").  "The bottom line is that a jury must decide whether Defendants' Medicare submissions were false.  The Court cannot resolve that issue … on summary judgment." *U.S. v. Burkich*, No. 1:19-CV-3510-MLB, 2022 WL 4236243, at *6 (N.D. Ga. Sep. 14, 2022) (denying summary judgment and explaining "Defendants also claim their certification of medical necessity could not have been false because it reflected a subjective clinical opinion rather than an objective fact. But that is simply not the law.").

The ONC Certification Program relies on EHR developers to truthfully represent that their software conforms to the applicable certification criteria.  *See* ECF 218-17, ONC 30(b)(6)

Dep. at 94:9-17 (developer chooses "those criteria to which they want their product certified. Once they do, they are then accountable for performance to those criteria."); ECF 238, Aug. 22, 2024 Meadors Dep. at 109:15-21 (agreeing program is based on trusting the developer to truthfully tell ACB how the software works). If a developer knows a vulnerability related to certification exists in its software, it should inform its ACB. *See* ECF 238, Aug. 22, 2024 Meadors Dep. at 133:25-134:10 (admitting Drummond "would be interested" in knowing about vulnerability that allowed a user to obtain all usernames and passwords to the software); *id*. at 154:14-21 (developer should inform ACB if they know the screen does not lock in workflows different than that actually tested). Developers cannot knowingly seek certification for software they know fails to satisfy the certification requirements or withhold information about non-conformities to obtain certification. eCW repeatedly did that for Version 11 and each subversion.

Relators have shown that many of the core security vulnerabilities present in Version 11 persisted in the Version 11 subversions. In May 2021, Relators analyzed the 11.52 update and found that several original vulnerabilities persisted including (1) failure to enforce access controls, (2) allowing exfiltration of data without being captured on the audit log, (3) hardcoded passwords, (4) storing PHI locally and unencrypted, and (5) using outdated encryption on passwords. ECF 218-134 at 62-66. In September 2021, Relators conducted a further analysis of Version 11.52 and found additional hardcoded passwords and weak encryption still being used, including specific instances that Relators identified several times before. *Id*. at 69-86.

But it wasn't only Relators who identified and warned eCW of security vulnerabilities that existed in its Version 11 subversions that could affect certification. In several third-party penetration tests both before and after certification of the subversions, eCW was notified again about security vulnerabilities that Relators had raised years before. *See* ECF 266-79, Oct. 8,

13

2021 Veracode Application Security Rep. at 6 (noting high severity authorization bypass and recommending "that authorization is properly enforced at the server side for every action"); ECF 266-80, Jul. 10, 2023 Secureworks Web Applications Security Review at 2 (insufficient access control found).  Even eCW's own internal penetration testing flagged that Version 11.52.301 contained "broken access control" where a user could access resources or perform actions they were not supposed to be able to – a vulnerability that Relators raised in their very first disclosures in the case.  Ex. 10, Apr. 1, 2022 eCW 11.52.301 Penetration Testing Report at 17; ECF 218-134 at 17 (alleging software does not properly check access control).

eCW's internal ticketing systems also show that eCW knew about many of these persistent issues and either failed to fix them in the subversions or said they were fixed.  eCW's employees documented the same broken access control in the subversions that Relators found in Version 11 where the user was able to tell the server what their permissions were.  *See* Ex. 11, Mar. 7, 2022 Insufficient Access Control Ticket.  Another JIRA ticket noted an access control vulnerability in the Version 11 subversions where a user could improperly gain access to information within the system.  ECF 575-4 at 24-28.  The ticket was created in April 2022, allegedly fixed in May 2022, and updated as late as November 2023.  *Id*. at 25.[9]  There are also several JIRA tickets relating to eCW's software allowing unauthorized users to gain access to PHI without using the appropriate security keys.  ECF 575-4 at 16-20.  The issue was first reported in July 2020, but the problem existed in the software as of November 2021, just one month before the first Version 11 subversion was certified.  *Id*.  Additionally, a JIRA ticket created by eCW in September 2019 (likely in response to Relators' allegations) noted eCW's use

---

[9] Like Relators, Dr. Cole also identified JIRA tickets that identified hardcoded keys that were still in existence in Version 12 of the software in 2023 despite repeated notifications of this issue.  *Id*. at 45.  Meaning the problem existed in Version 11, the subversions, and throughout Version 12.

