| Parties' Consolidated Deposition Designations and Objections for April 2024 Deposition of Brad Ulrich | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Ulrich Apr. 2024 | 8:1-9:3 | R - Affirm | | |
| Ulrich Apr. 2024 | 10:5-7 | R - Affirm | | |
| Ulrich Apr. 2024 | 11:3-8 | R - Affirm | | |
| Ulrich Apr. 2024 | 13:6 –15:04 | R - Affirm | | |
| Ulrich Apr. 2024 | 20:11-21:05 | R - Affirm | | |
| Ulrich Apr. 2024 | 21:13-22:8 | R - Affirm | Lack of relevance.  Mr. Ulrich is a fact witness, not an expert witness.  This appears to be an attempt to bolster his testimony by eliciting that the federal government at one point retained him as an expert in some other matter. | Only 21:13-23 relates to Mr. Ulrich's prior experience where he lead a team from Quandary Peak to provide technical review and auditing for the Consumer Financial Protections Bureau. During this review, Mr. Ulrich conducted software process and code review. This is relevant to Mr. Ulrich's background and demonstrates his prior experience performing the same type of work he did as the SQOO for eCW.  21:24-22:8 discusses Mr. Ulrich's prior experience working with eCW as part of the ICE team which is again relevant to Mr. Ulrich's background and history with eCW. Additionally, in later testimony designated below at 161:15-19, eCW sought to itself establish that the SQOO team was considered experts in the certification criteria. So, what is good for the goose is good for the gander. If eCW wants to introduce evidence that the SQOO team, including Mr. Ulrich, were experts, then it cannot also seek to exclude testimony on that same basis. |
| Ulrich Apr. 2024 | 22:11 –27:3 | R - Affirm | 22:11-26:16: Lack of relevance.  Mr. Ulrich is a fact witness, not an expert witness.  Eliciting testimony about engagements he has had with other EHR vendors seems like an attempt to bolster his testimony or, by implication, to suggest that eCW does not favorably compare to those other vendors.  The limited point re: the drafting of policies and procedures seems irrelevant. 26:23-27:3: We don't object to generally establishing that QP was retained by eCW for another engagement prior to the CIA.  We would object to that being a means to get into the details of Delaney, which is why we included these lines in our objection. | 22:11-26:16 relates to Mr. Ulrich's prior experience working on Quandary Peak teams that were retained by eHR companies to assist with technical review and help with compliance to the CEHRT regulations.  This included helping the companies creating and implementing practices and procedures. Mr. Ulrich's prior experience with eHR vendors was similar to what Mr. Ulrich did as the SQOO for eCW. This is relevant to Mr. Ulrich's background and demonstrates his experience assisting eHR companies with similar tasks that he did with eCW as SQOO. 26:23-27:3 relates to the timeline for how Quandary Peak began engaged with eCW to serve as an independent consultant expert and then later the SQOO. This line of questioning does not reference Delaney at all. It is clearly relevant to demonstrating Quandary Peak's history and role with eCW. Additionally, in later testimony designated below at 161:15-19, eCW sought to itself establish that the SQOO team was considered experts in the certification criteria. So, what is good for the goose is good for the gander. If eCW wants to introduce evidence that the SQOO team, including Mr. Ulrich, were experts, then it cannot also seek to exclude testimony on that same basis. |
| Ulrich Apr. 2024 | 29:3-25 | R - Affirm | | |
| Ulrich Apr. 2024 | 33:10 – 24 | R - Affirm | | |
| Ulrich Apr. 2024 | 36:09– 38:18 | R - Affirm | | |
| Ulrich Apr. 2024 | 38:24 – 39:22 | R - Affirm | | |
| Ulrich Apr. 2024 | 40:7–9 | R - Affirm | | |
| Ulrich Apr. 2024 | 40:21-41:16 | E - Counter | | |

| Ulrich Apr. 2024 | 41:25-42:11 | R - Affirm | | |
|---|---|---|---|---|
| Ulrich Apr. 2024 | 43:12 – 44:13 | R - Affirm | Lack of relevance, and 403.  These lines seem to have been designated simply to elicit testimony regarding eCW's size, in a manner of for a reason that the judge has deemed irrelevant. | 43:12-18 establishes that eCW is one of the largest eHR vendors in the US. This is relevant for materiality and intent. eCW was one of the largest eHR vendors in the country and, as the SQOO put it, "a large portion of the U.S. population depends on eCW's software..." This could explain why the gov't chose not to take the most extreme action in response to Relators' allegations. Additionally, demonstrating eCW's size and market share is relevant to show why eCW would be motivated to defraud the gov't to maintain that size and market share. The Court only ruled that the numerical value of eCW's profits and revenues were irrelevant. It said clearly that "dollars themselves are not relevant, but the financial motivation is." Jun. 24, 2026 Hrg. at 90:9-10. |
| Ulrich Apr. 2024 | 47:9 – 53:13 | R - Affirm | 51:21-53:13: Lack of relevance, and 403.  We do not believe the IA report summary that was read during these transcript pages relate to the specific security issues that the jury is being asked to adjudicate here.  We also think the reference to "risk to patient safety" should excluded under 403.  The reference to the vulnerabilities remediation policy should also be excluded under 403, as it could confuse the jury into believing that eCW's policy allows *certification issues*  to go unremediated. | 51:21-53:13 discusses eCW's application security department the SQOO's conclusions that the department had a pattern of ineffective approaches and decision making and failed to acknowledge pervasive security problems in eCW's software. It also discusses security gaps and exposures that eCW either didn't know about or didn't report to the SQOO. This testimony demonstrates eCW's insular management structure and how the AppSec department was not equipped to design the software in ways that did not result in certification non-conformities which Relators contend did impact eCW's certification and attestation process. Testimony about "risk to patient safety" is just a conclusion reached by the SQOO. It has nothing to do with a possible breach which is clearly excluded. |
| Ulrich Apr. 2024 | 55:23 – 56:10 | R - Affirm | Lack of relevance, and 403.  The question in this case is not generally whether eCW's software is "secure."  The security issues have to tie back to certification requirements.  The IA report statement is thus not relevant, and it should also be excluded under 403.  The reference to "significant patient safety risk" should also be excluded under 403 | This testimony relates to the SQOO's conclusion that eCW's software "cannot and should not be considered secure" for a number of reasons including lax vulnerability remediation timelinse, lack of accountability, etc. This demonstrates eCW's ineffective processes and procedures and refusal to acknowledge issues in its software. This is relevant to establish intent and repeated notice of alarming issues that it chose not to fix. Security issues presented at trial will all be tied to certification requirements by Relators' certification expert. Testimony about "significant patient safety risk" is just a conclusion reached by the SQOO. It has nothing to do with a possible breach which is clearly excluded. |
| Ulrich Apr. 2024 | 58:11-17 | R - Affirm | Lack of relevance, and 403.  The question in this case is not generally whether eCW's software is "secure."  The security issues have to tie back to certification requirements.  The IA report statement is thus not relevant, and it should also be excluded under 403.  The reference to "significant patient safety risk" should also be excluded under 403. | This testimony relates to the SQOO's conclusion that eCW's software "cannot and should not be considered secure" for a number of reasons including lax vulnerability remediation timelinse, lack of accountability, etc. This demonstrates eCW's ineffective processes and procedures and refusal to acknowledge issues in its software. This is relevant to establish intent and repeated notice of alarming issues that it chose not to fix. Security issues presented at trial will all be tied to certification requirements by Relators' certification expert. Testimony about "significant patient safety risk" is just a conclusion reached by the SQOO. It has nothing to do with a possible breach which is clearly excluded. |

| | | | | |
|---|---|---|---|---|
| Ulrich Apr. 2024 | 60:6-25 | E - Counter (only if 61:1-19 objection is denied) | Relevance (FRE 401 and 403). Mr. Ulrich's testimony that some of his medical providers use eCW and whether that is concerning to him in light of eCW's security lapses is not relevant to any issue in this case. | If Relators are permitted to play 61:1-19 (in which Ulrich is asked to comment on a generic finding that eCW's software "cannot be considered secure"), then 60:6-25 provides context that will aid the jury's understanding of what the SQOO (led by Ulrich at the time) meant by that finding. |
| Ulrich Apr. 2024 | 61:1-19 | R - Affirm | Lack of relevance, and 403.  The question in this case is not generally whether eCW's software is "secure."  The security issues have to tie back to certification requirements.  The IA report statement is thus not relevant, and it should also be excluded under 403.  The reference to "significant patient safety risk" should also be excluded under 403. | This testimony relates to the SQOO's conclusion that eCW's software "cannot and should not be considered secure" for a number of reasons including lax vulnerability remediation timelinse, lack of accountability, etc. This demonstrates eCW's ineffective processes and procedures and refusal to acknowledge issues in its software. This is relevant to establish intent and repeated notice of alarming issues that it chose not to fix. Security issues presented at trial will all be tied to certification requirements by Relators' certification expert. This portion of testimony does not reference "significant patient safety risk". |
| Ulrich Apr. 2024 | 61:22 – 63:10 | R - Affirm | | |
| Ulrich Apr. 2024 | 63:18 – 64:02 | R - Affirm | | |
| Ulrich Apr. 2024 | 64:13-67:15 | R - Affirm | Lack of relevance, 403.  We do not believe the portions of the Baseline report being discussed in these passages relate to the security issues raised in the qui tam complaint. | This testimony discusses the SQOO's conclusion that it could not say whether there remained security related certification issues in eCW's software because scope of eCW's certification testing was limited and the SQOO thought eCW could do a better job. It also discusses the SQOO's conclusion that eCW did not maintain clear and useful documentation. Both of these lines of questioning go directly to eCW's certification processes and issues inherent in eCW's certification and attestation process. This case is not just about security issues in eCW's software, it is also about eCW's certification and attestation process. |
| Ulrich Apr. 2024 | 71:16 – 75:13 | R - Affirm | Lack of relevance, 403.  We do not believe the portions of the Baseline report being discussed in these passages relate to the security components of the EHR software or the security-responsible personnel. | This testimony discusses the SQOO's concerns that eCW didn't have the right resources and personnel to handle the work that was needed, including that employees had conflicting priorities and weren't empowered to bring up issues. This demonstrates eCW's insular management structure and its ineffective processes related to resolving identified issues. Both issues impacted eCW's certification and attestation process and are relevant to demonstrate falsity and notice. |