of identical security keys across customer servers.  ECF 266-9 at 15.  eCW implemented an alleged fix in June 2021, but Relators were able to show that vulnerability persisted not just in the Version 11 subversions, but also into Version 12 as well.  *Id*. at 17.  Relators also demonstrated a remote code execution vulnerability, based on information found in a Contrast security ticket created long before Version 11, that persisted through the subversions and into Version 12.  ECF 266-8 at 5-8.  Thus, while logged in to one eCW customer practice, Relators were able to exfiltrate data and PHI without any authentication from a different eCW practice. *Id*.

eCW's own experts also confirmed the existence of these pervasive security vulnerabilities throughout the different versions of eCW's software.  For example, in September 2023, Sygnia consultant Mr. Litwak found that eCW's Versions 11 and 12 were vulnerable to authentication bypass and it was "clear that there is a lack of both authentication and authorization checks."  ECF 503-2 at 14, 37.  Similarly, Mr. Dayan identified authentication and authorization bypasses in both Version 11 and Version 12 of the eCW software.  ECF 503-7.

There is no evidence that eCW disclosed ***any*** of these vulnerabilities to Drummond or the ONC at any time.  Instead, as eCW did with Version 11, it continued to mislead and withhold information from ONC, Drummond, and the SQOO.  There also is evidence that eCW made demonstrably false statements about allegations Relators had raised related to the Version 11 subversions.  Most notable is eCW's misrepresentation to the SQOO regarding SELinux and cross-practice access control during the summer of 2021.  Following Relators' May 2021 disclosures to the DOJ which included allegations about cross-practice access to PHI, ONC asked the SQOO to investigate those security concerns.  ECF 218-134 at 62; ECF 218-135; ECF 218-25.  During that investigation, eCW told the SQOO that its SELinux protections prevented

one cloud customer from accessing another customer's PHI.  Based largely on that representation and others, the SQOO concluded eCW was or would be addressing all issues raised by Relators in May 2021.  ECF 218-137.  But, as discussed above, Relators proved that representation was false.  ECF 266-8 at 5-8.

In short, throughout the subversion certification process, eCW made repeated false representations to ONC, the SQOO, and Drummond claiming that vulnerabilities had been fixed (when they hadn't), were being fixed (when they weren't), or did not present significant security concerns (when they did).  Whether those representations constituted misleading half-truths is precisely the type of factual question reserved for the jury.

### b.  eCW's Repeated Materiality Argument Fails Again

eCW has repackaged its summary judgment materiality arguments in an effort to exclude the subversions it previously tried to leverage in support of summary judgment.  According to eCW, ONC's decision to certify Version 11 subversions despite knowledge of Relators' allegations dispositively means that any non-conformities associated with those certifications were immaterial.  That misstates the record and the law.  Relators do not dispute the ONC knew about their complaint and some of their allegations.[10]  But, as Relators argued before, knowledge of allegations of non-conformities is not the same as actual knowledge of non-conformities. Especially when, at every stage, eCW denied the identified vulnerabilities were certification non-conformities, claimed the issues had been fixed, or represented the vulnerabilities presented no real security concerns.  *See, e.g.*, ECF 266-104, eCW Response to IA5 at 3 ("eClinicalWorks

---

[10] ONC testified it learned of Relators' Complaint in November 2018.  *See* ECF 218-17, ONC 30(b)(6) Dep. at 133:10-15.  ONC, however, did not review Relators' amended complaint, any discovery that was produced in the case, any expert report other than Dr. Skipper's report, or any of the many depositions taken.  *Id*. at 173:7-174:14.

16

rejects assertions by the SQOO that its EHR is or may be "unsafe." It is unclear what objective

standard, if any, the SQOO is using to reach this conclusion.").