| Ulrich Apr. 2024 | 78:15 – 94:18 | R - Affirm | For 78:24-82:9: Lack of relevance, 403.  The conversation with Mr. Jaiswal had nothing to do with any security-related issues raised in the qui tam complaint, and we do not think that QP's lay opinion about Mr. Jaiswal's qualifications is admissible.  We think the jury can decide for itself whether Mr. Jaiswal was qualified to serve in his position and, if not, what the relevance of that is. For 82:22-83:14: Lack of relevance, 403.  These lines discus a supposed security incident that has nothing to do with certification or the issues raised in the qui tam. For 83:20-85:25: Lack of relevance, 403.  These lines relate to supposed security issues that do not necessarily relate to certification and are not the security issues raised in relators' complaint. | 78:24-82:9 relates to the SQOO's concerns relating to Mr. Jaiswal, eCW's AppSec Director, specifically that he needed to be proactive in understanding industry standards and best practices instead of just waiting for the SQOO to tell him what to do. Mr. Ulrich worked with Mr. Jaiswal for years when he made this conclusion and was in the best position to determine if Mr. Jaiswal was qualified for his role. This testimony demonstrates eCW's insular management structure and how the AppSec department was not equipped to design the software in ways that did not result in certification non-conformities or to correct identified issues which Relators contend did impact eCW's certification and attestation process. 82:22-83:14 discusses an incident where malware was found on eCW's production system and eCW removed it without properly investigating it in the SQOO's opinions. This demonstrates eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. 83:20-85:25 discusses the April 2019 systemic issues memo the SQOO sent to the gov't that noted concerns about eCW including how they responded to and attempted to fix szecurity issues raised, issues with eCW's management structure, and issues with eCW's policies and procedures. Again, all of this demonstrates eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. |
| Ulrich Apr. 2024 | 95:15-98:20 | R - Affirm | Lack of relevance, 403.  These line of questioning pertains to the "OWASP Top 10," which does not overlap with the certification-related issues that the case is about. | This testimony discusses an instance where eCW stated in completed an IA recommendation and the SQOO was not able to validate that eCW had actually completed it. Mr. Ulrich makes clear that the SQOO did not conclude that it found all of these vulnerabilities existed, just that it couldn't confirm eCW's statement that it had resolved all OWASP Top 10 vulnerabilities. This is relevant to eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. |

| Ulrich Apr. 2024 | 100:13– 126:22 | R - Affirm | For 100:13-102:24: Lack of relevance, 403.  We do not believe the portions of the Baseline report being discussed in these passages relate to the security issues raised in the qui tam complaint.  In addition, the discussion about the Contrast tool's assessment of open vulnerabilities is misleading because it is known that Contrast provides false positives. For 103:19-104:18, 106:3-107:15: Lack of relevance, 403.  These SQOO critiques do not necessarily relate to the security issues in the qui tam complaint, security issues generally, or even certification issues generally. For 107:16-109:18: Lack of relevance, 403.  These passages related to the stipulated penalties demand, which is akin to an unproven allegation of non-compliance with the CIA.  The OIG already has stated that the stipulated penalties demand had nothing to do with alleged violations of the security-related certification requirements. For 109:19-117:6: Lack of relevance, 403, 404(b).  These passages relate to a totally unproven allegation made by an anonymous reporter, punctuated by Mr. Ulrich agreeing that there would always be a generic "concern" that someone might be being dishonest.  We do not think any of that is relevant, and it is unduly prejudicial and confusing to the jury.  Allegations of collateral dishonesty are barred by Rule 404(b) unless proven by a preponderance, which these allegations are not. For 117:17-123:1: Lack of relevance, 403.  The "Expressions of Concern" document had nothing to do with the allegations in the qui tam complaint, and this seems to just be an excuse to inject into the case that the SQOO made assertions that eCW's software was unsafe, which we think the judge has clearly disallowed. For 124:4-6, 124:9-14: Lack of relevance, 403.  We think these passages relate to portions of the RG letter that must be | 100:13-102:24 discusses an instances where eCW stated in completed an IA recommendation and the SQOO was not able to validate that eCW had actually completed it. Mr. Ulrich makes clear that the SQOO did not conclude that it found all of these vulnerabilities existed, just that it couldn't confirm eCW's statement that it had resolved all OWASP Top 10 vulnerabilities. This is relevant to eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. 103:19-104:18 and 106:3-107:15 relate to the SQOO's concerns with eCW's progress in resolving IA recommendations and that eCW was not resolving recommendations in a way that would establish a strong foundation moving forward. This is relevant to eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. 107:16-109:18 discusses how one of the reasons that OIG issued stipulated penalties was because of the SQOO's concerns with how eCW was responding to its recommendations. That is relevant to materiality and goes to show that the gov't was very concerned with eCW fixing any security problems identified and working with the SQOO to improve its processes. 109:19-117:6 discusses the SQOO's memos to Felicia Heimer about two allegations of eCW falsifying and destroying reports and records in its work with the SQOO. This testimony is not offered to prove that eCW falsified records it gave to the SQOO but to show that the SQOO had concerns about whether eCW was being entirely forthcoming in its dealings with the SQOO. This is relevant to eCW's inefficient and ineffective process for addressing issues raised |
| Ulrich Apr. 2024 | 126:23-127:7 | E - Counter | | |

| | | | | |
|---|---|---|---|---|
| Ulrich Apr. 2024 | 127:8 —141:7 | R - Affirm | For 132:24-133:5: Lack of relevance, 403.  Mr. Ulrich answered that he did not know who reviewed the RG letter.  There is no reason these passages are necessary for any point, other than to raise that the letter was from Mr. Katz, which is something that we are asking the Court to prohibit. For 135:13-138:3: Lack of relevance, 403. This is a conversation between the lawyers regarding whether Mr. Ulrich could testify re: the settlement agreement.  We fail to see the relevance, and it seems to be trying to mislead the jury into believing that eCW was seeking to block Mr. Ulrich from testifying re: the settlement agreement. | 132:24-133:5: This testimony is relevant to show that ONC did not remove the SQOO despite allegations of racism from eCW. eCW also gets to choose its counsel, that is has chosen Mr. Katz to serve in this dual role has been flagged by the Court multiple times. That Mr. Katz represented eCW in its dealings with the gov't is relevant given he is now defending eCW here as well. It demonstrates eCW's intent in that it continues to hire the same people in its defense (Mr. Katz, Mr. Meadors) that it has already used to avoid consequences earlier and demonstrates their lack of accountability to fixing its root issues that render its product uncertifiable. 135:13-138:3 discusses the Quandary Peak and eCW settlement agreement and whether Mr. Ulrich was allowed to testify to such at his deposition or if eCW would enforce the confidentiality provision against him. The Court has already ruled this settlement is relevant and admissible. It goes to both materiality and intent. Initially, eCW's counsel objected to Mr. Ulrich's testimony based on confidentiality, but then agreed not to enforce the confidentiality provision if Mr. Ulrich's testimony was limited to specific confines. It is absolutely relevant for the jury to hear how eCW was dictating what Mr. Ulrich was allowed to about the settlement at his deposition. It goes to their intent in deceiving not just the gov't over the years but also the Relators by trying to hide information about the SQOO's work and only releasing that which they are forced to. |
| Ulrich Apr. 2024 | 143:15 – 148:20 | R - Affirm | | |
| Ulrich Apr. 2024 | 149:5-9 | R - Affirm | | |
| Ulrich Apr. 2024 | 149:10-150:8 | E - Counter | | |
| Ulrich Apr. 2024 | 150:9-16 | R - Affirm | | |
| Ulrich Apr. 2024 | 150:17-151:5 | E - counter | | |
| Ulrich Apr. 2024 | 152:14-23 | R - Affirm | | |
| Ulrich Apr. 2024 | 152:24-155:2 | E - counter | | |
| Ulrich Apr. 2024 | 156:2-18 | R - Affirm | | |
| Ulrich Apr. 2024 | 156:19-161:13 | E- counter | Relators have removed their objection to this testimony. Relators will note however that eCW has objected to testimony about Mr. Ulrich's background on the basis that he is not an expert. However, in the testimony designated here and in the line below, eCW sought to itself establish that the SQOO team was considered experts in the certification criteria. So, what is good for the goose is good for the gander. If eCW wants to introduce evidence that the SQOO team, including Mr. Ulrich, were experts, then it cannot also seek to exclude testimony on that same basis. | eCW has objected to the testimony regarding Ulrich's background because it seeks to connect him with DOJ and Ropes & Gray in a way that eCW contends is misleading and irrelevant (he testified that he was engaged in a prior matter).  Establishing that SQOO team members were experts in security is directly relevant to whether the SQOO (and by extension the government agencies to which the SQOO reported its findings) were capable of having knowledge of the alleged security vulnerabilities in eCW's software, which is one of the Bibby materiality factors.  Relators are comparing apples and oranges here. |
| Ulrich Apr. 2024 | 161:15 – 163:22 | R - Affirm | | |
| Ulrich Apr. 2024 | 164:23-171:8 | E - counter (only if objection to 113:12-117:11 denied) | | |
| Ulrich Apr. 2024 | 171:9-24 | R - Affirm | | |
| Ulrich Apr. 2024 | 171:25-172:7 | E - counter | | |