While ONC may have known of Relators' allegations, it was also receiving reports from

the SQOO related to eCW's software and its purported efforts to remediate any issues. *See* ECF

270-7, QP IA6 Excerpts at 270-272, 293-294, 312-313 (noting eCW made progress in cataloging

known software security vulnerabilities, updating database passwords, sunsetting weak password

hashes, and preparing JIRA tickets); ECF 270-4, QP IA7 Excerpts at 155 (eCW had only two

customers remaining on its eHX version 6 that used an insecure password hashing algorithm);

ECF 270-12, QP IA8 Excerpts at 191-192 (noting eCW made progress on reducing open

vulnerabilities); ECF 270-13, QP IA9 Excerpts at 116 (eCW made "progress during this IA9

reporting period by reducing the number of open Recommendations").[11]  As referenced above,

the SQOO also investigated Relators' May 2021 disclosures at ONC's direction and reported to

ONC that eCW was or would be addressing all the  issues raised.  ECF 218-137.

In addition to the SQOO's reports to ONC, ONC also received information from

Drummond.  In April 2021, Drummond performed surveillance testing of eCW's software.  ECF

216-2, ¶¶ 262-263.  Drummond found no non-conformities, presumably because eCW concealed

the vulnerabilities it knew to exist, so Drummond simply ran the basic certification testing. *Id*.

ONC was informed of this testing and expressed it was refreshing that eCW's software was "put

through the paces."  ECF 218-89, Feb. 12, 2021 ONC Email to SQOO.  This testing was done

---

[11] Notably, just nine months before obtaining certification of the first Version 11 subversion, eCW entered into its secret settlement with the SQOO successfully removing several members of the SQOO team by lodging allegations of racism against the members.  The members who were removed, including the SQOO team lead, were unsurprisingly those that were the most vocal and critical of eCW's software security.  Ajit Dhavle was appointed as the replacement SQOO team lead.  He was the perfect choice for eCW because he had no technical expertise, knew nothing about application security, and was likely to relieve the pressure eCW was feeling related to its software security.  So, every report received by the SQOO during this transition was likely to paint an unrealistically rosy picture for ONC.

just months before the first Version 11 subversion was certified and formed the foundation for the subversion certifications later that year and in 2022.

A "'finding' of materiality by the 'factfinder' does not require the government to have taken 'the strongest possible action,' only that some enforcement action is taken." Doc. 90 at 24 (quoting *U.S. ex rel Bibby v. Mort. Inv. Co.*, 987 F. 3d 1340, 1352 (11th Cir. 2021)). As Relators established above and in their summary judgment briefing, when the government was faced with Relators' allegations, whether through Relators' initial disclosures or their later 2021 disclosures, the government took steps to investigate the issues and instructed eCW to fix them. And each time Relators raised issues, eCW lied, concealed facts, and misrepresented its efforts to remediate the issues. As a result, the government could only be left to assume all problems were resolved. And if ONC believes an issue has already been fixed, it is unlikely to seek an administrative remedy. ECF 218-17, ONC 30(b)(6) Dep. at 132:8-14.[12]

From a materiality standpoint, eCW's subversion certification argument is no different than the arguments this Court has twice rejected. eCW argues that ONC's certification related decisions, whether to certify or not to decertify, are dispositive of materiality. *See* Jun. 24, 2026 Hrg. Tr. at 141:9-21 ("[I]f the government knows everything and they decide to certify anyways, that really ought to be the end of the matter."). But the Eleventh Circuit in *Bibby* rejected that exact narrow single-factor materiality analysis. There, the Circuit concluded the VA continued issuing loan guaranties after acquiring ***actual*** knowledge that the defendant violated the applicable requirements. *Bibby*, 987 F.3d at 1349-50. Each of these guaranties was a new

---

[12] If eCW argues CMS' decision to continue making payments to providers who attested to using Version 11 subversions, despite knowledge of Relators' allegations, forecloses materiality, it is incorrect. CMS' uncontroverted testimony is that it did not have knowledge of Relators' allegations until May 2023, after the subversions were certified and withdrawn. ECF 262-1 at 1. And as the Court noted in its Order denying eCW's summary judgment motion, "courts have held that continued payment does not necessarily negate materiality, especially when, as here, payments are made to innocent third parties." ECF 345 at 47 (citations omitted).