| Ulrich Apr. 2024 | 172:8 – 174:15 | R - Affirm | | |
|---|---|---|---|---|
| Ulrich Apr. 2024 | 174:16-175:11 | E - counter | | |
| Ulrich Apr. 2024 | 175:12 – 177:9 | R - Affirm | | |
| Ulrich Apr. 2024 | 177:11-24 | R - Affirm | | |
| Ulrich Apr. 2024 | 178:1 – 181:16 | R - Affirm | | |
| Ulrich Apr. 2024 | 181:18-21 | R - Affirm | | |
| Ulrich Apr. 2024 | 181:23 – 182:19 | R - Affirm | | |
| Ulrich Apr. 2024 | 188:10-192:11 | E - counter | 190:11-191:1, 191:2-16: lack of personal knowledge, lack of foundation, speculation (FRE 602). Mr. Ulrich does not work for the ONC and has never worked for the ONC. He can't speak to what the ONC can or would do. This testimony is also duplicative of testimony eCW is likely to receive from ONC; 191:17-192:2: lack of foundation, lack of personal knowledge (FRE 602). Mr. Ulrich does not work for Drummond or an ACB and never has. He cannot speak to what Drummond can or would do. eCW can't replace testimony from Drummond with that of Mr. Ulrich. | eCW is agreeable to withdrawing 191:2-191:16. The balance of these designations speak for itself. Mr. Ulrich does not claim lack of personal knowledge with respect to the answers to the questions. Instead, he answers them clearly and directly (and correctly). |
| Ulrich Apr. 2024 | 192:12 – 193:9 | R - Affirm | | |
| Ulrich Apr. 2024 | 193:10-194:25 | E - counter | | |
| Ulrich Apr. 2024 | 195:12-196:9 | E - counter | | |
| Ulrich Apr. 2024 | 196:10 – 197:19 | R - Affirm | For 196:17-197:19: Lack of relevance, 403. This is just Mr. Ulrich engaging in stream of consciousness exposition that he would never know whether someone was lying to the SQOO. The unfounded implication is that individuals were not being honest with the SQOO. This is not appropriate testimony, as it is wholly speculative. | 196:17-197:16 discusses the SQOO's role when working with eCW and how it approaches interacting with eCW employees. eCW has signaled it plans to present evidence of the SQOO's "unprofessional" and "racist" behavior, so this testimony is directly relevant to what the SQOO believed its role was and how it viewed its interactions with eCW employees. |
| Ulrich Apr. 2024 | 198:12-22 | E- counter | | |
| Ulrich Apr. 2024 | 201:19-25 | E - counter | | |
| Ulrich Apr. 2024 | 202:15-203:6 | E - counter | | |
| Ulrich Apr. 2024 | 203:25-212:25 | E - counter | | |
| Ulrich Apr. 2024 | 214:9-14 | R - Affirm | | |
| Ulrich Apr. 2024 | 214:21 – 221:17 | R - Affirm | | |
| Ulrich Apr. 2024 | 221:19-24 | R - Affirm | | |
| Ulrich Apr. 2024 | 222:1 – 223:24 | R - Affirm | | |
| Ulrich Apr. 2024 | 224:8-225:19 | E - counter | | |
| Ulrich Apr. 2024 | 226:1-227:24 | E - counter | | |
| Ulrich Apr. 2024 | 228:12-229:25 | E - counter | Misstates the record (FRE 403). Mr. Wright left the SQOO team in early 2020 just a few months after the email that is the subject of this line of questioning. This line of questioning suggests the Mr. Wright could've raised issues with the ONC that were raised in security chapters that weren't released until after his departure from the SQOO team. 229:1-17: lack of foundation and calls for speculation (FRE 602). Mr. Ulrich cannot speak to what Mr. Wright may or may not have done. eCW can call Mr. Wright if they'd like testimony on what he would have done. | The factual record is clear that Adam Wright left the SQOO project voluntarily shortly after January 2020 because of competing duties at Vanderbilt University. eCW previously produced several documents to relators showing them this fact. Neither the question nor Mr. Ulrich's answer misstate the record in any way. The Q&A to which relators make a foundation objection simply ask Ulrich to confirm that Adam Wright had the ability to confer with other SQOO team members while on the project, which Ulrich clearly has personal knowledge of. |
| Ulrich Apr. 2024 | 231:8-231:23 | E - counter | | |
| Ulrich Apr. 2024 | 233:18-236:11 | E - counter | | |
| Ulrich Apr. 2024 | 240:3-244:22 | E - counter | | |

| | | | | |
|---|---|---|---|---|
| Ulrich Apr. 2024 | 245:25 –273:2 | R - Affirm | For 261:15-263:19: Lack of relevance, 403.  The implication of this testimony seems to be that I (or RG on a matter that I led) retained QP or Mr. Ulrich, which (if true) is designed to bolster Mr. Ulrich's credibility.  This is improper.  It also is untrue that I (or RG) retained Mr. Ulrich on the matter that I led.  Hogan Lovells' partner Ginny Gibson retained him, without any input by RG and before RG even was engaged on the matter. For 265:23-273:2: Lack of relevance, 403, 404(b).  As stated previously, deposition testimony that relates to the unproven allegations of falsified security reports are not admissible. | 261:15-263:19 discusses a prior engagement Mr. Ulrich worked on where Ropes & Gray was involved. This testimony is relevant to Mr. Ulrich's background and experience as well as his credibility. eCW appears to make a factual argument that Mr. Ulrich was not retained by Ropes & Gray, but that evidence is not in the record. If eCW wants to attempt to introduce that at trial, it can try to do so in an admissible way. But Mr. Ulrich's testimony about his prior experience is relevant. 265:23-273:2 discusses the SQOO's interactions with eCW and whether it believed eCW was engaging with the SQOO truthfully. This is directly relevant to the SQOO's relationship with eCW which eCW has signaled its intention to put on trial. The SQOO's opinion on eCW's approach to handling the SQOO's recommendations and how eCW engaged with the SQOO is also relevant to intent. It demonstrates eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. |
| Ulrich Apr. 2024 | 273:5-15 | R - Affirm | 403. We think this brief colloquy could confuse the jury into believing that there was some other opportunity for SQOO to make a determination about whether eCW violated the False Claims Act. We do not object to 273:17-21 going in, but we assume that Relators would not seek to admit those portions without 273:5-16. | eCW is going to play questions it asked Mr. Ulrich about whether he ever told the DOJ that the security vulnerabilities raised by the Relators were certification nonconformities. eCW is attempting to suggest that because the SQOO didn't tell the DOJ that these were certification nonconformities that Relators must not have a case. Mr. Ulrich's testimony clarifying that the SQOO's discussions with the DOJ about vulnerabilities was not intended as an assessment of whether this is a viable FCA case is therefore relevant. |
| Ulrich Apr. 2024 | 274:6 – 276:9 | R - Affirm | Lack of relevance, 403, 404(b).  This questioning relates to a topic that we believe is inadmissible (the unproven, anonymous allegations of falsified security reports).  If the Court overrules our objections to this topic of questioning being admitted, we may ask that 274:6-276:9 be included, however. | This testimony relates to the allegations that eCW was falsifying records in its work with the SQOO. This testimony is relevant to demonstrate eCW's relationship with the SQOO which it has signaled it will put on trial. This testimony is also not offered to prove that eCW falsified records it gave to the SQOO but to show that the SQOO had concerns about whether eCW was being entirely forthcoming in its dealings with the SQOO. This is relevant to eCW's inefficient and ineffective process for addressing issues raised which Relators will show impacted eCW's certification and attestation process. |

| Parties' Consolidated Deposition Designations and Objections for May 2024 Deposition of Matt Lewis | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Lewis May 2024 | 6:3-11 | R - Affirm | | |
| Lewis May 2024 | 7:25 – 8:2 | R - Affirm | | |
| Lewis May 2024 | 14:24 – 15:04 | R - Affirm | | |
| Lewis May 2024 | 17:3-18:17 | R - Affirm | | |
| Lewis May 2024 | 19:08 – 19:19 | R - Affirm | | |
| Lewis May 2024 | 21:6- 27:23 | R - Affirm | 27:9-13.  Prior MIL ruling.  These lines make a specific reference to Delaney as a False Claims Act settlement. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. |
| Lewis May 2024 | 29:12- 31:13 | R - Affirm | 29:12-30:1. Lack of relevance, prior MIL ruling.  These passages ask Lewis to opine on whether eCW is a "well-functioning company." | Nothing in the Court's MIL ruling prohibits Relators from introducing evidence of eCW's management structure and operations. In fact, the Court noted that Relators can introduce evidence of "management issues" as long as Relators directly relate these management issues to specific problems that are relevant to eCW's certification. Which is what Relators intend to do with this testimony. They will put in evidence of how the company was run and its culture and explain how that impacted eCW's ability to truthfully attest to complying with the certification requirements. |
| Lewis May 2024 | 57:9-58:5 | R - Affirm | 57:9-58:5.  Lack of relevance, 403.  Whether Paul Diettrich was vocal about certain security issues that are not connected to the issues raised in the qui tam complaint is not relevant. | This testimony is relevant to eCW's corporate structure and culture. Specifically, its culture for discouraging employees from raising issues and either punishing them or ignoring them whenever issues were raised - especially security issues like Mr. Dittrich often raised. Relators will use this evidence to show how the company's management and culture impacted eCW's ability to truthfully attest to complying with the certification requirements. |
| Lewis May 2024 | 65:1-16 | R - Affirm | 65:1-16. Lack of relevance, 403.  The questions insinuate that eCW should share the results of penetration tests with customers. Whether eCW does or does not share the results of penetration tests with customers is not probative of any issue in the case, and the questions would confuse the jury into believe that eCW has some sort of obligation to do so. | This line of questioning demonstrates that eCW does both internal and external penetration testing. It will be used to demonstrate that eCW had notice of the security vulnerabilities in its software not just from Relators, but from its own internal team and third-parties. eCW has stated its intention to question Relators about their participation in one SRA for their customers to determine why Relators did not share information about the vulnerabilities they had identified. What's good for the goose is good for the gander. Relators should also be able to present evidence that eCW also didn't share this information with its own customers, for much of the same reasons that Relators chose not to. |

| Lewis May 2024 | 67:05-70:23 | R - Affirm | 67:05-70:23. Lack of relevance, 403. This case is not about the patient portal, or about the supposed vulnerability discussed in this communication between Lewis and Strug. Moreover, without providing further context for the jury, the exchange will just cause jury confusion. | This line of questioning is relevant for two reasons. First, it includes a discussion between eCW employees about how they could not share vulnerability scan results with a customer. eCW has stated its intention to question Relators about their participation in one SRA for their customers to determine why Relators did not share information about the vulnerabilities they had identified. What's good for the goose is good for the gander. Relators should also be able to present evidence that eCW also didn't share this information with its own customers, for much of the same reasons that Relators chose not to. Second, it includes a discussion between eCW employees about how a vulnerability had existed for "far too long" and needed to be remediated. This is relevant to eCW lack of accountability and refusal or inability to fix vulnerabilities in an appropriate time. Which is something Relators have said, the SQOO has said, and eCW's employees have now said in this testimony. This demonstrates notice and intent. |
| Lewis May 2024 | 71:18 –78:4 | R - Affirm | Lack of relevance, 403, improper lay opinion. There is no evidence that Nainil Chedha is responsible for ONC attestations, certification testing, or any of the alleged vulnerabilities at issue in the qui tam complaint. That Chedha has a role in security at the company does not relevant a fellow employee's personal opinion of his qualifications. There also is a lack of foundation that the fellow employee's opinion of Chedha is an admissible lay opinion. There likewise is a lack of foundation for a lay opinion on the other employees discussed in these communications. | It is not "improper lay opinion" for an employee to discuss his personal opinion on whether a coworker is qualified for their position. Mr. Lewis testified that he worked with Mr. Chheda for 13 or 14 years when he made statements that Mr. Chheda was unqualified for his role, that is an appropriate foundation for his to offer his personal opinion. Testimony from an eCW employee that Mr. Chheda, eCW's CISO, was unqualified is relevant to eCW's corporate management and structure. Relators will introduce evidence, both from eCW's own employees and the SQOO, the eCW did not have the right personnel in place and had a corporate culture of hiring from within even if employees lacked appropriate qualifications. Relators will also introduce evidence of how this management structure impacted eCW's ability to truthfully attest to meeting the certification requirements. This testimony is also based on a document produced by eCW in this litigation that is a communication between Mr. Lewis and another eCW employee. |