contract the VA entered into with the defendant and it happened thousands of times after the VA knew the defendant was not always compliant.  Although the Circuit acknowledged the VA's continued issuance of guaranties could constitute "strong evidence" of immateriality, it emphasized the "materiality test is holistic, with no single element—including the government's knowledge and its enforcement action—being dispositive." *Id*. at 1352.  The Circuit explained that evidence of "the VA's continued issuance of guaranties" still had to be weighed against other evidence supporting materiality, including that the violated requirement was a condition of payment and went to the essence of the bargain.  *Id*.  "Because there is sufficient evidence to support a finding of materiality," the issue had to be left "to the factfinder."  *Id*.  Other courts have similarly refused to find that evidence of later government action is dispositive and not just one factor in the materiality analysis.[13]

Likewise, here, the issuance of new CHPL listings for the Version 11 subversions is, at best, one piece of evidence related to materiality.  But that evidence must be weighed against the substantial evidence that during the same time those certifications were issued, eCW continued hiding vulnerabilities, and misleading ONC, Drummond, and the SQOO about those vulnerabilities to obtain and keep its certification.  Under *Bibby*, the Court cannot elevate the government's subsequent actions above all other evidence and treat them as dispositive of materiality.  Whether certification of the subversions outweighs Relators' evidence of continuing fraud, or instead reflect certifications issued in reliance on incomplete or misleading information

---

[13] *Scollick ex rel. U.S. v. Narula*, Case No. 1:14-cv-01339-RCL, 2022 WL 3020936, *10 (D.D.C. July 19, 2022) (Although VA was informed of allegations and later recertified contractor, that recertification was not a fact that was dispositive of materiality, noting that "government approval or certification cannot be used as a shield from liability, especially where that approval or certification was gained through fraudulent means."); *U.S. v. Care Alternatives*, 81 F.4th 361, 374 (3d Cir. 2023) (reversing summary judgment based on lack of materiality where OIG and DOJ conducted a full investigation but did not end relationship with contractor because "notwithstanding the government's prolonged inaction in the wake of Relators' fraud allegations, it was erroneous to treat this factor as determinative of immateriality.").

supplied by eCW, is the same type of factual dispute that precluded summary judgment in *Bibby* and here as the Court ruled last year. It is a jury issue.

## CONCLUSION

For the foregoing reasons, eCW's attempt to exclude damages related to the Version 11 subversions should be rejected. eCW waived any argument to the contrary, and Relators have presented sufficient evidence that the subversion certifications were procured through the same fraudulent certification scheme that the Court ruled supported the Version 11 claims. If the Court disagrees, then Ms. Wolfston can amend her models to include only providers who attested to Version 11 of the software (but this can also be done just as easily by the jury at trial when determining damages). But if the Court does so, it should also preclude eCW from presenting any evidence or argument related to the Version 11 subversions, including the 2021 Drummond surveillance testing.

Respectfully submitted this 1st day of July, 2026.

/s/ Robert H. Snyder, Jr.
Robert H. Snyder, Jr.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
Alexandra "Sachi" Cole
  Georgia Bar No. 696892
  sachi@cannellasnyder.com
Hannah Drosky Amanuel
  Georgia Bar No. 922743
  hannah@cannellasnyder.com
Chase Lyndale
  Georgia Bar No. 183762
  chase@cannellasnyder.com
CANNELLA SNYDER LLC
315 W. Ponce de Leon Ave, Suite 885
Decatur, Georgia 30030
Tel: (404) 800-4828
Fax: (404) 393-0365

Brian P. Adams
Georgia Bar No. 142474
brian@brianadamslaw.com
Mary Beth Hand
Georgia Bar No. 322836
mbhand@brianadamslaw.com
ADAMS LAW FIRM
915 Hill Park, Suite 101
Macon, Georgia 31201
Tel: (478) 238-0231
Fax: (478) 216-9188


Anna Green Cross
  Georgia Bar No. 306674
  anna@crosskincaid.com
Meredith Kincaid
  Georgia Bar No. 148549
  meredith@crosskincaid.com

CROSS KINCAID BASKAM LLC
315 W. Ponce de Leon Ave., Suite 715
Decatur, GA 30030
(404) 948-3022


*Counsel for Relators/Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the foregoing by electronically mailing a copy of the same to counsel of record, who, by registering with the Court's CM/ECF system, has consented to electronic service.

This 1st day of July, 2026.

/s/ *Robert H. Snyder, Jr*
Robert H. Snyder, Jr.
Georgia Bar No. 404522
rob@cannellasnyder.com

*Counsel for Relators/Plaintiffs*