| Lewis May 2024 | 78:16 –81:21 | R - Affirm | Lack of relevance, 403, improper lay opinion. There is no evidence that Nainil Chedha is responsible for ONC attestations, certification testing, or any of the alleged vulnerabilities at issue in the qui tam complaint.  That Chedha has a role in security at the company does not relevant a fellow employee's personal opinion of his qualifications.  There also is a lack of foundation that the fellow employee's opinion of Chedha is an admissible lay opinion.  There likewise is a lack of foundation for a lay opinion on the other employees discussed in these communications. | It is not "improper lay opinion" for an employee to discuss his personal opinion on whether a coworker is qualified for their position. Mr. Lewis testified that he worked with Mr. Chheda for 13 or 14 years when he made statements that Mr. Chheda was unqualified for his role, that is an appropriate foundation for his to offer his personal opinion. Testimony from an eCW employee that Mr. Chheda, eCW's CISO, was unqualified is relevant to eCW's corporate management and structure. Relators will introduce evidence, both from eCW's own employees and the SQOO, the eCW did not have the right personnel in place and had a corporate culture of hiring from within even if employees lacked appropriate qualifications. Relators will also introduce evidence of how this management structure impacted eCW's ability to truthfully attest to meeting the certification requirements. This testimony is also based on a document produced by eCW in this litigation that is a communication between Mr. Lewis and another eCW employee. |
| Lewis May 2024 | 82:3-86:8 | R - Affirm | Lack of relevance, 403, improper lay opinion. There is no evidence that Nainil Chedha is responsible for ONC attestations, certification testing, or any of the alleged vulnerabilities at issue in the qui tam complaint.  That Chedha has a role in security at the company does not relevant a fellow employee's personal opinion of his qualifications.  There also is a lack of foundation that the fellow employee's opinion of Chedha is an admissible lay opinion.  There likewise is a lack of foundation for a lay opinion on the other employees discussed in these communications. | It is not "improper lay opinion" for an employee to discuss his personal opinion on whether a coworker is qualified for their position. Mr. Lewis testified that he worked with Mr. Chheda for 13 or 14 years when he made statements that Mr. Chheda was unqualified for his role, that is an appropriate foundation for his to offer his personal opinion. Testimony from an eCW employee that Mr. Chheda, eCW's CISO, was unqualified is relevant to eCW's corporate management and structure. Relators will introduce evidence, both from eCW's own employees and the SQOO, the eCW did not have the right personnel in place and had a corporate culture of hiring from within even if employees lacked appropriate qualifications. Relators will also introduce evidence of how this management structure impacted eCW's ability to truthfully attest to meeting the certification requirements. This testimony is also based on a document produced by eCW in this litigation that is a communication between Mr. Lewis and another eCW employee. |
| Lewis May 2024 | 140:7-142:24 | R - Affirm | | |
| Lewis May 2024 | 154:14-156:14 | E - Counter | | |
| Lewis May 2024 | 157:17-158:25 | E - Counter (only if objection to designations on the chats/emails re: Nainil Chheda denied) | | |
| Lewis May 2024 | 167:8-168:12 | E - Counter | | |
| Lewis May 2024 | 172:3-175:25 | E - Counter | | |
| Lewis May 2024 | 180:2-181:5 | E - Counter | | |

| | | | | |
|---|---|---|---|---|
| Lewis May 2024 | 185:16-189:22 | E - Counter | 187:22-189:22: relevance (FRE 401) and subject to the Court's prior MIL rulings. Whether eCW's software has been breached and what eCW purportedly does to protect its software from breach, including evidence of compensating controls is not admissible. This testimony discusses mitigating controls eCW has in place for its software which is not relevant. Whether eCW has mitigating controls in place that may stop the exploitation of a vulnerability does not have any impact on whether eCW's software complied with the certification requirements. Portions of this testimony also discuss malicious actors, hackers exploiting the system, and the exploitability of vulnerabilities which is inadmissible under the Court's MIL rulings. | Mr. Lewis was providing this information specifically for purposes of responding to the DOJ with respect to DOJ's December 2018 letter to eCW.  If relators are permitted to introduce the DOJ's December 2018 letter, eCW must be able to introduce evidence about what it did to respond informationally to DOJ's letter. Otherwise, the jury would be left with a misleading impression that eCW did not endeavor to provide to DOJ the information that DOJ specifically requested in its letter. |
| Lewis May 2024 | 190:17-197:25 | E - Counter | 191:25-194:11, 195:3-16, 196:17 (starting at "thus)-19, 197:14-25: relevance (FRE 401) and subject to the Court's prior MIL rulings. Whether eCW's software has been breached and what eCW purportedly does to protect its software from breach, including evidence of compensating controls is not admissible. This testimony discusses mitigating controls eCW has in place for its software which is not relevant. Whether eCW has mitigating controls in place that may stop the exploitation of a vulnerability does not have any impact on whether eCW's software complied with the certification requirements. Portions of this testimony also discuss malicious actors, hackers exploiting the system, and the exploitability of vulnerabilities which is inadmissible under the Court's MIL rulings. | Mr. Lewis was providing this information specifically for purposes of responding to the DOJ with respect to DOJ's December 2018 letter to eCW.  If relators are permitted to introduce the DOJ's December 2018 letter, eCW must be able to introduce evidence about what it did to respond informationally to DOJ's letter. Otherwise, the jury would be left with a misleading impression that eCW did not endeavor to provide to DOJ the information that DOJ specifically requested in its letter. |
| Lewis May 2024 | 201:11-205:2 | E - Counter (only if objection to designations re: the Dittrich communications denied) | | |
| Lewis May 2024 | 207:23-209:14 | E - Counter (only if objection to designations re: communications with Susan Strug denied) | | |
| Lewis May 2024 | 211:4-214:9 | E - Counter (only if objection to designations re: the Dittrich communications denied) | | |
| Lewis May 2024 | 245:15-248:13 | E - Counter | | |
| Lewis May 2024 | 251:17-255:9 | E - Counter | | |
| Lewis May 2024 | 255:20-259:12 (ending at "they would do that.") | R - Reply | | |
| Lewis May 2024 | 271:11-273:24 | R - Reply | | |
| Lewis May 2024 | 277:4-13 | R - Reply | | |

| Parties' Consolidated Deposition Designations and Objections for May 2024 Deposition of Ajit Dhavle | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Dhavle May 2024 | 8:13 – 9:21 | R - Affirm | | |
| Dhavle May 2024 | 13:3-19 | R - Affirm | | |
| Dhavle May 2024 | 17:7-22 | E - Counter | | |
| Dhavle May 2024 | 18:23 – 19:08 | R - Affirm | | |
| Dhavle May 2024 | 20:12-21:04 | R - Affirm | | |
| Dhavle May 2024 | 21:15-24:19 | R - Affirm | | |
| Dhavle May 2024 | 24:21 – 25:11 | R - Affirm | | |
| Dhavle May 2024 | 25:24 – 30:1 | R - Affirm | 28:14-29:1: Lack of foundation, 403.  The question embeds an untrue fact, which is that the settlement agreement "barred Mr. Ulrich, Mr. Wright, Mr. Sittig, and Mr. Flaum from initiating communications about eClinicalWorks with the ONC or OIG or DOJ." | 28:14-29:1 discusses how the QP-eCW settlement agreement prohibited the removed members from talking to the DOJ, ONC, or OIG about eCW. This is clearly relevant to materiality, intent, and eCW's relationship with the SQOO. This is also not an untrue fact as eCW alleges. Under prohibited activities in the individual settlement agreements with the removed SQOO members, the Subject Individual agrees not to "initiate any Restricted Communications with the [OIG], the [ONC], the [DOJ] or any other government agency." Restricted Communications is defined as confidential work performed while with the SQOO, any opinions of or views about eCW, eCW personnel, or the Engagement. |
| Dhavle May 2024 | 30:3 – 31:11 | R - Affirm | | |
| Dhavle May 2024 | 31:12-32:16 | E - Counter | | |
| Dhavle May 2024 | 32:17 – 39:15 | R - Affirm | | |
| Dhavle May 2024 | 40:9 – 41:16 | R - Affirm | | |
| Dhavle May 2024 | 42:20 – 45:01 | R - Affirm | | |
| Dhavle May 2024 | 45:12- 48:13 | R - Affirm | | |
| Dhavle May 2024 | 50:22 – 51:25 | R - Affirm | | |
| Dhavle May 2024 | 52:23 – 53:11 | R - Affirm | | |
| Dhavle May 2024 | 55:5-15 | R - Affirm | | |
| Dhavle May 2024 | 56:8-24 | R - Affirm | | |
| Dhavle May 2024 | 57:1 – 61:25 | R - Affirm | | |
| Dhavle May 2024 | 62:2-23 | R - Affirm | | |
| Dhavle May 2024 | 62:25 – 68:4 | R - Affirm | | |
| Dhavle May 2024 | 68:15-21 | R - Affirm | | |
| Dhavle May 2024 | 68:23 – 69:8 | R - Affirm | | |
| Dhavle May 2024 | 69:25 – 70:15 | R - Affirm | | |
| Dhavle May 2024 | 70:17- 20 | R - Affirm | | |
| Dhavle May 2024 | 72:13 – 77:22 | R - Affirm | Lack of relevance, 403, 404(b).  We do not see any relevance to the Amber Asaro accusations or resignation.  To the extent the implication is that the company had acted improperly toward her, those allegations are both irrelevant and unproven (and thus inadmissible under 404(b)). | The Amber Asaro allegations are relevant to eCW's management structure and its corporate culture that discourage employees from reporting issues or raising criticisms. This structure and corporate culture directly impacted eCW's certification, attestation, and application security processes and procedures. |
| Dhavle May 2024 | 78:17 – 80:13 | R - Affirm | Lack of relevance, 403, 404(b).  We do not see any relevance to the Amber Asaro accusations or resignation.  To the extent the implication is that the company had acted improperly toward her, those allegations are both irrelevant and unproven (and thus inadmissible under 404(b)). | The Amber Asaro allegations are relevant to eCW's management structure and its corporate culture that discourage employees from reporting issues or raising criticisms. This structure and corporate culture directly impacted eCW's certification, attestation, and application security processes and procedures. |

| Dhavle May 2024 | 81:1 – 82:25 | R - Affirm | Lack of relevance, 403.  This questioning is entirely focused on patient safety issues that have no clear relationship with the security certification issues that are at issue for the jury. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. |
| --- | --- | --- | --- | --- |
| Dhavle May 2024 | 84:15 – 85:5 | R - Affirm | Lack of relevance, 403.  This questioning is entirely focused on patient safety issues that have no clear relationship with the security certification issues that are at issue for the jury. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. |
| Dhavle May 2024 | 86:16 – 87:2 | R - Affirm | Lack of relevance, 403.  This questioning is entirely focused on patient safety issues that have no clear relationship with the security certification issues that are at issue for the jury. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |
| Dhavle May 2024 | 87:20 – 90:25 | R - Affirm | Lack of relevance, 403.  This questioning is entirely focused on patient safety issues that have no clear relationship with the security certification issues that are at issue for the jury. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |

| Dhavle May 2024 | 94:9– 97:22 | R - Affirm | Lack of relevance, 403. These questions and documents pertain to reportable events that have nothing to do with the security-related certification issues at issue in the case.  The jury will be misled and confused.  If the Relators' point is that the ONC was unable to take action on Relators' security-related allegations because the agency was too focused on other reportable events, it should seek to lay that foundation with Steve Posnack. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |
| Dhavle May 2024 | 99:9-15 | R - Affirm | Lack of relevance, 403.  These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | This testimony is relevant to demonstrating that eCW did not lack for resources and could have addressed patient safety issues and security issues at the same time. eCW has argued that it had to prioritize responding to patient safety issues and that is one reason it was unable to resolve the security issues quickly. Mr. Dhavle's testimony directly contradicts that. |
| Dhavle May 2024 | 99:17-24 | R - Affirm | Lack of relevance, 403.  These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | This testimony is relevant to demonstrating that eCW did not lack for resources and could have addressed patient safety issues and security issues at the same time. eCW has argued that it had to prioritize responding to patient safety issues and that is one reason it was unable to resolve the security issues quickly. Mr. Dhavle's testimony directly contradicts that. |
| Dhavle May 2024 | 100:1 | R - Affirm | Lack of relevance, 403.  These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | This testimony is relevant to demonstrating that eCW did not lack for resources and could have addressed patient safety issues and security issues at the same time. eCW has argued that it had to prioritize responding to patient safety issues and that is one reason it was unable to resolve the security issues quickly. Mr. Dhavle's testimony directly contradicts that. |
| Dhavle May 2024 | 100:3-12 | R - Affirm | Lack of relevance, 403.  These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |

| Dhavle May 2024 | 100: 16 – 102:18 | R - Affirm | Lack of relevance, 403. These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |
| Dhavle May 2024 | 102:21 – 105:21 | R - Affirm | Lack of relevance, 403. These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | This testimony is relevant to demonstrate that eCW lacked accountability and did not take recommendations to improve its software seriously which bears on intent. eCW's patient safety board recommended that eCW keep the SQOO on longer than the CIA period to continue addressing issues, but Mr. Dhavle testified that he did not recall anyone ever asking the SQOO to stay on longer. |
| Dhavle May 2024 | 106:9 – 114:13 | R - Affirm | Lack of relevance, 403. These transcript pages relate to software issues that have nothing to do with the security-related issues raised by the qui tam complaint, and they are replete with irrelevant and prejudicial references to patient safety. | This testimony demonstrates that the end of the CIA period, eCW still had several outstanding recommendations. In part because, as the SQOO concluded, eCW failed to allocate sufficient resources to the recommendations. Additionally, the testimony demonstrates that at the end of the CIA period the SQOO still had serious concerns about eCW's software. This is relevant to intent and materiality. It is also relevant to eCW's lack of accountability and refusal to fix the issues in its software. |
| Dhavle May 2024 | 115:10-119:21 | E - Affirm | 118:11-15: lack of foundation (FRE 602), hearsay (FRE 801, 802). Mr. Dhavle cannot speak to why Dr. Hunt was doing anything and anything that Dr. Hunt told him is hearsay; 118:16-24: hearsay (FRE 801, 802), confusing, waste of time (FRE 403). Mr. Dhavle cannot speak to why Dr. Hunt was doing anything and anything that Dr. Hunt told him is hearsay. | This Q&A is not seeking to elicit hearsay from Dr. Hunt. It is seeking to establish why Mr. Dhavle was providing the ONC the information he provided to the ONC. To the extent Mr. Hunt made statements to Mr. Dhavle, his words go to the effect on the listener (Mr. Dhavle). Mr. Dhavle's testimony establishes clearly that the SQOO treated requests from the ONC like "orders from a boss." |
| Dhavle May 2024 | 119:22-122:8 | R - Counter | 119:22-120:24. Lack of foundation. eCW objects because Mr. Dhavle's answer to the questions essentially was that he didn't know. We otherwise do not object to this portion. | This testimony is about an email that was sent to Mr. Dhavle that he was able to review at his deposition. He confirmed that he forward an email from ONC that related to Relators' allegations to the SQOO members who were experienced in security matters. This is relevant to show that Mr. Dhavle, the replacement SQOO team lead after eCW had Mr. Ulrich removed, had no security experience or expertise. This is relevant to intent and materiality. It is also relevant to eCW's relationship with the SQOO and why it wanted to have SQOO members removed. |
| Dhavle May 2024 | 123:4-22 | E - Affirm | | |
| Dhavle May 2024 | 125:6-10 | R - Counter | | |
| Dhavle May 2024 | 126:19-127:10 | E - Affirm | | |
| Dhavle May 2024 | 127:17-128:23 | E - Affirm | | |
| Dhavle May 2024 | 129:2-132:2 | E - Affirm | | |

| | | | | |
|---|---|---|---|---|
| Dhavle May 2024 | 133:23-135:15 | E - Affirm | 134:18-135:7: Compound, confusing, waste of time (FRE 403); lack of foundation (FRE 602); hearsay (FRE 801, 802). Mr. Dhavle cannot speak to what Dr. Hunt felt or believed about the SQOO's work. Anything Dr. Hunt told him is hearsay. | This Q&A does not seek to ask Mr. Dhavle to testify to what Mr. Hunt "felt." It asked Mr. Dhavle to testify to what Mr. Hunt "expressed" to the SQOO, which Mr. Dhavle clearly had personal knowledge of. The purpose of the Q&A is to establish that the SQOO took care to do a good job responding to ONC's informational requests. This is not a waste of time or confusing, but rather goes to the heart of several Bibby materiality factors. |
| Dhavle May 2024 | 136:6-137:3 | E - Affirm | 136:12-18: speculation (FRE 602), confusion, waste of time (FRE 403); witness did not understand the question and did not answer it; 136:19-137:3: lack of foundation, speculation (FRE 602); compound question, confusion, waste of time (FRE 403); failure to meet requirements for habit evidence (FRE 406). Mr. Dhavle cannot speak for OIG or ONC and what they may have done. | This testimony explains, from Mr. Dhavle's personal knowledge, that when information was sent to the OIG, the SQOO's expectation is that it was also sending the information to the ONC (and vice versa). This testimony clarifies for the jury that the SQOO did not perceive itself to be communicating with one agency versus another when only one agency was included in a communication. |
| Dhavle May 2024 | 137:7-22 | R - Counter | | |
| Dhavle May 2024 | 138:12-139:22 | R - Counter | | |
| Dhavle May 2024 | 140:5-141:13 | E - Reply | | |
| Dhavle May 2024 | 141:14-142:14 | R - Counter | | |
| Dhavle May 2024 | 142:17-143:24 | R - Counter | | |
| Dhavle May 2024 | 145:9-146:11 | E - Reply | | |
| Dhavle May 2024 | 149:14-20 | R - Counter | | |
| Dhavle May 2024 | 149:21-150:3 (through "Yes") | E - Reply | | |
| Dhavle May 2024 | 150:14-151:8 | E - Reply | | |
| Dhavle May 2024 | 152:4-153:19 | R - Counter | 152:4-153:14. Lack of relevance, 403. These questions all pertain to patient safety issues that eCW contends are irrelevant and prejudicial. | Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Dhavle's testimony sets up this issue from the SQOO's perspective and provides the necessary background for how much work the SQOO was dealing with just on the patient safety issues. Relators will obtain testimony from ONC related to its perspective on the issue as well. |
| Dhavle May 2024 | 155:10-157:3 | E - Affirm | | |

| Parties' Consolidated Deposition Designations and Objections for August 2025 Deposition of Brad Ulrich | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Ulrich Aug. 2025 | 8:12-9:7 | R - Counter | | |
| Ulrich Aug. 2025 | 15:6-16:2 | E - Affirm | | |
| Ulrich Aug. 2025 | 17:18-18:20 | E - Affirm | | |
| Ulrich Aug. 2025 | 19:17-22 | E - Affirm | | |
| Ulrich Aug. 2025 | 26:15-27:24 | E - Affirm | | |
| Ulrich Aug. 2025 | 29:8-30:13 | E - Affirm | | |
| Ulrich Aug. 2025 | 30:20-32:8 | E - Affirm | | |
| Ulrich Aug. 2025 | 33:5-35:2 | E - Affirm | | |
| Ulrich Aug. 2025 | 36:11-37:7 | E - Affirm | | |
| Ulrich Aug. 2025 | 37:21-40:4 | E - Affirm | | |
| Ulrich Aug. 2025 | 40:21-41:1 | E - Affirm | | |
| Ulrich Aug. 2025 | 42:8-46:5 | E - Affirm | | |
| Ulrich Aug. 2025 | 48:18-50:5 | E - Affirm | | |
| Ulrich Aug. 2025 | 55:13-55:19 | E - Affirm | | |
| Ulrich Aug. 2025 | 55:22-56:9 | E - Affirm | | |
| Ulrich Aug. 2025 | 56:23-57:4 | E - Affirm | | |
| Ulrich Aug. 2025 | 58:23-59:13 | E - Affirm | | |
| Ulrich Aug. 2025 | 62:12-64:8 | E - Affirm | | |
| Ulrich Aug. 2025 | 64:9-65: 18 | R - Counter | | |
| Ulrich Aug. 2025 | 65:19-23 | E - Affirm | | |
| Ulrich Aug. 2025 | 65:24-66:2 | R - Counter | | |
| Ulrich Aug. 2025 | 66:3-9 | E - Affirm | | |
| Ulrich Aug. 2025 | 66:12-67:24 | E - Affirm | | |
| Ulrich Aug. 2025 | 68:2-6 | E - Affirm | | |
| Ulrich Aug. 2025 | 68:15-70:16 | E - Affirm | | |
| Ulrich Aug. 2025 | 70:17-71:4 | R - Counter | | |
| Ulrich Aug. 2025 | 73:16-75:24 | E - Affirm | | |
| Ulrich Aug. 2025 | 75:25-76:18 | R - Counter | | |
| Ulrich Aug. 2025 | 76:19-77:1 | E - Affirm | | |
| Ulrich Aug. 2025 | 77:2-11 | R - Counter | | |
| Ulrich Aug. 2025 | 77:12-23 | E - Affirm | | |
| Ulrich Aug. 2025 | 78:12-80:10 | E - Affirm | | |
| Ulrich Aug. 2025 | 80:11-14 | R - Counter | | |
| Ulrich Aug. 2025 | 81:18-83:13 | E - Affirm | | |
| Ulrich Aug. 2025 | 83:14-17 | R - Counter | | |
| Ulrich Aug. 2025 | 83:18-85:3 | E - Affirm | | |
| Ulrich Aug. 2025 | 85:6-86:6 | R - Counter | | |
| Ulrich Aug. 2025 | 86:9-88:8 | E - Affirm | | |
| Ulrich Aug. 2025 | 88:11-90:11 | R - Counter | | |
| Ulrich Aug. 2025 | 90:12-19 | E - Affirm | | |
| Ulrich Aug. 2025 | 90:20-91:17 | R - Counter | | |
| Ulrich Aug. 2025 | 91:20:00 | R - Counter | | |
| Ulrich Aug. 2025 | 104:21-106:22 | E - Affirm | | |
| Ulrich Aug. 2025 | 106:23-24 | R - Counter | | |
| Ulrich Aug. 2025 | 107:2-109:7 | E - Affirm | | |
| Ulrich Aug. 2025 | 109:12-111:6 | E - Affirm | | |
| Ulrich Aug. 2025 | 111:23-118:12 | E - Affirm | | |

| | | | | |
|---|---|---|---|---|
| Ulrich Aug. 2025 | 120:2-124:16 | E - Affirm | | |
| Ulrich Aug. 2025 | 135:23-138:3 | R - Counter | 136:23-137:17, 137:23-139:4. Argumentative, prior MIL ruling. Most of these questions are argumentative (e.g., asking Mr. Ulrich to opine on a "hostile witness" Rule of Evidence). One portion also injects information about the Delaney settlement that transgresses the Court's MIL ruling and is unnecessary to provide context for Mr. Ulrich's subsequent testimony. | This testimony discusses eCW's treatment of Mr. Ulrich as a hostile witness during his deposition and whether Mr. Ulrich, during his time as the SQOO team leader, viewed his role as hostile to eCW. He testified no. This testimony also discusses the existence of the CIA and how the SQOO was actually engaged by eCW prior to settlement of Delaney and entering the CIA. This testimony is all relevant to eCW's intent, scienter, and materiality. eCW intends to introduce evidence that the SQOO was hostile to eCW and unprofessional. Mr. Ulrich's testimony directly contradicts that. And limited evidence of the existence of the Delaney case, its settlement, and the CIA is admissible per the Court's MIL ruling. Certainly so where it relates to the SQOO's work with eCW and that timeline. |
| Ulrich Aug. 2025 | 138:15 (starting at "The corporate…")-141:6 | R - Counter | 136:23-137:17, 137:23-139:4. Argumentative, prior MIL ruling. Most of these questions are argumentative (e.g., asking Mr. Ulrich to opine on a "hostile witness" Rule of Evidence). One portion also injects information about the Delaney settlement that transgresses the Court's MIL ruling and is unnecessary to provide context for Mr. Ulrich's subsequent testimony. | This testimony discusses the existence of the CIA and how the SQOO was actually engaged by eCW prior to settlement of Delaney and entering the CIA. Limited evidence of the existence of the Delaney case, its settlement, and the CIA is admissible per the Court's MIL ruling. Certainly so where it relates to the SQOO's work with eCW and that timeline. This testimony is relevant to eCW's intent, scienter, and materiality. This testimony also clarifies that Mr. Ulrich stands by certain testimony he offered in his first deposition. The jury is going to hear testimony from both depositions and it is important they understand that nothing Mr. Ulrich did not change his testimony or disavow anything said in his first deposition. |
| Ulrich Aug. 2025 | 141:12-142:9 | R - Counter | 141:7-15. Lack of relevance, 403, prior MIL ruling. The implication is that eCW or its attorneys acted wrongfully by not producing the documents prior to the deposition. This is both incorrect and, even assuming it were correct, has been deemed inadmissible by the judge. 142:4-9: Lack of foundation. These questions assume an incorrect fact, which is that the settlement agreement prohibited Mr. Ulrich from having "further conversations with the DOJ after [he] left the SQOO team as the leader." The "protected activities" provision of the settlement agreement plainly permits Mr. Ulrich to have as many conversations with DOJ as he and DOJ wished. | Relators have withdrawn 141:7-11. 142:4-9 is not based on an incorrect fact. Under prohibited activities in the individual settlement agreements with the removed SQOO members, the Subject Individual agrees not to "initiate any Restricted Communications with the [OIG], the [ONC], the [DOJ] or any other government agency." Restricted Communications is defined as confidential work performed while with the SQOO, any opinions of or views about eCW, eCW personnel, or the Engagement. Mr. Ulrich also confirmed it was his understanding that the settlement agreement limited his ability to speak with the DOJ, ONC, etc. This testimony is relevant to intent and materiality and eCW's secret settlement agreement with QP which impacted its relationship with the SQOO. |

| | | | | |
|---|---|---|---|---|
| Ulrich Aug. 2025 | 142:11-146:5 | R - Counter | 142:11-143:25. Lack of foundation. These questions assume an incorrect fact, which is that the settlement agreement prohibited Mr. Ulrich from having "further conversations with the DOJ after [he] left the SQOO team as the leader." The "protected activities" provision of the settlement agreement plainly permits Mr. Ulrich to have as many conversations with DOJ as he and DOJ wished. | 142:4-9 is not based on an incorrect fact. Under prohibited activities in the individual settlement agreements with the removed SQOO members, the Subject Individual agrees not to "initiate any Restricted Communications with the [OIG], the [ONC], the [DOJ] or any other government agency." Restricted Communications is defined as confidential work performed while with the SQOO, any opinions of or views about eCW, eCW personnel, or the Engagement. Mr. Ulrich also confirmed it was his understanding that the settlement agreement limited his ability to speak with the DOJ, ONC, etc. This testimony is relevant to intent and materiality and eCW's secret settlement agreement with QP which impacted its relationship with the SQOO. |
| Ulrich Aug. 2025 | 146:10-147:22 | R - Counter | | |
| Ulrich Aug. 2025 | 147:24:00 | R - Counter | | |
| Ulrich Aug. 2025 | 148:1-3 | R - Counter | | |
| Ulrich Aug. 2025 | 148:5-13 | R - Counter | | |
| Ulrich Aug. 2025 | 148:15 (starting at "If you'll flip…")-150:24 | R - Counter | | |
| Ulrich Aug. 2025 | 151:13-153:20 | R - Counter | | |
| Ulrich Aug. 2025 | 153:24-156:21 | R - Counter | | |
| Ulrich Aug. 2025 | 156:23-157:1 | R - Counter | | |
| Ulrich Aug. 2025 | 157:5-158:04 | R - Counter | | |
| Ulrich Aug. 2025 | 158:12-160:5 | R - Counter | 159:22-159:25. Lack of relevance, 403. These lines are just counsel's characterizations of a prior deposition. This is not appropriate. | Mr. Ulrich understood the questions as asked and answered. Counsel did not misstate the deposition testimony and merely summarized the testimony, that is not inappropriate. This testimony is relevant to establish that Mr. Jaiswal was the AppSec Director and the SQOO did not recall Mr. Jaiswal having any conversations with eCW's certification team. Mr. Ulrich worked with Mr. Jaiswal for years during the CIA period and can testify about what he knew to be true during that period. This testimony is relevant to eCW's internal structure and dysfunction which impacted eCW's certification and attestation process. |

| | | | | |
|---|---|---|---|---|
| Ulrich Aug. 2025 | 160:7-168:5 | R - Counter | 160:7-16.  Lack of relevance, 403.  These lines are just counsel's characterizations of a prior deposition.  This is not appropriate. 163:2-18, 163:23-164:20, 168:1-3.  Lack of relevance, 403.  These lines are unnecessary background, and they inject the irrelevant issue of "patient safety."  The relevant questions will make just as much sense to the jury without these lines. | Mr. Ulrich understood the questions as asked and answered.  Counsel did not misstate the deposition testimony and merely summarized the testimony, that is not inappropriate. This testimony is relevant to establish that Mr. Jaiswal was the AppSec Director and the SQOO did not recall Mr. Jaiswal having any conversations with eCW's certification team. Mr. Ulrich worked with Mr. Jaiswal for years during the CIA period and can testify about what he knew to be true during that period. This testimony is relevant to eCW's internal structure and dysfunction which impacted eCW's certification and attestation process. Limited questioning related to patient safety issues very generally, focusing largely on the number of patient safety issues the SQOO was trying to get eCW to fix and that were being reported during the SQOO term is relevant to materiality. That the gov't may have been focused on addressing the overwhelming number of patient safety numbers could explain why they did not take more severe action against eCW related to the security issues. Mr. Ulrich can testify as to the SQOO's experience with eCW's patient safety issues. |
| Ulrich Aug. 2025 | 168:10-174:1 | R - Counter | | |
| Ulrich Aug. 2025 | 174:8-175:1 | R - Counter | | |
| Ulrich Aug. 2025 | 176:14-176:18 | R - Counter | | |
| Ulrich Aug. 2025 | 177:15-180:19 | R - Counter | eCW has removed its designation of Katz's questioning on Exhibit 17, which is what 180:20-183:3 relate to | Relators have withdrawn 180:20-183:3 |
| Ulrich Aug. 2025 | 183:9-194:20 | R - Counter | 188:11-25.  Improper lay opinion, 403.  This portion of the SQOO's communication is providing a lay opinion on an issue where the SQOO had no expertise (namely, whether Michael Laycob was acting appropriately as a Chief Compliance Officer).  It is thus lay opinion that is not helpful to the jury. 192:20-194:20.  Improper lay opinion, 403.  We think these always constitute improper lay opinion, as they essentially opine on specific employees' attitudes. This is not within the scope of the SQOO's expertise and is not helpful to the jury, particularly given that the SQOO was making those assessments with very limited interactions with Mr. Jaiswal and Parmenter at that time. | The SQOO worked closely with Mr. Laycob, Mr. Jaiswal, and Mrs. Stagg-Parmenter/Madhusudhan during the CIA period. Mr. Ulrich can speak to what the SQOO thought of Mr. Laycob, Mr. Jaiswal, and Mrs. Madhusudhan and their work during the time the SQOO worked with them. The SQOO believed that eCW's compliance officer was not had limited knowledge of the inner workings of the company and was not trying to help eCW achieve its compliance goals, but rather trying to protect eCW's testimony. It also believed that Mrs. Madhusudhan was inexperienced and Mr. Jaiswal didn't seem willing to proactively fix issues before they were reported. This testimony is relevant to eCW's management structure and lack of accountability. It is relevant to intent and scienter. It is also relevant to Mr. Laycob's, Mr. Jaiswal's, and Mrs. Madhusudhan's credibility. All of whom will testify at trial (Mrs. Madhusudhan via video dep). |
| Ulrich Aug. 2025 | 195:19-198:9 | E - Reply | | |
| Ulrich Aug. 2025 | 196:19-197:1 | R - Counter | | |
| Ulrich Aug. 2025 | 199:15-200:6 | R - Counter | | |
| Ulrich Aug. 2025 | 200:9-15 | R - Counter | | |

| Parties' Consolidated Deposition Designations and Objections for September 2025 Deposition of Ajit Dhavle | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Dhavle Sep. 2025 | 8:25-9:5 | R - Counter | | |
| Dhavle Sep. 2025 | 23:5-27:25 | E - Affirm | | |
| Dhavle Sep. 2025 | 28:9-30:3 | E - Affirm | | |
| Dhavle Sep. 2025 | 31:5-33:24 | E - Affirm | | |
| Dhavle Sep. 2025 | 33:25-34:13 | R - Counter | | |
| Dhavle Sep. 2025 | 34:14-35:12 | E - Affirm | | |
| Dhavle Sep. 2025 | 35:22-39:5 | E - Affirm | | |
| Dhavle Sep. 2025 | 39:6-9 | R - Counter | | |
| Dhavle Sep. 2025 | 39:10-41:5 | E - Affirm | | |
| Dhavle Sep. 2025 | 41:6-8 | R - Counter | | |
| Dhavle Sep. 2025 | 42:24-43:25 | E - Affirm | | |
| Dhavle Sep. 2025 | 44:13-44:20 | E - Affirm | | |
| Dhavle Sep. 2025 | 45:17-46:18 | E - Affirm | | |
| Dhavle Sep. 2025 | 54:19-55:3 | E - Affirm | | |
| Dhavle Sep. 2025 | 56:4-56:22 | E - Affirm | | |
| Dhavle Sep. 2025 | 77:9-11 | R - Counter | | |
| Dhavle Sep. 2025 | 77:14:00 | R - Counter | | |
| Dhavle Sep. 2025 | 77:16-19 | R - Counter | | |
| Dhavle Sep. 2025 | 77:21-78:21 | E - Affirm | | |
| Dhavle Sep. 2025 | 82:15-85:5 | E - Affirm | | |
| Dhavle Sep. 2025 | 90:17-25 | R - Counter | | |
| Dhavle Sep. 2025 | 91:5-92:11 | R - Counter | 91:8-24. Lack of relevance, 403.  We do not believe the jury needs to hear about Mr. Dhavle's father-in-law passing away.  The questions and answers are understandable without that information. | This testimony confirms that the only error Mr. Dhavle found in his prior testimony was that he said his father-in-law instead of father had passed. This is relevant to showing that Mr. Dhavle stands by the testimony that he gave at his prior deposition which will also be played at trial. If this is not included, the jury could question why Mr. Dhavle was deposed twice and whether he's contradicting earlier testimony. |
| Dhavle Sep. 2025 | 93:17-93:20 | R - Counter | | |
| Dhavle Sep. 2025 | 93:22-94:23 | R - Counter | | |
| Dhavle Sep. 2025 | 94:25-95:22 | R - Counter | | |
| Dhavle Sep. 2025 | 96:2-4 | R - Counter | Lack of foundation, 403.  The documentary evidence is very clear that Adam Wright left the SQOO team in early 2020 (as documented in a January 31, 2020 email from Mr. Ulrich to Mr. Laycob).  We do not think that Relators should be able to introduce deposition testimony that is clearly factually wrong. | The documentary evidence shows that Mr. Wright was required to sign an individual settlement agreement with eCW as a result of the secret settlement. The line of questioning that is designated here is that of eCW's counsel. If eCW's counsel felt that the witness's answer was incorrect, he could have cleared that up at the deposition. That eCW now disagrees with this testimony does not make the testimony incorrect or inadmissible. |

| Parties' Consolidated Deposition Designations and Objections for September 2025 Deposition of Jordan Madhusudhan | | | | |
|---|---|---|---|---|
| Deposition | Designation | Party Designating | Objection | Response |
| Madhusudhan | 10:2 – 24 | R - Affirm | | |
| Madhusudhan | 11:7- 11:16 | R - Affirm | | |
| Madhusudhan | 11:21-14:6 | R - Affirm | | |
| Madhusudhan | 17:1-4 | R - Affirm | | |
| Madhusudhan | 17:9-15 | R - Affirm | Lack of foundation, 403. The questions and the answers purport to describe legal requirements, and the descriptions provided are wrong. It is misleading and confusing to the jury for a lay witness to provide an incorrect description of the law. | That medical providers need to use certified software to participate in government programs is not a legal requirement, it is a fact. Ms. Madhusudhan is an employee of eCW's certification department, she personally assisted in getting Version 11 certified, she frequently interacted with eCW's ACB Drummond, and is extremely familiar with the certification requirements. Ms. Madhusudhan can testify factually as to her understanding of the importance of certified software to government programs and eCW. This is relevant to materiality, intent, and damages. Additionally, the Court already ruled that evidence of eCW's financial motivation to defraud the gov't (i.e. that without certification eCW is out of business) is admissible. |
| Madhusudhan | 17:19 – 18:13 | R - Affirm | Lack of foundation, 403. The questions and the answers purport to describe legal requirements, and the descriptions provided are wrong. It is misleading and confusing to the jury for a lay witness to provide an incorrect description of the law. | That medical providers need to use certified software to participate in government programs is not a legal requirement, it is a fact. Ms. Madhusudhan is an employee of eCW's certification department, she personally assisted in getting Version 11 certified, she frequently interacted with eCW's ACB Drummond, and is extremely familiar with the certification requirements. Ms. Madhusudhan can testify factually as to her understanding of the importance of certified software to government programs and eCW. This is relevant to materiality, intent, and damages. Additionally, the Court already ruled that evidence of eCW's financial motivation to defraud the gov't (i.e. that without certification eCW is out of business) is admissible. |
| Madhusudhan | 18:15-17 | R - Affirm | Lack of foundation, 403. The questions and the answers purport to describe legal requirements, and the descriptions provided are wrong. It is misleading and confusing to the jury for a lay witness to provide an incorrect description of the law. | That medical providers need to use certified software to participate in government programs is not a legal requirement, it is a fact. Ms. Madhusudhan is an employee of eCW's certification department, she personally assisted in getting Version 11 certified, she frequently interacted with eCW's ACB Drummond, and is extremely familiar with the certification requirements. Ms. Madhusudhan can testify factually as to her understanding of the importance of certified software to government programs and eCW. This is relevant to materiality, intent, and damages. Additionally, the Court already ruled that evidence of eCW's financial motivation to defraud the gov't (i.e. that without certification eCW is out of business) is admissible. |
| Madhusudhan | 18:19 – 19:23 | R - Affirm | | |
| Madhusudhan | 20:1-6 | R - Affirm | | |
| Madhusudhan | 21:9-12 | R - Affirm | | |
| Madhusudhan | 21:14-15 | R - Affirm | | |
| Madhusudhan | 22:4-21 | R - Affirm | | |
| Madhusudhan | 22:23-24 (through "roll") | R - Affirm | | |
| | 22:24-23:1 | E - Counter | | |

| | | | | |
|---|---|---|---|---|
| Madhusudhan | 23:3-4 | R - Affirm | | |
| Madhusudhan | 23:7 | R - Affirm | | |
| Madhusudhan | 23:9-11 | R - Affirm | | |
| Madhusudhan | 23:13-18 | R - Affirm | | |
| Madhusudhan | 23:20-22 | R - Affirm | | |
| Madhusudhan | 23:24 – 24:7 | R - Affirm | | |
| Madhusudhan | 24:9-14 | R - Affirm | | |
| Madhusudhan | 24:16-17 | R - Affirm | | |
| Madhusudhan | 24:19-25: 6 | R - Affirm | 24:22-25:6. Lack of relevance, 403. This is just the lawyer baselessly arguing that the witness had not answered her questions. | This testimony is relevant to the jury's determination of the witness's credibility. The witness was asked the same question several times and with each answer she evaded providing an actual response to the question. The witness had to be instructed to answer the question that was asked which is relevant to the jury's determination of whether her testimony is credible given she was clearly engaging in evasiveness. |
| Madhusudhan | 26:2-13 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b). This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |

| Madhusudhan | 26:15-17 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b). This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |
| Madhusudhan | 26:19 – 27:16 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b). This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |

| Madhusudhan | 27:19-22 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b). This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |
| Madhusudhan | 28:10-16 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b). This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |

| | | | | |
|---|---|---|---|---|
| Madhusudhan | 28:23 – 29:4 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |
| Madhusudhan | 29:7-23 | R - Affirm | | |
| Madhusudhan | 30:7-19 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |

| | | | | |
|---|---|---|---|---|
| Madhusudhan | 33:11-14 | R - Affirm | | |
| Madhusudhan | 33:16 – 34:1 | R - Affirm | | |
| Madhusudhan | 34:6-7 | R - Affirm | | |
| Madhusudhan | 34:18-35:3 | R - Affirm | | |
| Madhusudhan | 35:6-36:10 | R - Affirm | | |
| Madhusudhan | 36:12-17 | R - Affirm | | |
| Madhusudhan | 36:19 | R - Affirm | | |
| Madhusudhan | 36:21-24 | R - Affirm | | |
| Madhusudhan | 37:3-13 | R - Affirm | | |
| Madhusudhan | 40:7-19 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |

| Madhusudhan | 40:21-22 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the allegations in the Delaney case, it merely discusses the existence of the case, its settlement, and the CIA which is appropriate under the Court's ruling and the parties' stipulation. It is also relevant to eCW's notice and intent. Ms. Madhusudhan was brought on to help get eCW's Version 11 certified and she was leading the charge on that certification. Her knowledge of the Delaney allegations (without getting into the substance of those allegations) is relevant to show that eCW had not changed its processes at all after the Delaney settlement. Ms. Madhusudhan did not know even generally about the Delaney allegations outside of what she read in a press release. So, eCW had not made its employees aware of precisely what was done incorrectly and needed to be fixed. It was still intent on running basic testing, checking off the attestation boxes, ignoring security concerns raised internally and externally, and failing to remediate certification non-conformities inherent in how it designed its software. |
| Madhusudhan | 41:2 – 42:4 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators has designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 45:11-45:15 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 45:21 – 46:5 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| | | | | |
|---|---|---|---|---|
| Madhusudhan | 46:7-8 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 46:10-11 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 46:14 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 46:18-21 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 47:1-24 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 48:9 – 50:12 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 50:14 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 50:16 - 51:10 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 51:12 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 51:14-16 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 51:19 – 52:8 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 52:10-18 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 52:20 – 53:12 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 53:14-15 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 54:10 – 55:12 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Nothing in this line of questioning discusses the substance of the allegations in the Delaney case. Instead, this line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. All of the questioning Relators have designated has removed any substantive discussion of the actual allegations in Delaney. It generally references "the allegations" but does not go further. This testimony is relevant to eCW's notice and intent but also goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 58:2-59:8 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. This line of questioning does make one reference to an allegation in Delaney that appeared in Mr. Meadors deposition testimony. This line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. He also testified that Ms. Madhusudhan "admitted that the company had hard-coded those RxNorm codes." This testimony goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |

| Madhusudhan | 59:11 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. This line of questioning does make one reference to an allegation in Delaney that appeared in Mr. Meadors deposition testimony. This line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. He also testified that Ms. Madhusudhan "admitted that the company had hard-coded those RxNorm codes." This testimony goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. |
| Madhusudhan | 59:13 – 61:3 | R - Affirm | Lack of relevance, prior MIL ruling, 403, 404(b).  This entire line of questioning is simply seeking to inject the Delaney allegations into evidence, and insinuate that eCW has a reputation or character for dishonesty | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. This line of questioning does make one reference to an allegation in Delaney that appeared in Mr. Meadors deposition testimony. This line of questioning is appropriate cross of Ms. Madhusudhan based on comments she made to eCW's current expert and former consultant Mr. Meadors. Mr. Meadors testified that Ms. Madhusudhan had a conversation with him where Mr. Meadors expressed concerns about the Delaney allegations and his associated with eCW in light of the allegations. He also testified that Ms. Madhusudhan "admitted that the company had hard-coded those RxNorm codes." This testimony goes to the credibility of Ms. Madhusudhan and Mr. Meadors who is eCW's certification expert in this case. This testimony also includes a very high level discussion of the existence of the CIA which the Court has already said is admissible given eCW's intention to rely on it. |
| Madhusudhan | 61:9-23 | R - Affirm | | |
| Madhusudhan | 62:1 – 11 | R - Affirm | | |
| Madhusudhan | 63:15 | R - Affirm | | |
| Madhusudhan | 63:17-64:8 | R - Affirm | | |
| Madhusudhan | 65:9 – 66:4 | R - Affirm | | |
| Madhusudhan | 66:5 – 66:15 | R - Affirm | | |
| Madhusudhan | 73:14 – 74:6 | R - Affirm | | |
| Madhusudhan | 74:8-9 | R - Affirm | | |
| Madhusudhan | 74:12-14 | R - Affirm | | |

| Madhusudhan | 74:16 – 76:7 | R - Affirm | | | |
|---|---|---|---|---|---|
| Madhusudhan | 76:10-15 | R - Affirm | | | |
| Madhusudhan | 76:18-21 | R - Affirm | | | |
| Madhusudhan | 77:3-10 | R - Affirm | | | |
| Madhusudhan | 77:13 – 78:18 | R - Affirm | | | |
| Madhusudhan | 78:20 – 79:9 | R - Affirm | | | |
| Madhusudhan | 79:13 | R - Affirm | | | |
| Madhusudhan | 79:15-20 | R - Affirm | | | |
| Madhusudhan | 79:22 | R - Affirm | | | |
| Madhusudhan | 79:24 – 80:1 | R - Affirm | | | |
| Madhusudhan | 80:3-11 | R - Affirm | | | |
| Madhusudhan | 80:13-14 | R - Affirm | | | |
| Madhusudhan | 80:16-24 | R - Affirm | | | |
| Madhusudhan | 81:2-3 | R - Affirm | | | |
| Madhusudhan | 81:5-12 | R - Affirm | | | |
| | 81:13-82:24 | E - Counter | | | |
| Madhusudhan | 83:3 (at "how") – 84:19 | R - Affirm | | | |
| Madhusudhan | 84:21-24 | R - Affirm | | | |
| Madhusudhan | 85:2-22 | R - Affirm | | | |
| Madhusudhan | 86:4-20 | R - Affirm | | | |
| Madhusudhan | 87:3-7 (through "roughly.") | R - Affirm | | | |
| Madhusudhan | 90:2 (at "You") – 4 | R - Affirm | | Lack of relevance, 403.  This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria.  In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |

| Madhusudhan | 90:6 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| Madhusudhan | 90:8 – 91:21 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| Madhusudhan | 91:23 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |

| Madhusudhan | 92:1-7 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| --- | --- | --- | --- | --- |
| Madhusudhan | 92:13-21 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| Madhusudhan | 92:23-24 | R - Affirm | Lack of relevance, 403. This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria. In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |

| Madhusudhan | 93:2 – 94:6 | R - Affirm | Lack of relevance, 403.  This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria.  In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| Madhusudhan | 94:8-9 | R - Affirm | Lack of relevance, 403.  This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria.  In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |
| Madhusudhan | 94:11 – 95:12 | R - Affirm | Lack of relevance, 403.  This line of questioning relates to a SQOO criticism of QA testing that does not relate to the security-related certification criteria.  In addition to not being relevant, the SQOO criticism would cause jury confusion. | The SQOO's criticism of the QA testing did not except security-related certificatin criteria testing that she have been performed. The SQOO stated in general that eCW was only doing the minimum amount of QA required to pass certification testing. There is no indication that this criticism is not equally applicable to the security-related certifications. Additionally, even if it were limited, this testimony goes directly to eCW's certification and attestation process generally which the SQOO thought was insufficient. This testimony also discusses eCW's culture for responding to error reports and commplaints in a reactive fashion instead of proactively which is evidence of its corporate culture for refusing to take accountability. That is absolutely relevant to the allegations in this case and will be used to demonstrate that eCW's ineffective and inadequate certification and attestation process made it impossible for eCW to truthfully attest to the security-related certification criteria. |

| | 95:12-97:6 (counter if eCW's objection to 94:11-95:12 is denied) | E - Counter | | |
|---|---|---|---|---|
| Madhusudhan | 107:16 (at "Did") – 108:14 | R - Affirm | Prior MIL ruling, 403, 404(b). This line of questioning seeks to inject the Delany issues into evidence and to insinuate that eCW has a reputation for dishonesty. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Regardless, nothing in this line of questioning even mentions the word Delaney or lawsuit or discusses the allegations in the Delaney case. Instead, this is a conversation between two eCW employees where Ms. Madhusudhan says no one at eCW wants to do compliance and agrees that "word on the street about eCW is not great" "especially as related to certification." This testimony is directly relevant to eCW's corporate culture and management. It shows how eCW employees did not take compliance seriously even after they had settled the Delaney case and they were more concerned with eCW's reputation than actually fixing the software and ensuring that the product complied with the certification criteria. This refusal of employees to participate in compliance and focus on the wrong priorities directly impacted eCW's certification and attestation process and made it impossible for eCW to truthfully attest to compliance with the certification requirements. |
| Madhusudhan | 108:17-18 | R - Affirm | Prior MIL ruling, 403, 404(b). This line of questioning seeks to inject the Delany issues into evidence and to insinuate that eCW has a reputation for dishonesty. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Regardless, nothing in this line of questioning even mentions the word Delaney or lawsuit or discusses the allegations in the Delaney case. Instead, this is a conversation between two eCW employees where Ms. Madhusudhan says no one at eCW wants to do compliance and agrees that "word on the street about eCW is not great" "especially as related to certification." This testimony is directly relevant to eCW's corporate culture and management. It shows how eCW employees did not take compliance seriously even after they had settled the Delaney case and they were more concerned with eCW's reputation than actually fixing the software and ensuring that the product complied with the certification criteria. This refusal of employees to participate in compliance and focus on the wrong priorities directly impacted eCW's certification and attestation process and made it impossible for eCW to truthfully attest to compliance with the certification requirements. |

| Madhusudhan | 108:20 – 109:5 | R - Affirm | Prior MIL ruling, 403, 404(b). This line of questioning seeks to inject the Delany issues into evidence and to insinuate that eCW has a reputation for dishonesty. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Regardless, nothing in this line of questioning even mentions the word Delaney or lawsuit or discusses the allegations in the Delaney case. Instead, this is a conversation between two eCW employees where Ms. Madhusudhan says no one at eCW wants to do compliance and agrees that "word on the street about eCW is not great" "especially as related to certification." This testimony is directly relevant to eCW's corporate culture and management. It shows how eCW employees did not take compliance seriously even after they had settled the Delaney case and they were more concerned with eCW's reputation than actually fixing the software and ensuring that the product complied with the certification criteria. This refusal of employees to participate in compliance and focus on the wrong priorities directly impacted eCW's certification and attestation process and made it impossible for eCW to truthfully attest to compliance with the certification requirements. |
| Madhusudhan | 109:15-16 | R - Affirm | Prior MIL ruling, 403, 404(b). This line of questioning seeks to inject the Delany issues into evidence and to insinuate that eCW has a reputation for dishonesty. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Regardless, nothing in this line of questioning even mentions the word Delaney or lawsuit or discusses the allegations in the Delaney case. Instead, this is a conversation between two eCW employees where Ms. Madhusudhan says no one at eCW wants to do compliance and agrees that "word on the street about eCW is not great" "especially as related to certification." This testimony is directly relevant to eCW's corporate culture and management. It shows how eCW employees did not take compliance seriously even after they had settled the Delaney case and they were more concerned with eCW's reputation than actually fixing the software and ensuring that the product complied with the certification criteria. This refusal of employees to participate in compliance and focus on the wrong priorities directly impacted eCW's certification and attestation process and made it impossible for eCW to truthfully attest to compliance with the certification requirements. |

| Madhusudhan | 109:22 – 112:13 | R - Affirm | Prior MIL ruling, 403, 404(b).  This line of questioning seeks to inject the Delany issues into evidence and to insinuate that eCW has a reputation for dishonesty. | Nothing in the Court's MIL ruling prohibited any reference to Delaney. In fact, the Court contemplated that there would be some discussion of Delaney given eCW's reliance on the CIA and what transpired because of the CIA. Further, the Court noted it had no problem with the parties stipulation about the existence of the Delaney settlement that was related to an earlier version of eCW's software. Regardless, nothing in this line of questioning even mentions the word Delaney or lawsuit or discusses the allegations in the Delaney case. Instead, this is a conversation between two eCW employees where Ms. Madhusudhan says no one at eCW wants to do compliance and agrees that "word on the street about eCW is not great" "especially as related to certification." This testimony is directly relevant to eCW's corporate culture and management. It shows how eCW employees did not take compliance seriously even after they had settled the Delaney case and they were more concerned with eCW's reputation than actually fixing the software and ensuring that the product complied with the certification criteria. This refusal of employees to participate in compliance and focus on the wrong priorities directly impacted eCW's certification and attestation process and made it impossible for eCW to truthfully attest to compliance with the certification requirements. |
| Madhusudhan | 120:4-5 | R - Affirm | | |